IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Deborah Moss,** 63 Salem Court Hinckley, OH 44233  Plaintiff,  v.  **University Hospitals at Parma Medical Center,** C/O Janet Miller, Statutory Agent 7007 Powers Blvd Parma, OH 44129  Defendant. | CASE NO.  JUDGE:  MAGISTRATE:  **CIVIL COMPLAINT FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**  **JURY DEMAND ENDORSED HEREON** |

Now comes Plaintiff, Deborah Moss, by and through counsel, and for her Complaint against Defendant, University Hospitals at Parma Medical Center, states as follows:

## INTRODUCTION

1. This is an action to vindicate the legal rights Plaintiff Deborah Moss, an individual with a disability employed by Defendant University Hospitals at Parma Medical Center, for violations of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et al.*

2. After eighteen years of employment, during which she safely performed the essential functions of her job with accommodations, Ms. Moss was placed on involuntary unpaid leave and subsequently terminated due to her vision impairment.

3. Although her employer claimed that its actions were based on safety concerns, this determination had no basis in objective facts or evidence but was based upon unfounded fears, stereotypes, and assumptions about individuals with low vision.

1

## PARTIES, JURISDICTION, AND VENUE

4. Plaintiff, Deborah Moss is a person with a disability residing in Parma, Ohio.

5. Ms. Moss has a substantial functional limitation in the major life activity of seeing.

6. Defendant, University Hospitals at Parma Medical Center, is a hospital located in Parma, Ohio, and is within the territorial jurisdiction of this Court.

7. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.

8. Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391 as the incidents, events, or omissions complained of and giving rise to the instant claim or controversy occurred within this district.

## FACTS

9. Since 1989, Deborah Moss has worked as a Therapeutic Recreation Specialist, certified by the National Council on Therapeutic Recreation.

10. Ms. Moss has a visual impairment due to Stargardt's disease, a progressive condition that has diminished her central vision, but does not affect her peripheral vision.

11. Due to her disability related limitations, Ms. Moss has difficulty reading facial expressions from a distance, and some minor difficulty with mobility in low-contrast settings, and difficulty reading small print.  Ms. Moss uses assistive technology, auditory compensation techniques, verbal cues, workplace modifications, and natural supports to address her disability related limitations in the workplace.

12. In 1998, Ms. Moss started working as a Rehabilitation Therapist in the Behavioral Health Unit of Parma Hospital, which merged with University Hospital (UH) in 2016.

13. As a certified recreation therapist, Ms. Moss worked with psychiatric patients to provide therapeutic programing.  Her job duties included interacting with patients and assessing

their functional and rehabilitative needs, planning and providing appropriate therapies, and supporting and working with the patient's treatment team on the Behavioral Health Unit. (Job Description attached hereto as Exhibit A.)

14. Ms. Moss's disability related limitations are obvious, and were known to her employer, supervisors, and coworkers throughout her career as a Recreational Therapist at UH.

15. From 1989 through February 2017, Ms. Moss safely and effectively performed her job duties, utilizing assistive technology, and common sense accommodations and natural workplace supports.

16. Beginning in 1998, Ms. Moss used a closed circuit TV to access smaller printed materials at work. Supervisors and coworkers have routinely provided written materials in advance. Coworkers have utilized verbal and sometimes physical cues to communicate with Ms. Moss. Nurses and other staff verbally alerted Ms. Moss about patients who were agitated or a particular cause for concern. With her peripheral vision, Ms. Moss can safely move throughout the workplace, and has had no issues detecting and responding to call lights.

17. Over the years, there were a few instances in which Ms. Moss bumped into colleagues wearing dark clothing in the dark hallway on the unit, but these instances were not serious or frequent.

18. Throughout more than a decade of employment, Ms. Moss's disability related accommodations were never reduced to writing, but were understood and provided without issue.

19. Since 1998, Ms. Moss successfully completed nearly a dozen workplace trainings on crisis intervention, involving instruction in both verbal and physical de-escalation techniques on topics such as how to divert a punch and how to respond to hair pulling, choking, or kicking.

20. Prior to February 2017, the trainings had been conducted in a group setting, and involved verbal and physical prompts performed with a partner. The trainings were always followed by a written test, which Ms. Moss successfully completed on each occasion.

21. Ms. Moss has a long history of good performance evaluations, and commendations for her performance at work. (See 2014 and 2015 performance evaluations attached hereto as Exhibits B and C; see "Going the Extra Mile Awards" attached hereto as Exhibit D.)

**Adverse Employment Action**

22. In 2016, shortly after the merger with University Hospitals, Ms. Moss was assigned to a new supervisor, Kathy Holley.

23. Ms. Holley was aware of Ms. Moss's visual impairment.

24. During a performance evaluation soon after becoming Ms. Moss's supervisor, Ms. Holley questioned Ms. Moss about why there were no written accommodation requests in her file.

25. Ms. Holley requested that Ms. Moss submit medical documentation regarding her disability related limitations and workplace accommodations.

26. Ms. Moss submitted the documentation requested by Ms. Holley and a request updated assistive technology for magnification and reading in October 2016.

27. After Ms. Moss submitted written documentation detailing her disability related limitations and her request for accommodations, Ms. Holley began closely observing and questioning Ms. Moss about patient safety and repeatedly asked Ms. Moss to state what job duties she was unable to perform because of her disability.

28. In February 2017, University Hospital held another crisis intervention training.

29. As with past trainings, Ms. Moss was paired with a partner, and her partner provided some verbal and physical prompts.

4

30. Unlike past trainings, and without prior notice to Ms. Moss, the instructor relied solely on visual demonstrations of de-escalation techniques that were not accessible to Ms. Moss.

31. At no point before or after the training did University Hospitals engage in the interactive process to discuss reasonable accommodations necessary to make the training accessible to Ms. Moss.

32. There was no written test following the training, and Ms. Moss was given no indication during the training that her performance was not satisfactory.

33. On February 14, 2017, Ms. Moss was summoned for a meeting with University Hospital's Human Resources Department and her supervisor. Ms. Moss was placed on immediate leave from her position and ordered to submit to a fitness for duty examination.

34. Ms. Moss was told the reason for the leave was concerns about her ability to perform her job due to her vision impairment, and that she would not be permitted to return to work until she had submitted medical documentation proving that she could safely perform her job.

35. As part of the fitness for duty examination, Ms. Moss was ordered to submit to drug and alcohol screening tests, which the referral records falsely categorized as "random". (See drug and alcohol screening tests, attached hereto as Exhibit E.)

36. University Hospitals also sent a fitness for duty examination form to her two treating physicians, her chiropractor and her eye doctor, inquiring about medical issues that were unrelated to her job or her visual impairment.

37. University Hospitals asked Ms. Moss's chiropractor about whether she had any lifting restrictions, even though her job duties did not require lifting. (See Exhibit F.)

38. Following a medical examination, Ms. Moss's chiropractor released her for work immediately and noted that she had no work restrictions.

39. University Hospitals also demanded that Ms. Moss submit to a medical examination by her eye doctor.

40. Ms. Moss's doctor confirmed that due to disability, Ms. Moss was limited in her ability to read print and facial expressions and noted that "in poor contrast environments may not always have visual awareness of everything in a room" but specifically advised that she was unable to assess how these limitations impacted Ms. Moss's ability to perform her job with or without accommodations without first observing Ms. Moss in her workplace. (See letter from eye doctor, attached hereto as Exhibit G.)

41. Ms. Moss sought out her own assessment by an Occupational Therapist from the Cleveland Sight Center, who completed a Low Vision Evaluation Report. (See Cleveland Sight Center Report, attached hereto as Exhibit H.)

42. The Cleveland Sight Center Occupational Therapist noted that she had requested permission to assess Ms. Moss's workplace, but that University Hospitals refused access.

43. Nevertheless, based upon an in depth assessment with Ms. Moss, the Cleveland Sight Center Occupational Therapist identified a number of common sense workplace accommodations, almost all of which Ms. Moss had successfully and safely utilized for decades, including the following:

    a. Assistive technology to magnify and read printed material

    b. A signature guide for signing treatment plan.

    c. Higher contrast written materials in the workplace

    d. Verbal cues from staff when entering an occupied room

    e.    The use of auditory compensation strategies such as reading patient's' tone of voice or responsiveness to questions

    f.    Natural supports including verbal feedback from other staff about patient behavioral issues.

    44.    With respect to crisis intervention training, the Occupational Therapist recommended providing written instructional materials in advance, and providing a partner or staff member who is aware of the need for verbal and touch prompts for physical components of training.

    45.    On June 12, 2017, University Hospitals informed Ms. Moss in writing that it was refusing to grant the accommodations she requested and she would not be permitted to return to work. (See email from University Hospitals, attached hereto as Exhibit I.)

    46.    In reaching its determination that Ms. Moss could not safely perform her job duties, University Hospitals relied upon an assessment by Allison Evans, a University Hospitals nurse with no experience or expertise in disability accommodations, who was not aware of and had not considered the workplace accommodations Ms. Moss had utilized in safely performing her job duties for eighteen years.

    47.    Ms. Evans concluded that situational awareness was an essential function of the job that can only be assessed through visual observation of facial expression and body language, and that Ms. Moss was therefore unable to maintain sufficient situational awareness to perform her job due to her visual impairment.

    48.    Ms. Evans' assessment did not take account of Ms. Moss's long and successful history of safely performing her job, or consider whether Ms. Moss could perform these functions with accommodations.

49. Ms. Evans did not assess or consider whether auditory compensation strategies and natural supports were effective accommodations.

50. For the purpose of Ms. Evan's assessment, University Hospital defined Ms. Moss's job responsibilities in visual rather than functional terms, unlike the written job description for the position and Ms. Moss's previous performance evaluations.

51. In July 2017, Ms. Moss filed a timely charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission, and on August 11, 2017, she received acknowledgment that the dual filing had been received and was being investigated. (See charge of discrimination, attached hereto as Exhibit K.)

52. On September 6, 2017, University Hospital advised Ms. Moss that it "needed to bring closure to this matter" and that her employment would be terminated as soon as her paid time off run out. (See letter from University Hospitals, attached hereto as Exhibit J.)

53. Ms. Moss received a right to sue letter from the Equal Employment Opportunity Commission dated July 3, 2018. (See right to sue letter, attached hereto as Exhibit L.)

## COUNT ONE
### *Title I of the Americans with Disabilities Act*

54. Plaintiff realleges and incorporates herein all allegations contained in the preceding paragraphs.

55. Title I of the Americans with Disabilities Act prohibits an employer from discriminating against a qualified individual with a disability by failing to provide reasonable accommodations or taking other adverse employment actions because of disability.

56. Ms. Moss is a qualified individual with a disability who safely performed the essential functions of her job with accommodations for over eighteen years.

57. "The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

58. "It is unlawful for a covered entity to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of disability, unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job related for the position in question and is consistent with business necessity." 29 C.F.R. § § 1630.10(a).

59. An employer is only permitted to exclude an employee from a job for safety reasons if the individual's disability related limitations pose a direct threat to harm to self or others that cannot be reduced or eliminated through reasonable accommodations.

60. The ADA specifically defines direct threat as follows: "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a direct threat shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm."

29 CFR § 1630.2(r).

61. Plaintiff is a qualified person with a disability, who is able to perform the essential functions of her job with reasonable accommodations.

62. Defendant is an employer and a covered entity subject to Title I of the Americans with Disabilities Act.

63. Plaintiff has informed Defendant of her disability related need for reasonable accommodations in accessing printed and written materials.

64. Defendant has failed to take reasonable steps to ensure that effective accommodations are provided to Plaintiff.

65. Defendant has discriminated against Plaintiff on the basis of disability by failing to provide reasonable accommodations in regard to job training, in violation of 29 U.S.C. § 12112(a) and 29 U.S.C. § 12112(b)(5)(A).

66. Defendant has discriminated against Plaintiff on the basis of disability by failing to provide reasonable accommodations in regard to the terms, conditions, and privileges of employment, in violation of 29 U.S.C. § 12112(a) and 29 U.S.C. § 12112(b)(5)(A).

67. Defendant has discriminated against Plaintiff on the basis of disability by denying her employment opportunities because of her disability in violation of 29 U.S.C. § 12112(a) and 29 U.S.C. § 12112(b)(5)(B).

68. Defendant failed to establish that Plaintiff's disability poses a direct threat, because it failed to consider the nature and severity of any potential threat, and whether that threat could be reduced or eliminated through reasonable accommodations, based on objective evidence.

69. By engaging in the foregoing conduct, Defendant has violated Title I of the Americans with Disabilities Act.

70. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has lost her job, and employment benefits.

71. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional harm and distress.

72. Defendants acted willfully and in reckless disregard for the rights of Plaintiff, entitling her to compensatory and punitive damages, and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant Plaintiff judgment against Defendant as follows:

a. Compensatory damages in an amount to be determined at trial;
b. Interest on all sums found due to Plaintiff;
c. Reasonable Attorney's fees;
d. Court costs; and
e. Any additional relief deemed equitable and just.

Respectfully submitted,

/s/ Emily White
Emily White (0085662)
Marc E. Dann (0039425)
THE DANN LAW FIRM
P.O. Box 6031040
Cleveland, OH 44103

>Phone (216) 373-0539
>Fax (216) 373-0536
>notices@dannlaw.com

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

>/s/ Emily White
>Emily White (0085662)
>THE DANN LAW FIRM