Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~~

5      DEBORAH MOSS,

6                  Plaintiff,

7          vs.           Case No. 1:18-cv-02257

8      UNIVERSITY HOSPITALS

9      AT PARMA MEDICAL CENTER,

10                 Defendant.

11             ~~~~~~~~~~~~~~~~~~~~~~

12                 Deposition of

13                 DEBORAH A. MOSS

14

15

16              April 8, 2019

17                10:00 a.m.

18

19                Taken at:

20             Giffen & Kaminski

21       1300 East Ninth Street, Suite 1600

22              Cleveland, Ohio

23

24

25            Cynthia Sullivan, RPR

Page 2

1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4            Dann Law, by

5            EMILY WHITE, ESQ.

6            629 North High Street

7            Fourth Floor

8            Columbus, Ohio  43215

9            (614) 500-3495

10           ewhite@dannlaw.com

11

12       On behalf of the Defendant:

13           Giffen & Kaminski, by

14           DONALD C. BULEA, ESQ.

15           KERIN LYN KAMINSKI, ESQ.

16           1300 East Ninth Street

17           Suite 1600

18           Cleveland, Ohio  44114

19           (216) 621-2399

20           dbulea@thinkgk.com

21           kkaminski@thinkgk.com

22

23                ~ ~ ~ ~ ~

24

25

Page 3

1                    TRANSCRIPT INDEX

2

3     APPEARANCES................................    2

4

5     INDEX OF EXHIBITS ........................    4

6

7     EXAMINATION OF DEBORAH A. MOSS:

8     By Mr. Bulea...............................    5

9

10    REPORTER'S CERTIFICATE.................... 169

11

12    EXHIBIT CUSTODY

13    EXHIBITS RETAINED BY COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS
2    NUMBER              DESCRIPTION              MARKED
3    Exhibit 29    A Document Bates Labeled ..... 96
                   UH-MOSS 1361 through 1362
4
     Exhibit 30    A Document Bates Labeled ..... 103
5                  Moss Production 000262
                   through 000264
6
     Exhibit 31    An Email Bates Labeled ....... 118
7                  UH-MOSS 1392
8    Exhibit 32    A Document Bates Labeled ..... 121
                   Moss Production 000265
9
     Exhibit 33    A Letter of 9/6/17 from ...... 136
10                 Deborah Sheldon
11   Exhibit 34    A Document Bates Labeled ..... 144
                   Moss Production 000941
12                 through 000948
13   Exhibit 35    A Document Bates Labeled ..... 147
                   Moss Production 000793
14                 through 000879 and 000393
15   Exhibit 36    A Document Bates Labeled ..... 165
                   UH-MOSS 1388
16
                   AFTERNOON SESSION............. 88
17
18
19
20
21
22
23
24
25

1          DEBORAH A. MOSS, of lawful age, called

2    for examination, as provided by the Federal

3    Rules of Civil Procedure, being by me first

4    duly sworn, as hereinafter certified, deposed

5    and said as follows:

6              EXAMINATION OF DEBORAH A. MOSS

7    BY MR. BULEA:

8          Q.    Could you please state your name

9    for the record.

10         A.    Deborah Ann Moss.

11         Q.    How would you like me to address

12   you today?

13         A.    Debbie.

14         Q.    Debbie, is there any reason that

15   you are not able to answer my questions

16   truthfully today?

17         A.    No.

18         Q.    You have filed a lawsuit against

19   University Hospitals alleging disability

20   discrimination, correct?

21         A.    Correct.

22         Q.    The medical condition that forms

23   the basis for those claims is Stargardt

24   disease; is that correct?

25         A.    Yes.

1      Q.    The Stargardt disease manifests

2   itself primarily in the form of a vision

3   impairment; is that right?

4      A.    Yes.

5      Q.    Are there any other ways in which

6   it manifests itself?

7      A.    No.

8      Q.    Other than the vision impairment,

9   are there any other medical conditions or

10   impairments that form the basis of your claims

11   in this lawsuit?

12      A.    No.

13      Q.    When were you diagnosed with

14   Stargardt disease?

15      A.    I believe when I was 18.

16      Q.    Is that a progressive condition?

17      A.    Correct.

18      Q.    So if you could, describe for me

19   the progression of the vision impairment from

20   your diagnosis until today, please.

21      A.    It's been a slow progression.  It's

22   not to lead to total blindness.  It's just the

23   loss of central vision.  So, for example, I

24   guess, you know, initially being able to read

25   the old film strips, you know, on the wall and

1    then not being able to do that.

2          Q.    Okay.

3          A.    Having to write things in larger

4    print.  At one point being able to read larger

5    print books and then being no longer able to do

6    so.

7          Q.    Is the vision impairment still

8    progressing?

9          A.    I don't believe so.

10          Q.    Around what time did the vision

11    impairment fully progress to the state it's in

12    now?

13          A.    That's hard to say.

14          Q.    A rough guess?  I mean, has it been

15    the same for the last year?  Two years?  Five

16    years?

17          A.    According to my doctor, there

18    hasn't been many changes over the last several

19    years.

20          Q.    Who is your doctor for the

21    Stargardt disease?

22          A.    Elias Traboulsi.

23          Q.    When did you start treating with

24    Dr. Traboulsi?

25          A.    I would say probably at least ten

Page 8

1  years ago.

2      Q.   I'm sorry.  I've already forgotten

3  your answer.  You said according to

4  Dr. Traboulsi there hasn't been any worsening

5  of the progression in the last few years did

6  you say?

7      A.   At least the last five.

8      Q.   Could you tell me then for the last

9  five years how the vision impairment, the loss

10  of central vision, has impacted your daily

11  life, and I guess first we'll start with your

12  life at home outside of the workplace.

13      A.   Well, mine, it's pretty much been

14  the same.  I guess that's a very open or broad

15  question.

16      Q.   Sure.  I guess what I'm looking for

17  is if you could tell me how the loss of central

18  vision limits you in any way.  Are there

19  activities that you can't perform or you need

20  assistance with in your home life?

21      A.   I mean, it's been the case, you

22  know, ever since I was young.  You know, you

23  can't drive.

24      Q.   Are you able to, for example, cook?

25      A.   Oh, sure.  I do everything most

1    people do.

2          Q.    Other than driving, any other

3    activities that you can think of that you're

4    unable to do at all?

5          A.    No.

6          Q.    I want to limit it to your life

7    outside of work, but are there any activities

8    at home as far as cooking or cleaning or

9    getting dressed or ready for the day that you

10   use accommodations or need help in completing?

11         A.    No.

12         Q.    I know you can't drive, so are

13   there other means of transportation that you

14   use to get from place to place?

15         A.    Family or friends or hiring

16   drivers.

17         Q.    Do you use public transportation?

18         A.    It's not accessible to my area, but

19   if need be I would be able to.

20         Q.    When you say not accessible, you

21   mean it's simply not offered?

22         A.    I'm not on a route.  There are no

23   routes close.

24         Q.    Where do you live?

25         A.    Hinckley.  What routes used to be

Page 10

1    closer are no longer in existence.

2         Q.    Could you tell me, I know you said

3    there is a loss of central vision, but could

4    you describe for me in a little more detail

5    what you mean by that?

6         A.    Well, I mean, it's hard to

7    describe.  I guess I often tell people if they

8    wear glasses and don't have them on, that's

9    probably how I see.  My eyes tend to shift over

10   so that I can see better utilizing the

11   peripheral vision.

12        Q.    So am I correct then it's not a

13   total blindness, but it's blurriness in the

14   central vision; is that accurate?

15        A.    I don't know if it's so much

16   blurriness.  It's just I guess the detail isn't

17   there.

18        Q.    Are you able to see the detail in

19   your peripheral vision?

20        A.    To an extent.

21        Q.    The central vision impairment, is

22   it better or worse if you're looking at

23   something close up as opposed to far away, or

24   does it stay the same?

25        A.    I guess it would be probably the

Page 11

1   same.  I mean, if I'm closer I can see things

2   better than further away.

3        Q.    But there is no point where if you

4   bring something close enough to you that you'll

5   be able to see it clearly; is that right?

6        A.    I'd be able to see it better.

7        Q.    So for the peripheral vision, and

8   I'm not sure how else to ask this, are you able

9   to see, for example, the court reporter better

10  than you could see me?

11       A.    I can see bodies and, yeah, a

12  little bit of her face and head.

13       Q.    Just so I can get an understanding,

14  would you be able to, for example, tell the

15  court reporter's facial expressions better than

16  mine or about the same?

17            MS. WHITE:  For the clarity of the

18  record, can we state distances?

19            MR. BULEA:  Sure.  The court

20  reporter is probably 5 feet to my left or your

21  right.

22       A.    No.  I can't see her facial

23  expression.  It looks like she's just doing her

24  job.

25       Q.    I'm just trying to get an

                                                    Page 12

1    understanding of what central vision is as

2    opposed to peripheral.  I guess I'm trying to

3    get an understanding of what from your

4    periphery could you see better than central,

5    and I don't know if I'm asking that question

6    very well.

7            A.    Right.  It's just there is so much

8    to see that you can't really pinpoint it to

9    narrow it down.

10           Q.    I know you said that you can't see

11   facial expressions.  Are you able to see

12   movement?

13           A.    Yes.

14           Q.    Are you able to discern whether

15   someone is moving their hands, arms, head, or

16   is it just general movement you can see?

17           A.    It would depend on the distance,

18   but in most cases I would be able to.

19           Q.    Are you currently employed?

20           A.    Yes.

21           Q.    Where are you currently employed?

22           A.    Holy Family Daycare.

23           Q.    How long have you worked there?

24           A.    A year.

25           Q.    Since April of 2018?

Page 13

1           A.      Correct.

2           Q.      Who is your supervisor there?

3           A.      Renee, and I can't think of her

4    last name off the top of my head.  I know it

5    starts with a B.

6           Q.      What is your job for Holy Family

7    Daycare?

8           A.      Caring for infants under 18 months.

9           Q.      What are your hours?

10          A.      They vary.  If I get to work and

11   just lately they have gone from 8:00 to 2:00,

12   but previously it's been 9:30 to 1:00, and that

13   hasn't always been every day.

14          Q.      Is the 8:00 to 2:00, and just for

15   the record, that's 8:00 a.m. to 2:00 p.m., is

16   that something you've been working every day?

17          A.      For the most part for the last week

18   except for last Wednesday when they called me

19   off.  It depends on the number of kids.  There

20   is a staff-to-kid ratio.

21          Q.      What is the ratio?

22          A.      It could be either one to four or

23   one to five.

24          Q.      Where is Holy Family Daycare

25   located?

Page 14

1          A.     In Parma.

2          Q.     I know you said your job was caring

3    for infants.  Do you have a job title?

4          A.     Infant co-teacher.

5          Q.     Does Holy Family have written job

6    descriptions?

7          A.     I'm sure they do.

8          Q.     Have you ever seen yours?

9          A.     No.

10         Q.     Have you ever been provided with a

11   job description?

12         A.     No.

13         Q.     Could you please describe for me a

14   typical 8:00 a.m. to 2:00 p.m. work shift at

15   Holy Family Daycare?

16         A.     It can consist of feeding the kids

17   either bottles or food on a plate depending on

18   their age, playing with them, preparing them

19   for lunch, washing hands.  Then if there is any

20   extracurricular activities, we do those with

21   the kids.  If there is like a trike-a-thon or

22   taking them out for a stroller ride or the

23   petting farm.

24         Q.     Do you work in a classroom, or I

25   guess is there separate rooms for the groups?

1          A.    Yes.

2          Q.    I'm sorry.  Let me just start that

3     over.  Is there separate rooms for each group

4     of four to five infants under the age of

5     18 months that you care for?

6          A.    No.  The young infants are in one

7     room, and the older infants are in another

8     room.

9          Q.    Are you always in the young infants

10    room?

11         A.    I was up until last week, and they

12    have had a change in their census, so they

13    moved me up to the older infants.

14         Q.    So what is the age range of young

15    infants and old infants?

16         A.    Young infants is six weeks to

17    generally a year, and older infants is

18    generally a year to 18 months.

19         Q.    So up until a week ago you had

20    worked in the young infants room?

21         A.    Correct.

22         Q.    How many young infants are in that

23    room?

24         A.    They can hold up to ten, but they

25    are now down to four.

1         Q.    Is the move down to four, is that
2    why you've been moved over to the older infants
3    room?
4         A.    Correct.
5         Q.    Was there ever a time where you
6    were responsible for working the young infants
7    room by yourself?
8         A.    It would only be for brief periods
9    of time.
10        Q.    How brief?
11        A.    Probably up to five or ten minutes.
12   I'm not the main teacher.
13        Q.    Is there one main teacher for each
14   room?
15        A.    Correct.  Yes.  There is a lead
16   teacher.
17        Q.    So I take it then you're not the
18   lead teacher for the older infants, either?
19        A.    Correct.
20        Q.    You're doing a good job, but I
21   should have said this before.  Just do your
22   best to let me finish my question before you
23   answer so that the court reporter can get it
24   down.
25        A.    Sure.

Page 17

1          Q.     Are you receiving any
2     accommodations at Holy Family Daycare?
3          A.     No.
4          Q.     Do you have any responsibility for
5     documenting or reporting a child's daily
6     activities for the family?
7          A.     No.  That's the lead teacher's
8     responsibility.
9          Q.     For the older infants room, is
10    there also up to ten children at any given
11    time?
12         A.     Up to eight.
13         Q.     So are you and the lead teacher the
14    only two employees in that room?
15         A.     No.  There could be others that
16    swap in and out, be there would only be two
17    people in there, one to two at a time.
18         Q.     I know it's only been a short time,
19    but is it also the same that you would not be
20    working in the older infants room by yourself
21    other than for brief five- to ten-minute
22    periods at a time?
23         A.     Correct.
24         Q.     Is there only the lead teacher now
25    in the young infants room?

1        A.    Yes.

2        Q.    What is your rate of pay at Holy

3    Family?

4        A.    $9.50.

5        Q.    Do you receive any benefits?

6        A.    No.

7        Q.    Do you currently have health

8    insurance?

9        A.    Yes.

10        Q.    Where did you get that from?

11        A.    My husband's.

12        Q.    His employer?

13        A.    Yes.

14        Q.    What is your husband's name?

15        A.    William.

16        Q.    Same last name, Moss?

17        A.    Correct.

18        Q.    Where is he employed?

19        A.    Parma City Schools.

20        Q.    How long have you been on the

21    health insurance through the Parma City

22    Schools?

23        A.    Since January of '18.

24        Q.    You had health insurance through

25    University Hospitals through December of 2017;

1    is that correct?

2          A.    Correct.  My husband's employer

3    states that if a spouse is offered it through

4    their company, they have to take it even though

5    it doesn't cost any more for me to go back on

6    his plan.

7          Q.    So that was going to be my next

8    question, but I think you answered it.  Is

9    there a cost out of pocket for you to be

10   covered under your husband's plan through

11   Parma?

12         A.    No.

13         Q.    No?

14         A.    No.  It's the same cost whether I'm

15   on or off.

16         Q.    Where was your last employment

17   prior to Holy Family?

18         A.    University Hospitals at Parma.

19         Q.    You were employed there as a

20   rehabilitation therapist?

21         A.    Correct.

22         Q.    You worked for UH Parma on a

23   geriatric psych floor; is that correct?

24         A.    Yes.

25         Q.    You were part of a team of

Page 20

1    professionals treating individuals that were

2    experiencing some type of acute psychiatric

3    condition; is that right?

4          A.    Yes.

5          Q.    At any given time, there could be

6    14 patients in the department; is that right?

7          A.    True.

8          Q.    The staff in the department, other

9    than recreational therapists, there were what

10   other staff?

11         A.    Generally, three nurses, the head

12   manager, the assistant manager, a social

13   worker, and the physician when he was there.

14         Q.    From 2016 forward who were the

15   nurses that were working there?

16         A.    There were several.  Marlene Kiel,

17   I believe, Daniela Magda, Corey Kramer, I

18   believe.  I know there was somebody else.

19   Let's see who else.  Jen English.  I know I had

20   a list of them.

21         Q.    So Marlene, Daniela, Corey, Jen,

22   and you think maybe one or two others?

23         A.    Yeah, at least.  Their names are

24   just escaping me at this time.

25         Q.    In 2015-16 was there always three

Page 21

1    nurses on duty?

2         A.    I believe so.  Candace was another

3    nurse.

4         Q.    You said there was a head manager?

5         A.    Correct.

6         Q.    Who was the head manager in 2016?

7         A.    Kathy Holley.

8         Q.    Who was the assistant manager?

9         A.    Chrissy Rivera.

10        Q.    Who was the social worker?

11        A.    She was a newer social worker, so I

12   can't think of her name.

13        Q.    There was a physician who oversaw

14   the patient care there; is that right?

15        A.    Yes.

16        Q.    Who was the physician?

17        A.    Dr. John Sanitato.

18        Q.    You would agree that one of the

19   objectives and requirements of all of the staff

20   collectively of the geriatric psych ward is to

21   ensure that patients receive appropriate

22   treatment and therapy to help address their

23   acute psychiatric condition that they are

24   experiencing, correct?

25        A.    Yes.

Page 22

1          Q.    You would agree that UH as the

2     operator of the facility was obligated to

3     ensure that that therapy and treatment was

4     received in a safe environment, correct?

5          A.    Yes.

6          Q.    Did UH have policies or procedures

7     in place to ensure patient and staff safety?

8          A.    Yes.

9          Q.    Can you tell me a little bit about

10    those?

11         A.    There would be a whole binder full,

12    but it's basically keeping the patients safe at

13    all times.  If they are at a risk for falls,

14    being aware of that, and making sure they don't

15    have any harmful items in their possession.

16         Q.    If a patient in the example you

17    gave is at a risk for a fall, as an example,

18    how would that information be shared or

19    communicated among the staff?

20         A.    The nurses would usually make it

21    aware.  In many cases it was kind of an

22    automatic precaution.

23         Q.    What precaution would that be?

24         A.    That the doctor's notes when they

25    write precautions would usually be for falls.

Page 23

1    It could be for elopement.

2         Q.    So if that precaution or note is in

3    a patient's record, how, if at all, would you

4    change the way, for example, you provided

5    therapy to those patients?

6         A.    I would sit closer to them.

7         Q.    Anything else other than sitting

8    closer to them?

9         A.    If they needed to be seated at a

10   table for additional safety if we were in a

11   circle, that could be an option as well.

12        Q.    When did you start your employment

13   at Parma?

14        A.    In December of 1996.

15        Q.    Were you always employed as a

16   rehabilitation therapist?

17        A.    Correct.

18        Q.    From December of 1996 until

19   sometime in 2014, was Parma a community

20   hospital of its own?

21        A.    Yes.

22        Q.    Are you aware that in 2014

23   University Hospitals acquired Parma?

24        A.    Yes.

25        Q.    So prior to UH's acquisition of

1    Parma, can you tell me how patients would come

2    to be seen on the geriatric psych unit?

3           A.    Many came from the physicians

4    working on this unit, from their private

5    practice, nursing homes, the emergency room,

6    possibly outside referrals.

7           Q.    Were there different physicians

8    other than Dr. John Sanitato?

9           A.    Correct.

10          Q.    Who were the physicians that were

11   overseeing the unit prior to UH's acquisition?

12          A.    Over the years or --

13          Q.    Sure.  Why don't we start with

14   right in 2014 moving back to whenever there was

15   a change.

16          A.    Dr. David Fox, Daniel Polster, and

17   Robert Smitley.

18          Q.    Do you know how to spell Daniel's

19   last name?

20          A.    Polster?

21          Q.    Is it just P-O-L-S-T-E-R?

22          A.    I don't know if there is an E after

23   the L or not.

24          Q.    How about Dr. Smitley?

25          A.    Smitley, probably S-M-I-T-L-E-Y.

1       Q.    So Drs. Fox, Polster, and Smitley,

2    they were all overseeing the unit at the same

3    time?

4       A.    It was Dr. Fox initially, and then

5    Dr. Smitley joined his practice, and then

6    Dr. Smitley -- I think he still practiced when

7    Dr. Polster came on board, but eventually

8    Dr. Smitley left.

9       Q.    Were Drs. Fox, Smitley, and then

10   eventually Polster all part of the same private

11   practice outside of Parma?

12      A.    I believe so.  Oh, there was

13   another doctor in there, too, at one time, John

14   Maholik.

15      Q.    You said, and again, this is prior

16   to the UH acquisition, the patients would come

17   from the doctors' private practice, correct?

18      A.    Correct.

19      Q.    And then you said nursing homes?

20      A.    Correct.

21      Q.    The nursing home patients would be

22   referred directly to Parma, or would the

23   referrals come in through the doctors, if you

24   know?

25      A.    I'm not sure on the exact process.

1    It could be both.

2         Q.    Was there an emergency room at

3    Parma?

4         A.    Yes.

5         Q.    When you said the emergency room,

6    is that the emergency room that would then lead

7    to the patients being seen?

8         A.    Correct.  If they met that

9    criteria, yes.

10         Q.    Prior to UH acquiring Parma in

11    2014, what were the most common diagnoses of

12    the patients that you would see or provide

13    therapy to?

14         A.    Depression, dementia with

15    agitation, bipolar disorder, psychosis.

16         Q.    Was there any one of those four

17    that one or two or more were more common, or

18    was that a pretty even spread of diagnoses

19    among the patients?

20         A.    Probably even spread.  Maybe

21    dementia with agitation was the higher.

22         Q.    I know it's a geriatric population,

23    but can you tell me in terms of age what the

24    most common age of patients was that you were

25    seeing prior to 2014?

Page 27

1          A.     Well, the unit is for 55 and older,
2     so it could be any number there, but probably
3     70s, 80s.
4          Q.     Probably 70s and 80s was the most
5     common age of patients?
6          A.     Yes.
7          Q.     So I know the doctors were
8     different.  Once UH made the acquisition of
9     Parma in 2014, were there other staffing
10    changes on the psych unit, the geriatric psych
11    unit I should say?
12         A.     I believe the assistant supervisor
13    was a new position.
14         Q.     So you hadn't worked with Chrissy
15    Rivera before?
16         A.     Not when I was at Parma, no.
17         Q.     Was there a different person
18    holding that position?
19         A.     No.
20         Q.     Was there a head manager at Parma?
21         A.     Yes.
22         Q.     That person was not Kathy Holley,
23    correct?
24         A.     Correct.
25         Q.     Who was that?

Page 28

1          A.     Allison Fisher.  She got married,
2     so I'm not sure what her married name became.
3          Q.     When did she stop working at the
4     Parma geriatric psych unit?
5          A.     I believe it was sometime in the
6     summer or fall of 2015 when she stopped.
7     That's what you said, correct?
8          Q.     Right.  Do you know why she stopped
9     working there?
10          A.     She got her master's in nurse
11     practitioner.
12          Q.     So she took a different job?
13          A.     Correct.
14          Q.     Who was the head manager after
15     Allison?
16          A.     I believe that Chrissy Rivera was
17     an interim.
18          Q.     How about after the interim, was
19     Kathy Holley the next head manager?
20          A.     Correct.  Yes.
21          Q.     Let me go back.  Were the nurses
22     the same both prior to UH's acquisition of
23     Parma and after?
24          A.     Those have changed, too.  I mean,
25     it's just kind of a transition of changes.

1   When Dr. Smitley and Polster left, a couple of

2   the other nurses followed them.

3        Q.    Do you know where they went,

4   Drs. Smitley and Polster?

5        A.    Southwest.

6        Q.    Their move to Southwest, did that

7   coincide with UH's acquisition?

8        A.    I'm not sure.

9        Q.    Do you know Drs. Smitley and

10  Polster, are they working in the same capacity

11  at Southwest as they were at Parma in the sense

12  that they have a private practice and oversee

13  an acute geriatric psych unit?

14       A.    Dr. Smitley didn't go over to

15  Southwest.  He had left Parma, and I'm not sure

16  where he went, but it was Fox and Polster.

17       Q.    Okay.  So Drs. Fox and Polster, are

18  they operating, if you know, essentially in the

19  same manner with a private practice?

20       A.    I believe so.

21       Q.    And then kind of an acute geriatric

22  psych unit at Southwest?

23       A.    Yes.

24       Q.    Upon UH's acquisition of Parma,

25  were there any changes made to the way the

Page 30

1    geriatric psych unit operated?

2         A.    Probably gradual changes,

3    paperwork, documentation.

4         Q.    Changes in paperwork and

5    documentation you said?

6         A.    Yes.

7         Q.    What kind of changes?

8         A.    Moving over to what UH had already

9    in place for their other facilities, I'm

10   guessing.

11        Q.    Are there other geriatric psych

12   units at UH that you're aware of?

13        A.    Yes.

14        Q.    Where?

15        A.    Richmond for sure, I believe

16   Geauga, and possibly Elyria.

17        Q.    Had you ever worked at any of those

18   locations?

19        A.    I observed over at Richmond

20   Hospital one day.

21        Q.    What was the purpose of that?

22        A.    We were supposed to be mirroring

23   their facility, so they were encouraging staff

24   to go over there and see how they operate, so

25   it was on our own time.

1          Q.    Did you say mirroring?

2          A.    Mirroring, yes.

3          Q.    So UH was, for lack of a better

4    term, wanting all the geriatric psych units to

5    operate in the same manner?

6          A.    I believe so.

7          Q.    Was there a change in patient

8    population after UH acquired Parma?

9          A.    Yes.

10         Q.    Can you describe that for me,

11   please?

12         A.    Well, since UH is much larger, we

13   would get referrals from all over Northeast

14   Ohio.

15         Q.    As opposed to?

16         A.    As opposed to probably more local.

17         Q.    More local meaning around Parma?

18         A.    Correct, and the surrounding

19   suburbs.

20         Q.    Did that result in an overall

21   younger patient population?

22         A.    To some extent, yes.

23         Q.    So I think you said geriatric age

24   ranges 55 and up, correct?

25         A.    Correct.

1      Q.    Prior to UH's acquisition, I think
2   you told me the lowest common age range was 70s
3   and 80s?
4      A.    Yes.
5      Q.    Were you seeing now after the UH
6   acquisition more patients in their late 50s and
7   60s?
8      A.    At times.
9      Q.    After the UH acquisition, was there
10  a more diverse set of diagnoses that the
11  patients were experiencing?
12     A.    Probably.
13     Q.    Was there an increase in patients
14  who were diagnosed with schizophrenia, for
15  example?
16     A.    Statistic-wise I couldn't say.
17     Q.    How about just in your general
18  observation do you believe that to be true?
19     A.    A few more, yes.
20     Q.    After UH's acquisition, was there
21  also an increase of patients with depression
22  with a suicide component, either ideation or
23  actual attempts?
24     A.    There may have been.
25     Q.    Is that something that you

1    observed?

2         A.    It's hard to say, you know, how

3    much more, but slightly it increased.

4         Q.    So there was an increase, but you

5    are not able to say with any specificity how

6    much more common that would be?

7         A.    Right.  The unit kept statistics, I

8    would think.

9         Q.    One of the terms I've seen in some

10   of the records is patient acuity.  Can you tell

11   me what that term means, if you know?

12        A.    Well, acute is usually short term.

13        Q.    If someone says there is after the

14   UH acquisition patients with a higher acuity,

15   would you know what that phrase is referring

16   to?

17        A.    Probably higher risk, I would

18   guess.

19        Q.    Higher risk of either self-harm or

20   harm to others?

21        A.    I think so.

22        Q.    Would you agree that there was an

23   increase in patients with a higher level of

24   acuity after UH's acquisition?

25        A.    To some degree, yes.

1      Q.    After UH's acquisition, was there

2   an increase in patient events that would cause

3   the need for intervention, physical

4   intervention?

5      A.    There may have been.

6      Q.    Is that something that you

7   personally observed?

8      A.    Possibly at times.

9      Q.    Did you observe the need, for

10   example, I guess the increased need of either

11   security involvement or other staff intervening

12   physically with patients after UH's

13   acquisition?

14      A.    Probably.

15      Q.    Were there any changes in policies

16   or procedures after UH acquired Parma?

17      A.    I would think so.

18      Q.    Do you have a memory or

19   recollection of what any of those were?

20      A.    I do not.

21      Q.    When Parma became part of the UH

22   system, was there, for lack of a better term, a

23   general onboarding training process that you

24   went through?

25      A.    Yes.

Page 35

1        Q.    That would have occurred sometime
2    in 2014 or 2015; is that right?
3        A.      Probably.
4        Q.    Do you have any recollection of the
5    topics covered or what was discussed during
6    that onboarding and training?
7        A.      UH has an LMS which I believe is
8    like the continuing education items to
9    complete.
10        Q.    LMS stands for learning management
11    system?
12        A.    I believe so.
13        Q.    That would require regular internal
14    kind of coursework or training?
15        A.    Right.  Right.
16        Q.    On whatever topics would be
17    necessary for you, for example, for working on
18    the geriatric psych unit?
19        A.    Correct, or in the hospital in
20    general.
21        Q.    That was different than the system
22    in place under Parma prior to UH?
23        A.    Right.  Parma had their own system,
24    and UH had theirs.
25        Q.    How did they differ?

1        A.    Well, some of the change came with

2    the increase in technology, too, at one point.

3    You know, a lot of items at Parma were maybe

4    paperwork or set up where you walk through and

5    complete items like a safety fair they would

6    have, and you would go from table to table

7    answering questions, and then eventually that

8    stuff just moved on to on line to complete.

9        Q.    Other than doing it in person or at

10   a safety fair, for example, versus on line, was

11   there a change in kind of the substance or the

12   volume of the training material?

13       A.    The volume definitely increased as

14   well as the topics.

15       Q.    So more topics and more often under

16   UH as opposed to Parma?

17       A.    Correct.   Yes.

18       Q.    That was something that everyone I

19   guess in your world, everyone at the geriatric

20   psych unit who was at Parma previously and then

21   continued at UH, was required to go through?

22       A.    Yes.

23             MR. BULEA:  We'll just take a

24   break.

25                  (Brief recess.)

Page 37

1          A.     There was another doctor that I
2     could add for UH.
3          Q.     Okay.
4          A.     Dr. Fitzgerald.
5          Q.     That was you said after --
6          A.     Yes.  She was another UH
7     psychiatrist.  She was there for a short time,
8     and I couldn't tell you the dates.
9          Q.     After the acquisition?
10          A.     Correct.
11          Q.     But prior to Dr. Sanitato?
12          A.     No.  She did work with him.
13          Q.     To your knowledge did
14     Dr. Fitzgerald and Dr. Sanitato maintain
15     private practices?
16          A.     I believe so.
17          Q.     Could you tell me what your
18     understanding of your job duties and
19     obligations were as a rehabilitation therapist?
20          A.     To provide therapeutic groups to
21     the patients, work as a member of the
22     interdisciplinary team.
23          Q.     Anything else?
24          A.     Whatever else was required of the
25     job, you know, completing continuing education

1    or whatever learning.

2         Q.    As part of providing therapeutic

3    groups for patients, was patient assessments

4    part of your job responsibilities?

5         A.    Yes.

6         Q.    That would include an assessment

7    upon the patient's initial arrival to the

8    geriatric psych unit, correct?

9         A.    I believe within 24 hours.

10        Q.    What was the purpose of that

11   assessment that you would complete?

12        A.    To identify any specific issues to

13   address.

14        Q.    How would you go about completing

15   those assessments?

16        A.    Asking questions, observation in

17   group, other information from staff in the team

18   meetings, the chart.

19        Q.    Your assessment was specifically

20   geared toward the functional and rehabilitative

21   needs of the patients; is that correct?

22        A.    Generally their leisure interests.

23        Q.    What does that mean, leisure

24   interests?

25        A.    What they like to do for fun,

Page 39

1    social, emotional, physical, cognitive.

2         Q.    Was the goal to gain an

3    understanding of that so that you could gear

4    your therapy towards improving, for example,

5    their cognitive and emotional functioning?

6         A.    Right, along with their diagnosis.

7         Q.    So after the initial assessment,

8    you would then plan and implement and evaluate

9    the therapy for each patient; is that right?

10        A.    Identify goals to work on with that

11   patient, yes.

12        Q.    Was each therapeutic session

13   planned and implemented based on the different

14   goals of whatever patient population you were

15   serving at a given time?

16        A.    Generally, yes.

17        Q.    Then as part of your job you were

18   required to evaluate how the patients responded

19   to the therapy, correct?

20        A.    Correct.

21        Q.    You would then report on that

22   evaluation and outcome to the rest of the

23   treatment team to complete the patient's

24   assessment?

25        A.    Each patient was documented on

Page 40

1    after each group.  There were generally two

2    group sessions a day, so there were two group

3    notes that were written, and then adding any

4    information in the treatment team that occurred

5    on a daily basis in the morning.

6         Q.    When you say two group notes per

7    day, that would be individual to the patient,

8    though, correct?

9         A.    Correct.

10        Q.    So how each individual patient

11   performed or responded to the group therapy?

12        A.    Right.  Yes.  Each patient got a

13   note twice a day from the rehab therapist.

14        Q.    What methods would you use to

15   perform your evaluation of how an individual

16   patient was performing or responding to the

17   therapy you were providing?

18        A.    There was a standard note, and

19   often a check box for behaviors and their

20   participation, and then an area for a brief

21   summary, I believe.

22        Q.    So you said there was a check box

23   for behaviors?

24        A.    Correct.  Yeah.  We had a list of

25   various behaviors noted, and you would check

Page 41

1    those off if any applied.

2         Q.    What were those?

3         A.    They could vary; calm, agitated,

4    probably hallucinating, affect.  I'm sure there

5    is more.

6         Q.    What methods would you use to

7    determine whether a patient was calm, agitated,

8    hallucinating, or to judge their affect?

9         A.    Their observation and participation

10   in group.

11        Q.    How did you observe and make an

12   assessment of their participation in group?

13        A.    Through interaction, questioning,

14   getting up, moving around the room at times,

15   just, again, observing.

16        Q.    When you say through interaction,

17   is that verbal communication with the patient?

18        A.    Yes.

19        Q.    Between you and the patient?

20        A.    Yes.  It could be physical if we

21   were exercising.

22        Q.    What type of physical interaction

23   as an example?

24        A.    Like chair exercises, just moving

25   arms, legs, sometimes assisting a patient if

1    they weren't able to do it themselves, a pat on

2    the shoulder for doing a good job, or if they

3    need to wake up, you know, a pat on the knee or

4    the shoulder again, verbal cues, prompts.

5           Q.    You said if they need to wake up?

6           A.    Yeah.  They could fall asleep.

7           Q.    Were these patients, I'm sure they

8    were all different, but in a general sense were

9    they being medicated while they were on the

10   unit?

11          A.    If the doctor felt so, yes.

12          Q.    Was that pretty typical, that the

13   patients you were doing group therapy with

14   would be on some type of medication?

15          A.    Yes.  Yes.

16          Q.    How would you identify, for

17   example, I think you said agitated, how would

18   you come to the conclusion that a patient was

19   agitated.

20          A.    If they are very fidgety, restless,

21   sometimes verbal, if they are calling out or

22   starting to get a change in their tone of

23   voice.

24          Q.    Did you ever have patients who were

25   non-verbal?

Page 43

1          A.     A few.

2          Q.     In what ways did you change your

3    technique or your evaluation process to

4    complete the assessments of those patients?

5          A.     More interactions with nursing.  I

6    guess it would depend on the patient, asking

7    them questions, maybe if they nod their head

8    yes or no, writing things down if they are

9    able.  Sometimes I would write questions out

10   for them to read.  Again, they could agree or

11   disagree if able.

12         Q.     Part of your job included you said

13   participating in interdisciplinary rounds on a

14   daily basis; is that right?

15         A.     Yes.

16         Q.     What did that entail?

17         A.     Nursing, the physician, the

18   manager, myself, and a social worker met every

19   morning to go over the patients to review their

20   treatment plans if they were needing an update.

21         Q.     So you would give daily updates of

22   the patients' performance in your group

23   therapy?  Is that how you contributed to that

24   discussion?

25         A.     Yes.

Page 44

1        Q.     Were there any other ways that you

2    would participate in that discussion?

3        A.     Not that I can think of.

4        Q.     Were there call lights on the unit?

5        A.     Yes.

6        Q.     Can you tell me what those are?

7        A.     If the patient is in their room and

8    needs assistance, they have a button that they

9    can press or that nursing can press if they

10   need additional assistance, and there were also

11   call lights in the group rooms and in the rest

12   rooms.

13       Q.     Was it part of your

14   responsibilities to respond to those?

15       A.     Yes.

16       Q.     Is that a duty that everyone on the

17   unit has?

18       A.     Yes.

19       Q.     Is it also part of your job to

20   ensure that patients are in a safe environment

21   when they are, for example, in the group

22   therapy sessions?

23       A.     Yes.

24       Q.     For your therapy sessions, what

25   types of activities were included in those?

Page 45

1          A.     Generally, morning group started

2     with a community group where we would go over

3     orientation, maybe some trivia relating to the

4     day, asking -- we could do patient

5     introductions if it's a whole new group or if

6     we had a new person.

7                    Sometimes I'd ask them like a

8     question of the day, and everybody could go

9     around the circle.  Generally, we're set up in

10    a circle for that.  Maybe goal setting, how

11    they are feeling, and then we'd move into chair

12    exercises and then maybe some other type of

13    large motor skill activity, and then that

14    generally would go 45 minutes to an hour.

15                    Then we would rearrange back to

16    tables for the next activity.  I'd give them a

17    snack or a beverage, and then the second

18    activity within -- because in the morning it

19    was like a two-hour time span that we had them

20    -- it could be a discussion maybe on depression

21    or self-awareness, self-esteem, depression,

22    just depending on whatever the need of the

23    group was.

24          Q.     When you say chair exercises, can

25    you tell me what that entails?

1          A.    Basically stretching while sitting

2     in a chair.  Some techniques are yoga.  My

3     training came through the Arthritis Foundation.

4          Q.    So stretching?  Yoga?

5          A.    Deep breathing.

6          Q.    Then you said large motor skill

7     activities?

8          A.    Correct.

9          Q.    What were some of those?

10         A.    Those could be like throwing a ball

11    into a basket, horseshoes, bowling, balloon

12    volleyball.

13         Q.    I take it, for example, horseshoes,

14    bowling, those would be set up in the group

15    therapy, right?  You weren't going outside of

16    the unit with these patients?

17         A.    Correct.

18         Q.    In fact, it was a locked unit,

19    right?

20         A.    Yes.

21         Q.    So that would be the morning

22    session, and then there was also an afternoon

23    session?

24         A.    Correct.

25         Q.    What happened at the afternoon

Page 47

1    session?

2         A.    Again, that could be more leisure

3    based or again for the diagnosis depending on

4    the group, but it could be Wheel of Fortune was

5    common, other cognitive activities, word games.

6         Q.    Would you then complete a second

7    round of documentation in the afternoon after

8    that session for each patient?

9         A.    Yes.

10        Q.    When did you meet Kathy Holley?

11        A.    Sometime in early January when she

12   started.

13        Q.    Of what year?

14        A.    2016.

15        Q.    Was there a change in the way that

16   the treatment and therapy and operation of the

17   unit ran after Kathy became the head manager?

18        A.    I think we were working on some

19   minor changes.

20        Q.    Can you describe those?

21        A.    Probably the times in which groups

22   started would be the biggest, and then, again,

23   like working on changing the documentation for

24   the groups.

25        Q.    Did Kathy make it a point of

Page 48

1    emphasis to increase the activity level for the

2    younger geriatric patients or patients with

3    higher acuity?

4         A.    Well, the activities would gear

5    towards whatever population we had.

6         Q.    You worked part time, correct?

7         A.    Correct.

8         Q.    When you were on duty, were you the

9    only recreational therapist on the unit?

10        A.    Yes.

11        Q.    Were you the one charged then with

12   operating both the morning and afternoon

13   groups?

14        A.    Yes.

15        Q.    Did you run those groups solo, on

16   your own?

17        A.    Yes.

18        Q.    In February or March of 2016, Kathy

19   Holley provided a performance review for you;

20   is that correct?

21        A.    Yes, in March.

22        Q.    Can you tell me everything you

23   recall about that discussion?

24        A.    I believe there were no issues with

25   the evaluation.  She raised a concern that

Page 49

```
1    there was, quote, nothing in my file, end
2    quote, and went on to elaborate in regards to
3    accommodations.  I had explained to her that,
4    you know, I have various accommodations, and a
5    lot of those I've done on my own or with
6    previous assistance with managers.
7         Q.    Was the conversation more specific
8    than what you just relayed to me, or was that
9    just in a general sense?
10        A.    I believe it was just general.
11        Q.    What accommodations, if any, were
12   you receiving at the time, and, if so, did you
13   discuss those with Kathy at that time?
14        A.    I had a closed circuit TV that I
15   came with upon day one of my employment with
16   Parma, and, you know, those may have changed
17   over the years if they stopped functioning or I
18   needed a new one.  It was the computer
19   technology, adaptive software, a larger
20   monitor, and keyboard.
21        Q.    Did you discuss the closed circuit
22   TV, the adaptive software, larger monitor, and
23   keyboard with Kathy?
24        A.    I may have.
25        Q.    Did Kathy ever express any concern
```

1  or unwillingness to continue to provide those

2  accommodations?

3        A.    I think she felt the need that

4  there needed to be some kind of record in my

5  file with documentation of accommodations.

6        Q.    Okay.  Did she ever convey to you

7  that those accommodations would be stopped or

8  no longer provided or anything like that?

9        A.    No.  No.

10        Q.    What led you to believe that she

11  thought there needed to be documentation in

12  regard to those accommodations?

13        A.    Well, the fact that she stated

14  there was nothing in my file.

15        Q.    That's what she said, there is

16  nothing in your file?

17        A.    Correct.

18        Q.    Did she ask that you provide

19  information for the file?

20        A.    I don't believe so.

21        Q.    Between that conversation in March

22  of 2016 and when you made some additional

23  requests for accommodations later in October of

24  2016, did you provide any documentation to

25  Kathy or anyone at UH?

Page 51

1        A.    Yes.  I figured since she wanted

2    something in my file, I would request a new

3    closed circuit TV as the one I had was not

4    always functioning to par.  I did not get to

5    choose that one when it was purchased for me,

6    and the contrast was fairly poor, and

7    oftentimes I would use it to write.  So it's a

8    closed circuit TV.  You write, it comes up on

9    the screen, and oftentimes as I'm writing, it

10   would white out so I wouldn't necessarily see,

11   or depending on what the material was, it may

12   not show up in a distinct manner.

13        Q.    Because of that you made a request

14   for a newer --

15        A.    A new one, yes.

16        Q.    When was that request made?

17        A.    I believe October of '16.

18        Q.    Between January of 2016 when you

19   first met Kathy and that request in October of

20   2016, was any documentation requested by Kathy

21   or anyone at UH for the accommodations that you

22   were currently receiving?

23        A.    The process may have started

24   earlier from the point of the evaluation.  I

25   believe I wrote Kathy Holley a letter

1    requesting the closed circuit TV and that she

2    had returned that to me stating I needed to go

3    through disability management services.

4         Q.    Okay.  So before that, and I guess

5    maybe I'm not wording this correctly, before

6    you made the request for the new TV, was there

7    ever a time that Kathy or anyone from UH

8    required you to submit documentation to keep

9    receiving the accommodations that were

10   currently in place?

11        A.    No.

12        Q.    So other than this conversation in

13   March prior to your request for the new closed

14   circuit TV, were there any other discussions

15   that you had either with Kathy Holley or anyone

16   else at UH about accommodations that either you

17   had or that you needed?

18        A.    I don't believe so.

19        Q.    So in October of 2016, you

20   submitted a request to Kathy for this newer

21   closed circuit TV, and she returned it to you

22   and said you need to go to disability

23   management?

24        A.    Correct.

25        Q.    Is that what you did, did you go to

1    disability management?

2          A.    Yes.

3          Q.    Who at disability management did

4    you speak to?

5          A.    I believe it was Kara.

6          Q.    Is her last name Ladaika?

7          A.    Yes.

8          Q.    What conversation did you and Kara

9    have?

10         A.    I don't recall if it was so much of

11   a conversation other than just getting the

12   motions in place and the request, and she

13   mailed out forms that had to be completed and

14   then submitted.

15         Q.    What types of forms?

16         A.    I believe information from a

17   physician for the need to validate the

18   reasoning.

19         Q.    Did one of your physicians complete

20   that form?

21         A.    Yes.

22         Q.    Who was that?

23         A.    I believe it was Dr. Traboulsi.

24         Q.    Was there also a form for you to

25   complete?

Page 54

1          A.     Probably.

2          Q.     Did you complete it?

3          A.     Yes.

4          Q.     Did Dr. Traboulsi provide his

5    completed form directly to UH, or did he give

6    it to; do you know?

7          A.     Offhand I don't recall.

8          Q.     Do you know when he completed his

9    portion of the forms?

10         A.     I know it was in a timely manner.

11         Q.     I think you said in October it was

12   submitted.

13         A.     Right.

14         Q.     Do you know whether the form

15   Dr. Traboulsi completed would have been

16   submitted around that time?

17         A.     No, but that would be in whatever

18   records I've turned in.

19         Q.     Did you complete your portion of

20   the form?

21         A.     Yes.

22         Q.     Around that same time?

23         A.     Yes.

24         Q.     When was the next time you had a

25   discussion with anyone from UH about any type

1   of accommodation request?

2       A.    I don't recall.  It was --

3       Q.    In your complaint in this case, you

4   stated that in October of 2016 Kathy Holley had

5   repeatedly asked you what job duties you

6   couldn't perform; is that correct?

7       A.    I don't think it was October.  I

8   thought it was January of '17.

9       Q.    What did she ask you?

10      A.    She had concerns over my ability to

11  complete the essential job functions.

12      Q.    Is that what she told you, that she

13  had concerns over the ability you had to

14  complete your essential job functions?

15      A.    Yes.

16      Q.    Did she ever ask you what job

17  functions that you couldn't perform?

18      A.    Yes.

19      Q.    How did you respond?

20      A.    I told her I could perform all of

21  them.

22      Q.    Was that multiple conversations, or

23  did she ask that one time or many?

24      A.    Maybe twice.  Once she arranged a

25  meeting with HR to go over that, and then I

Page 56

```
1    think the second time may have been February on
2    the day that she told me that I was going on
3    mandatory medical leave.
4          Q.    Another allegation in the complaint
5    is that after you made this request for a new
6    closed circuit TV in October of 2016 that Kathy
7    Holley increased her observation and scrutiny
8    of your work performance.  Is that correct?
9          A.    I agree.
10         Q.    How did Kathy increase her
11   observation and scrutiny of your work
12   performance?
13         A.    I believe she was present in the
14   group room more often.
15         Q.    Was that something that was
16   atypical of her prior to that request?
17         A.    Yes.
18         Q.    So prior to October of 2016, it
19   wasn't her regular practice to observe at least
20   portions of the group therapy?
21         A.    Correct.
22         Q.    She was not in there at all?
23         A.    She may have been here or there,
24   but not as often.
25         Q.    How often was she in there
```

1   following your request in 2016?

2          A.     I can't say.

3          Q.     So what forms the basis for your

4   allegation that the scrutiny and observation

5   was increased?

6          A.     Just whenever she had come in, I

7   guess.

8          Q.     So her presence there; am I

9   understanding that testimony correctly?

10         A.     Well, if we're thinking of the one

11  particular episode with the bingo incident.

12         Q.     What is that you're referring to?

13         A.     That's when she stated that I

14  wasn't able to assist a patient with the

15  activity and that nursing had to help.

16         Q.     Let me just back up for a second.

17  This would have happened sometime in late 2016?

18         A.     No.  I believe it was January of

19  '17.

20         Q.     Bingo, I take it, was part of the

21  therapeutic activities that you were doing that

22  day?

23         A.     Yes.

24         Q.     So was it true then that you

25  weren't able to assist the patient with their

1    completion of the bingo activity?

2         A.    I was taking a passive approach.

3         Q.    What does that mean?

4         A.    That patient in particular could

5    often monopolize group, so I was just being

6    more passive with him and just providing some

7    reassurance with maybe a yes or good job.

8         Q.    What specifically was that patient

9    doing at the time?

10        A.    Sitting at the table leaning in

11   towards me a little bit, no significant or bad

12   behaviors.

13        Q.    So I take it then you disagreed

14   with Kathy's conclusion that there was

15   assistance needed and you didn't recognize it?

16        A.    Correct.

17        Q.    So was there, I guess for lack of a

18   better term, and you can describe it however

19   you want, but was this patient asking for

20   assistance or signaling for assistance in some

21   way?

22        A.    Possibly.

23        Q.    Do you know one way or the other?

24        A.    No.

25        Q.    Kathy was there that day?

1          A.     Yes.

2          Q.     It wasn't Kathy that stepped in,

3    correct?

4          A.     No.

5          Q.     Who did?

6          A.     I don't know if there were other

7    nurses that may have, but they occasionally

8    have helped out in the past, and then other

9    patients help each other which is a therapeutic

10   technique in itself.

11         Q.     In this specific instance, did one

12   of the nurses step in to help this patient?

13         A.     They may have.

14         Q.     Do you know?

15         A.     I don't know for sure.

16         Q.     Would that be upsetting to you if

17   they did?

18         A.     No.

19         Q.     If you were using a passive

20   technique, would you have redirected that nurse

21   and told them, hey, I'm working on a

22   therapeutic technique here, so please don't do

23   that?

24         A.     No.

25         Q.     Why not?

Page 60

1          A.    It wasn't necessary.

2          Q.    So did you and Kathy discuss this

3     situation?

4          A.    Not until her initiating the

5     meeting with HR.

6          Q.    What was the discussion at that

7     time?

8          A.    Again, based on being able to

9     perform my essential job functions and her

10    making the comment about that particular group

11    with the patient.

12         Q.    What did you say?

13         A.    I think I just was caught off

14    guard.

15         Q.    Did you ever explain to Kathy that

16    you were using a passive approach on that

17    patient?

18         A.    No.

19         Q.    Did you disagree with her

20    conclusion that the patient was trying to

21    signal for help, and you didn't see it or

22    didn't recognize it?

23         A.    I don't know that I agreed or

24    disagreed.

25         Q.    Is that something that could

1    happen, that patients would be signaling for

2    help, and you wouldn't be able to recognize it?

3          A.    It would depend on the situation.

4          Q.    So sometimes that could happen, and

5    other times it wouldn't; is that what you're

6    saying?

7          A.    It would probably depend on how

8    many people were in the group, what the group

9    activity was, who was needing my attention at

10   the time.

11         Q.    Up to how many people are in a

12   group therapy session?

13         A.    Up to 14.

14         Q.    So a larger group, better chance

15   that perhaps the need would go unrecognized; am

16   I understanding your testimony correctly?

17         A.    That could be.

18         Q.    So after the conversation with

19   Kathy in October in which she referred you to

20   Kara in disability management, when was the

21   next time you had a discussion with Kathy about

22   any accommodation requests you had or concerns

23   that Kathy voiced about your ability to

24   complete your job functions?

25         A.    I think, as I recall, it was

Page 62

1    January of '17.

2         Q.    Before we get to that other, I

3    asked you in which ways was Kathy's scrutiny or

4    observation of your job performance increased,

5    and you said she was in the group therapy room

6    more often, correct?

7         A.    I believe so.

8         Q.    Were there any other ways other

9    than her being in the group therapy room more

10   often that her scrutiny or observation of your

11   job performance increased?

12        A.    I couldn't say if she was asking

13   other people what their thoughts of my group

14   leadership was.

15        Q.    Who was she asking?

16        A.    I don't know.  That's what I said.

17   I don't know if she was asking other people to

18   observe as well.

19        Q.    So you don't know one way or

20   another whether that was happening?

21        A.    I know that Kathy was present more

22   often it seemed after October.

23        Q.    I get that.  I'm just trying to

24   understand the facts behind the allegation that

25   her scrutiny and observation increased.  So she

1    was more present in the group therapy room.  I

2    get that.  Is there any other way that you were

3    aware of or recognized her increasing scrutiny

4    of your work after October of 2016?

5           A.    Not that I could think of.

6           Q.    You said the next conversation with

7    Kathy about accommodations or performance

8    concerns took place in January of 2017,

9    correct?

10          A.    I believe so.

11          Q.    Tell me what happened in that

12   conversation.

13          A.    She approached me one afternoon and

14   said we had a 3:00 meeting in HR, so I believe

15   we went down together and met with Deb Sheldon,

16   and that was also when again she brought up the

17   ability to perform the essential job functions.

18          Q.    So in January you met with Deb

19   Sheldon who is an HR generalist, correct?

20          A.    Correct.

21          Q.    And Kathy Holley, your manager?

22          A.    Yes.

23          Q.    During that meeting they voiced

24   concerns about you being able to complete your

25   job duties?

1          A.     Correct.

2          Q.     What specifically did they say?

3          A.     Well, they -- Deb Sheldon mentioned

4     that the accommodations for a closed circuit TV

5     were not an issue, but that, again, being able

6     to perform the essential job functions which,

7     you know, we went over the list, and Kathy said

8     what her -- what she thought I could not do,

9     and I disagreed with her because I feel I could

10    do all those job functions.

11         Q.     So in this meeting you said that

12    there was discussion about the closed circuit

13    TV accommodation request, and Deb Sheldon told

14    you that was not an issue?

15         A.     Correct.

16         Q.     Did you take that to mean that that

17    was not part of their concerns in regard to you

18    performing your job functions?

19         A.     Right.  I felt by her response that

20    them providing the closed circuit TV would not

21    be a problem.

22         Q.     Certainly no one at UH ever stated

23    that your use of a closed circuit TV was

24    worrisome or caused them concern about your

25    ability to do the job, right?

Page 65

1          A.     Correct.

2          Q.     You said the other part of the

3    discussion was, I am paraphrasing what you

4    said, but more detail about specific job

5    functions that Kathy didn't believe that you

6    could perform?

7          A.     Yes.

8          Q.     This was in January; is that right?

9          A.     I believe so.

10         Q.     So this is separate and apart from

11   the meeting where you were referred for a

12   fitness for duty evaluation?

13         A.     Right.  That would have been the

14   next meeting.

15         Q.     Do you have a recollection of what

16   specific job functions Kathy Holley raised

17   concern about in that January meeting?

18         A.     Not off the top of my head.

19         Q.     Were they the same ones that were

20   raised a couple weeks later in the fitness for

21   duty meeting?

22         A.     Probably.

23         Q.     Did you have any discussions with

24   anyone at UH between the January meeting you

25   had with Deb Sheldon and Kathy Holley and then

Page 66

1    the subsequent meeting in February where you

2    were referred to a fitness for duty evaluation

3    about either your accommodations or their

4    concerns about your ability to perform the job

5    functions?

6         A.    Can you repeat that again, please?

7         Q.    Sure.  Maybe I'll lay a little bit

8    more clear foundation.  I understand there was

9    two conversations, one in January and one in

10   February, about Kathy's concerns in regard to

11   your ability to do the job, right?

12        A.    Uh-huh.  Yes.

13        Q.    Between the January meeting and the

14   February meeting in which you were referred for

15   a fitness for duty examination, did you discuss

16   those concerns or any accommodation request you

17   had with anyone else at UH?

18        A.    I don't think so.

19        Q.    So the next time you had discussion

20   about it was in February, specifically

21   February 14th, 2017; is that right?

22        A.    I believe so.

23        Q.    Who was at that meeting?

24        A.    Again, the same, Deb Sheldon and

25   Kathy Holley.

Page 67

1      Q.    What transpired during that

2  meeting?

3      A.    I believe they said that again they

4  had concerns that I was not able to perform the

5  essential job functions, that they had safety

6  concerns for myself as well as the patients and

7  staff, and that they were placing me on a

8  mandatory medical leave, and they had arranged

9  an appointment for the next day to go down to

10 the main campus and meet with the EAP staff.

11     Q.    Between those two meetings, was

12 there a non-violent crisis intervention

13 training that took place?

14     A.    Whether it was in between I'm not

15 sure.

16     Q.    Sometime in early February?

17     A.    Yes.

18     Q.    What is non-violent crisis

19 intervention training?

20     A.    It's where the staff learn

21 techniques to deal with patients' behaviors,

22 aggressive behaviors.

23     Q.    What types of aggressive behaviors?

24     A.    Hitting, kicking.

25     Q.    Violent outbursts?

1        A.    Yes.

2        Q.    Is patient self-harm included in

3   that as well?

4        A.    Offhand I can't say.

5        Q.    In February of 2017, was that the

6   first time you went through the non-violent

7   crisis intervention training since UH had

8   acquired Parma?

9        A.    I don't think so.  I think it was

10  the second.

11       Q.    When was the first?

12       A.    It probably would have been two

13  years prior.

14       Q.    So sometime in early 2015?

15       A.    I think so.

16       Q.    You had been through non-violent

17  crisis intervention training prior to UH's

18  acquisition of Parma, right?

19       A.    Yes.

20       Q.    Was the training in 2015 the same

21  or very similar to the training, the

22  non-violent crisis intervention training, that

23  was done prior to UH's acquisition of Parma?

24       A.    And then there were some things

25  that were similar, but it had changed over the

1    20 years that I was there.  I would say the one

2    in '15 was fairly similar to the one in '17.

3    Maybe the way in which the techniques were

4    performed may have changed a little bit.

5            Q.    Was there a written component to

6    the 2015 training?

7            A.    I don't believe so.  I believe that

8    was in the past.

9            Q.    In 2015 had you received written

10   materials about the training ahead of time?

11           A.    I don't believe so.

12           Q.    In 2015 did you work with a partner

13   to complete the physical portion to the

14   training?

15           A.    Like everybody else, yes.

16           Q.    That was going to be my next

17   question.  That would be true for everyone in

18   the training?

19           A.    Yes.

20           Q.    In 2015 there was no written test

21   following the training, correct?

22           A.    No.

23           Q.    I'm sorry?

24           A.    No.

25           Q.    So, no, there was not?

Page 70

1        A.    There was no test.

2        Q.    Prior to UH's acquisition that was

3   part of the training if I understand the

4   documents that I've received in this case; is

5   that right?

6        A.    I know initially when I started

7   there was a written.  I don't remember when

8   that stopped.

9        Q.    So in 2017, the crisis intervention

10  training, how large was the group that you

11  participated in for that training?

12       A.    Maybe 12 to 14.

13       Q.    Was it on the unit?

14       A.    No.  It was a separate facility.

15       Q.    Where was it?

16       A.    It was at the State Road

17  educational building.

18       Q.    Prior to that training, did you

19  have any communications with anyone at UH about

20  either concerns you had about completing the

21  training or any accommodations you needed or

22  were going to request for the training?

23       A.    No.  I've never had an issue in the

24  past.

25       Q.    Did you have an issue in 2017?

Page 71

1          A.     Nope.

2          Q.     I guess just describe it for me.

3    You show up at the State Road facility.  What

4    happens to complete the training?

5          A.     The presenter talks about different

6    things.  Then you go into practicing the

7    routines.  He'll demonstrate often with

8    somebody else, and then you and your partner

9    demonstrate both as the perpetrator and as the

10   victim.  I guess you can put it that way.

11         Q.     So you take turns.  For lack of

12   better terminology, I'll use a different term

13   than perpetrator.  You take turns as the

14   patient with the violent outburst, so to speak?

15         A.     Yes.

16         Q.     The other end of that would be?

17         A.     Right.  You're the staff versus the

18   patient.

19         Q.     What types of I guess physical

20   techniques were provided for training that day

21   in 2017?

22         A.     Well, there is the hair grab, the

23   choking, punching, grabbing, kicking.

24         Q.     So there would be techniques on how

25   to deescalate or stop that type of behavior?

Page 72

1          A.     Yes.

2          Q.     Who was your partner that you

3     worked with in 2017?

4          A.     Joy Rivera.

5          Q.     Would your central vision

6     impairment inhibit or prevent you from seeing a

7     potential patient experiencing a violent

8     outburst, grabbing for either your hair or some

9     other patient's hair?

10          A.     It would depend.

11          Q.     On what?

12          A.     I guess on the situation and the

13     distance.

14          Q.     So if it was happening I guess

15     further away than a couple of feet, would that

16     make it more difficult for you to recognize and

17     appreciate what was going on?

18          A.     Again, it's hard to say.  It would

19     depend on what they were doing.

20          Q.     How about if a patient approached

21     you directly to try and choke you, for example,

22     would the vision impairment prevent any

23     difficulty in observing or appreciating that

24     situation?

25          A.     I don't think so.

1          Q.     Have you ever had a patient

2     experience a violent outburst toward you during

3     your employment?

4          A.     No.

5          Q.     The group therapy session, I guess

6     in a typical session, how far away are you from

7     the patients that you're providing therapy to?

8          A.     It can vary depending on what the

9     group is.  If there is a circle, depending on

10    how many people are in the circle, it could be

11    at least 10 feet, I would say.

12         Q.     So at a distance of 10 feet, would

13    your vision impairment prevent you from seeing

14    one patient who might be experiencing a violent

15    outburst trying to reach out to grab the person

16    next to them to choke them or hit them?

17         A.     Again, it would depend.

18         Q.     On what?

19         A.     Probably the point at which the

20    behavior is occurring.

21         Q.     So, for example, if a patient was

22    reaching over to the person seated next to

23    them, given your vision impairment, would you

24    be able to tell whether or distinguish between

25    whether that patient is reaching over to pat

Page 74

1    the patient next to them on the shoulder?

2         A.    I would probably get up to

3    intervene just to see, you know, what was going

4    on, you know, redirect, you know, is there

5    something you need, you know, or we need to

6    keep our hands to ourselves.

7         Q.    So nothing about your vision

8    impairment would prevent you from seeing what a

9    patient is doing 10 feet away from you?

10        A.    Again, it's hard to say.

11        Q.    So what methods or techniques would

12   you use to determine whether, for example,

13   someone is reaching over to give another

14   patient help with their bingo as opposed to

15   reaching over to grab them or hit them or pull

16   their hair?

17        A.    Just their general mood, their

18   current participation, voice.  I mean, there is

19   many ways to determine, auditory.

20        Q.    If hypothetically, I mean, the mood

21   was fine and there was no, you know, auditory

22   warning beforehand, are there any other

23   techniques that you would utilize to recognize

24   a violent outburst?

25        A.    Probably just ongoing interaction

Page 75

1    with everybody.

2        Q.    You would agree there is certainly

3    a point that a violent outburst could occur

4    from one of the psych patients on the unit at

5    any given time, right?  I mean, there is at

6    least a small chance that could happen?

7        A.    Right.

8        Q.    In the non-violent crisis

9    intervention training, when Joy was performing,

10   for example, the hair grabbing or the punches

11   as a violent patient, were you able to complete

12   all the techniques that you were being trained

13   on?

14       A.    Yes, uh-huh.

15       Q.    To your knowledge was Joy Rivera

16   providing any auditory or physical prompts in a

17   way different than any of the other

18   participants?

19       A.    I don't believe so.

20       Q.    Was Joy Rivera someone you had

21   completed that training with as a partner in

22   the past?

23       A.    I don't believe so.

24       Q.    At the conclusion of the training

25   or at any time during it, did either Joy or

1    anyone else in the room including the trainer

2    express any concern to you about the way that

3    you were completing the training?

4         A.    Not at all.  I was very surprised

5    when that was brought up as an issue.

6         Q.    Did you yourself ever have concern

7    about being able to react in a crisis situation

8    that could potentially involve a violent

9    patient outburst?

10        A.    No.

11        Q.    So I want to get back to the

12   February meeting you had, and I think you said

13   it was with Deb and Kathy Holley again; is that

14   right?

15        A.    Yes.

16        Q.    In that meeting you said there was

17   a number of concerns that were raised, and you

18   had disagreed with all of them; is that right?

19        A.    Correct.

20        Q.    Was one of their concerns your

21   signing of treatment plan documents outside of

22   your office or when you otherwise wouldn't have

23   access to a closed circuit TV?

24        A.    I believe that was one of their

25   concerns, yes.

1          Q.    Is that something that you ever

2     did?

3          A.    There were different methods and

4     procedures over the years in which I've signed

5     the documents.  Sometimes I did have them in my

6     office.  Other times, you know, we just passed

7     them around the room and signed them then as a

8     team.

9          Q.    Had you ever completed or signed

10    off on a treatment plan document without a full

11    understanding of what was in that document?

12         A.    No.

13         Q.    If you weren't in your office or

14    near your closed circuit television, how would

15    you determine what was in the documentation

16    that you were signing?

17         A.    Through the discussion of the team

18    and from previous completion of my portion of

19    the treatment plan.

20         Q.    Did Kathy and Deb convey concerns

21    about your ability to complete assessments on

22    patients and how they were progressing through

23    therapy?

24         A.    I believe that was one of their

25    concerns.

Page 78

1          Q.     When they conveyed that concern,
2     how did you react?  What did you say?
3          A.     Again, I was surprised.  It's never
4     been brought to my attention that there were
5     any issues about my assessments.
6          Q.     Did they express their concern that
7     with a younger patient population and higher
8     levels of acuity, the inability to see facial
9     expressions and determine kind of mood through
10    expression was something that they had concerns
11    about?
12         A.     That was their concern, yes.
13         Q.     That's not something that you were
14    concerned about?
15         A.     No.
16         Q.     How would you complete assessments,
17    both initially and as therapy continued, to
18    determine the person's emotional response to
19    the therapy?
20         A.     Generally, the initial assessment
21    was completed either bedside or at a table, and
22    then other information may have been gathered
23    through participation in group.  Again,
24    information from the treatment team, the chart.
25         Q.     In your group therapy sessions,

Page 79

1    would you be able to tell whether a patient is,

2    for example, smiling or looking upset if they

3    weren't speaking?

4          A.    Yes.

5          Q.    How?

6          A.    Again, it just depends on what the

7    activity was and their level of participation,

8    and if I wasn't sure, then I would ask the

9    nurse that was present in the room if she

10   agreed with my observation.

11         Q.    What if there was not a nurse

12   present?

13         A.    Then I just based it on what I

14   observed and how they participated.

15         Q.    There wasn't always a nurse

16   present, correct?

17         A.    Intermittently there was not.

18         Q.    So if there was no nurse present

19   and the patient wasn't responding verbally,

20   would you be able to tell, for example, whether

21   they were experiencing an active hallucination?

22         A.    I believe so.

23         Q.    How would you do that?

24         A.    Again, through how they are

25   participating, reacting.

1    Q.    So when you say how they are

2  reacting, how would you assess how they are

3  reacting?

4    A.    If they are restless, fidgety,

5  calm, in a daze, asleep.

6    Q.    How do you differentiate, for

7  example, whether someone is in a daze or asleep

8  or experiencing some type of hallucination?

9    A.    Probably through my verbal cues to

10  them, and, again, maybe a pat on the shoulder

11  or the knee.

12    Q.    So if you give a verbal cue to a

13  patient and they don't respond to it, are you

14  able to assess that patient's reaction or

15  emotions at that time?

16    A.    Yes.

17    Q.    You would do that through what

18  technique?

19    A.    Just noting that they were a

20  passive participant and not actively engaging.

21    Q.    So how do you determine what the

22  cause of their non-participation is in that

23  situation?

24    A.    Observation, lack of interaction

25  physically if they are non-verbal.

1          Q.     Right.  So if they are non-verbal

2     or they are choosing not to respond to your

3     verbal cues, how is their emotional state

4     determined?  How would you make that

5     determination?

6          A.     Again, through my observation of

7     what they are doing at that time.

8          Q.     So their movements or lack thereof?

9          A.     Right.

10         Q.     If someone is not moving, you would

11    agree that they could still be experiencing a

12    number of different reactions to the therapy,

13    right?

14         A.     Possibly, yes.

15         Q.     If they are not moving and not

16    responding, what methods would you use to

17    determine their response to the therapy or

18    their current emotional state?

19         A.     Well, again, just trying to get

20    them to engage, and, like I said, physical

21    touch.

22         Q.     Was one of the concerns that was

23    raised in that February meeting that you were

24    unable to respond to patients' needs in group

25    therapy?

1          A.     That's what Kathy Holley said.

2          Q.     Was there ever a time that you were

3      unable to respond to a patient's needs?

4          A.     I don't believe so.

5          Q.     I think you said earlier other

6      patients assisting each other is sometimes part

7      of the therapeutic process?

8          A.     Yes.

9          Q.     Is that something that is always

10     encouraged or something that you determined

11     based on each group of patients and how they

12     are individually performing or their diagnosis

13     or whatever their individual characteristics

14     are?

15         A.     Right.  I mean, it's the dynamic of

16     the group, you know, and some people are

17     wanting to be more helpful and assist, and

18     sometimes those people need redirection as

19     well.

20         Q.     Are there times where you make a

21     choice that patients should not be interacting

22     with one another during the therapy?

23         A.     Correct.  Yeah.  Depending on the

24     activity, right.

25         Q.     Has there ever been a time where

1   you were unable to identify unwanted patient

2   interactions?

3          A.    No.

4          Q.    If patients are, for example,

5   reaching over and taking items from one

6   another, is that something that you'd be able

7   to recognize?

8          A.    Possibly.

9          Q.    Is it possible that you would not

10  recognize it?

11         A.    Again, it could depend on the whole

12  situation, what's going on.

13         Q.    Certainly, it's possible, right?

14  There is the possibility that someone could be,

15  for example, taking items from another person,

16  and you wouldn't see it, right?

17         A.    Correct.

18         Q.    Was one of the concerns that Kathy

19  and Deb raised with you that other staff was

20  worried or would not be willing to leave you

21  alone in group therapy because of their

22  concerns for your or the patient's safety?

23         A.    It was brought up, yes.

24         Q.    Was that something that you ever

25  discussed with any other staff members?

1          A.     Nope.

2          Q.     No one other than Kathy and Deb in

3     this meeting ever expressed concern for you or

4     about your safety or the patients' safety in

5     the group therapy room?

6          A.     Right.  No, I just thought we

7     worked well as a team.

8          Q.     Did you believe that concern was

9     unfounded as well?

10         A.     Yes.

11         Q.     Were there times that you would be

12    in the group therapy room by yourself?

13         A.     Yes.

14         Q.     And you would be leading the

15    therapy and assessing the patients and

16    evaluating them on how they were doing?

17         A.     Right.

18         Q.     So another concern raised I think

19    was a physical walking into other staff members

20    in hallways; is that right?

21         A.     Correct.

22         Q.     Is that something that had ever

23    happened?

24         A.     A few times.

25         Q.     Was that of concern to you?

1          A.     No.

2          Q.     Did you ever have concern about

3    running into either a patient or someone else

4    in the group therapy room that could put you in

5    an unsafe situation?

6          A.     No.

7          Q.     I guess tell me.  You said it

8    happened a couple of times.  Describe for me

9    the incidents which you can recall which were

10   you walking into other people or other staff in

11   the hallway.

12         A.     I think there was one instance in

13   the group room.  I mean, it's hard to recall.

14         Q.     When it happened did the other

15   staff apologize or converse with you about it?

16         A.     They both said, oops, sorry.

17         Q.     So were there any other concerns

18   that were raised by Deb or Kathy at that

19   February 14th meeting?

20         A.     Not that I can think of.

21         Q.     So they raised these concerns with

22   you.  I take it during this February 14th

23   meeting you voiced your disagreement with their

24   concerns?

25         A.     I believe I did.

Page 86

1          Q.      What did you tell them?

2          A.      Well, that -- I mean, I just

3     followed their -- what they were telling me to

4     do.

5          Q.      Did you then go to EAP, employee

6     assistance, the following day?

7          A.      Yes.

8          Q.      Was it your understanding the

9     reason you were sent there was because there

10    was a concern about patient and personnel

11    safety and your ability to perform the

12    essential duties of your job?

13         A.      That's what they said.

14         Q.      Were there any other reasons that

15    they provided you other than that on why you

16    were being referred to the fitness for duty

17    evaluation?

18         A.      I don't think so.

19         Q.      Is there anything else that you can

20    recall about that February conversation with

21    Deb and Kathy that we haven't already talked

22    about?

23         A.      No.

24         Q.      Did you acknowledge in that meeting

25    that their concerns about patient safety were

Page 87

1    valid?

2         A.    I may have agreed that patient

3    safety is important.

4         Q.    Did you tell Deb and Kathy that you

5    understood why they were concerned?

6         A.    Sure.  Yes.

7         Q.    Why would you make that statement?

8         A.    Well, I mean, I can see how a

9    person not being in my shoes can have concerns.

10        Q.    What do you mean by that?

11        A.    Well, if they are aware that I have

12   visual limitations, I can see how their

13   concerns are that I wouldn't be able to do the

14   job, but they don't realize the extent to what

15   I can and cannot see.

16              MR. BULEA:  Let's take a brief

17   break.

18              MS. WHITE:  Would this be a good

19   point to take a lunch break?  It's 12:30.

20              MR. BULEA:  Yes.  Sure.

21              (Luncheon recess taken.)

22                    - - - - -

23

24

25

1                    AFTERNOON SESSION

2        CONTINUED EXAMINATION OF DEBORAH A. MOSS

3    BY MR. BULEA:

4        Q.    Before the lunch break, we had just

5    talked about the meeting you had with Deb

6    Sheldon and Kathy Holley that resulted in your

7    referral to the EAP department for a fit for

8    duty process.

9              So is it your understanding that as

10   a result of that meeting and the concerns that

11   Kathy and Deb expressed in that meeting that

12   you received what's called a mandatory referral

13   to a fit for duty process?

14       A.    Right.  Yes.

15       Q.    Then you went the following day,

16   February 15th, to the EAP department to start

17   that process?

18       A.    Correct.

19       Q.    Who did you meet there?

20       A.    Georgene Kohlbacher.

21       Q.    How long did that meeting last?

22       A.    Well, I met with her initially, and

23   we just kind of socialized before Karen Farley,

24   the nurse, was ready to meet, but the overall

25   meeting probably close to two hours I would

Page 89

1    think.
2         Q.    As part of that meeting, were you
3    required to complete some intake forms and
4    questionnaires?
5         A.    Yes.
6         Q.    Did you have any difficulty
7    completing those?
8         A.    No.  They read them and wrote their
9    answers in.
10         Q.    What did Georgene and Karen Farley
11    explain to you about the process?
12         A.    Goodness.  Well, Georgene explained
13    her role as, you know, gathering information
14    and kind of, I believe, as an employee
15    advocate, I could be wrong, like the liaison,
16    and, you know, that she would be the contact
17    person for information if I had any questions,
18    and then Karen Farley was the RN that gathered
19    her medical piece.
20         Q.    Did they advise you what you would
21    need to do in order to return to work or what
22    needed to happen, I should say, before you
23    could return to work?
24         A.    Yes, the completion of paperwork by
25    physicians, which they did not give me any.

Page 90

1    Apparently, it was sent directly to those

2    doctors.

3          Q.    What doctors?  Where were they sent

4    at least to your knowledge?

5          A.    Initially, it was to be my general

6    physician that I had just seen within I think

7    the last couple weeks of that visit, and then

8    my eye doctor, Dr. Traboulsi.

9          Q.    So was it explained to you that in

10   order to have you return to work your doctors

11   would have to complete forms or advise in

12   writing to UH that they felt you could return

13   to work and perform the essential functions of

14   your job either with or without accommodations?

15         A.    Yes.

16         Q.    Your doctors, you said initially

17   they asked for information from a primary care

18   doctor?

19         A.    Right.

20         Q.    That would be Dr. Bures; is that

21   right?

22         A.    Yes.

23         Q.    And Dr. Traboulsi?

24         A.    Correct.

25         Q.    Did you also undergo a drug and

Page 91

1    alcohol screen?

2          A.    Yes.

3          Q.    Did you ask any questions about why

4    that was necessary?

5          A.    I believe so, or just like, really?

6          Q.    What was the response that you got?

7          A.    It was just part of the testing.

8          Q.    What did that entail from your end?

9    What did you have to do to complete that drug

10   and alcohol screening?

11         A.    A urine sample.

12         Q.    Was that done that day?

13         A.    Yes.

14         Q.    In the EAP facility?

15         A.    Yes.

16         Q.    Did you have to complete some forms

17   associated with that?

18         A.    Specifically to the drug test?

19         Q.    Yes.

20         A.    There may have been questions.

21         Q.    Did you have any difficulty

22   completing those or further accommodations that

23   you would have needed to complete those?

24         A.    No.  Again, they just read them

25   off, which I'm assuming they would probably do

Page 92

1    with anybody else.

2          Q.    Good.  Did EAP or Karen Farley or

3    anyone else from UH provide you with any

4    documents that day?

5          A.    They may have.  I'm guessing they

6    probably did.

7          Q.    Do you know what those documents

8    were?

9          A.    Part of it could be just the

10   general policy of the process itself.  I don't

11   think there was anything that I needed to

12   complete to fill out to return.

13         Q.    Did you contact your doctors,

14   Dr. Bures or Dr. Traboulsi, about the fit for

15   duty process?

16         A.    Right away.

17         Q.    What did you tell them?  I guess

18   that's not a real fair question.  Let's start

19   with Dr. Bures.  What did you tell Dr. Bures?

20         A.    I scheduled that appointment and

21   went in, and he's like, What are you here for?

22   I'm like, Well, I was put on mandatory medical

23   leave, and apparently there is some papers you

24   need to fill out.  He told me that he had done

25   everything, and I think I got a bill for like

Page 93

1    $95, and that was it.  So it was like very

2    minimal.

3         Q.    Dr. Bures returned you to work

4    without any restrictions?

5         A.    Yes.

6         Q.    How about Dr. Traboulsi, what was

7    the discussion you had with him?

8         A.    It was a phone call, and he was not

9    under my insurance, so that was an issue as to

10   how that would be covered.  Again, I don't

11   recall when I had last -- let's see.  I would

12   have last have seen him right before I went on

13   UH's insurance, so either like December of '14

14   or December of '15.  Prior to that I would have

15   seen him within those years.

16             So I think he may have already had

17   the paperwork, I'm not sure, but he referred me

18   to the Cleveland Sight Center and said they

19   would be a better judge.

20        Q.    Okay.  Did you go to the Cleveland

21   Sight Center?

22        A.    Yes.

23        Q.    Who did you see there?

24        A.    Dr. Balciunas.

25        Q.    Was that the first time you had

1  seen Dr. Balciunas?

2      A.    No.

3      Q.    When were the previous times?

4      A.    Offhand I don't recall.  Certainly

5  not on an annual basis, so maybe three to five

6  years if that.

7      Q.    So sometime between the 2012 to

8  2014 time frame would have been the time

9  previous to this 2017 visit?

10     A.    Possibly.  They would have their

11 records.

12     Q.    What would have been the purpose

13 for the prior visit to Dr. Balciunas?

14     A.    Probably just to go over if there

15 were any new devices to utilize with the job or

16 at home.

17     Q.    Was Dr. Balciunas ever a treating

18 physician of yours?

19     A.    No.

20     Q.    So you were just there for --

21     A.    It's their low vision clinic.

22     Q.    So for vocational assessments?

23     A.    More or less, yes.

24     Q.    When did see Dr. Balciunas in 2017

25 as part of the fit for duty process?

Page 95

1          A.     I believe it was April.

2          Q.     What happened at that meeting or

3     visit, I should say?

4          A.     She did an eye exam, I believe, and

5     then obviously discussed the job duties in

6     detail, went over the essential job functions.

7     She may have had some adaptive devices that we

8     tried out to see if they could be helpful for

9     different situations.

10          Q.     Did you report to Dr. Balciunas

11     that you had difficulty seeing patient facial

12     expressions?

13          A.     I may have.

14          Q.     Did you report that sometimes

15     you're not aware if a patient is getting out of

16     their seat to Dr. Balciunas?

17          A.     I may have.

18          Q.     Did you report that sometimes you

19     had difficulty identifying whether individuals

20     were leaving or entering the room?

21          A.     Possibly.

22          Q.     Were those all things that are true

23     that you sometimes have difficulty with?

24          A.     At times.  Again, it depends on the

25     situation.

Page 96

1          Q.    Did Dr. Balciunas complete the

2     return to work paperwork from UH that was part

3     of the fit for duty process?

4          A.    I believe so.

5          Q.    Were you aware that Dr. Balciunas

6     in those forms indicated that you were unable

7     to perform some of the functions of your job

8     due to your vision impairment?

9          A.    I think there were a few notes.

10         Q.    So is that a yes, you were aware of

11    that, or is that news to you?

12         A.    Yes, that there maybe would be

13    limitations with some of the job functions.

14              MR. BULEA:  We can go off for a

15    second.

16              (Discussion off record.)

17                    -  -  -  -  -

18              (Thereupon, Deposition Exhibit 29, a

19              Document Bates Labeled UH-MOSS 1361

20              through 1362, was marked for

21              purposes of identification.)

22                    -  -  -  -  -

23         Q.    I'm putting in front of you,

24    Debbie, what's been marked as Defendant's

25    Exhibit 29, and we just had a discussion off

1    the record, but certainly I want to give your

2    counsel a chance to weigh in.  I'll represent

3    to you that this is the UH return to work form

4    that Dr. Balciunas completed after her visit

5    with you and returned to UH, and I have a

6    couple of questions about it.

7              Dr. Balciunas indicated, and I'll

8    read this in the middle of the page.  I'm going

9    to read it out loud.  The question is, "Is the

10   employee unable to perform any of his/her job

11   functions due to the condition?"  Dr. Balciunas

12   put a checkmark next to yes.

13             The form continues, "If so,

14   identify the job functions the employee is

15   unable to perform," after which Dr. Balciunas

16   hand wrote, "Facial recognition and

17   expressions, signing treatment plans when not

18   near CCTV, seeing in poor contrast

19   environments, may not always have visual

20   awareness of everything going on in a room,

21   uses other cues to gather information."

22             MR. BULEA:  Do you want to confirm,

23   Emily, that's read correctly?

24             MS. WHITE:  There is just a lot of

25   other information on the page, so I'd just like

1    to note at the bottom of the page, it's not

2    clear which question this is attached to, it

3    says, "With appropriate adaptations including

4    access to Topaz CCTV, her specialized glasses,

5    plus Zoom Text talking software, Ms. Moss may

6    be able to continue working part time with

7    support from other staff members when needed.

8    All of the employment related variables and

9    necessary factors cannot be determined/fully

10   assessed.  By my assessment visual acuity is

11   severely reduced, but Ms. Moss has been working

12   with this condition for many years in her

13   current capacity."

14        Q.    Okay.  As I read and then your

15   counsel finished, is that consistent with your

16   recollection of the discussion you had with

17   Dr. Balciunas as part of the fit for duty

18   process?

19        A.    Yes.

20        Q.    To the best of your knowledge, is

21   that the information that Dr. Balciunas

22   forwarded on to UH as part of the fit for duty

23   process?

24        A.    I believe so.

25        Q.    Would you disagree with any of the

1    statements that Dr. Balciunas made which we

2    just read to you?

3         A.    No.

4         Q.    After your visit with

5    Dr. Balciunas, did you have further discussion

6    with anyone from the Cleveland Sight Center?

7         A.    She referred me to the occupational

8    therapist and thought that would be a good

9    source for further assistance in the workplace.

10        Q.    Okay.  Was the reason for that, as

11   indicated on this form that we just read, that

12   Dr. Balciunas was of the opinion that she

13   couldn't complete a full assessment of your

14   ability to perform the job functions?

15        A.    I would agree.

16        Q.    If we just go to the second page of

17   Exhibit 29, I'll give your counsel a chance to

18   see whether or not this is read accurately.

19             In the middle of that second page

20   of Exhibit 29, there is a question that says,

21   "Will the condition intermittently prevent the

22   employee from performing some or all of his/her

23   essential job functions?"  Then there is a

24   space for checking yes or no, neither of which

25   are checked.

```
                                        Page 100
 1              Instead Dr. Balciunas hand wrote,
 2      "As noted certain job functions are challenging
 3      due to loss of central vision such as facial
 4      recognition and expressions interpretation."
 5              MR. BULEA:  I just want to make
 6      sure, Emily, that I read that correctly.
 7              MS. WHITE:  Sure.  Just to note
 8      that there is another line that says, "I am
 9      unable to complete this portion in the manner
10      requested by Dr. Balciunas."
11              MR. BULEA:  Okay.
12          Q.    Again, the question for you,
13      Debbie, would be is that consistent with your
14      recollection of the meeting and discussion you
15      had with Dr. Balciunas as part of the fit for
16      duty process?
17          A.    Yes.
18          Q.    Again, do you have any disagreement
19      with that comment or statements by
20      Dr. Balciunas?
21          A.    No.
22          Q.    I'm sorry?
23          A.    No.
24          Q.    Did you discuss with anyone from UH
25      your visit with Dr. Balciunas?
```

Page 101

1          A.    Such as.

2          Q.    Georgene Kohlbacher or Deb Sheldon

3    or Karen Farley or anyone else from the EAP

4    department.

5          A.    Possibly through phone calls to say

6    that I've made the appointments.

7          Q.    Was it your expectation that

8    Dr. Balciunas would be providing the comments

9    and the form directly to UH?

10         A.    Yes.

11         Q.    You had provided authorization for

12   Dr. Balciunas to do that?

13         A.    Yes.

14         Q.    After seeing Dr. Balciunas, you

15   said you were referred to an occupational

16   therapist at the Sight Center; is that right?

17         A.    Yes.

18         Q.    Is that Erin St. Denis?

19         A.    Yes.

20         Q.    Did you meet with Erin?

21         A.    Yes.

22         Q.    What was the purpose of that

23   meeting?

24         A.    To go over ways in which I would be

25   able to perform my essential job functions,

Page 102

1    different techniques to try out.

2         Q.    Where did you meet with Erin?

3         A.    At the Sight Center.

4         Q.    How long was that meeting?

5         A.    Probably about two hours.

6         Q.    Were you able to answer all the

7    questions Erin had about your job and the

8    duties you were charged with performing?

9         A.    Yes.

10        Q.    Was there any information that Erin

11   requested from you that you weren't able to

12   provide?

13        A.    No.

14        Q.    Did you report to Erin that there

15   had been changes in the population served at

16   the geriatric psych center?

17        A.    It may have come up in

18   conversation.

19        Q.    What did you tell her about the

20   change in population?

21        A.    Offhand I would guess that it was

22   younger, more psychiatric diagnoses.

23        Q.    What do you mean by more

24   psychiatric diagnoses for somebody who is not

25   in the field?

Page 103

1        A.     Right.   Probably more psychosis
2    which includes hallucinations.
3        Q.     Were there any other ways that you
4    would have conveyed to Erin the change in
5    population?
6        A.     I don't think so.
7        Q.     Is this the first time you saw Erin
8    St. Denis?
9        A.     Yes.
10        Q.     In her report, which we certainly
11    don't need to read the whole thing, but which
12    I'm going to mark so it's attached to the
13    transcript as Defendant's Exhibit 30.
14                   -  -  -  -  -
15              (Thereupon, Deposition Exhibit 30, a
16              Document Bates Labeled Moss
17              Production 000262 through 000264,
18              was marked for purposes of
19              identification.)
20                   -  -  -  -  -
21        Q.     She noted that while you were
22    previously assessed and accommodation
23    recommendations were made, there are some
24    continued concerns.  Do you know what previous
25    assessment and accommodation recommendations

Page 104

1    Erin is referencing in that statement?

2         A.    I would only presume Dr. Balciunas'

3    report.

4         Q.    Okay.  You had mentioned earlier in

5    your testimony that you and Erin discussed some

6    techniques that could be used or implemented to

7    assist you in performing your job functions.

8    What techniques were those?

9         A.    Well, a lot of the issues that she

10   brought up were a surprise to me, but I would

11   start with I guess an iPad for some

12   documentation, whiteboards that were not in

13   use, gridding off those for scheduling.  We had

14   used those back in the Parma days, and

15   apparently they were looking to doing that in

16   the future.

17        Q.    Okay.

18        A.    What else?  A tool for being able

19   to sign treatment plans.

20        Q.    Did you discuss with Erin St. Denis

21   and go through with her some exercises using

22   the closed circuit television, the Topaz unit?

23        A.    I think so.

24        Q.    Well, not the Topaz, but the closed

25   circuit television was something that you had

Page 105

1    been using since the start of your employment,

2    correct?

3              A.    Correct.

4              Q.    Did you discuss with Erin St. Denis

5    the Zoom Text software in conjunction with a

6    larger monitor and adaptive keyboard that was

7    present at your workstation at UH?

8              A.    Yes.

9              Q.    Jumping back to the CCTV, the Topaz

10   model that you were looking to upgrade to, did

11   anyone at UH ever tell you that that was going

12   to be an issue or problem to provide to you?

13             A.    No.

14             Q.    I understand the Zoom Tech software

15   was having some compatibility issues with some

16   of the UH systems; is that right?

17             A.    Yes.

18             Q.    Did anyone from UH ever indicate to

19   you that that would be an issue or a problem to

20   have fixed through the IT department or

21   otherwise?

22             A.    No.

23             Q.    According to Erin St. Denis'

24   report, you and her also discussed copiers at

25   the workplace at UH having a flat touch screen

1    making them difficult for you to use; is that

2    right?

3          A.    Correct.  They were just in the

4    process of making everything uniform, so we got

5    a new copier, and it had a flat screen.

6          Q.    Did you have to use the copier as

7    part of your job?

8          A.    Yes.

9          Q.    From the time that this copier was

10   in place until you went out for the fit for

11   duty, were you able to make copies by asking

12   others for assistance or in some other ways?

13         A.    Correct.  Yes.

14         Q.    Is that how you did it?

15         A.    Yes.  I'd have to ask somebody for

16   help.

17         Q.    Did anyone at UH ever convey to you

18   that providing bump dots on the copier would be

19   an issue or that they wouldn't be provided?

20         A.    Again, I think it was just one of

21   those things that like just came up in the

22   conversation that it was a concern, so I don't

23   know that it ever went beyond what can we do to

24   fix it.

25         Q.    Certainly, no one said they are not

1    willing to work with you or provide some kind

2    of solution so you'd be able to access the

3    copier?

4         A.    There was no -- I would say no

5    response.

6         Q.    Who did you talk with at UH about

7    the modifications you'd like made to the flat

8    screen copier?

9         A.    I probably mentioned it to Jeri

10   Novicky, the secretary on the unit.

11        Q.    What did she say?

12        A.    Offhand I don't know.  I just -- I

13   remember at one point I needed something taken

14   care of, and she said to basically do it

15   myself, and I said, Well, I can't read the

16   screen to do it.

17        Q.    Did she respond to your statement?

18        A.    I don't think so.

19        Q.    Were you able to get what you

20   needed done that day?

21        A.    Yes.

22        Q.    Completed?

23        A.    Yes.

24        Q.    Did you speak with anyone other

25   than her about the copier at UH?

1          A.    Again, I would say no because it

2     was just everything coming up at one time and

3     within a short time frame.

4          Q.    Did you and Erin St. Denis discuss

5     the fact that you had other coworkers reading

6     emails for you at work?

7          A.    Yes.

8          Q.    Did anyone at UH ever indicate to

9     you that that was a problem or something that

10    wouldn't be permitted to continue?

11         A.    No.

12         Q.    Erin mentions in here that one of

13    the things that could be beneficial is a

14    typoscope; is that right?

15         A.    I believe, yes.

16         Q.    Can you tell me what that is?

17         A.    I don't know.  I don't recall

18    offhand.

19              MS. WHITE:  For the record, it says

20    typoscope/signature guide.

21         A.    So a signature guide, I know what

22    that is.

23         Q.    What is that?

24         A.    It's generally they can come

25    probably in different forms, but basically it's

Page 109

1    a credit card size with a cutout for where you

2    could place your signature, and you would just

3    line it up on the line where you need to sign.

4         Q.    Prior to this meeting with Erin St.

5    Denis, was that something you had ever

6    discussed or asked for from anyone at UH?

7         A.    No.

8         Q.    Did anyone at UH ever indicate that

9    that wouldn't be provided had you returned to

10   work?

11        A.    No.

12        Q.    I think we talked about the

13   whiteboard being something that was mentioned

14   as possibly being used in the future?

15        A.    Right, and I had used it in the

16   past with no issues.

17        Q.    I think Erin suggested the use of

18   contrasting electrical tape to grid off the

19   whiteboard as a technique?

20        A.    That's how it already was, yes.

21        Q.    Again, no one from UH ever

22   discussed any problem or issues with that setup

23   with you, correct?

24        A.    Again, no, I wasn't aware that was

25   their plans until the evaluation.

1        Q.    Did you and Erin St. Denis discuss
2    the I guess several occasions in which you had
3    bumped into staff on the unit?
4        A.    That's a question?
5        Q.    Yes.  Did you and Erin St. Denis
6    discuss that?
7        A.    Yes.
8        Q.    Did you report to Erin that that
9    was a mild concern of yours?
10        A.    Yes.
11        Q.    Do you recall any suggestions or
12    techniques that Erin would have discussed with
13    you or recommended to address that concern of
14    yours?
15        A.    Offhand I don't recall, but she
16    probably did.  She had quite a lengthy report
17    with suggestions.
18        Q.    Was one of the suggestions verbal
19    cues from staff?
20        A.    Yes.
21        Q.    That was also her suggestion in
22    regard to entering patient rooms if there is
23    something else going on in that room that you
24    need to be aware of, correct?
25        A.    Right.

1    Q.    Did anyone at UH indicate that

2    providing those types of verbal cues would be

3    an issue or a problem?

4    A.    I would say that all these

5    solutions were done while I was on leave, and I

6    was never given the opportunity to return to

7    work to implement them.

8    Q.    Is that something you were already

9    taking advantage of, the verbal cues from

10   staff?

11   A.    Oh, definitely.

12   Q.    No one ever said don't ask for

13   those or don't provide them to Debbie or

14   anything like that, right?

15   A.    No.

16   Q.    Did you and Erin discuss the crisis

17   intervention training that was required by UH?

18   A.    Yes.

19   Q.    Can you tell me what that

20   discussion consisted of?

21   A.    Again, it was either her or

22   Dr. Balciunas that brought it up of being a

23   concern of UH.  Again, it was a total surprise

24   to me because I thought I had no issues with

25   performing the tasks and was very surprised

1    when they came back saying I was unable to

2    participate which was totally false.

3         Q.    Did Kathy or Deb mention to you

4    that their concern centered around your ability

5    to respond to an actual crisis should it happen

6    on the unit in real life as opposed to the

7    training?

8         A.    Repeat that again, please.

9         Q.    Sure.  Did Kathy or Deb ever

10   express to you that their concern was your

11   ability to respond to an actual crisis should

12   it happen as opposed to completing the

13   training?

14        A.    They had concerns that a potential

15   situation could arise and that I would not be

16   able to react.

17        Q.    Was there any discussion between

18   you and Erin about how to address that

19   situation or whether there was any recommended

20   techniques to help you respond in that

21   situation?

22        A.    I'm guessing there probably was.

23        Q.    I'm just asking if you can recall

24   what that was.

25        A.    Yeah, off the top of my head, I

Page 113

1    don't remember.

2         Q.    She says here, Erin that is, having

3    materials ahead of time for review and

4    partnering with a staff member or trainer who

5    is aware of the need for verbal and touch

6    prompts to motor Ms. Moss through any physical

7    components would be beneficial, and that would

8    have to do with the training, correct?

9         A.    Correct.

10        Q.    I don't see anything in the report

11   about an actual crisis, and I'm just wondering

12   if you have any recollection of discussing what

13   may or could be done in an actual crisis.

14        A.    Well, utilizing those techniques

15   that I've learned, and if there is a crisis,

16   there is other team members there.  You know,

17   the nurses take lead and charge and give

18   direction as to what they need done.  There

19   have been plenty of situations where we've had

20   patients get agitated, and we have needed to

21   what we call table them and get them into a

22   reclining chair and up against the table where

23   I've assisted.

24        Q.    Erin St. Denis also noted that, "It

25   was reported that Ms. Moss has difficulty

1    noticing when patients get up from their seats,

2    need assistance, i.e., during bingo, or reading

3    patients' facial expressions."

4              Is that what you reported to her,

5    or is that someone else's report?

6         A.    That sounds like the report from

7    Kathy Holley.

8         Q.    Would you disagree that you would

9    sometimes have difficulty noticing when

10   patients get up from their seats?

11        A.    Again, it would depend on the

12   situation, how far away they are.

13        Q.    So how far away would they need to

14   be for you to have difficulty seeing them get

15   up out of their seats?

16        A.    It's just a guesstimate; 10,

17   15 feet.

18        Q.    So inside of 10, 15 feet you'd be

19   able to see it?

20        A.    I would think so.

21        Q.    You would think.  I mean, judging

22   by that answer, are you uncertain, or are you

23   able to say whether or not with certainty you

24   would be able to?

25        A.    I mean, I would think I would be

1    able to.  Again, it's the situation.  I mean,

2    like Kerin just got up.  The environment makes

3    a big difference.

4          Q.    Okay.  In her report Erin noted

5    that you use auditory compensation strategies

6    to listen for tone of voice or responsiveness

7    when you're initiating a question or

8    interaction.  Is that accurate?

9          A.    Yes.

10         Q.    Can you give me an example of how

11   you would use auditory compensation strategies?

12         A.    Again, just, you know, listening

13   for the tone of voice.  I can generally tell

14   when somebody is starting to escalate.  Their

15   speech can become more rapid.  They can be more

16   repetitive.  They can be asking for help.

17         Q.    Are there ever times where auditory

18   compensation strategies could not be used or

19   that you wouldn't be able to use those in your

20   daily activities?

21         A.    Not that I can think of.

22         Q.    What about patients on mood control

23   medication, for example, who are sedated?

24         A.    Well, if they are that sedated,

25   they are probably in bed.

Page 116

1      Q.    How about in determining a
2  patient's affect?
3      A.    Again, just, you know, being closer
4  to them, watching how they are partaking in the
5  activity.
6      Q.    How would you confirm that the
7  patients who are speaking to you are accurately
8  relaying what their experience is?
9      A.    Well, I can only assume if they are
10  saying that's what they are feeling that that's
11  what the case is, and it would probably be
12  based on previous group participation, just
13  historically their behavior and if it's totally
14  out of the norm or typical.
15      Q.    Erin St. Denis also notes in her
16  report that you would ask other staff/nurses
17  for feedback regarding patient behavior or
18  affect.  Otherwise, Ms. Moss is unable to see
19  faces or expressions.  Is that correct?
20      A.    At times I would ask nursing to
21  verify.  I would offer what I felt was going on
22  and see if they validated that, but there is
23  not ever a case where I can't see anything at
24  all, I mean.
25      Q.    The report from Erin St. Denis then

1    concludes with a set of ten recommendations.

2    Are you aware of whether or not those were

3    discussed with UH as part of the EAP process?

4         A.    I would presume they were

5    discussed, but, again, I was never given the

6    opportunity to go back to work to utilize them.

7         Q.    Well, you knew that Erin St. Denis'

8    report was going to be provided to the EAP --

9         A.    Right.

10        Q.    -- counselor at UH, correct?

11        A.    Right.

12        Q.    Again, you had authorized release

13   of all that information, right?

14        A.    Correct.

15        Q.    Do you know Allison Evans?

16        A.    I do not.

17        Q.    You never met her?

18        A.    Never.

19        Q.    Do you know what her job at UH is?

20        A.    Only from Deb Sheldon's deposition,

21   that she's the occupational therapy supervisor,

22   I guess.

23        Q.    During the EAP process, were you

24   aware that Allison Evans was going to be

25   completing a functional capacity assessment of

Page 118

1    your work environment?

2          A.    I was not aware.

3          Q.    As we sit here today, you're aware

4    that Allison Evans did submit some findings and

5    conclusions to the EAP counselor, Georgene

6    Kohlbacher, in regard to your fit for duty

7    process, correct?

8          A.    Yes.

9                MS. WHITE:  Can we go off the

10    record for just a second?

11                MR. BULEA:  Sure.

12                (Discussion off record.)

13                    -  -  -  -  -

14                (Thereupon, Deposition Exhibit 31,

15                an Email Bates Labeled UH-MOSS 1392,

16                was marked for purposes of

17                identification.)

18                    -  -  -  -  -

19          Q.    I just want to state for the

20    record, I guess I'll just ask, that you had the

21    chance to listen to your counsel read you what

22    has now been marked as Exhibit 31 which is an

23    assessment that Allison Evans completed as part

24    of a fit for duty process, correct?

25          A.    Correct.

1      Q.    Would you agree with Allison's

2    conclusion that the geriatric psych unit is a

3    dynamic environment?

4      A.    It is, yes.

5      Q.    It's continuously changing day to

6    day with new patients, right?

7      A.    It can.

8      Q.    Patients themselves also have

9    differing behavior in and of themselves,

10   correct?

11     A.    They can, yes.

12     Q.    That can be from day to day or even

13   maybe within group sessions, right?

14     A.    Yes.

15     Q.    Would you agree that your job as a

16   rehabilitation therapist requires excellent

17   situational awareness as Allison concluded?

18     A.    Yes.

19     Q.    Do you agree that you have to

20   determine the affect of multiple patients at

21   once as part of a group therapy session?

22     A.    That you have to be able to be

23   aware of each patient, yes.

24     Q.    And perceive and report on how each

25   individual patient is responding and behaving

Page 120

1    in the therapy, correct?

2          A.    Yes.

3          Q.    I think you and your counsel were

4    discussing that the groups can be up to 14

5    patients at a time, correct?

6          A.    Correct.

7          Q.    Do you agree with Allison that you

8    have to be able to respond to patients

9    experiencing internal stimuli?

10         A.    Yes.

11         Q.    Do you agree that you would have to

12   assess and respond to patients even if they had

13   communication or behavioral issues that could

14   pose a safety risk or threat?

15         A.    Yes.

16         Q.    Do you agree with Allison's

17   conclusion that it's necessary to track patient

18   movements and interactions with one another?

19         A.    Right.  It's important to be aware

20   of what they are doing.

21         Q.    Her ultimate conclusion is that

22   there is little that can be done to accommodate

23   for the variability of a psychiatric patient

24   population for someone with such significant

25   vision deficits.  Do you agree with that?

Page 121

1          A.     Not necessarily.

2          Q.     Why not?

3          A.     Because I believe that there are

4    reasonable accommodations.

5          Q.     Such as?

6          A.     Again, another staff person

7    present, you know, still being able to pick up

8    on different behaviors, different signs that

9    the patients are showing.

10         Q.     Through means other than visually,

11   you mean?

12         A.     Correct.

13         Q.     Did you as part of the fit for duty

14   process ultimately end up meeting with

15   Dr. Traboulsi?

16         A.     I do not believe so.

17         Q.     Are you aware that he submitted a

18   report to UH as part of the EAP process?

19         A.     Yes.

20         Q.     Again, that would have been

21   something that you authorized disclosure of to

22   UH?

23         A.     Correct.

24                       -   -   -   -   -

25                 (Thereupon, Deposition Exhibit 32, a

1              Document Bates Labeled Moss

2              Production 000265, was marked for

3              purposes of identification.)

4                  -   -   -   -   -

5              MS. WHITE:  Do you want me to take

6     a minute and read this one, too, this letter?

7              MR. BULEA:  We can do that, too,

8     certainly.  It's not long at all.

9              (Discussion off record.)

10         Q.    Ms. Moss, Debbie, did you have the

11    opportunity just now to hear the report of

12    Dr. Traboulsi as your counsel just read which

13    is marked as Exhibit 32?

14         A.    Yes.

15         Q.    As you heard, one of the things

16    that Dr. Traboulsi noted is that your ability

17    to see details and small targets from a

18    distance and even near is -- strike that.  Let

19    me start over.

20              Dr. Traboulsi noted that you've

21    lost your central vision that provides you with

22    the ability to see details and small targets

23    from a distance and even near.  Do you agree

24    with his assessment?

25         A.    That can be true, yes.

1          Q.    When you say it can be true, is

2     that a distance kind of issue for you again?

3          A.    Right.  Again, yes, situational.

4          Q.    Dr. Traboulsi also says that you're

5     not able to provide or that he's not able to

6     provide the impact of the poor central vision

7     on your ability to perform your job tasks,

8     correct?

9          A.    I believe.

10         Q.    He also reiterates here that from a

11    distance you would not be able to recognize

12    faces or expressions on faces, correct?

13         A.    In some cases.

14         Q.    And you agree with that?

15         A.    Yes.

16         Q.    He also indicates that his hope is

17    that you would receive appropriate training.

18    Did you hear that?

19         A.    Yes.

20         Q.    Do you know what training he's

21    referring to?

22         A.    I again would be presuming.  It

23    would be up to the professional in that area

24    providing that particular training, but ways

25    again to make things accessible and easy to do.

Page 124

1          Q.    You're aware that this report from

2     Dr. Traboulsi was provided to UH in May,

3     specifically May 23rd of 2017, as part of the

4     EAP process?

5          A.    Yes.

6          Q.    After your meeting with Kathy

7     Holley and Deb Sheldon in February, when was

8     the next time you met with either Deb Sheldon

9     or Kathy Holley to discuss the fit for duty

10    process?

11         A.    I believe it was June 1st.

12         Q.    Between February 15th and June 1st

13    of 2017, did you have discussions with anyone

14    at UH?

15         A.    There were some phone calls.

16         Q.    Who did you have phone calls with?

17         A.    There were some with Deb Sheldon

18    and Kathy Holley, some with Georgene, Kara, and

19    possibly Karen Farley from EAP.

20         Q.    What was discussed on those phone

21    calls?

22         A.    There were various things.  I'm

23    guessing a lot was just follow-up status,

24    questions on some forms and what was going on,

25    just trying to keep up to date and making sure

1    I'm getting everything completed.

2         Q.    At some point in the fit for duty

3    process, did you go to your chiropractor to use

4    the fax machine to provide UH information?

5         A.    Yes.

6         Q.    What's the name of your

7    chiropractor?

8         A.    Tom Ormsby.

9         Q.    Did anyone from UH request from you

10   information from Tom Ormsby?

11        A.    One of the forms in the fit for

12   duty was to evaluate squatting, standing,

13   sitting, and Dr. Traboulsi said he's in no --

14   that's not his area of expertise for him to

15   assess, and it was not done with Paul Bures, so

16   I figured my chiropractor would be the next

17   best person to evaluate that.

18        Q.    That's a discussion you had with

19   Dr. Traboulsi about the squatting, standing,

20   sitting?

21        A.    He said somebody else would need to

22   evaluate that.

23        Q.    Was, if you know, Dr. Traboulsi

24   asking those questions because that information

25   was on a return to work form that UH had

Page 126

1    provided?

2          A.    Right, I believe so, and he said he

3    wasn't qualified to do that.

4          Q.    Did you discuss with Georgene

5    Kohlbacher or anyone else at UH whether they

6    needed that information about squatting,

7    standing, or sitting?

8          A.    No.  It was part of the packet, and

9    I just presumed it had to be completed.

10          Q.    Did anyone from UH ever discuss

11    with you, either before or after Tom Ormsby

12    provided that information, any restrictions or

13    limitations you would have on squatting,

14    standing, or sitting?

15          A.    No.

16          Q.    Did anyone ever ask you questions

17    about that at all?

18          A.    I don't believe so.

19          Q.    What, if anything, did you fax to

20    UH from Tom Ormsby's office?

21          A.    Well, it would be whatever

22    information you have.  Offhand I don't recall.

23    It was probably information that they needed,

24    and that was the easiest way to get it to UH.

25          Q.    So you used Tom Ormsby's fax

1   machine to provide information beyond Tom

2   Ormsby's assessment of your squatting,

3   standing, sitting; is that correct?

4        A.    I'm not sure what else was included

5   in the information he would have faxed over.

6        Q.    While you were on the fit for duty

7   process, were you continuing to be paid?

8        A.    I was on administrative leave, yes.

9        Q.    What was your understanding of

10  administrative leave?  What did that mean?

11       A.    That they would pay me up to

12  30 working days which for me was ten weeks

13  because I only worked three days a week.

14       Q.    Did you continue to receive your

15  regular pay while you were on administrative

16  leave from the initial fit for duty referral in

17  February 2017 through the end of that process

18  in June of 2017?

19       A.    Yes.

20       Q.    There was never a time where you

21  weren't getting paid in that process?

22       A.    I don't believe so.

23       Q.    What benefits were you receiving at

24  the time from UH in February of 2017?

25       A.    There was the medical, the 401(k),

```
                                               Page 128
```

1    the HSA.  Those are the main ones I can think

2    of.

3          Q.    You continued to receive those

4    benefits from the time you were referred to the

5    fitness for duty evaluation until June of 2017;

6    is that right?

7          A.    I believe so.

8          Q.    I think you said on June 1st you

9    had a meeting with Kathy Holley and Deb

10   Sheldon; is that right?

11         A.    Yes.

12         Q.    Was there anyone else present for

13   that meeting?

14         A.    Georgene Kohlbacher.

15         Q.    Can you tell me everything that you

16   recall about that meeting?

17         A.    Basically, that I think they had

18   received all the paperwork, but they still have

19   not come up with a decision.  They hope to have

20   one within the week, but they could

21   basically -- I could resign, be terminated, or

22   they can bring me back on a trial basis were

23   the three options that came up.

24         Q.    Did you express any desire or have

25   the option to make a choice of one of those

1    three, or was that just what they told you?

2         A.    Well, it was thrown out there.  I

3    certainly wasn't going to resign.

4         Q.    Was there a discussion about the

5    findings of Dr. Balciunas, Erin St. Denis, and

6    Dr. Traboulsi during that June 1st meeting?

7         A.    They may have been reviewed.  I

8    don't recall offhand.

9         Q.    Do you recall in that meeting on

10   June 1st being told that having another staff

11   member in the group therapy room was not a

12   reasonable accommodation at least in UH's

13   belief?

14        A.    Yes, even though at Richmond there

15   is two staff to lead groups.

16        Q.    In that June 1st, 2017, meeting,

17   was it mentioned to you that Kathy and Deb

18   Sheldon continued to have concerns about safety

19   both for you and the patients?

20        A.    Yes.

21        Q.    And that they didn't believe any of

22   the recommendations from either the physicians

23   or occupational therapist would address those?

24        A.    That's what they said.

25        Q.    So is there anything else about the

1    June 1st meeting that you can recall?

2         A.    I did inquire about other jobs

3    within the hospital.

4         Q.    What were you told?

5         A.    That, yes, I could look for other

6    positions that I would qualify for.

7         Q.    Were you referred to a Career

8    Pathways coach named Faye Naftzger?

9         A.    Yes.

10        Q.    Did you contact Faye?

11        A.    Not initially.

12        Q.    At what point did you contact Faye?

13        A.    In March of this year.

14        Q.    Why didn't you contact Faye between

15   June of 2017 and March of 2019?

16        A.    I wasn't sure in what way she might

17   be able to help, and I was upset over the whole

18   situation, and that I just was seeking

19   assistance with Ohioans With Disabilities with

20   my counselor there that I've worked with for

21   numerous years.

22        Q.    Is that Tim Sullivan?

23        A.    Correct.

24        Q.    Was Tim helping you look at the job

25   postings at UH or discussing potential jobs at

1    UH Parma?

2         A.    There may have been a few that

3    we've looked up.

4         Q.    Did you reach out to Deb Sheldon or

5    Faye or anyone else at UH about those jobs?

6         A.    I had asked Deb Sheldon if she

7    would be able to send me openings or postings,

8    and she said, no, I would need to go onto the

9    website and look that up myself.

10        Q.    Is that something that you were

11   able to do?

12        A.    With great difficulty.

13        Q.    Do you know whether or not that is

14   something that Faye Naftzger would be able to

15   do is send you new job postings at Parma?

16        A.    After having met with her last

17   month, yes.

18        Q.    Do you have any reason to believe

19   she wouldn't have been able to do that for you

20   in June of 2017?

21        A.    No.

22        Q.    You mentioned that one of the

23   topics discussed in the June 2017 meeting was

24   the potential to bring you back on a trial

25   basis; is that right?

```
                                         Page 132
 1          A.      Correct.
 2          Q.      Bring you back meaning put you back
 3   as a rehabilitation therapist on the geriatric
 4   psych unit?
 5          A.      Yes.
 6          Q.      Was that something that you were
 7   open to or requested?
 8          A.      I did not request it, and I would
 9   not be comfortable resuming that position after
10   the issues with Kathryn Holley and the whole
11   situation.
12          Q.      Why not?
13          A.      Because I believe I would be
14   scrutinized even further.  It's just a very
15   awkward situation.
16          Q.      Is that what you conveyed to Kathy
17   and Deb during that meeting?
18          A.      No, because they basically just
19   laid out that that was what they were thinking,
20   that there were the three options, and I may
21   have said that I wouldn't resign, so that just
22   left the other two, and nothing further was
23   said.  They would have their decision hopefully
24   in another week.
25          Q.      Is there anything else about that
```

1    June meeting that you can recall?

2        A.    No.

3        Q.    When is the next time you had

4    discussions with either Kathy or Deb or anyone

5    from UH about the fit for duty process or your

6    employment?

7        A.    It was probably the following week

8    or two.

9        Q.    Who was the conversation with?

10       A.    I want to say it was probably a

11   phone call from Deb Sheldon stating that they

12   were not going to bring me back, that my

13   position as a rehabilitation therapist was not

14   an option to resume.

15       Q.    Is there anything else you can

16   recall about that conversation?

17       A.    Not that I recall.

18       Q.    Did Deb advise you again at that

19   time to reach out to Faye, the Career Pathways

20   coach?

21       A.    That I do not recall.  I only seem

22   to remember her name coming up in a letter in

23   September of '17 when they gave me all the

24   final details.

25       Q.    How did you respond to Deb when she

1    told you you wouldn't be permitted to come back

2    to your job?

3         A.    I can't really recall.  I guess,

4    you know, it was just left at, all right,

5    that's how they feel, you know.  She said I

6    could still continue to look for jobs, that

7    they would again let me use my PTO time which

8    would end in September.

9              I don't think until September did

10   they decide then that once that PTO time ran

11   out, I figured that would be the end, but they

12   did send a letter then stating that they would

13   keep me employed until December 31st without

14   pay.

15        Q.    Did you and Deb discuss on that

16   phone call in June of 2017 the potential for

17   you to be put on a medical leave of absence?

18        A.    Yes.  That did come up.

19        Q.    Was that an option that you

20   explored at all?

21        A.    I looked at it and decided it was

22   not beneficial to me.  The wording in the

23   letter asks for the doctor's reason for putting

24   you on disability, and it would totally

25   contradict that the doctors had all just stated

1  that I was fine to return to work.

2      Q.    Which doctors had stated that you

3  were fine to return to work?

4      A.    I believe it was all of them;

5  Traboulsi, Balciunas, and Bures.

6      Q.    After that phone conversation with

7  Deb Sheldon in June of 2017, when was the next

8  time you had any discussion with anyone from UH

9  about your employment?

10      A.    There is probably a note somewhere.

11  Offhand I don't recall.

12      Q.    After the in-person meeting in June

13  of 2017, was there any further discussion that

14  you had at any time with anyone from UH about

15  potential reasonable accommodations that would

16  allow you to continue to perform your job?

17      A.    No.

18      Q.    You said in September you received

19  a letter from Deb Sheldon; is that right?

20      A.    I believe so.

21          MS. WHITE:  I can go ahead and read

22  that letter to you.

23          MR. BULEA:  Let me just take a

24  minute to look at it and see if I want to ask

25  anything about it, but you can do that if you

Page 136

1    want.

2              MS. WHITE:  Yes.  I'll go ahead and

3    start the process.

4              (Discussion off record.)

5                   -  -  -  -  -

6              (Thereupon, Deposition Exhibit 33, a

7              Letter of 9/6/17 from Deborah

8              Sheldon, was marked for purposes of

9              identification.)

10                   -  -  -  -  -

11         Q.    Debbie, just while we were off the

12    record, I just wanted to confirm that your

13    counsel read to you and you heard and

14    understood the letter that's dated

15    September 6th, 2017, from Deb Sheldon to you

16    that's now been marked as Defendant's

17    Exhibit 33.

18         A.    Correct.

19         Q.    You received that letter sometime

20    in early September 2017?

21         A.    Yes.

22         Q.    In this letter, as your counsel

23    just read to you, Deb Sheldon stated that,

24    "During the June 1st, 2017, meeting, you

25    acknowledged the legitimacy of our safety

Page 137

1    concerns, the increase in patient acuity, the

2    increased severity of psychiatric issues, the

3    change in patient demographics, increased code

4    violets, and fewer staff to monitor patient

5    activities and to deliver assistance during

6    patient outbursts."

7              Did you acknowledge those things in

8    the June 1st meeting?

9         A.    Yes.

10        Q.    In accordance with the letter, all

11   of the PTO that you had was paid out by

12   September 21st of 2017 or thereabouts; is that

13   right?

14        A.    Yes.

15        Q.    You remained on as an employee of

16   UH on a personal leave until the end of 2017;

17   is that correct?

18        A.    Yes.

19        Q.    During that time you would have not

20   been getting paid, but you would have received

21   your medical benefits; is that right?

22        A.    Correct.

23        Q.    Between June of 2017 and the end of

24   2017, did you apply for any other positions at

25   UH?

1          A.     No.   There were none that were a

2      fit as far as being part time, a day's shift,

3      and something that I was qualified to do.

4          Q.     Were you also engaging in efforts

5      to find employment outside of UH during that

6      time?

7          A.     Yes.

8          Q.     Were there other jobs that you

9      actually put in applications for during that

10     time?

11         A.     Yes.

12         Q.     What were those?

13         A.     There were numerous jobs, nursing

14     homes, assisted livings, customer service,

15     daycare.

16         Q.     Did you receive any job interviews

17     for any of those positions?

18         A.     I had an interview for a

19     receptionist job at an assisted living facility

20     that was going to be opening up.

21         Q.     Any other interviews?

22         A.     There may have been one or two

23     other phone or in-person interviews.

24         Q.     Were you offered any positions?

25         A.     No.

Page 139

```
 1          Q.    Was the first job you were offered

 2     the one with Holy Family Daycare that you

 3     currently have?

 4          A.    I was offered another job at

 5     another daycare, but I turned that one down

 6     because I had already visited Holy Family, I

 7     believe, and that was a better fit.

 8          Q.    What was the pay at the other job

 9     that you turned down?

10          A.    I think it was less pay for more

11     work.

12          Q.    More hours you mean?

13          A.    No.

14          Q.    Just like --

15          A.    Just more duties.  I know another

16     nursing home that I had contacted, you know,

17     right away they asked, you know, my hourly

18     rate, and they said, you know, there is no way

19     they can come close to that, and I brought up

20     another number, and that was $15 an hour, and

21     she said we can't even do that, you know.  I

22     tried to call back and, you know, negotiate

23     further, but I never got any responses.

24               I'm trying to think.  I believe

25     there was another interview, too, at another
```

1  nursing facility that I never heard back from

2  and also again tried to reach out and never got

3  any calls back.

4          Q.    Did you ever apply I guess between

5  June of 2017 and any time thereafter for Social

6  Security disability benefits?

7          A.    No.

8          Q.    Were you receiving unemployment?

9          A.    Yes.

10         Q.    When did that start?

11         A.    That kicked in at the end of

12  September.

13         Q.    After the PTO from UH ended?

14         A.    Correct.

15              MR. BULEA:  I'm just going to take

16  a quick break.

17                  (Brief recess.)

18         Q.    In your earlier testimony, Debbie,

19  you indicated that you believe that there were

20  two recreational therapists that run the group

21  therapy sessions at Richmond; is that right?

22         A.    Correct.

23         Q.    How did you come to learn that?

24         A.    When I went there for my

25  observation and spent the day with them and

Page 141

1    asked them questions.

2         Q.    Remind me, when was that?

3         A.    June of probably '15 or '16.

4         Q.    Are you aware of whether or not two

5    recreational therapists continuing to operate

6    the group therapy together as of June 2017?

7         A.    I am not.

8         Q.    During your time at Parma Medical

9    Center after the acquisition by UH, at least in

10   the Parma geriatric unit there was always only

11   one recreational therapist on duty at a time,

12   correct?

13        A.    Initially when I started, I would

14   say yes, there was only one.  Sometimes we

15   cotreated with OT or nursing, and then I think

16   somewhere down the road there were two of us at

17   times that would overlap, but then it basically

18   came down to just one person at a time.

19        Q.    When you say when I started, are

20   you referring back to the late '90s?

21        A.    Correct.

22        Q.    So from the time that UH took over

23   and acquired Parma sometime in 2014 forward,

24   was it always that there was one recreational

25   therapist on the geriatric psych unit at any

1    given time?

2         A.    I believe so.

3         Q.    You mentioned that you recently I

4    guess met with Faye you said in March of 2019,

5    Faye Naftzger?

6         A.    Correct.

7         Q.    What happened during that meeting?

8         A.    We took an inventory survey to find

9    out what my interests might be, and then I

10   believe that feeds into UH jobs, so a few were

11   identified there.  I think one was a patient

12   concierge, and one was another, I don't know

13   what it was called, another patient like maybe

14   rights, and then the daycare position came up

15   there as well.  So I did apply for that, and

16   that also was one of the jobs that was sent by

17   UH, one of four jobs that I said I'd be

18   interested in and that I actually qualified for

19   because the other three jobs sent by UH

20   required education and training.

21        Q.    Is the daycare position the only

22   one you've applied for as of today?

23        A.    Yes, because, again, it was the

24   only one that fit my qualifications.

25        Q.    Okay.  The patient concierge or

                                                    Page 143

1    patient rights positions, those were --

2         A.    There were no openings at Parma.

3         Q.    Are you going to continue to work

4    with Faye such that she would notify you if any

5    of those positions become available?

6         A.    We didn't discuss any follow-up,

7    but I could very well do that.

8              MS. WHITE:  I haven't objected yet,

9    but we're getting kind of close to that

10   language.

11             MR. BULEA:  Yes.  That's fine.  Let

12   me ask it another way.

13        A.    Maybe another thing I can add, too,

14   is when you were asking about Tim Sullivan, I

15   was working with Amy Rumrill, a vocational

16   specialist, for jobs.

17        Q.    After your meeting with Faye, when

18   you left that meeting were there any further

19   activities that you and she agreed to undertake

20   either separately or together?

21        A.    No.  She just told me that I could

22   go home and apply for that job.

23        Q.    Have you received any response to

24   that job application?

25        A.    None.  Again, that was one that was

1    sent initially to Emily and then forwarded to

2    me, and I went back to Emily stating that the

3    daycare job would be the most suitable, and we

4    never heard back.

5         Q.    When did you apply for that?

6         A.    March 3rd or, I'm sorry, March 11th

7    I believe it was.  Did you want to know other

8    results of jobs like from this year if I had

9    interviews?  I know you had asked.

10        Q.    Yes.  Are you still actively

11   looking for work outside of the daycare?

12        A.    Yes.

13        Q.    Where have you looked?

14        A.    It was Royalton Woods Assisted

15   Living.  I had an interview there.  They chose

16   somebody else.  I interviewed at another

17   daycare that was closer to home, and, again,

18   they chose somebody else.

19        Q.    Are there any other jobs that

20   you've currently applied for but are still

21   waiting to hear back from other than the one at

22   UH?

23        A.    No.

24                    -  -  -  -  -

25                (Thereupon, Deposition Exhibit 34, a

Page 145

1            Document Bates Labeled Moss

2            Production 000941 through 000948,

3            was marked for purposes of

4            identification.)

5                    -  -  -  -  -

6       Q.    I'm going to hand to your counsel

7    what I've marked as Defendant's Exhibit 34.

8    Again, I certainly don't need you to read the

9    whole thing, so I'll direct you to the page

10   that I have specific questions about, and

11   hopefully we can speed things up.  The Bates

12   number is Moss Production 946.

13           Generally, I'll just say this is a

14   document that was produced to me in this

15   litigation by your counsel, so I know that,

16   Debbie, you probably don't have the equipment

17   needed to identify it.

18           MR. BULEA:  But, Emily, if you're

19   able to identify it for the record, that would

20   be helpful.

21           MS. WHITE:  So which part were you

22   going to ask her about because I'd be happy to

23   read that section.

24           MR. BULEA:  The first question

25   would be to identify it, and the second

Page 146

1    question is going to be about the top portion

2    of Bates number 946 under the other comments

3    section.

4                 MS. WHITE:  Okay.

5                 (Discussion off record.)

6         Q.    So the first question I have about

7    Defendant's Exhibit 34, which I understand is

8    an application that you made in January of 2017

9    with Opportunities for Ohioans with

10   Disabilities, is I guess, first, do you recall

11   making such an application in or around January

12   of 2017?

13        A.    I believe so.

14        Q.    Was this application in conjunction

15   with your efforts to obtain an updated closed

16   circuit television?

17        A.    I'm not sure if it was for that or

18   something else needed for the computer,

19   possibly a new computer keyboard.  I don't

20   recall specifically.

21        Q.    As to the specific page 946, there

22   is a comment here that your vision is getting

23   worse and vision now requires bigger and darker

24   (more contrast) than before.

25                 My question, if you know, is what

Page 147

1    the reference point for that comment would be,

2    and if you know whether that comment refers to

3    some previous point in time comparing your

4    vision getting worse.

5         A.    I would write out in large print

6    things that I would discuss with the patients,

7    and over 20 years that's changed.

8         Q.    So my question is really as of

9    January 2017, is your vision still getting

10   worse at that point?

11        A.    From 1996 it had.

12        Q.    Okay.  How about from 2015?

13        A.    I can't say.

14        Q.    Do you believe your vision is still

15   getting worse as we move forward to today?

16             MS. WHITE:  I'll object, asked and

17   answered.  You can answer.

18        A.    I mean, aging issues?  I don't

19   know.  I would say for the most part it seems

20   to be the same.

21                      -  -  -  -  -

22             (Thereupon, Deposition Exhibit 35, a

23             Document Bates Labeled Moss

24             Production 000793 through 000879 and

25             000393, was marked for purposes of

Page 148

1          identification.)

2                 -  -  -  -  -

3          Q.    I'm handing you what's been marked

4     as Defendant's Exhibit 35, and I believe this,

5     and I'll let your counsel comment as well, this

6     to be the case notes for you from Opportunities

7     for Ohioans With Disabilities that were

8     maintained by Tim Sullivan and provided to me

9     in this litigation.

10               (Discussion off record.)

11         Q.    So I'm going to ask you a few

12    questions about some specific pages now,

13    Debbie, in the case notes from Tim Sullivan

14    which I know you haven't seen.  The first Bates

15    number that I have questions about is Moss

16    Production 808.  It's really the question I

17    have is about Section 2, the note summary.

18               MS. WHITE:  Off the record.

19               (Discussion off record.)

20         Q.    Debbie, I just want to confirm that

21    you had the opportunity to listen to your

22    counsel read the Section 2, note summary, from

23    document Bates numbered Moss Production 808 of

24    Exhibit 35.

25         A.    Yes.

Page 149

1         Q.    Is that summary that your counsel

2    just read to you a synopsis of a voicemail that

3    you left for Mr. Sullivan in February of 2017?

4         A.    It appears to be.

5         Q.    Is that what you told Mr. Sullivan,

6    that you were initially okay with this referral

7    because you thought of it as a way to get the

8    items you needed?

9         A.    I don't recall that particularly,

10   but Tim has always been helpful in being able

11   to get what I need for work.

12        Q.    It's also noted here by Tim that

13   you conveyed your belief that this all, meaning

14   the mandatory fit for duty process, came about

15   when University Hospitals absorbed Parma

16   Hospital where you work.  Is that still your

17   belief?

18        A.    More particularly with Kathy Holley

19   in 2016.

20        Q.    The next page I have a question

21   about is Bates numbered 810.  Again, it's under

22   Section 2, notes, and it appears to be an email

23   from Debbie Moss to Tim Sullivan.

24             MS. WHITE:  If we can go off the

25   record for a second.

1          (Discussion off record.)

2          Q.    Debbie, did you have the chance to

3     read the email that you sent on or around

4     March 9th, 2017, to Tim Sullivan as just read

5     by your counsel and conveyed on document Bates

6     numbered 810 as part of Exhibit 35?

7          A.    Yes.

8          Q.    Is that an email that you would

9     have sent to Tim at that time?

10         A.    Yes.

11         Q.    A couple of questions.  Do you know

12    which coworker it was that called?

13         A.    Possibly Joy Rivera.

14         Q.    Do you know what questions she had

15    for you or what you discussed?

16         A.    I believe she just reached out to

17    me to see what was going on, why I wasn't at

18    work.

19         Q.    Was Joy conveying some it sounds

20    like stress she was having with conversion to

21    the UH computer system?

22         A.    That's what it sounds like.

23         Q.    You say, "I am enjoying my 20-year

24    sabbatical."  What did you mean by that?

25         A.    It's a good question because I

1    don't really recall that, but I guess after

2    having worked for 20 years and just getting a

3    little bit of time off.

4         Q.    You also stated that your eye

5    doctor referred you to the low vision clinic at

6    the Sight Center, and they are certainly all on

7    the wrong pages.  What did you mean by that?

8         A.    There was a lot of

9    miscommunication, and specifically I don't

10   recall offhand, but I had called -- I know the

11   referral was made to see Erin, the OT, and it

12   was just the Sight Center not passing the

13   information on to the right person initially

14   and waiting on phone calls, so that eventually

15   that process got cleared up, but it took a

16   couple weeks to figure out what was going on.

17        Q.    Okay.  This is not something you

18   are blaming or attributing to UH?

19        A.    No, not at all.

20        Q.    You're not conveying here that you

21   think anyone either at the Sight Center or

22   Dr. Traboulsi or any of the other physicians

23   made any mistakes in their assessments or

24   anything like that?

25        A.    No.

1          Q.    Did Tim Sullivan refer you to

2     anyone to help you with your job search?

3          A.    Yes.  He gave me a couple

4     vocational specialists to interview and decide

5     which one I'd like to work with.

6          Q.    Who were those people?

7          A.    Well, I chose Amy Rumrill.  I don't

8     know who the other one was offhand.

9          Q.    Did you I don't know if engage is

10    the right word, but did you work with Amy to

11    get her assistance in trying to locate a

12    position?

13         A.    A position?

14         Q.    A new job.

15         A.    Yes.

16         Q.    Was she able to help you?

17         A.    Yes.

18         Q.    How did she help?

19         A.    We worked on updating my resume,

20    which didn't need too much updating as Kathryn

21    Holley had needed a new one, I believe, as of

22    January '17, looking for jobs, applying for

23    jobs.

24         Q.    Are you still working with Amy?

25         A.    No.

1       Q.    When did you stop?

2       A.    Maybe, I don't know, January,

3  February of '18 maybe.

4       Q.    What caused you to stop working

5  with Amy?

6       A.    At that time a lot of the jobs that

7  we were applying for were very low paying jobs,

8  and I was still on unemployment, so it wouldn't

9  have been -- I would have taken a significant

10  cut in pay to take a job at lower pay versus

11  collecting my unemployment.

12       Q.    Okay.  So if I'm understanding you

13  correctly, the jobs Amy was finding were all

14  lower paying than the amount you were receiving

15  from unemployment; is that right?

16       A.    Correct.

17       Q.    As a result of that, did Amy

18  basically say I'm not able to find a job that's

19  going to fit your requirements, or how did that

20  end?

21       A.    It ended that we would resume once

22  my unemployment ran out if I still needed

23  assistance.

24       Q.    Okay.  When did your unemployment

25  run out?

Page 154

1          A.     The end of March, I believe, of

2      '18.

3          Q.     Did you reach back out to Amy at

4      that time?

5          A.     I had not because I had gotten the

6      job at Holy Family, was offered the job there.

7      What I was able to do versus what Amy was able

8      to do, you know, I could still look for work on

9      my own and not to have OOD having to spend the

10     money for her to somewhat do the same thing

11     because pretty much the only job market that

12     would pay what I was making would be another

13     hospital.

14         Q.     Did you contact Dr. Fox or

15     Dr. Polster at Southwest about potentially

16     working with them?

17         A.     No.

18         Q.     Is there any specific reason why

19     you wouldn't have done that?

20         A.     Accessibility to get to Southwest.

21         Q.     Where do they work?  What's their

22     location for Southwest?

23         A.     It's in Middleburg Heights.

24         Q.     So you're not able to get

25     transportation there?

Page 155

1          A.     Correct.

2          Q.     How were you getting to and from

3     Parma Medical Center?

4          A.     To the hospital?

5          Q.     Yes, when you were working for UH

6     at Parma.

7          A.     Well, at one point it was some

8     neighbors would take me to the bus stop and

9     then the bus in.  Then that transporation was

10    cut off.  So then it was RTA had a contract

11    with another Provide-a-Ride service, so, again,

12    a neighbor or family member to that location,

13    and then they would take me to work.

14               Then just through some

15    advertisements I was able to find a person that

16    worked in the general vicinity that could pick

17    me up from home and take me, and coming home

18    was always usually my husband.

19         Q.     Did you not believe you could make

20    a similar arrangement to Middleburg Heights if

21    you were to work at Southwest, or have you even

22    explored the possibility?

23         A.     No.  It's much further out, and

24    that would require more assistance in both

25    directions.

1      Q.    Do you recall completing responses

2   to some written questions that were asked by UH

3   in the course of this litigation?  They are

4   called interrogatories.

5      A.    Yes.

6      Q.    I'm going to ask you some questions

7   about those.  One of the interrogatories asked

8   you to identify people who you believe have

9   knowledge of the facts in your complaint or the

10  damages that you suffered as alleged in this

11  case, and I'm just going to ask you what

12  knowledge you think some of these people have.

13          It looks like a good number of them

14  we already covered including Marlene Kiel,

15  Lindsay Kingery, Corey Kramer, Daniela Magda,

16  Nicolette Mullinax.  Those would be the nurses

17  at Parma; is that right?

18     A.    Yes.

19     Q.    Would they have any specific

20  knowledge of the facts of your claim other than

21  being present in the workplace?

22     A.    Not that I communicated with them,

23  no.

24     Q.    Have you talked with any of them

25  about the case?

Page 157

1          A.     I have not.

2          Q.     Who is Jessica DiMassa?

3          A.     She's a nursing assistant, PCA.

4          Q.     At Parma?

5          A.     Yes.

6          Q.     Have you spoken with her about the

7    case?

8          A.     No.

9          Q.     Is she listed here because she

10   would have general knowledge of the work

11   environment?

12         A.     Yes.

13         Q.     Anything more specific than that?

14         A.     No.

15         Q.     How about Jennifer English?

16         A.     The same.

17         Q.     Courtney Holbrook?

18         A.     The same.

19         Q.     Vanessa McCoy?

20         A.     The same.

21         Q.     Candace Miles?

22         A.     The same.

23         Q.     Kathryn Holley I know.  Allison

24   Henton-Fisher, that would be your prior

25   supervisor?

                                                              Page 158

1          A.     Correct.

2          Q.     Have you spoken with her about the

3     lawsuit?

4          A.     I have not.

5          Q.     Chrissy Rivera, she was the

6     assistant?

7          A.     Yes.

8          Q.     And Joy Rivera?

9          A.     Is my coworker.

10         Q.     She's a recreational therapist?

11         A.     She's a music therapist.

12         Q.     Have you spoken with her about the

13    lawsuit?

14         A.     I don't know specifically if I

15    mentioned that I was suing.

16         Q.     Are you still in regular contact

17    with her?

18         A.     No.

19         Q.     When is the last time you spoke

20    with her?

21         A.     Maybe, I'm not sure when I cleaned

22    out my office, June of '18.

23         Q.     Okay.  Carol Biernacki, who is

24    that?

25         A.     She's an occupational therapist.

Page 159

1          Q.    At UH Parma?

2          A.    Yes.

3          Q.    Is there any specific knowledge she

4    would have?

5          A.    She's just a coworker.

6          Q.    No specific knowledge she would

7    have about the case?

8          A.    No.

9          Q.    Katie Metzger, who is that?

10         A.    Another former coworker, and she

11   had been filling in prn once they let me go.

12         Q.    Filling in meaning performing the

13   duties you used to perform?

14         A.    Correct, just like maybe once a

15   month.  I don't know what her schedule was.

16         Q.    Have you spoken with her about the

17   lawsuit?

18         A.    I'm not sure if I mentioned that to

19   her or not.

20         Q.    When is the last time you spoke

21   with Katie?

22         A.    I ran into her at a function in

23   October of '18.

24         Q.    Did you discuss the lawsuit?

25         A.    I don't recall.

Page 160

1          Q.    How about Mike Wagner, who is he?

2          A.    A former supervisor before Allison.

3          Q.    Have you spoken with him about the

4    lawsuit?

5          A.    No.

6          Q.    Who is Linda Roberts?

7          A.    A retired social worker from the

8    unit.

9          Q.    When did she retire?

10          A.    Probably sometime in maybe the

11    summer of '16.

12          Q.    How about Ella Wagner?

13          A.    A former coworker, no

14    communication.

15          Q.    Dr. Sanitato, who is he or she?

16          A.    He's the psychiatrist.

17          Q.    The psychiatrist?

18          A.    The current psychiatrist at UH.

19          Q.    Is that different than Sanitato?

20          A.    It's the same.

21          Q.    They are just spelled differently

22    here, so it's the same person?

23                MS. WHITE:  That's on me.  Sorry.

24          Q.    But it's the same person?

25          A.    No.  Correct.

Page 161

1        Q.     There is only one of them however
2    they spell their name?
3        A.     Yes.
4        Q.     Jeri Novicky, I think she was
5    someone you talked to about the copier?
6        A.     She's the secretary at UH, the
7    secretary to the unit.
8        Q.     Other than the conversation about
9    the copier, is there any other specific
10   information she would have about the lawsuit?
11       A.     No.
12       Q.     Have you spoken with her about the
13   lawsuit?
14       A.     No.
15       Q.     Diane Levi, who is she?
16       A.     She's a former public relations
17   person on the unit.  Again, I have had no
18   communication with her.
19       Q.     So just general knowledge of the
20   unit's operation?
21       A.     Yes.
22       Q.     You have listed here your husband,
23   William Moss, and two children, Kyle and Tyler?
24       A.     Correct.  Yes.
25       Q.     I assume they would have knowledge

1    of how this has impacted your life; is that

2    right?

3         A.    Yes.

4         Q.    I know it's not the easiest topic,

5    but if you can, just tell me how this has

6    impacted your life.

7         A.    Well, I mean, huge.  I mean,

8    financially is number one.  Not being able to

9    do a job that I went to school for and figured

10   I'd be doing until I retired.  Self-esteem,

11   anxiety, just, I mean, all the things that come

12   with a drastic change in lifestyle.  I mean,

13   going from a structured schedule to not so much

14   structured or going from working three days a

15   week to sometimes five days a week for less

16   money.  You know, the decrease in contributions

17   to my 401(k) for preparing for retirement.  My

18   traveling, vacations are limited to little.

19        Q.    Have you sought -- I'm sorry.  I

20   don't mean to cut you off.  Did you have

21   anything else?

22        A.    Not that I can think of.

23        Q.    Have you sought any treatment,

24   either mental health or otherwise, for any of

25   the anxiety or other issues you just described?

1          A.    No.

2          Q.    You have I think a couple people

3    here you referenced as longtime friends,

4    Patricia Kimnach and Connie King.  Would their

5    testimony be the same as to the impact on your

6    life?

7          A.    Yes.

8          Q.    Anything beyond that?

9          A.    No.

10         Q.    Renee Buchtel, the current

11   employer, is that the Renee who is your

12   supervisor at Holy Family?

13         A.    Yes.  She doesn't know I'm involved

14   in a lawsuit.

15         Q.    We did receive some voided pay

16   stubs.  Did you receive a W-2 or end-of-year

17   tax statement from Holy Family Daycare for

18   2018?

19         A.    That's this current year?

20         Q.    Last year.

21         A.    Right, but would be received for

22   this year.  I'm not sure.  My husband does all

23   the taxes.

24         Q.    Okay.  I would imagine you probably

25   did.

1              MR. BULEA:  If it's not too much

2     trouble --

3              MS. WHITE:  We'll follow up.

4              MR. BULEA:  -- if you could provide

5     it rather than having a bunch of different

6     checks, that would be great.  Thank you.

7              THE WITNESS:  Did you just need

8     that emailed to you then?

9              MS. WHITE:  We'll discuss it when

10    we get off the record.

11         Q.   In one of your interrogatory

12    responses, you indicate that in September

13    someone from UH HR called and asked you how you

14    were planning to pay for health benefits

15    through the end of 2017.  Were you charged for

16    your health benefits through the end of 2017 by

17    UH?

18         A.   I do not believe so.  Whoever it

19    was that called, I told them I would not be

20    paying.

21         Q.   And they --

22         A.   There was never a response back.

23         Q.   Certainly, the health care remained

24    in place, correct?

25         A.   Yes.

1       Q.    Did you have a conversation with

2   anyone from UH in January of 2018 about the end

3   of your employment?

4       A.    I don't believe so.

5       Q.    Did you receive a letter from Deb

6   Sheldon that notified you that you would be no

7   longer employed by UH?

8       A.    I know that letter came in

9   September.  I don't know about after January of

10  '18.

11                    -  -  -  -  -

12              (Thereupon, Deposition Exhibit 36, a

13              Document Bates Labeled UH-MOSS 1388,

14              was marked for purposes of

15              identification.)

16                    -  -  -  -  -

17              (Discussion off record.)

18      Q.    Back on.  Debbie, were you able to

19  listen to the letter that's now been marked as

20  Defendant's Exhibit 36 which your counsel just

21  read for you?

22      A.    Yes.

23      Q.    The letter is dated January 28th,

24  2018.  Do you recall receiving this letter

25  around that time?

Page 166

1          A.    Yes.

2          Q.    As you heard, there was a phone

3    call sometime in early January that you had

4    with Deb Sheldon.  Do you remember that call?

5          A.    I do not.

6          Q.    Did Kathy Holley or anyone else

7    employed by UH ever make any derogatory

8    statements to or towards you about your

9    disability?

10         A.    I don't believe so.

11         Q.    Did you ever hear, even if it's

12   secondhand or a rumor, that any such comments

13   were made by Kathy or anyone else at UH?

14         A.    I don't believe so.

15         Q.    I know we've talked today about the

16   referral for the fitness for duty process,

17   going through and ultimately not being

18   permitted to return to your position as a

19   rehabilitation therapist, and I know that forms

20   the basis for your claims in the lawsuit.

21              Are there any other employment

22   related decisions that UH made that you believe

23   were discriminatory based on your disability or

24   vision impairment?

25         A.    Not that I can think of.

Page 167

1           MR. BULEA:  We'll take about five
2    minutes.  I'm going to look through my notes.
3                   (Brief recess.)
4           MR. BULEA:  I think we're done.
5           MS. WHITE:  We will be reading.
6        (Deposition concluded at 3:54 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                    TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12              Mr. Bulea ordered the original

13   transcript for expedited delivery on 4/12/19.

14              Ms. White did not order a copy at

15   this time.

16

17

18

19

20

21

22

23

24

25

Page 169

1                    REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                                    SS:

4     County of Cuyahoga.  )

5

6              I, Cynthia Sullivan, a Notary

7     Public within and for the State of Ohio, duly

8     commissioned and qualified, do hereby certify

9     that the within named witness, DEBORAH A. MOSS,

10    was by me first duly sworn to testify the

11    truth, the whole truth and nothing but the

12    truth in the cause aforesaid; that the

13    testimony then given by the above-referenced

14    witness was by me reduced to stenotypy in the

15    presence of said witness; afterwards

16    transcribed, and that the foregoing is a true

17    and correct transcription of the testimony so

18    given by the above-referenced witness.

19              I do further certify that this

20    deposition was taken at the time and place in

21    the foregoing caption specified and was

22    completed without adjournment.

23

24

25

Page 170

1            I do further certify that I am not

2      a relative, counsel or attorney for either

3      party, or otherwise interested in the event of

4      this action.

5            IN WITNESS WHEREOF, I have hereunto

6      set my hand and affixed my seal of office at

7      Cleveland, Ohio, on this 12th day of

8      April, 2019.

9

10

11

12

13

14            Cynthia Sullivan, Notary Public

15            within and for the State of Ohio

16

17      My commission expires October 17, 2021.

18

19

20

21

22

23

24

25

Page 171

1                              Veritext Legal Solutions
                                  1100 Superior Ave
2                                    Suite 1820
                                Cleveland, Ohio 44114
3                                Phone: 216-523-1313
4      April 12, 2019
5      To: Ms. White
6      Case Name: Moss, Deborah v. University Hospitals at Parma Medical
       Center
7
       Veritext Reference Number: 3282489
8
       Witness:  Deborah A. Moss        Deposition Date:  4/8/2019
9
       Dear Sir/Madam:
10
       The deposition transcript taken in the above-referenced
11
       matter, with the reading and signing having not been
12
       expressly waived, has been completed and is available
13
       for review and signature.  Please call our office to
14
       make arrangements for a convenient location to
15
       accomplish this or if you prefer a certified transcript
16
       can be purchased.
17
       If the errata is not returned within thirty days of your
18
       receipt of this letter, the reading and signing will be
19
       deemed waived.
20
21     Sincerely,
22
23     Production Department
24
25     NO NOTARY REQUIRED IN CA

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS

2

            ASSIGNMENT REFERENCE NO: 3282489
3           CASE NAME: Moss, Deborah v. University Hospitals at Parma
      Medical Center
            DATE OF DEPOSITION: 4/8/2019
4           WITNESS' NAME: Deborah A. Moss
5           In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7           I have made no changes to the testimony
      as transcribed by the court reporter.

8

      _____        _____
9     Date                    Deborah A. Moss
10          Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:

12

            They have read the transcript;
13          They signed the foregoing Sworn
                  Statement; and
14          Their execution of this Statement is of
                  their free act and deed.

15

            I have affixed my name and official seal

16

      this _____ day of_____, 20_____.
17

                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS

2
          ASSIGNMENT REFERENCE NO: 3282489
3         CASE NAME: Moss, Deborah v. University Hospitals at Parma
    Medical Center
          DATE OF DEPOSITION: 4/8/2019
4         WITNESS' NAME: Deborah A. Moss
5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9         I request that these changes be entered
    as part of the record of my testimony.

10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                     Deborah A. Moss

14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20____.
23        _____
          Notary Public

24
          _____
25        Commission Expiration Date
```

Page 174

1                        ERRATA SHEET
             VERITEXT LEGAL SOLUTIONS MIDWEST
2                    ASSIGNMENT NO: 3282489
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19
      _____        _____
20    Date                    Deborah A. Moss
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

**[& - 6th]**

| & |
|---|
| **&** 1:20 2:13 |

| 0 |
|---|
| **000262** 4:5 103:17 |
| **000264** 4:5 103:17 |
| **000265** 4:8 122:2 |
| **000393** 4:14 147:25 |
| **000793** 4:13 147:24 |
| **000879** 4:14 147:24 |
| **000941** 4:11 145:2 |
| **000948** 4:12 145:2 |
| **02257** 1:7 |

| 1 |
|---|
| **10** 73:11,12 74:9 114:16,18 |
| **103** 4:4 |
| **10:00** 1:17 |
| **1100** 171:1 |
| **118** 4:6 |
| **11th** 144:6 |
| **12** 70:12 171:4 |
| **121** 4:8 |
| **12:30** 87:19 |
| **12th** 170:7 |
| **1300** 1:21 2:16 |
| **136** 4:9 |
| **1361** 4:3 96:19 |
| **1362** 4:3 96:20 |
| **1388** 4:15 165:13 |
| **1392** 4:7 118:15 |
| **14** 20:6 61:13 70:12 93:13 120:4 |
| **144** 4:11 |
| **147** 4:13 |
| **14th** 66:21 85:19 85:22 |

| 15 69:2 93:14 |
|---|
| 114:17,18 139:20 141:3 |
| **15th** 88:16 124:12 |
| **16** 51:17 141:3 160:11 |
| **1600** 1:21 2:17 |
| **165** 4:15 |
| **169** 3:10 |
| **17** 55:8 57:19 62:1 69:2 133:23 152:22 170:17 |
| **18** 6:15 13:8 15:5 15:18 18:23 153:3 154:2 158:22 159:23 165:10 |
| **1820** 171:2 |
| **1996** 23:14,18 147:11 |
| **1:00** 13:12 |
| **1:18** 1:7 |
| **1st** 124:11,12 128:8 129:6,10,16 130:1 136:24 137:8 |

| 2 |
|---|
| **2** 3:3 148:17,22 149:22 163:16 |
| **20** 69:1 147:7 150:23 151:2 172:16 173:22 174:22 |
| **2012** 94:7 |
| **2014** 23:19,22 24:14 26:11,25 27:9 35:2 94:8 141:23 |
| **2015** 28:6 35:2 68:14,20 69:6,9,12 69:20 147:12 |

| 2015-16 20:25 |
|---|
| **2016** 20:14 21:6 47:14 48:18 50:22 50:24 51:18,20 52:19 55:4 56:6 56:18 57:1,17 63:4 149:19 |
| **2017** 18:25 63:8 66:21 68:5 70:9 70:25 71:21 72:3 94:9,24 124:3,13 127:17,18,24 128:5 129:16 130:15 131:20,23 134:16 135:7,13 136:15,20,24 137:12,16,23,24 140:5 141:6 146:8 146:12 147:9 149:3 150:4 164:15,16 |
| **2018** 12:25 163:18 165:2,24 |
| **2019** 1:16 130:15 142:4 170:8 171:4 |
| **2021** 170:17 |
| **216** 2:19 |
| **216-523-1313** 171:3 |
| **21st** 137:12 |
| **2231** 170:13 |
| **23rd** 124:3 |
| **24** 38:9 |
| **28th** 165:23 |
| **29** 4:3 96:18,25 99:17,20 |
| **2:00** 13:11,14,15 14:14 |

| 3 |
|---|
| **30** 4:4 103:13,15 127:12 |
| **31** 4:6 118:14,22 |
| **31st** 134:13 |
| **32** 4:8 121:25 122:13 |
| **3282489** 171:7 172:2 173:2 174:2 |
| **33** 4:9 136:6,17 |
| **34** 4:11 144:25 145:7 146:7 |
| **35** 4:13 147:22 148:4,24 150:6 |
| **36** 4:15 165:12,20 |
| **3:00** 63:14 |
| **3:54** 167:6 |
| **3rd** 144:6 |

| 4 |
|---|
| **4** 3:5 |
| **4/12/19** 168:13 |
| **4/8/2019** 171:8 172:3 173:3 |
| **401** 127:25 162:17 |
| **43215** 2:8 |
| **44114** 2:18 171:2 |
| **45** 45:14 |

| 5 |
|---|
| **5** 3:8 11:20 |
| **500-3495** 2:9 |
| **50s** 32:6 |
| **55** 27:1 31:24 |

| 6 |
|---|
| **60s** 32:7 |
| **614** 2:9 |
| **621-2399** 2:19 |
| **629** 2:6 |
| **6th** 136:15 |

| 7 |
|---|
| **70s** 27:3,4 32:2 |

| 8 |
|---|
| **8** 1:16 |
| **808** 148:16,23 |
| **80s** 27:3,4 32:3 |
| **810** 149:21 150:6 |
| **88** 4:16 |
| **8:00** 13:11,14,15 14:14 |

| 9 |
|---|
| **9.50.** 18:4 |
| **9/6/17** 4:9 136:7 |
| **90s** 141:20 |
| **946** 145:12 146:2 146:21 |
| **95** 93:1 |
| **96** 4:3 |
| **9:30** 13:12 |
| **9th** 150:4 |

| a |
|---|
| **a.m.** 1:17 13:15 14:14 |
| **ability** 55:10,13 61:23 63:17 64:25 66:4,11 77:21 86:11 99:14 112:4 112:11 122:16,22 123:7 |
| **able** 5:15 6:24 7:1 7:4,5 8:24 9:19 10:18 11:5,6,8,14 12:11,14,18 33:5 42:1 43:9,11 57:14,25 60:8 61:2 63:24 64:5 67:4 73:24 75:11 76:7 79:1,20 80:14 83:6 87:13 98:6 101:25 102:6 |

102:11 104:18 106:11 107:2,19 112:16 114:19,23 114:24 115:1,19 119:22 120:8 121:7 123:5,5,11 130:17 131:7,11 131:14,19 145:19 149:10 152:16 153:18 154:7,7,24 155:15 162:8 165:18
**absence** 134:17
**absorbed** 149:15
**access** 76:23 98:4 107:2
**accessibility** 154:20
**accessible** 9:18,20 123:25
**accommodate** 120:22
**accommodation** 55:1 61:22 64:13 66:16 103:22,25 129:12
**accommodations** 9:10 17:2 49:3,4 49:11 50:2,5,7,12 50:23 51:21 52:9 52:16 63:7 64:4 66:3 70:21 90:14 91:22 121:4 135:15
**accomplish** 171:15
**accurate** 10:14 115:8
**accurately** 99:18 116:7
**acknowledge** 86:24 137:7

172:11 173:16
**acknowledged** 136:25
**acquired** 23:23 31:8 34:16 68:8 141:23
**acquiring** 26:10
**acquisition** 23:25 24:11 25:16 27:8 28:22 29:7,24 32:1,6,9,20 33:14 33:24 34:1,13 37:9 68:18,23 70:2 141:9
**act** 172:14 173:20
**action** 170:4
**active** 79:21
**actively** 80:20 144:10
**activities** 8:19 9:3 9:7 14:20 17:6 44:25 46:7 47:5 48:4 57:21 115:20 137:5 143:19
**activity** 45:13,16 45:18 48:1 57:15 58:1 61:9 79:7 82:24 116:5
**actual** 32:23 112:5 112:11 113:11,13
**acuity** 33:10,14,24 48:3 78:8 98:10 137:1
**acute** 20:2 21:23 29:13,21 33:12
**adaptations** 98:3
**adaptive** 49:19,22 95:7 105:6
**add** 37:2 143:13
**adding** 40:3

**additional** 23:10 44:10 50:22
**address** 5:11 21:22 38:13 110:13 112:18 129:23
**adjournment** 169:22
**administrative** 127:8,10,15
**advantage** 111:9
**advertisements** 155:15
**advise** 89:20 90:11 133:18
**advocate** 89:15
**affect** 41:4,8 116:2 116:18 119:20
**affixed** 170:6 172:15 173:21
**aforesaid** 169:12
**afternoon** 4:16 46:22,25 47:7 48:12 63:13 88:1
**age** 5:1 14:18 15:4 15:14 26:23,24 27:5 31:23 32:2
**aggressive** 67:22 67:23
**aging** 147:18
**agitated** 41:3,7 42:17,19 113:20
**agitation** 26:15,21
**ago** 8:1 15:19
**agree** 21:18 22:1 33:22 43:10 56:9 75:2 81:11 99:15 119:1,15,19 120:7 120:11,16,25 122:23 123:14

**agreed** 60:23
79:10 87:2 143:19
**ahead** 69:10 113:3
135:21 136:2
**alcohol** 91:1,10
**allegation** 56:4
57:4 62:24
**alleged** 156:10
**alleging** 5:19
**allison** 28:1,15
117:15,24 118:4
118:23 119:17
120:7 157:23
160:2
**allison's** 119:1
120:16
**allow** 135:16
**amount** 153:14
**amy** 143:15 152:7
152:10,24 153:5
153:13,17 154:3,7
**ann** 5:10
**annual** 94:5
**answer** 5:15 8:3
16:23 102:6
114:22 147:17
**answered** 19:8
147:17
**answering** 36:7
**answers** 89:9
**anxiety** 162:11,25
**anybody** 92:1
**apart** 65:10
**apologize** 85:15
**apparently** 90:1
92:23 104:15
**appear** 172:11
173:15
**appearances** 2:1
3:3

**appears** 149:4,22
**appended** 173:11
173:18
**applicable** 168:7
**application** 143:24
146:8,11,14
**applications** 138:9
**applied** 41:1
142:22 144:20
**apply** 137:24
140:4 142:15
143:22 144:5
**applying** 152:22
153:7
**appointment** 67:9
92:20
**appointments**
101:6
**appreciate** 72:17
**appreciating**
72:23
**approach** 58:2
60:16
**approached** 63:13
72:20
**appropriate** 21:21
98:3 123:17
**april** 1:16 12:25
95:1 170:8 171:4
**area** 9:18 40:20
123:23 125:14
**arms** 12:15 41:25
**arranged** 55:24
67:8
**arrangement**
155:20
**arrangements**
171:14
**arrival** 38:7
**arthritis** 46:3

**asked** 55:5 62:3
90:17 109:6 131:6
139:17 141:1
144:9 147:16
156:2,7 164:13
**asking** 12:5 38:16
43:6 45:4 58:19
62:12,15,17
106:11 112:23
115:16 125:24
143:14
**asks** 134:23
**asleep** 42:6 80:5,7
**assess** 80:2,14
120:12 125:15
**assessed** 98:10
103:22
**assessing** 84:15
**assessment** 38:6
38:11,19 39:7,24
41:12 78:20 98:10
99:13 103:25
117:25 118:23
122:24 127:2
**assessments** 38:3
38:15 43:4 77:21
78:5,16 94:22
151:23
**assignment** 172:2
173:2 174:2
**assist** 57:14,25
82:17 104:7
**assistance** 8:20
44:8,10 49:6
58:15,20,20 86:6
99:9 106:12 114:2
130:19 137:5
152:11 153:23
155:24
**assistant** 20:12
21:8 27:12 157:3

158:6
**assisted** 113:23
138:14,19 144:14
**assisting** 41:25
82:6
**associated** 91:17
**assume** 116:9
161:25
**assuming** 91:25
**attached** 98:2
103:12 173:7
**attempts** 32:23
**attention** 61:9
78:4
**attorney** 170:2
**attributing** 151:18
**atypical** 56:16
**auditory** 74:19,21
75:16 115:5,11,17
**authorization**
101:11
**authorize** 173:11
**authorized** 117:12
121:21
**automatic** 22:22
**available** 143:5
171:12
**ave** 171:1
**aware** 22:14,21
23:22 30:12 63:3
87:11 95:15 96:5
96:10 109:24
110:24 113:5
117:2,24 118:2,3
119:23 120:19
121:17 124:1
141:4
**awareness** 45:21
97:20 119:17
**awkward** 132:15

**b**

**b** 13:5
**back** 19:5 24:14
  28:21 45:15 57:16
  76:11 104:14
  105:9 112:1 117:6
  128:22 131:24
  132:2,2 133:12
  134:1 139:22
  140:1,3 141:20
  144:2,4,21 154:3
  164:22 165:18
**bad** 58:11
**balciunas** 93:24
  94:1,13,17,24
  95:10,16 96:1,5
  97:4,7,11,15 98:17
  98:21 99:1,5,12
  100:1,10,15,20,25
  101:8,12,14 104:2
  111:22 129:5
  135:5
**ball** 46:10
**balloon** 46:11
**based** 39:13 47:3
  60:8 79:13 82:11
  116:12 166:23
**basically** 22:12
  46:1 107:14
  108:25 128:17,21
  132:18 141:17
  153:18
**basis** 5:23 6:10
  40:5 43:14 57:3
  94:5 128:22
  131:25 166:20
**basket** 46:11
**bates** 4:3,4,6,8,11
  4:13,15 96:19
  103:16 118:15
  122:1 145:1,11

  146:2 147:23
  148:14,23 149:21
  150:5 165:13
**bed** 115:25
**bedside** 78:21
**behalf** 2:3,12
**behaving** 119:25
**behavior** 71:25
  73:20 116:13,17
  119:9
**behavioral** 120:13
**behaviors** 40:19
  40:23,25 58:12
  67:21,22,23 121:8
**belief** 129:13
  149:13,17
**believe** 6:15 7:9
  20:17,18 21:2
  25:12 27:12 28:5
  28:16 29:20 30:15
  31:6 32:18 35:7
  35:12 37:16 38:9
  40:21 48:24 49:10
  50:10,20 51:17,25
  52:18 53:5,16,23
  56:13 57:18 62:7
  63:10,14 65:5,9
  66:22 67:3 69:7,7
  69:11 75:19,23
  76:24 77:24 79:22
  82:4 84:8 85:25
  89:14 91:5 95:1,4
  96:4 98:24 108:15
  121:3,16 123:9
  124:11 126:2,18
  127:22 128:7
  129:21 131:18
  132:13 135:4,20
  139:7,24 140:19
  142:2,10 144:7
  146:13 147:14

  148:4 150:16
  152:21 154:1
  155:19 156:8
  164:18 165:4
  166:10,14,22
**beneficial** 108:13
  113:7 134:22
**benefits** 18:5
  127:23 128:4
  137:21 140:6
  164:14,16
**best** 16:22 98:20
  125:17
**better** 10:10,22
  11:2,6,9,15 12:4
  31:3 34:22 58:18
  61:14 71:12 93:19
  139:7
**beverage** 45:17
**beyond** 106:23
  127:1 163:8
**biernacki** 158:23
**big** 115:3
**bigger** 146:23
**biggest** 47:22
**bill** 92:25
**binder** 22:11
**bingo** 57:11,20
  58:1 74:14 114:2
**bipolar** 26:15
**bit** 11:12 22:9
  58:11 66:7 69:4
  151:3
**blaming** 151:18
**blindness** 6:22
  10:13
**blurriness** 10:13
  10:16
**board** 25:7
**bodies** 11:11

**books** 7:5
**bottles** 14:17
**bottom** 98:1
**bowling** 46:11,14
**box** 40:19,22
**break** 36:24 87:17
  87:19 88:4 140:16
**breathing** 46:5
**brief** 16:8,10
  17:21 36:25 40:20
  87:16 140:17
  167:3
**bring** 11:4 128:22
  131:24 132:2
  133:12
**broad** 8:14
**brought** 63:16
  76:5 78:4 83:23
  104:10 111:22
  139:19
**buchtel** 163:10
**building** 70:17
**bulea** 2:14 3:8 5:7
  11:19 36:23 87:16
  87:20 88:3 96:14
  97:22 100:5,11
  118:11 122:7
  135:23 140:15
  143:11 145:18,24
  164:1,4 167:1,4
  168:12
**bump** 106:18
**bumped** 110:3
**bunch** 164:5
**bures** 90:20 92:14
  92:19,19 93:3
  125:15 135:5
**bus** 155:8,9
**button** 44:8

[c - collecting]

Page 5

**c**

c  2:14
ca  171:25
call  44:4,11 93:8
  113:21 133:11
  134:16 139:22
  166:3,4 171:13
called  5:1 13:18
  88:12 142:13
  150:12 151:10
  156:4 164:13,19
calling  42:21
calls  101:5 124:15
  124:16,21 140:3
  151:14
calm  41:3,7 80:5
campus  67:10
candace  21:2
  157:21
capacity  29:10
  98:13 117:25
caption  169:21
card  109:1
care  15:5 21:14
  90:17 107:14
  164:23
career  130:7
  133:19
caring  13:8 14:2
carol  158:23
case  1:7 8:21 55:3
  70:4 116:11,23
  148:6,13 156:11
  156:25 157:7
  159:7 171:6 172:3
  173:3
cases  12:18 22:21
  123:13
caught  60:13
cause  34:2 80:22
  169:12

caused  64:24
  153:4
cctv  97:18 98:4
  105:9
census  15:12
center  1:9 93:18
  93:21 99:6 101:16
  102:3,16 141:9
  151:6,12,21 155:3
  171:6 172:3 173:3
centered  112:4
central  6:23 8:10
  8:17 10:3,14,21
  12:1,4 72:5 100:3
  122:21 123:6
certain  100:2
certainly  64:22
  75:2 83:13 94:4
  97:1 103:10
  106:25 122:8
  129:3 145:8 151:6
  164:23
certainty  114:23
certificate  3:10
  169:1 173:11
certification  172:1
  173:1
certified  5:4
  171:15
certify  169:8,19
  170:1
chair  41:24 45:11
  45:24 46:2 113:22
challenging  100:2
chance  61:14 75:6
  97:2 99:17 118:21
  150:2
change  15:12 23:4
  24:15 31:7 36:1
  36:11 42:22 43:2
  47:15 102:20

103:4 137:3
  162:12 173:8
  174:3
changed  28:24
  49:16 68:25 69:4
  147:7
changes  7:18
  27:10 28:25 29:25
  30:2,4,7 34:15
  47:19 102:15
  172:7 173:7,9
changing  47:23
  119:5
characteristics
  82:13
charge  113:17
charged  48:11
  102:8 164:15
chart  38:18 78:24
check  40:19,22,25
checked  99:25
checking  99:24
checkmark  97:12
checks  164:6
child's  17:5
children  17:10
  161:23
chiropractor
  125:3,7,16
choice  82:21
  128:25
choke  72:21 73:16
choking  71:23
choose  51:5
choosing  81:2
chose  144:15,18
  152:7
chrissy  21:9 27:14
  28:16 158:5
circle  23:11 45:9
  45:10 73:9,10

circuit  49:14,21
  51:3,8 52:1,14,21
  56:6 64:4,12,20,23
  76:23 77:14
  104:22,25 146:16
city  18:19,21
civil  5:3 168:3,7
  172:5 173:5
claim  156:20
claims  5:23 6:10
  166:20
clarity  11:17
classroom  14:24
cleaned  158:21
cleaning  9:8
clear  66:8 98:2
cleared  151:15
clearly  11:5
cleveland  1:22
  2:18 93:18,20
  99:6 170:7 171:2
clinic  94:21 151:5
close  9:23 10:23
  11:4 88:25 139:19
  143:9
closed  49:14,21
  51:3,8 52:1,13,21
  56:6 64:4,12,20,23
  76:23 77:14
  104:22,24 146:15
closer  10:1 11:1
  23:6,8 116:3
  144:17
coach  130:8
  133:20
code  137:3
cognitive  39:1,5
  47:5
coincide  29:7
collecting  153:11

**collectively** 21:20
**columbus** 2:8
**come** 24:1 25:16
25:23 42:18 57:6
102:17 108:24
128:19 134:1,18
139:19 140:23
162:11
**comes** 51:8
**comfortable** 132:9
**coming** 108:2
133:22 155:17
**comment** 60:10
100:19 146:22
147:1,2 148:5
**comments** 101:8
146:2 166:12
**commission**
170:17 172:19
173:25 174:25
**commissioned**
169:8
**common** 26:11,17
26:24 27:5 32:2
33:6 47:5
**communicated**
22:19 156:22
**communication**
41:17 120:13
160:14 161:18
**communications**
70:19
**community** 23:19
45:2
**company** 19:4
**comparing** 147:3
**compatibility**
105:15
**compensation**
115:5,11,18

**complaint** 55:3
56:4 156:9
**complete** 35:9
36:5,8 38:11
39:23 43:4 47:6
53:19,25 54:2,19
55:11,14 61:24
63:24 69:13 71:4
75:11 77:21 78:16
89:3 90:11 91:9
91:16,23 92:12
96:1 99:13 100:9
**completed** 53:13
54:5,8,15 75:21
77:9 78:21 97:4
107:22 118:23
125:1 126:9
169:22 171:12
**completing** 9:10
37:25 38:14 70:20
76:3 89:7 91:22
112:12 117:25
156:1
**completion** 58:1
77:18 89:24
**component** 32:22
69:5
**components** 113:7
**computer** 49:18
146:18,19 150:21
**concern** 48:25
49:25 64:24 65:17
76:2,6 78:1,6,12
84:3,8,18,25 85:2
86:10 106:22
110:9,13 111:23
112:4,10
**concerned** 78:14
87:5
**concerns** 55:10,13
61:22 63:8,24

64:17 66:4,10,16
67:4,6 70:20
76:17,20,25 77:20
77:25 78:10 81:22
83:18,22 85:17,21
85:24 86:25 87:9
87:13 88:10
103:24 112:14
129:18 137:1
**concierge** 142:12
142:25
**concluded** 119:17
167:6
**concludes** 117:1
**conclusion** 42:18
58:14 60:20 75:24
119:2 120:17,21
**conclusions** 118:5
**condition** 5:22
6:16 20:3 21:23
97:11 98:12 99:21
**conditions** 6:9
**confirm** 97:22
116:6 136:12
148:20
**conjunction** 105:5
146:14
**connie** 163:4
**consist** 14:16
**consisted** 111:20
**consistent** 98:15
100:13
**contact** 89:16
92:13 130:10,12
130:14 154:14
158:16
**contacted** 139:16
**continue** 50:1 98:6
108:10 127:14
134:6 135:16
143:3

**continued** 36:21
78:17 88:2 103:24
128:3 129:18
**continues** 97:13
**continuing** 35:8
37:25 127:7 141:5
**continuously**
119:5
**contract** 155:10
**contradict** 134:25
**contrast** 51:6
97:18 146:24
**contrasting**
109:18
**contributed** 43:23
**contributions**
162:16
**control** 115:22
**convenient** 171:14
**conversation** 49:7
50:21 52:12 53:8
53:11 61:18 63:6
63:12 86:20
102:18 106:22
133:9,16 135:6
161:8 165:1
**conversations**
55:22 66:9
**converse** 85:15
**conversion** 150:20
**convey** 50:6 77:20
106:17
**conveyed** 78:1
103:4 132:16
149:13 150:5
**conveying** 150:19
151:20
**cook** 8:24
**cooking** 9:8
**copier** 106:5,6,9
106:18 107:3,8,25

161:5,9
**copiers**  105:24
**copies**  106:11
**copy**  168:14
**corey**  20:17,21
  156:15
**correct**  5:20,21,24
  6:17 10:12 13:1
  15:21 16:4,15,19
  17:23 18:17 19:1
  19:2,21,23 21:5,24
  22:4 23:17 24:9
  25:17,18,20 26:8
  27:23,24 28:7,13
  28:20 31:18,24,25
  35:19 36:17 37:10
  38:8,21 39:19,20
  40:8,9,24 46:8,17
  46:24 48:6,7,20
  50:17 52:24 55:6
  56:8,21 58:16
  59:3 62:6 63:9,19
  63:20 64:1,15
  65:1 69:21 76:19
  79:16 82:23 83:17
  84:21 88:18 90:24
  105:2,3 106:3,13
  109:23 110:24
  113:8,9 116:19
  117:10,14 118:7
  118:24,25 119:10
  120:1,5,6 121:12
  121:23 123:8,12
  127:3 130:23
  132:1 136:18
  137:17,22 140:14
  140:22 141:12,21
  142:6 153:16
  155:1 158:1
  159:14 160:25
  161:24 164:24

169:17
**corrections**  173:17
**correctly**  52:5
  57:9 61:16 97:23
  100:6 153:13
**cost**  19:5,9,14
**cotreated**  141:15
**counsel**  97:2 98:15
  99:17 118:21
  120:3 122:12
  136:13,22 145:6
  145:15 148:5,22
  149:1 150:5
  165:20 168:1,10
  170:2
**counselor**  117:10
  118:5 130:20
**county**  169:4
  172:10 173:15
**couple**  29:1 65:20
  72:15 85:8 90:7
  97:6 150:11
  151:16 152:3
  163:2
**course**  156:3
**coursework**  35:14
**court**  1:1 3:13
  11:9,15,19 16:23
  172:7
**courtney**  157:17
**covered**  19:10
  35:5 93:10 156:14
**coworker**  150:12
  158:9 159:5,10
  160:13
**coworkers**  108:5
**credit**  109:1
**crisis**  67:12,18
  68:7,17,22 70:9
  75:8 76:7 111:16
  112:5,11 113:11

113:13,15
**criteria**  26:9
**cue**  80:12
**cues**  42:4 80:9
  81:3 97:21 110:19
  111:2,9
**current**  74:18
  81:18 98:13
  160:18 163:10,19
**currently**  12:19,21
  18:7 51:22 52:10
  139:3 144:20
**custody**  3:12
**customer**  138:14
**cut**  153:10 155:10
  162:20
**cutout**  109:1
**cuyahoga**  169:4
**cv**  1:7
**cynthia**  1:25 169:6
  170:14

| **d** |
|---|

**daily**  8:10 17:5
  40:5 43:14,21
  115:20
**damages**  156:10
**daniel**  24:16
**daniel's**  24:18
**daniela**  20:17,21
  156:15
**dann**  2:4
**dannlaw.com**  2:10
**darker**  146:23
**date**  124:25
  168:11 171:8
  172:3,9,19 173:3
  173:13,25 174:20
  174:25
**dated**  136:14
  165:23

**dates**  37:8
**david**  24:16
**day**  9:9 13:13,16
  30:20 40:2,7,13
  45:4,8 49:15 56:2
  57:22 58:25 67:9
  71:20 86:6 88:15
  91:12 92:4 107:20
  119:5,6,12,12
  140:25 170:7
  172:16 173:22
  174:22
**day's**  138:2
**daycare**  12:22
  13:7,24 14:15
  17:2 138:15 139:2
  139:5 142:14,21
  144:3,11,17
  163:17
**days**  104:14
  127:12,13 162:14
  162:15 171:17
**daze**  80:5,7
**dbulea**  2:20
**deal**  67:21
**dear**  171:9
**deb**  63:15,18 64:3
  64:13 65:25 66:24
  76:13 77:20 83:19
  84:2 85:18 86:21
  87:4 88:5,11
  101:2 112:3,9
  117:20 124:7,8,17
  128:9 129:17
  131:4,6 132:17
  133:4,11,18,25
  134:15 135:7,19
  136:15,23 165:5
  166:4
**debbie**  5:13,14
  96:24 100:13

111:13 122:10
136:11 140:18
145:16 148:13,20
149:23 150:2
165:18
**deborah** 1:5,13
3:7 4:10 5:1,6,10
88:2 136:7 169:9
171:6,8 172:3,4,9
173:3,4,13 174:20
**december** 18:25
23:14,18 93:13,14
134:13
**decide** 134:10
152:4
**decided** 134:21
**decision** 128:19
132:23
**decisions** 166:22
**decrease** 162:16
**deed** 172:14
173:20
**deemed** 171:19
**deep** 46:5
**deescalate** 71:25
**defendant** 1:10
2:12
**defendant's** 96:24
103:13 136:16
145:7 146:7 148:4
165:20
**deficits** 120:25
**definitely** 36:13
111:11
**degree** 33:25
**deliver** 137:5
**delivery** 168:9,11
168:13
**dementia** 26:14,21
**demographics**
137:3

**demonstrate** 71:7
71:9
**denis** 101:18 103:8
104:20 105:4,23
108:4 109:5 110:1
110:5 113:24
116:15,25 117:7
129:5
**department** 20:6,8
88:7,16 101:4
105:20 171:23
**depend** 12:17 43:6
61:3,7 72:10,19
73:17 83:11
114:11
**depending** 14:17
45:22 47:3 51:11
73:8,9 82:23
**depends** 13:19
79:6 95:24
**deposed** 5:4
**deposition** 1:12
96:18 103:15
117:20 118:14
121:25 136:6
144:25 147:22
165:12 167:6
169:20 171:8,10
172:1,3 173:1,3
**depression** 26:14
32:21 45:20,21
**derogatory** 166:7
**describe** 6:18 10:4
10:7 14:13 31:10
47:20 58:18 71:2
85:8
**described** 162:25
**description** 4:2
14:11
**descriptions** 14:6

**desire** 128:24
**detail** 10:4,16,18
65:4 95:6
**details** 122:17,22
133:24
**determination**
81:5
**determine** 41:7
74:12,19 77:15
78:9,18 80:21
81:17 119:20
**determined** 81:4
82:10 98:9
**determining** 116:1
**devices** 94:15 95:7
**diagnosed** 6:13
32:14
**diagnoses** 26:11
26:18 32:10
102:22,24
**diagnosis** 6:20
39:6 47:3 82:12
**diane** 161:15
**differ** 35:25
**difference** 115:3
**different** 24:7 27:8
27:17 28:12 35:21
39:13 42:8 71:5
71:12 75:17 77:3
81:12 95:9 102:1
108:25 121:8,8
160:19 164:5
**differentiate** 80:6
**differently** 160:21
**differing** 119:9
**difficult** 72:16
106:1
**difficulty** 72:23
89:6 91:21 95:11
95:19,23 113:25
114:9,14 131:12

**dimassa** 157:2
**direct** 145:9
**direction** 113:18
**directions** 155:25
**directly** 25:22
54:5 72:21 90:1
101:9
**disabilities** 130:19
146:10 148:7
**disability** 5:19
52:3,22 53:1,3
61:20 134:24
140:6 166:9,23
**disagree** 43:11
60:19 98:25 114:8
**disagreed** 58:13
60:24 64:9 76:18
**disagreement**
85:23 100:18
**discern** 12:14
**disclosure** 121:21
**discrimination**
5:20
**discriminatory**
166:23
**discuss** 49:13,21
60:2 66:15 100:24
104:20 105:4
108:4 110:1,6
111:16 124:9
126:4,10 134:15
143:6 147:6
159:24 164:9
**discussed** 35:5
83:25 95:5 104:5
105:24 109:6,22
110:12 117:3,5
124:20 131:23
150:15
**discussing** 113:12
120:4 130:25

**discussion** 43:24 44:2 45:20 48:23 54:25 60:6 61:21 64:12 65:3 66:19 77:17 93:7 96:16 96:25 98:16 99:5 100:14 111:20 112:17 118:12 122:9 125:18 129:4 135:8,13 136:4 146:5 148:10,19 150:1 165:17

**discussions** 52:14 65:23 124:13 133:4

**disease** 5:24 6:1,14 7:21

**disorder** 26:15

**distance** 12:17 72:13 73:12 122:18,23 123:2 123:11

**distances** 11:18

**distinct** 51:12

**distinguish** 73:24

**district** 1:1,2

**diverse** 32:10

**division** 1:3

**doctor** 7:17,20 25:13 37:1 42:11 90:8,18 151:5

**doctor's** 22:24 134:23

**doctors** 25:17,23 27:7 90:2,3,10,16 92:13 134:25 135:2

**document** 4:3,4,8 4:11,13,15 77:10 77:11 96:19

103:16 122:1 145:1,14 147:23 148:23 150:5 165:13

**documentation** 30:3,5 47:7,23 50:5,11,24 51:20 52:8 77:15 104:12

**documented** 39:25

**documenting** 17:5

**documents** 70:4 76:21 77:5 92:4,7

**doing** 11:23 16:20 36:9 42:2,13 57:21 58:9 72:19 74:9 81:7 84:16 104:15 120:20 162:10

**donald** 2:14

**dots** 106:18

**dr** 7:24 8:4 21:17 24:8,16,24 25:4,5 25:6,7,8 29:1,14 37:4,11,14,14 53:23 54:4,15 90:8,20,23 92:14 92:14,19,19 93:3,6 93:24 94:1,13,17 94:24 95:10,16 96:1,5 97:4,7,11 97:15 98:17,21 99:1,5,12 100:1,10 100:15,20,25 101:8,12,14 104:2 111:22 121:15 122:12,16,20 123:4 124:2 125:13,19,23 129:5,6 151:22 154:14,15 160:15

**drastic** 162:12

**dressed** 9:9

**drive** 8:23 9:12

**drivers** 9:16

**driving** 9:2

**drs** 25:1,9 29:4,9 29:17

**drug** 90:25 91:9 91:18

**due** 96:8 97:11 100:3

**duly** 5:4 169:7,10

**duties** 37:18 55:5 63:25 86:12 95:5 102:8 139:15 159:13

**duty** 21:1 44:16 48:8 65:12,21 66:2,15 86:16 88:8,13 92:15 94:25 96:3 98:17 98:22 100:16 106:11 118:6,24 121:13 124:9 125:2,12 127:6,16 128:5 133:5 141:11 149:14 166:16

**dynamic** 82:15 119:3

**e**

**e** 24:21,22,25

**eap** 67:10 86:5 88:7,16 91:14 92:2 101:3 117:3 117:8,23 118:5 121:18 124:4,19

**earlier** 51:24 82:5 104:4 140:18

**early** 47:11 67:16 68:14 136:20

166:3

**easiest** 126:24 162:4

**east** 1:21 2:16

**eastern** 1:3

**easy** 123:25

**education** 35:8 37:25 142:20

**educational** 70:17

**efforts** 138:4 146:15

**eight** 17:12

**either** 13:22 14:17 16:18 32:22 33:19 34:10 52:15,16 66:3 70:20 72:8 75:25 78:21 85:3 90:14 93:13 111:21 124:8 126:11 129:22 133:4 143:20 151:21 162:24 170:2

**elaborate** 49:2

**electrical** 109:18

**elias** 7:22

**ella** 160:12

**elopement** 23:1

**else's** 114:5

**elyria** 30:16

**email** 4:6 118:15 149:22 150:3,8

**emailed** 164:8

**emails** 108:6

**emergency** 24:5 26:2,5,6

**emily** 2:5 97:23 100:6 144:1,2 145:18

**emotional** 39:1,5 78:18 81:3,18

**emotions** 80:15
**emphasis** 48:1
**employed** 12:19
   12:21 18:18 19:19
   23:15 134:13
   165:7 166:7
**employee** 86:5
   89:14 97:10,14
   99:22 137:15
**employees** 17:14
**employer** 18:12
   19:2 163:11
**employment** 19:16
   23:12 49:15 73:3
   98:8 105:1 133:6
   135:9 138:5 165:3
   166:21
**encouraged** 82:10
**encouraging** 30:23
**ended** 140:13
   153:21
**engage** 81:20
   152:9
**engaging** 80:20
   138:4
**english** 20:19
   157:15
**enjoying** 150:23
**ensure** 21:21 22:3
   22:7 44:20
**entail** 43:16 91:8
**entails** 45:25
**entered** 173:9
**entering** 95:20
   110:22
**entire** 172:5 173:5
**environment** 22:4
   44:20 115:2 118:1
   119:3 157:11
**environments**
   97:19

**episode** 57:11
**equipment** 145:16
**erin** 101:18,20
   102:2,7,10,14
   103:4,7 104:1,5,20
   105:4,23 108:4,12
   109:4,17 110:1,5,8
   110:12 111:16
   112:18 113:2,24
   115:4 116:15,25
   117:7 129:5
   151:11
**errata** 171:17
   173:7,10,18 174:1
**escalate** 115:14
**escaping** 20:24
**esq** 2:5,14,15
**essential** 55:11,14
   60:9 63:17 64:6
   67:5 86:12 90:13
   95:6 99:23 101:25
**essentially** 29:18
**esteem** 45:21
   162:10
**evaluate** 39:8,18
   125:12,17,22
**evaluating** 84:16
**evaluation** 39:22
   40:15 43:3 48:25
   51:24 65:12 66:2
   86:17 109:25
   128:5
**evans** 117:15,24
   118:4,23
**event** 170:3
**events** 34:2
**eventually** 25:7,10
   36:7 151:14
**everybody** 45:8
   69:15 75:1

**ewhite** 2:10
**exact** 25:25
**exam** 95:4
**examination** 3:7
   5:2,6 66:15 88:2
**example** 6:23 8:24
   11:9,14 22:16,17
   23:4 32:15 34:10
   35:17 36:10 39:4
   41:23 42:17 44:21
   46:13 72:21 73:21
   74:12 75:10 79:2
   79:20 80:7 83:4
   83:15 115:10,23
**excellent** 119:16
**executed** 173:10
**execution** 172:14
   173:19
**exercises** 41:24
   45:12,24 104:21
**exercising** 41:21
**exhibit** 3:12 4:3,4
   4:6,8,9,11,13,15
   96:18,25 99:17,20
   103:13,15 118:14
   118:22 121:25
   122:13 136:6,17
   144:25 145:7
   146:7 147:22
   148:4,24 150:6
   165:12,20
**exhibits** 3:5,13 4:1
**existence** 10:1
**expectation** 101:7
**expedited** 168:13
**experience** 73:2
   116:8
**experiencing** 20:2
   21:24 32:11 72:7
   73:14 79:21 80:8
   81:11 120:9

**expertise** 125:14
**expiration** 172:19
   173:25 174:25
**expires** 170:17
**explain** 60:15
   89:11
**explained** 49:3
   89:12 90:9
**explored** 134:20
   155:22
**express** 49:25 76:2
   78:6 112:10
   128:24
**expressed** 84:3
   88:11
**expression** 11:23
   78:10
**expressions** 11:15
   12:11 78:9 95:12
   97:17 100:4 114:3
   116:19 123:12
**expressly** 171:12
**extent** 10:20 31:22
   87:14
**extracurricular**
   14:20
**eye** 90:8 95:4
   151:4
**eyes** 10:9

## f

**face** 11:12
**faces** 116:19
   123:12,12
**facial** 11:15,22
   12:11 78:8 95:11
   97:16 100:3 114:3
**facilities** 30:9
**facility** 22:2 30:23
   70:14 71:3 91:14
   138:19 140:1

**[fact - further]** Page 11

**fact** 46:18 50:13
  108:5
**factors** 98:9
**facts** 62:24 156:9
  156:20
**fair** 36:5,10 92:18
**fairly** 51:6 69:2
**fall** 22:17 28:6
  42:6
**falls** 22:13,25
**false** 112:2
**family** 9:15 12:22
  13:6,24 14:5,15
  17:2,6 18:3 19:17
  139:2,6 154:6
  155:12 163:12,17
**far** 9:8 10:23 73:6
  114:12,13 138:2
**farley** 88:23 89:10
  89:18 92:2 101:3
  124:19
**farm** 14:23
**fax** 125:4 126:19
  126:25
**faxed** 127:5
**faye** 130:8,10,12
  130:14 131:5,14
  133:19 142:4,5
  143:4,17
**february** 48:18
  56:1 66:1,10,14,20
  66:21 67:16 68:5
  76:12 81:23 85:19
  85:22 86:20 88:16
  124:7,12 127:17
  127:24 149:3
  153:3
**federal** 5:2
**feedback** 116:17
**feeding** 14:16

**feeds** 142:10
**feel** 64:9 134:5
**feeling** 45:11
  116:10
**feet** 11:20 72:15
  73:11,12 74:9
  114:17,18
**felt** 42:11 50:3
  64:19 90:12
  116:21
**fewer** 137:4
**fidgety** 42:20 80:4
**field** 102:25
**figure** 151:16
**figured** 51:1
  125:16 134:11
  162:9
**file** 49:1 50:5,14
  50:16,19 51:2
**filed** 5:18
**fill** 92:12,24
**filling** 159:11,12
**film** 6:25
**final** 133:24
**financially** 162:8
**find** 138:5 142:8
  153:18 155:15
**finding** 153:13
**findings** 118:4
  129:5
**fine** 74:21 135:1,3
  143:11
**finish** 16:22
**finished** 98:15
**first** 5:3 8:11
  51:19 68:6,11
  93:25 103:7 139:1
  145:24 146:6,10
  148:14 169:10
**fisher** 28:1 157:24

**fit** 88:7,13 92:14
  94:25 96:3 98:17
  98:22 100:15
  106:10 118:6,24
  121:13 124:9
  125:2,11 127:6,16
  133:5 138:2 139:7
  142:24 149:14
  153:19
**fitness** 65:12,20
  66:2,15 86:16
  128:5 166:16
**fitzgerald** 37:4,14
**five** 7:15 8:7,9
  13:23 15:4 16:11
  17:21 94:5 162:15
  167:1
**fix** 106:24
**fixed** 105:20
**flat** 105:25 106:5
  107:7
**floor** 2:7 19:23
**follow** 124:23
  143:6 164:3
**followed** 29:2 86:3
**following** 57:1
  69:21 86:6 88:15
  133:7
**follows** 5:5
**food** 14:17
**foregoing** 169:16
  169:21 172:13
  173:18
**forgotten** 8:2
**form** 6:2,10 53:20
  53:24 54:5,14,20
  97:3,13 99:11
  101:9 125:25
**former** 159:10
  160:2,13 161:16

**forms** 5:22 53:13
  53:15 54:9 57:3
  89:3 90:11 91:16
  96:6 108:25
  124:24 125:11
  166:19
**fortune** 47:4
**forward** 20:14
  141:23 147:15
**forwarded** 98:22
  144:1
**foundation** 46:3
  66:8
**four** 13:22 15:4,25
  16:1 26:16 142:17
**fourth** 2:7
**fox** 24:16 25:1,4,9
  29:16,17 154:14
**frame** 94:8 108:3
**free** 172:14 173:20
**friends** 9:15 163:3
**front** 96:23
**full** 22:11 77:10
  99:13
**fully** 7:11 98:9
**fun** 38:25
**function** 159:22
**functional** 38:20
  117:25
**functioning** 39:5
  49:17 51:4
**functions** 55:11,14
  55:17 60:9 61:24
  63:17 64:6,10,18
  65:5,16 66:5 67:5
  90:13 95:6 96:7
  96:13 97:11,14
  99:14,23 100:2
  101:25 104:7
**further** 11:2 72:15
  91:22 99:5,9

**[further - happened]** Page 12

132:14,22 135:13
139:23 143:18
155:23 169:19
170:1
**future** 104:16
109:14

**g**

**gain** 39:2
**games** 47:5
**gather** 97:21
**gathered** 78:22
89:18
**gathering** 89:13
**gear** 39:3 48:4
**geared** 38:20
**geauga** 30:16
**general** 12:16
32:17 34:23 35:20
42:8 49:9,10
74:17 90:5 92:10
155:16 157:10
161:19
**generalist** 63:19
**generally** 15:17,18
20:11 38:22 39:16
40:1 45:1,9,14
78:20 108:24
115:13 145:13
**georgene** 88:20
89:10,12 101:2
118:5 124:18
126:4 128:14
**geriatric** 19:23
21:20 24:2 26:22
27:10 28:4 29:13
29:21 30:1,11
31:4,23 35:18
36:19 38:8 48:2
102:16 119:2
132:3 141:10,25

**getting** 9:9 41:14
53:11 95:15 125:1
127:21 137:20
143:9 146:22
147:4,9,15 151:2
155:2
**giffen** 1:20 2:13
**give** 43:21 45:16
54:5 74:13 80:12
89:25 97:1 99:17
113:17 115:10
168:1,10
**given** 17:10 20:5
39:15 73:23 75:5
111:6 117:5 142:1
169:13,18
**glasses** 10:8 98:4
**go** 19:5 28:21
29:14 30:24 36:6
36:21 38:14 43:19
45:2,8,14 52:2,22
52:25 55:25 61:15
67:9 71:6 86:5
93:20 94:14 96:14
99:16 101:24
104:21 117:6
118:9 125:3 131:8
135:21 136:2
143:22 149:24
159:11
**goal** 39:2 45:10
**goals** 39:10,14
**going** 19:7 46:15
56:2 69:16 70:22
72:17 74:3 83:12
97:8,20 103:12
105:11 110:23
116:21 117:8,24
124:24 129:3
133:12 138:20
140:15 143:3

145:6,22 146:1
148:11 150:17
151:16 153:19
156:6,11 162:13
162:14 166:17
167:2
**good** 16:20 42:2
58:7 87:18 92:2
99:8 150:25
156:13
**goodness** 89:12
**gotten** 154:5
**grab** 71:22 73:15
74:15
**grabbing** 71:23
72:8 75:10
**gradual** 30:2
**great** 131:12 164:6
**grid** 109:18
**gridding** 104:13
**group** 15:3 38:17
40:1,2,2,6,11
41:10,12 42:13
43:22 44:11,21
45:1,2,5,23 46:14
47:4 56:14,20
58:5 60:10 61:8,8
61:12,14 62:5,9,13
63:1 70:10 73:5,9
78:23,25 81:24
82:11,16 83:21
84:5,12 85:4,13
116:12 119:13,21
129:11 140:20
141:6
**groups** 14:25
37:20 38:3 47:21
47:24 48:13,15
120:4 129:15
**guard** 60:14

**guess** 6:24 7:14
8:11,14,16 10:7,16
10:25 12:2 14:25
33:18 34:10 36:19
43:6 52:4 57:7
58:17 71:2,10,19
72:12,14 73:5
85:7 92:17 102:21
104:11 110:2
117:22 118:20
134:3 140:4 142:4
146:10 151:1
**guessing** 30:10
92:5 112:22
124:23
**guesstimate**
114:16
**guide** 108:20,21

**h**

**hair** 71:22 72:8,9
74:16 75:10
**hallucinating** 41:4
41:8
**hallucination**
79:21 80:8
**hallucinations**
103:2
**hallway** 85:11
**hallways** 84:20
**hand** 97:16 100:1
145:6 170:6
**handing** 148:3
**hands** 12:15 14:19
74:6
**happen** 61:1,4
75:6 89:22 112:5
112:12
**happened** 46:25
57:17 63:11 84:23
85:8,14 95:2
142:7

**happening** 62:20 72:14
**happens** 71:4
**happy** 145:22
**hard** 7:13 10:6 33:2 72:18 74:10 85:13
**harm** 33:19,20 68:2
**harmful** 22:15
**he'll** 71:7
**head** 11:12 12:15 13:4 20:11 21:4,6 27:20 28:14,19 43:7 47:17 65:18 112:25
**health** 18:7,21,24 162:24 164:14,16 164:23
**hear** 122:11 123:18 144:21 166:11
**heard** 122:15 136:13 140:1 144:4 166:2
**heights** 154:23 155:20
**help** 9:10 21:22 57:15 59:9,12 60:21 61:2 74:14 106:16 112:20 115:16 130:17 152:2,16,18
**helped** 59:8
**helpful** 82:17 95:8 145:20 149:10
**helping** 130:24
**henton** 157:24
**hereinafter** 5:4
**hereunto** 170:5

**hey** 59:21
**high** 2:6
**higher** 26:21 33:14,17,19,23 48:3 78:7
**hinckley** 9:25
**hiring** 9:15
**historically** 116:13
**hit** 73:16 74:15
**hitting** 67:24
**holbrook** 157:17
**hold** 15:24
**holding** 27:18
**holley** 21:7 27:22 28:19 47:10 48:19 51:25 52:15 55:4 56:7 63:21 65:16 65:25 66:25 76:13 82:1 88:6 114:7 124:7,9,18 128:9 132:10 149:18 152:21 157:23 166:6
**holy** 12:22 13:6,24 14:5,15 17:2 18:2 19:17 139:2,6 154:6 163:12,17
**home** 8:12,20 9:8 25:21 94:16 139:16 143:22 144:17 155:17,17
**homes** 24:5 25:19 138:14
**hope** 123:16 128:19
**hopefully** 132:23 145:11
**horseshoes** 46:11 46:13

**hospital** 23:20 30:20 35:19 130:3 149:16 154:13 155:4
**hospitals** 1:8 5:19 18:25 19:18 23:23 149:15 171:6 172:3 173:3
**hour** 45:14,19 139:20
**hourly** 139:17
**hours** 13:9 38:9 88:25 102:5 139:12
**hr** 55:25 60:5 63:14,19 164:13
**hsa** 128:1
**huge** 162:7
**huh** 66:12 75:14
**husband** 155:18 161:22 163:22
**husband's** 38:11 18:14 19:2,10
**hypothetically** 74:20

## i

**i.e.** 114:2
**ideation** 32:22
**identification** 96:21 103:19 118:17 122:3 136:9 145:4 148:1 165:15
**identified** 142:11
**identify** 38:12 39:10 42:16 83:1 97:14 145:17,19 145:25 156:8
**identifying** 95:19
**imagine** 163:24

**impact** 123:6 163:5
**impacted** 8:10 162:1,6
**impairment** 6:3,8 6:19 7:7,11 8:9 10:21 72:6,22 73:13,23 74:8 96:8 166:24
**impairments** 6:10
**implement** 39:8 111:7
**implemented** 39:13 104:6
**important** 87:3 120:19
**improving** 39:4
**inability** 78:8
**incident** 57:11
**incidents** 85:9
**include** 38:6
**included** 43:12 44:25 68:2 127:4
**includes** 103:2
**including** 76:1 98:3 156:14
**incorporated** 173:12
**increase** 32:13,21 33:4,23 34:2 36:2 48:1 56:10 137:1
**increased** 33:3 34:10 36:13 56:7 57:5 62:4,11,25 137:2,3
**increasing** 63:3
**index** 3:1,5 4:1
**indicate** 105:18 108:8 109:8 111:1 164:12

**indicated** 96:6
97:7 99:11 140:19
**indicates** 123:16
**individual** 40:7,10
40:15 82:13
119:25
**individually** 82:12
**individuals** 20:1
95:19
**infant** 14:4
**infants** 13:8 14:3
15:4,6,7,9,13,15
15:15,16,17,20,22
16:2,6,18 17:9,20
17:25
**information** 22:18
38:17 40:4 50:19
53:16 78:22,24
89:13,17 90:17
97:21,25 98:21
102:10 117:13
125:4,10,24 126:6
126:12,22,23
127:1,5 151:13
161:10
**inhibit** 72:6
**initial** 38:7 39:7
78:20 127:16
**initially** 6:24 25:4
70:6 78:17 88:22
90:5,16 130:11
141:13 144:1
149:6 151:13
**initiating** 60:4
115:7
**inquire** 130:2
**inside** 114:18
**instance** 59:11
85:12
**instruction** 168:2
168:10

**insurance** 18:8,21
18:24 93:9,13
**intake** 89:3
**interacting** 82:21
**interaction** 41:13
41:16,22 74:25
80:24 115:8
**interactions** 43:5
83:2 120:18
**interdisciplinary**
37:22 43:13
**interested** 142:18
170:3
**interests** 38:22,24
142:9
**interim** 28:17,18
**intermittently**
79:17 99:21
**internal** 35:13
120:9
**interpretation**
100:4
**interrogatories**
156:4,7
**interrogatory**
164:11
**intervene** 74:3
**intervening** 34:11
**intervention** 34:3
34:4 67:12,19
68:7,17,22 70:9
75:9 111:17
**interview** 138:18
139:25 144:15
152:4
**interviewed**
144:16
**interviews** 138:16
138:21,23 144:9
**introductions** 45:5

**inventory** 142:8
**involve** 76:8
**involved** 163:13
**involvement** 34:11
**ipad** 104:11
**issue** 64:5,14
70:23,25 76:5
93:9 105:12,19
106:19 111:3
123:2
**issues** 38:12 48:24
78:5 104:9 105:15
109:16,22 111:24
120:13 132:10
137:2 147:18
162:25
**items** 22:15 35:8
36:3,5 83:5,15
149:8

**j**

**january** 18:23
47:11 51:18 55:8
57:18 62:1 63:8
63:18 65:8,17,24
66:9,13 146:8,11
147:9 152:22
153:2 165:2,9,23
166:3
**jen** 20:19,21
**jennifer** 157:15
**jeri** 107:9 161:4
**jessica** 157:2
**job** 11:24 13:6
14:2,3,5,11 16:20
28:12 37:18,25
38:4 39:17 42:2
43:12 44:19 55:5
55:11,14,16 58:7
60:9 61:24 62:4
62:11 63:17,25
64:6,10,18,25 65:4

65:16 66:4,11
67:5 86:12 87:14
90:14 94:15 95:5
95:6 96:7,13
97:10,14 99:14,23
100:2 101:25
102:7 104:7 106:7
117:19 119:15
123:7 130:24
131:15 134:2
135:16 138:16,19
139:1,4,8 143:22
143:24 144:3
152:2,14 153:10
153:18 154:6,6,11
162:9
**jobs** 130:2,25
131:5 134:6 138:8
138:13 142:10,16
142:17,19 143:16
144:8,19 152:22
152:23 153:6,7,13
**john** 21:17 24:8
25:13
**joined** 25:5
**joy** 72:4 75:9,15
75:20,25 150:13
150:19 158:8
**judge** 41:8 93:19
**judging** 114:21
**jumping** 105:9
**june** 124:11,12
127:18 128:5,8
129:6,10,16 130:1
130:15 131:20,23
133:1 134:16
135:7,12 136:24
137:8,23 140:5
141:3,6 158:22

**k**

**k** 127:25 162:17
**kaminski** 1:20 2:13,15
**kara** 53:5,8 61:20 124:18
**karen** 88:23 89:10 89:18 92:2 101:3 124:19
**kathryn** 132:10 152:20 157:23
**kathy** 21:7 27:22 28:19 47:10,17,25 48:18 49:13,23,25 50:25 51:19,20,25 52:7,15,20 55:4 56:6,10 58:25 59:2 60:2,15 61:19,21,23 62:21 63:7,21 64:7 65:5 65:16,25 66:25 76:13 77:20 82:1 83:18 84:2 85:18 86:21 87:4 88:6 88:11 112:3,9 114:7 124:6,9,18 128:9 129:17 132:16 133:4 149:18 166:6,13
**kathy's** 58:14 62:3 66:10
**katie** 159:9,21
**keep** 52:8 74:6 124:25 134:13
**keeping** 22:12
**kept** 33:7
**kerin** 2:15 115:2
**keyboard** 49:20 49:23 105:6 146:19

**kicked** 140:11
**kicking** 67:24 71:23
**kid** 13:20
**kids** 13:19 14:16 14:21
**kiel** 20:16 156:14
**kimnach** 163:4
**kind** 22:21 28:25 29:21 30:7 35:14 36:11 50:4 78:9 88:23 89:14 107:1 123:2 143:9
**king** 163:4
**kingery** 156:15
**kkaminski** 2:21
**knee** 42:3 80:11
**knew** 117:7
**know** 6:24,25 8:22 8:22 9:12 10:2,15 12:5,10 13:4 14:2 17:18 20:18,19 24:18,22 25:24 26:22 27:7 28:8 29:3,9,18 33:2,11 33:15 36:3 37:25 42:3 49:4,16 54:6 54:8,10,14 58:23 59:6,14,15 60:23 62:16,17,19,21 64:7 70:6 74:3,4,4 74:5,21 77:6 82:16 89:13,16 92:7 103:24 106:23 107:12 108:17,21 113:16 115:12 116:3 117:15,19 121:7 123:20 125:23 131:13 134:4,5 139:15,16,17,18

139:21,22 142:12 144:7,9 145:15 146:25 147:2,19 148:14 150:11,14 151:10 152:8,9 153:2 154:8 157:23 158:14 159:15 162:4,16 163:13 165:8,9 166:15,19
**knowledge** 37:13 75:15 90:4 98:20 156:9,12,20 157:10 159:3,6 161:19,25
**kohlbacher** 88:20 101:2 118:6 126:5 128:14
**kramer** 20:17 156:15
**kyle** 161:23

**l**

**l** 24:21,23,25
**labeled** 4:3,4,6,8 4:11,13,15 96:19 103:16 118:15 122:1 145:1 147:23 165:13
**lack** 31:3 34:22 58:17 71:11 80:24 81:8
**ladaika** 53:6
**laid** 132:19
**language** 143:10
**large** 45:13 46:6 70:10 147:5
**larger** 7:3,4 31:12 49:19,22 61:14 105:6
**late** 32:6 57:17 141:20

**lately** 13:11
**law** 2:4
**lawful** 5:1
**lawsuit** 5:18 6:11 158:3,13 159:17 159:24 160:4 161:10,13 163:14 166:20
**lay** 66:7
**lead** 6:22 16:15,18 17:7,13,24 26:6 113:17 129:15
**leadership** 62:14
**leading** 84:14
**leaning** 58:10
**learn** 67:20 140:23
**learned** 113:15
**learning** 35:10 38:1
**leave** 56:3 67:8 83:20 92:23 111:5 127:8,10,16 134:17 137:16
**leaving** 95:20
**led** 50:10
**left** 11:20 25:8 29:1,15 132:22 134:4 143:18 149:3
**legal** 171:1 174:1
**legitimacy** 136:25
**legs** 41:25
**leisure** 38:22,23 47:2
**lengthy** 110:16
**letter** 4:9 51:25 122:6 133:22 134:12,23 135:19 135:22 136:7,14 136:19,22 137:10 165:5,8,19,23,24

171:18
**level** 33:23 48:1
  79:7
**levels** 78:8
**levi** 161:15
**liaison** 89:15
**life** 8:11,12,20 9:6
  112:6 162:1,6
  163:6
**lifestyle** 162:12
**lights** 44:4,11
**limit** 9:6
**limitations** 87:12
  96:13 126:13
**limited** 162:18
**limits** 8:18
**linda** 160:6
**lindsay** 156:15
**line** 36:8,10 100:8
  109:3,3 173:7
  174:3
**list** 20:20 40:24
  64:7
**listed** 157:9
  161:22 173:7,17
**listen** 115:6
  118:21 148:21
  165:19
**listening** 115:12
**listing** 173:7
**litigation** 145:15
  148:9 156:3
**little** 10:4 11:12
  22:9 58:11 66:7
  69:4 120:22 151:3
  162:18
**live** 9:24
**living** 138:19
  144:15
**livings** 138:14

**lms** 35:7,10
**local** 31:16,17
**locate** 152:11
**located** 13:25
**location** 154:22
  155:12 171:14
**locations** 30:18
**locked** 46:18
**long** 12:23 18:20
  88:21 102:4 122:8
**longer** 7:5 10:1
  50:8 165:7
**longtime** 163:3
**look** 130:5,24
  131:9 134:6
  135:24 154:8
  167:2
**looked** 131:3
  134:21 144:13
**looking** 8:16 10:22
  79:2 104:15
  105:10 144:11
  152:22
**looks** 11:23 156:13
**loss** 6:23 8:9,17
  10:3 100:3
**lost** 122:21
**lot** 36:3 49:5 97:24
  104:9 124:23
  151:8 153:6
**loud** 97:9
**low** 94:21 151:5
  153:7
**lower** 153:10,14
**lowest** 32:2
**lunch** 14:19 87:19
  88:4
**luncheon** 87:21
**lyn** 2:15

**m**

**m** 24:25
**machine** 125:4
  127:1
**madam** 171:9
**magda** 20:17
  156:15
**maholik** 25:14
**mailed** 53:13
**main** 16:12,13
  67:10 128:1
**maintain** 37:14
**maintained** 148:8
**making** 22:14
  60:10 106:1,4
  124:25 146:11
  154:12
**management**
  35:10 52:3,23
  53:1,3 61:20
**manager** 20:12,12
  21:4,6,8 27:20
  28:14,19 43:18
  47:17 63:21
**managers** 49:6
**mandatory** 56:3
  67:8 88:12 92:22
  149:14
**manifests** 6:1,6
**manner** 29:19
  31:5 51:12 54:10
  100:9
**march** 48:18,21
  50:21 52:13
  130:13,15 142:4
  144:6,6 150:4
  154:1
**mark** 103:12
**marked** 4:2 96:20
  96:24 103:18
  118:16,22 122:2

122:13 136:8,16
  145:3,7 147:25
  148:3 165:14,19
**market** 154:11
**marlene** 20:16,21
  156:14
**married** 28:1,2
**master's** 28:10
**material** 36:12
  51:11
**materials** 69:10
  113:3
**matter** 171:11
**mccoy** 157:19
**mean** 7:14 8:21
  9:21 10:5,6 11:1
  28:24 38:23 58:3
  64:16 74:18,20
  75:5 82:15 85:13
  86:2 87:8,10
  102:23 114:21,25
  115:1 116:24
  121:11 127:10
  139:12 147:18
  150:24 151:7
  162:7,7,11,12,20
**meaning** 31:17
  132:2 149:13
  159:12
**means** 9:13 33:11
  121:10
**medical** 1:9 5:22
  6:9 56:3 67:8
  89:19 92:22
  127:25 134:17
  137:21 141:8
  155:3 171:6 172:3
  173:3
**medicated** 42:9
**medication** 42:14
  115:23

**meet** 47:10 67:10
88:19,24 101:20
102:2
**meeting** 55:25
60:5 63:14,23
64:11 65:11,14,17
65:21,24 66:1,13
66:14,23 67:2
76:12,16 81:23
84:3 85:19,23
86:24 88:5,10,11
88:21,25 89:2
95:2 100:14
101:23 102:4
109:4 121:14
124:6 128:9,13,16
129:6,9,16 130:1
131:23 132:17
133:1 135:12
136:24 137:8
142:7 143:17,18
**meetings** 38:18
67:11
**member** 37:21
113:4 129:11
155:12
**members** 83:25
84:19 98:7 113:16
**memory** 34:18
**mental** 162:24
**mention** 112:3
**mentioned** 64:3
104:4 107:9
109:13 129:17
131:22 142:3
158:15 159:18
**mentions** 108:12
**met** 26:8 43:18
51:19 63:15,18
88:22 117:17
124:8 131:16

142:4
**methods** 40:14
41:6 74:11 77:3
81:16
**metzger** 159:9
**middle** 97:8 99:19
**middleburg**
154:23 155:20
**midwest** 174:1
**mike** 160:1
**mild** 110:9
**miles** 157:21
**mine** 8:13 11:16
**minimal** 93:2
**minor** 47:19
**minute** 17:21
122:6 135:24
**minutes** 16:11
45:14 167:2
**mirroring** 30:22
31:1,2
**miscommunicati...**
151:9
**mistakes** 151:23
**model** 105:10
**modifications**
107:7
**money** 154:10
162:16
**monitor** 49:20,22
105:6 137:4
**monopolize** 58:5
**month** 131:17
159:15
**months** 13:8 15:5
15:18
**mood** 74:17,20
78:9 115:22
**morning** 40:5
43:19 45:1,18
46:21 48:12

**moss** 1:5,13 3:7
4:3,5,7,8,11,13,15
5:1,6,10 18:16
88:2 96:19 98:5
98:11 103:16
113:6,25 116:18
118:15 122:1,10
145:1,12 147:23
148:15,23 149:23
161:23 165:13
169:9 171:6,8
172:3,4,9 173:3,4
173:13 174:20
**motions** 53:12
**motor** 45:13 46:6
113:6
**move** 16:1 29:6
45:11 147:15
**moved** 15:13 16:2
36:8
**movement** 12:12
12:16
**movements** 81:8
120:18
**moving** 12:15
24:14 30:8 41:14
41:24 81:10,15
**mullinax** 156:16
**multiple** 55:22
119:20
**music** 158:11

**n**

**naftzger** 130:8
131:14 142:5
**name** 5:8 13:4
18:14,16 21:12
24:19 28:2 53:6
125:6 133:22
161:2 171:6 172:3
172:4,15 173:3,4
173:21

**named** 130:8
169:9
**names** 20:23
**narrow** 12:9
**near** 77:14 97:18
122:18,23
**necessarily** 51:10
121:1
**necessary** 35:17
60:1 91:4 98:9
120:17
**need** 8:19 9:10,19
34:3,9,10 42:3,5
44:10 45:22 50:3
52:22 53:17 61:15
74:5,5 82:18
89:21 92:24
103:11 109:3
110:24 113:5,18
114:2,13 125:21
131:8 145:8
149:11 152:20
164:7
**needed** 23:9 49:18
50:4,11 52:2,17
58:15 70:21 89:22
91:23 92:11 98:7
107:13,20 113:20
126:6,23 145:17
146:18 149:8
152:21 153:22
**needing** 43:20
61:9
**needs** 38:21 44:8
81:24 82:3
**negotiate** 139:22
**neighbor** 155:12
**neighbors** 155:8
**neither** 99:24
**never** 70:23 78:3
111:6 117:5,17,18

127:20 139:23 140:1,2 144:4 164:22
**new**  27:13 45:5,6 49:18 51:2,15 52:6,13 56:5 94:15 106:5 119:6 131:15 146:19 152:14,21
**newer**  21:11 51:14 52:20
**news**  96:11
**nicolette**  156:16
**ninth**  1:21 2:16
**nod**  43:7
**non**  42:25 67:12 67:18 68:6,16,22 75:8 80:22,25 81:1
**nope**  71:1 84:1
**norm**  116:14
**north**  2:6
**northeast**  31:13
**northern**  1:2
**notary**  169:6 170:14 171:25 172:10,18 173:15 173:23 174:23
**note**  23:2 40:13,18 98:1 100:7 135:10 148:17,22
**noted**  40:25 100:2 103:21 113:24 115:4 122:16,20 149:12
**notes**  22:24 40:3,6 96:9 116:15 148:6 148:13 149:22 167:2
**noticing**  114:1,9

**notified**  165:6
**notify**  143:4
**noting**  80:19
**novicky**  107:10 161:4
**number**  4:2 13:19 27:2 76:17 81:12 139:20 145:12 146:2 148:15 156:13 162:8 171:7
**numbered**  148:23 149:21 150:6
**numbers**  173:7
**numerous**  130:21 138:13
**nurse**  21:3 28:10 59:20 79:9,11,15 79:18 88:24
**nurses**  20:11,15 21:1 22:20 28:21 29:2 59:7,12 113:17 116:16 156:16
**nursing**  24:5 25:19,21 43:5,17 44:9 57:15 116:20 138:13 139:16 140:1 141:15 157:3

**o**

**o**  24:21
**object**  147:16
**objected**  143:8
**objectives**  21:19
**obligated**  22:2
**obligations**  37:19
**observation**  32:18 38:16 41:9 56:7 56:11 57:4 62:4 62:10,25 79:10

80:24 81:6 140:25
**observe**  34:9 41:11 56:19 62:18
**observed**  30:19 33:1 34:7 79:14
**observing**  41:15 72:23
**obtain**  146:15
**obviously**  95:5
**occasionally**  59:7
**occasions**  110:2
**occupational**  99:7 101:15 117:21 129:23 158:25
**occur**  75:3
**occurred**  35:1 40:4
**occurring**  73:20
**october**  50:23 51:17,19 52:19 54:11 55:4,7 56:6 56:18 61:19 62:22 63:4 159:23 170:17
**offer**  116:21
**offered**  9:21 19:3 138:24 139:1,4 154:6
**offhand**  54:7 68:4 94:4 102:21 107:12 108:18 110:15 126:22 129:8 135:11 151:10 152:8
**office**  76:22 77:6 77:13 126:20 158:22 170:6 171:13
**official**  172:15 173:21

**oftentimes**  51:7,9
**oh**  8:25 25:12 111:11
**ohio**  1:2,22 2:8,18 31:14 169:2,7 170:7,15 171:2
**ohioans**  130:19 146:9 148:7
**okay**  7:2 29:17 37:3 50:6 52:4 93:20 98:14 99:10 100:11 104:4,17 115:4 142:25 146:4 147:12 149:6 151:17 153:12,24 158:23 163:24
**old**  6:25 15:15
**older**  15:7,13,17 16:2,18 17:9,20 27:1
**onboarding**  34:23 35:6
**once**  27:8 55:24 119:21 134:10 153:21 159:11,14
**ones**  65:19 128:1
**ongoing**  74:25
**ood**  154:9
**oops**  85:16
**open**  8:14 132:7
**opening**  138:20
**openings**  131:7 143:2
**operate**  30:24 31:5 141:5
**operated**  30:1
**operating**  29:18 48:12
**operation**  47:16 161:20

operator 22:2
opinion 99:12
opportunities 146:9 148:6
opportunity 111:6 117:6 122:11 148:21
opposed 10:23 12:2 31:15,16 36:16 74:14 112:6 112:12
option 23:11 128:25 133:14 134:19
options 128:23 132:20
order 89:21 90:10 168:14
ordered 168:12
orientation 45:3
original 168:12
ormsby 125:8,10 126:11
ormsby's 126:20 126:25 127:2
ot 141:15 151:11
outburst 71:14 72:8 73:2,15 74:24 75:3 76:9
outbursts 67:25 137:6
outcome 39:22
outside 8:12 9:7 24:6 25:11 46:15 76:21 138:5 144:11
overall 31:20 88:24
overlap 141:17
oversaw 21:13

oversee 29:12
overseeing 24:11 25:2

**p**

p 24:21
p.m. 13:15 14:14 167:6
packet 126:8
page 97:8,25 98:1 99:16,19 145:9 146:21 149:20 173:7 174:3
pages 148:12 151:7
paid 127:7,21 137:11,20
papers 92:23
paperwork 30:3,4 36:4 89:24 93:17 96:2 128:18
par 51:4
paraphrasing 65:3
parma 1:9 14:1 18:19,21 19:11,18 19:22 23:13,19,23 24:1 25:11,22 26:3,10 27:9,16,20 28:4,23 29:11,15 29:24 31:8,17 34:16,21 35:22,23 36:3,16,20 49:16 68:8,18,23 104:14 131:1,15 141:8,10 141:23 143:2 149:15 155:3,6 156:17 157:4 159:1 171:6 172:3 173:3
part 13:17 19:25 25:10 34:21 38:2 38:4 39:17 43:12

44:13,19 48:6 57:20 64:17 65:2 70:3 82:6 89:2 91:7 92:9 94:25 96:2 98:6,17,22 100:15 106:7 117:3 118:23 119:21 121:13,18 124:3 126:8 138:2 145:21 147:19 150:6 173:9
partaking 116:4
participant 80:20
participants 75:18
participate 44:2 112:2
participated 70:11 79:14
participating 43:13 79:25
participation 40:20 41:9,12 74:18 78:23 79:7 80:22 116:12
particular 57:11 58:4 60:10 123:24
particularly 149:9 149:18
partner 69:12 71:8 72:2 75:21
partnering 113:4
party 170:3
passed 77:6
passing 151:12
passive 58:2,6 59:19 60:16 80:20
pat 42:1,3 73:25 80:10
pathways 130:8 133:19

patient 21:14 22:7 22:16 31:7,21 33:10 34:2 38:3 39:9,11,14,25 40:7 40:10,12,16 41:7 41:17,19,25 42:18 43:6 44:7 45:4 47:8 57:14,25 58:4,8,19 59:12 60:11,17,20 68:2 71:14,18 72:7,20 73:1,14,21,25 74:1 74:9,14 75:11 76:9 78:7 79:1,19 80:13 83:1 85:3 86:10,25 87:2 95:11,15 110:22 116:17 119:23,25 120:17,23 137:1,3 137:4,6 142:11,13 142:25 143:1
patient's 23:3 38:7 39:23 72:9 80:14 82:3 83:22 116:2
patients 20:6 21:21 22:12 23:5 24:1 25:16,21 26:7,12,19,24 27:5 32:6,11,13,21 33:14,23 34:12 37:21 38:3,21 39:18 42:7,13,24 43:4,19,22 44:20 46:16 48:2,2 59:9 61:1 67:6,21 73:7 75:4 77:22 81:24 82:6,11,21 83:4 84:4,15 113:20 114:1,3,10 115:22 116:7 119:6,8,20 120:5,8,12 121:9

**[patients - preparing]** Page 20

129:19 147:6
**patricia** 163:4
**paul** 125:15
**pay** 18:2 127:11
127:15 134:14
139:8,10 153:10
153:10 154:12
163:15 164:14
**paying** 153:7,14
164:20
**pca** 157:3
**people** 9:1 10:7
17:17 61:8,11
62:13,17 73:10
82:16,18 85:10
152:6 156:8,12
163:2
**perceive** 119:24
**perform** 8:19
40:15 55:6,17,20
60:9 63:17 64:6
65:6 66:4 67:4
86:11 90:13 96:7
97:10,15 99:14
101:25 123:7
135:16 159:13
**performance**
43:22 48:19 56:8
56:12 62:4,11
63:7
**performed** 40:11
69:4
**performing** 40:16
64:18 75:9 82:12
99:22 102:8 104:7
111:25 159:12
**periods** 16:8 17:22
**peripheral** 10:11
10:19 11:7 12:2
**periphery** 12:4

**permitted** 108:10
134:1 166:18
**perpetrator** 71:9
71:13
**person** 27:17,22
36:9 45:6 73:15
73:22 83:15 87:9
89:17 121:6
125:17 135:12
138:23 141:18
151:13 155:15
160:22,24 161:17
**person's** 78:18
**personal** 137:16
**personally** 34:7
172:11 173:15
**personnel** 86:10
**petting** 14:23
**phone** 93:8 101:5
124:15,16,20
133:11 134:16
135:6 138:23
151:14 166:2
171:3
**phrase** 33:15
**physical** 34:3 39:1
41:20,22 69:13
71:19 75:16 81:20
84:19 113:6
**physically** 34:12
80:25
**physician** 20:13
21:13,16 43:17
53:17 90:6 94:18
**physicians** 24:3,7
24:10 53:19 89:25
129:22 151:22
**pick** 121:7 155:16
**piece** 89:19
**pinpoint** 12:8

**place** 9:14,14 22:7
30:9 35:22 52:10
53:12 63:8 67:13
106:10 109:2
164:24 169:20
**placing** 67:7
**plaintiff** 1:6 2:3
**plan** 19:6,10 39:8
76:21 77:10,19
**planned** 39:13
**planning** 164:14
**plans** 43:20 97:17
104:19 109:25
**plate** 14:17
**playing** 14:18
**please** 5:8 6:20
14:13 31:11 59:22
66:6 112:8 171:13
**plenty** 113:19
**plus** 98:5
**pocket** 19:9
**point** 7:4 11:3 36:2
47:25 51:24 73:19
75:3 87:19 107:13
125:2 130:12
147:1,3,10 155:7
**policies** 22:6 34:15
**policy** 92:10
**polster** 24:16,20
25:1,7,10 29:1,4
29:10,16,17
154:15
**poor** 51:6 97:18
123:6
**population** 26:22
31:8,21 39:14
48:5 78:7 102:15
102:20 103:5
120:24
**portion** 54:9,19
69:13 77:18 100:9

146:1
**portions** 56:20
**pose** 120:14
**position** 27:13,18
132:9 133:13
142:14,21 152:12
152:13 166:18
**positions** 130:6
137:24 138:17,24
143:1,5
**possession** 22:15
**possibility** 83:14
155:22
**possible** 83:9,13
**possibly** 24:6
30:16 34:8 58:22
81:14 83:8 94:10
95:21 101:5
109:14 124:19
146:19 150:13
**postings** 130:25
131:7,15
**potential** 72:7
112:14 130:25
131:24 134:16
135:15
**potentially** 76:8
154:15
**practice** 24:5 25:5
25:11,17 29:12,19
56:19
**practiced** 25:6
**practices** 37:15
**practicing** 71:6
**practitioner** 28:11
**precaution** 22:22
22:23 23:2
**precautions** 22:25
**prefer** 171:15
**preparing** 14:18
162:17

**presence** 57:8
169:15
**present** 56:13
62:21 63:1 79:9
79:12,16,18 105:7
121:7 128:12
156:21
**presenter** 71:5
**press** 44:9,9
**presume** 104:2
117:4
**presumed** 126:9
**presuming** 123:22
**pretty** 8:13 26:18
42:12 154:11
**prevent** 72:6,22
73:13 74:8 99:21
**previous** 49:6
77:18 94:3,9
103:24 116:12
147:3
**previously** 13:12
36:20 103:22
**primarily** 6:2
**primary** 90:17
**print** 7:4,5 147:5
**prior** 19:17 23:25
24:11 25:15 26:10
26:25 28:22 32:1
35:22 37:11 52:13
56:16,18 68:13,17
68:23 70:2,18
93:14 94:13 109:4
157:24
**private** 24:4 25:10
25:17 29:12,19
37:15
**prn** 159:11
**probably** 7:25
10:9,25 11:20
16:11 24:25 26:20

27:2,4 30:2 31:16
32:12 33:17 34:14
35:3 41:4 47:21
54:1 61:7 65:22
68:12 73:19 74:2
74:25 80:9 88:25
91:25 92:6 94:14
102:5 103:1 107:9
108:25 110:16
112:22 115:25
116:11 126:23
133:7,10 135:10
141:3 145:16
160:10 163:24
**problem** 64:21
105:12,19 108:9
109:22 111:3
**procedure** 5:3
168:7 172:5 173:5
**procedures** 22:6
34:16 77:4
**process** 25:25
34:23 43:3 51:23
82:7 88:8,13,17
89:11 92:10,15
94:25 96:3 98:18
98:23 100:16
106:4 117:3,23
118:7,24 121:14
121:18 124:4,10
125:3 127:7,17,21
133:5 136:3
149:14 151:15
166:16
**produced** 145:14
**production** 4:5,8
4:11,13 103:17
122:2 145:2,12
147:24 148:16,23
171:23

**professional**
123:23
**professionals** 20:1
**progress** 7:11
**progressing** 7:8
77:22
**progression** 6:19
6:21 8:5
**progressive** 6:16
**prompts** 42:4
75:16 113:6
**provide** 26:12
37:20 50:1,18,24
54:4 92:3 102:12
105:12 107:1
111:13 123:5,6
125:4 127:1
155:11 164:4
**provided** 5:2
14:10 23:4 48:19
50:8 71:20 86:15
101:11 106:19
109:9 117:8 124:2
126:1,12 148:8
**provides** 122:21
**providing** 38:2
40:17 58:6 64:20
73:7 75:16 101:8
106:18 111:2
123:24
**psych** 19:23 21:20
24:2 27:10,10
28:4 29:13,22
30:1,11 31:4
35:18 36:20 38:8
75:4 102:16 119:2
132:4 141:25
**psychiatric** 20:2
21:23 102:22,24
120:23 137:2

**psychiatrist** 37:7
160:16,17,18
**psychosis** 26:15
103:1
**pto** 134:7,10
137:11 140:13
**public** 9:17 161:16
169:7 170:14
172:10,18 173:15
173:23 174:23
**pull** 74:15
**punches** 75:10
**punching** 71:23
**purchased** 51:5
171:16
**purpose** 30:21
38:10 94:12
101:22
**purposes** 96:21
103:18 118:16
122:3 136:8 145:3
147:25 165:14
**pursuant** 168:3,6
**put** 71:10 85:4
92:22 97:12 132:2
134:17 138:9
**putting** 96:23
134:23

**q**

**qualifications**
142:24
**qualified** 126:3
138:3 142:18
169:8
**qualify** 130:6
**question** 8:15 12:5
16:22 19:8 45:8
69:17 92:18 97:9
98:2 99:20 100:12
110:4 115:7
145:24 146:1,6,25

[question - regarding] Page 22

147:8 148:16
149:20 150:25
**questioning** 41:13
**questionnaires**
89:4
**questions** 5:15
36:7 38:16 43:7,9
89:17 91:3,20
97:6 102:7 124:24
125:24 126:16
141:1 145:10
148:12,15 150:11
150:14 156:2,6
**quick** 140:16
**quite** 110:16
**quote** 49:1,2

**r**

**r** 24:21
**raised** 48:25 65:16
65:20 76:17 81:23
83:19 84:18 85:18
85:21
**ran** 47:17 134:10
153:22 159:22
**range** 15:14 32:2
**ranges** 31:24
**rapid** 115:15
**rate** 18:2 139:18
**ratio** 13:20,21
**reach** 73:15 131:4
133:19 140:2
154:3
**reached** 150:16
**reaching** 73:22,25
74:13,15 83:5
**react** 76:7 78:2
112:16
**reacting** 79:25
80:2,3
**reaction** 80:14

**reactions** 81:12
**read** 6:24 7:4
43:10 89:8 91:24
97:8,9,23 98:14
99:2,11,18 100:6
103:11 107:15
118:21 122:6,12
135:21 136:13,23
145:8,23 148:22
149:2 150:3,4
165:21 172:5,6,12
173:5,6,17
**reading** 108:5
114:2 167:5
171:11,18
**ready** 9:9 88:24
**real** 92:18 112:6
**realize** 87:14
**really** 12:8 91:5
134:3 147:8
148:16 151:1
**rearrange** 45:15
**reason** 5:14 86:9
99:10 131:18
134:23 154:18
173:8 174:3
**reasonable** 121:4
129:12 135:15
**reasoning** 53:18
**reasons** 86:14
**reassurance** 58:7
**recall** 48:23 53:10
54:7 55:2 61:25
85:9,13 86:20
93:11 94:4 108:17
110:11,15 112:23
126:22 128:16
129:8,9 130:1
133:1,16,17,21
134:3 135:11
146:10,20 149:9

151:1,10 156:1
159:25 165:24
**receipt** 171:18
**receive** 18:5 21:21
123:17 127:14
128:3 138:16
163:15,16 165:5
**received** 22:4 69:9
70:4 88:12 128:18
135:18 136:19
137:20 143:23
163:21
**receiving** 17:1
49:12 51:22 52:9
127:23 140:8
153:14 165:24
**receptionist**
138:19
**recess** 36:25 87:21
140:17 167:3
**reclining** 113:22
**recognition** 97:16
100:4
**recognize** 58:15
60:22 61:2 72:16
74:23 83:7,10
123:11
**recognized** 63:3
**recollection** 34:19
35:4 65:15 98:16
100:14 113:12
**recommendations**
103:23,25 117:1
129:22
**recommended**
110:13 112:19
**record** 5:9 11:18
13:15 23:3 50:4
96:16 97:1 108:19
118:10,12,20
122:9 136:4,12

145:19 146:5
148:10,18,19
149:25 150:1
164:10 165:17
173:9
**records** 33:10
54:18 94:11
**recreational** 20:9
48:9 140:20 141:5
141:11,24 158:10
**redirect** 74:4
**redirected** 59:20
**redirection** 82:18
**reduced** 98:11
169:14
**refer** 152:1
**reference** 147:1
171:7 172:2 173:2
**referenced** 163:3
169:13,18 171:10
172:11 173:15
**referencing** 104:1
**referral** 88:7,12
127:16 149:6
151:11 166:16
**referrals** 24:6
25:23 31:13
**referred** 25:22
61:19 65:11 66:2
66:14 86:16 93:17
99:7 101:15 128:4
130:7 151:5
**referring** 33:15
57:12 123:21
141:20
**refers** 147:2
**regard** 50:12
64:17 66:10
110:22 118:6
**regarding** 116:17
168:2,11

**regards** 49:2

**regular** 35:13
56:19 127:15
158:16

**rehab** 40:13

**rehabilitation**
19:20 23:16 37:19
119:16 132:3
133:13 166:19

**rehabilitative**
38:20

**reiterates** 123:10

**related** 98:8
166:22

**relating** 45:3

**relations** 161:16

**relative** 170:2

**relayed** 49:8

**relaying** 116:8

**release** 117:12

**remained** 137:15
164:23

**remember** 70:7
107:13 113:1
133:22 166:4

**remind** 141:2

**renee** 13:3 163:10
163:11

**repeat** 66:6 112:8

**repeatedly** 55:5

**repetitive** 115:16

**report** 39:21 95:10
95:14,18 102:14
103:10 104:3
105:24 110:8,16
113:10 114:5,6
115:4 116:16,25
117:8 119:24
121:18 122:11
124:1

**reported** 113:25
114:4

**reporter** 3:13 11:9
11:20 16:23 172:7

**reporter's** 3:10
11:15 169:1

**reporting** 17:5

**represent** 97:2

**request** 51:2,13,16
51:19 52:6,13,20
53:12 55:1 56:5
56:16 57:1 64:13
66:16 70:22 125:9
132:8 173:9,11

**requested** 51:20
100:10 102:11
132:7 168:1,6,10

**requesting** 52:1

**requests** 50:23
61:22

**require** 35:13
155:24

**required** 36:21
37:24 39:18 52:8
89:3 111:17
142:20 171:25

**requirements**
21:19 153:19

**requires** 119:16
146:23

**resign** 128:21
129:3 132:21

**respond** 44:14
55:19 80:13 81:2
81:24 82:3 107:17
112:5,11,20 120:8
120:12 133:25

**responded** 39:18
40:11

**responding** 40:16
79:19 81:16

119:25

**response** 64:19
78:18 81:17 91:6
107:5 143:23
164:22

**responses** 139:23
156:1 164:12

**responsibilities**
38:4 44:14

**responsibility**
17:4,8

**responsible** 16:6

**responsiveness**
115:6

**rest** 39:22 44:11

**restless** 42:20 80:4

**restrictions** 93:4
126:12

**result** 31:20 88:10
153:17

**resulted** 88:6

**results** 144:8

**resume** 133:14
152:19 153:21

**resuming** 132:9

**retained** 3:13

**retire** 160:9

**retired** 160:7
162:10

**retirement** 162:17

**return** 89:21,23
90:10,12 92:12
96:2 97:3 111:6
125:25 135:1,3
166:18

**returned** 52:2,21
93:3 97:5 109:9
171:17

**review** 43:19
48:19 113:3 168:2
168:6 171:13

172:1 173:1

**reviewed** 129:7

**richmond** 30:15
30:19 129:14
140:21

**ride** 14:22 155:11

**right** 6:3 11:5,21
12:7 20:3,6 21:14
24:14 28:8 33:7
35:2,15,15,23 39:6
39:9 40:12 43:14
46:15,19 54:13
64:19,25 65:8,13
66:11,21 68:18
70:5 71:17 75:5,7
76:14,18 81:1,9,13
82:15,24 83:13,16
84:6,17,20 88:14
90:19,21 92:16
93:12 101:16
103:1 105:16
106:2 108:14
109:15 110:25
111:14 117:9,11
117:13 119:6,13
120:19 123:3
126:2 128:6,10
131:25 134:4
135:19 137:13,21
139:17 140:21
151:13 152:10
153:15 156:17
162:2 163:21

**rights** 142:14
143:1

**risk** 22:13,17
33:17,19 120:14

**rivera** 21:9 27:15
28:16 72:4 75:15
75:20 150:13
158:5,8

**rn** 89:18
**road** 70:16 71:3
  141:16
**robert** 24:17
**roberts** 160:6
**role** 89:13
**room** 15:7,8,10,20
  15:23 16:3,7,14
  17:9,14,20,25 24:5
  26:2,5,6 41:14
  44:7 56:14 62:5,9
  63:1 76:1 77:7
  79:9 84:5,12 85:4
  85:13 95:20 97:20
  110:23 129:11
**rooms** 14:25 15:3
  44:11,12 110:22
**rough** 7:14
**round** 47:7
**rounds** 43:13
**route** 9:22
**routes** 9:23,25
**routines** 71:7
**royalton** 144:14
**rpr** 1:25
**rta** 155:10
**rules** 5:3 168:3,7
  172:5 173:5
**rumor** 166:12
**rumrill** 143:15
  152:7
**run** 48:15 140:20
  153:25
**running** 85:3

**s**

**s** 24:21,25 173:8,8
  174:3
**sabbatical** 150:24
**safe** 22:4,12 44:20
**safety** 22:7 23:10
  36:5,10 67:5

83:22 84:4,4
  86:11,25 87:3
  120:14 129:18
  136:25
**sample** 91:11
**sanitato** 21:17
  24:8 37:11,14
  160:15,19
**saw** 103:7
**saying** 61:6 112:1
  116:10
**says** 33:13 98:3
  99:20 100:8
  108:19 113:2
  123:4
**schedule** 159:15
  162:13
**scheduled** 92:20
**scheduling** 104:13
**schizophrenia**
  32:14
**school** 162:9
**schools** 18:19,22
**screen** 51:9 91:1
  105:25 106:5
  107:8,16
**screening** 91:10
**scrutinized** 132:14
**scrutiny** 56:7,11
  57:4 62:3,10,25
  63:3
**seal** 170:6 172:15
  173:21
**search** 152:2
**seat** 95:16
**seated** 23:9 73:22
**seats** 114:1,10,15
**second** 45:17 47:6
  56:1 57:16 68:10
  96:15 99:16,19
  118:10 145:25

149:25
**secondhand**
  166:12
**secretary** 107:10
  161:6,7
**section** 145:23
  146:3 148:17,22
  149:22
**security** 34:11
  140:6
**sedated** 115:23,24
**see** 10:9,10,18
  11:1,5,6,9,10,11
  11:22 12:4,8,10,11
  12:16 20:19 26:12
  30:24 51:10 60:21
  74:3 78:8 83:16
  87:8,12,15 93:11
  93:23 94:24 95:8
  99:18 113:10
  114:19 116:18,22
  116:23 122:17,22
  135:24 150:17
  151:11
**seeing** 26:25 32:5
  72:6 73:13 74:8
  95:11 97:18
  101:14 114:14
**seeking** 130:18
**seen** 14:8 24:2
  26:7 33:9 90:6
  93:12,15 94:1
  148:14
**self** 33:19 45:21,21
  68:2 162:10
**send** 131:7,15
  134:12
**sense** 29:11 42:8
  49:9
**sent** 86:9 90:1,3
  142:16,19 144:1

150:3,9
**separate** 14:25
  15:3 65:10 70:14
**separately** 143:20
**september** 133:23
  134:8,9 135:18
  136:15,20 137:12
  140:12 164:12
  165:9
**served** 102:15
**service** 138:14
  155:11
**services** 52:3
**serving** 39:15
**session** 4:16 39:12
  46:22,23 47:1,8
  61:12 73:5,6 88:1
  119:21
**sessions** 40:2
  44:22,24 78:25
  119:13 140:21
**set** 32:10 36:4 45:9
  46:14 117:1 170:6
**setting** 45:10
**setup** 109:22
**severely** 98:11
**severity** 137:2
**shared** 22:18
**sheet** 173:7,10,18
  174:1
**sheldon** 4:10
  63:15,19 64:3,13
  65:25 66:24 88:6
  101:2 124:7,8,17
  128:10 129:18
  131:4,6 133:11
  135:7,19 136:8,15
  136:23 165:6
  166:4
**sheldon's** 117:20

**shift**  10:9 14:14
    138:2
**shoes**  87:9
**short**  17:18 33:12
    37:7 108:3
**shoulder**  42:2,4
    74:1 80:10
**show**  51:12 71:3
**showing**  121:9
**sight**  93:18,21
    99:6 101:16 102:3
    151:6,12,21
**sign**  104:19 109:3
**signal**  60:21
**signaling**  58:20
    61:1
**signature**  108:20
    108:21 109:2
    168:5 170:13
    171:13
**signed**  77:4,7,9
    172:13 173:18
**significant**  58:11
    120:24 153:9
**signing**  76:21
    77:16 97:17
    171:11,18
**signs**  121:8
**similar**  68:21,25
    69:2 155:20
**simply**  9:21
**sincerely**  171:21
**sir**  171:9
**sit**  23:6 118:3
**sitting**  23:7 46:1
    58:10 125:13,20
    126:7,14 127:3
**situation**  60:3 61:3
    72:12,24 76:7
    80:23 83:12 85:5
    95:25 112:15,19

112:21 114:12
    115:1 130:18
    132:11,15
**situational**  119:17
    123:3
**situations**  95:9
    113:19
**six**  15:16
**size**  109:1
**skill**  45:13 46:6
**slightly**  33:3
**slow**  6:21
**small**  75:6 122:17
    122:22
**smiling**  79:2
**smitley**  24:17,24
    24:25 25:1,5,6,8,9
    29:1,4,9,14
**snack**  45:17
**social**  20:12 21:10
    21:11 39:1 43:18
    140:5 160:7
**socialized**  88:23
**software**  49:19,22
    98:5 105:5,14
**solo**  48:15
**solution**  107:2
**solutions**  111:5
    171:1 174:1
**somebody**  20:18
    71:8 102:24
    106:15 115:14
    125:21 144:16,18
**somewhat**  154:10
**sorry**  8:2 15:2
    69:23 85:16
    100:22 144:6
    160:23 162:19
**sought**  162:19,23
**sounds**  114:6
    150:19,22

**source**  99:9
**southwest**  29:5,6
    29:11,15,22
    154:15,20,22
    155:21
**space**  99:24
**span**  45:19
**speak**  53:4 71:14
    107:24
**speaking**  79:3
    116:7
**specialist**  143:16
**specialists**  152:4
**specialized**  98:4
**specific**  38:12 49:7
    59:11 65:4,16
    145:10 146:21
    148:12 154:18
    156:19 157:13
    159:3,6 161:9
**specifically**  38:19
    58:8 64:2 66:20
    91:18 124:3
    146:20 151:9
    158:14
**specificity**  33:5
**specified**  169:21
**speech**  115:15
**speed**  145:11
**spell**  24:18 161:2
**spelled**  160:21
**spend**  154:9
**spent**  140:25
**spoke**  158:19
    159:20
**spoken**  157:6
    158:2,12 159:16
    160:3 161:12
**spouse**  19:3
**spread**  26:18,20

**squatting**  125:12
    125:19 126:6,13
    127:2
**ss**  169:3
**st**  101:18 103:8
    104:20 105:4,23
    108:4 109:4 110:1
    110:5 113:24
    116:15,25 117:7
    129:5
**staff**  13:20 20:8,10
    21:19 22:7,19
    30:23 34:11 38:17
    67:7,10,20 71:17
    83:19,25 84:19
    85:10,15 98:7
    110:3,19 111:10
    113:4 116:16
    121:6 129:10,15
    137:4
**staffing**  27:9
**standard**  40:18
**standing**  125:12
    125:19 126:7,14
    127:3
**stands**  35:10
**stargardt**  5:23 6:1
    6:14 7:21
**start**  7:23 8:11
    15:2 23:12 24:13
    88:16 92:18
    104:11 105:1
    122:19 136:3
    140:10
**started**  45:1 47:12
    47:22 51:23 70:6
    141:13,19
**starting**  42:22
    115:14
**starts**  13:5

| | | | |
|---|---|---|---|
| **state** 5:8 7:11 | **stubs** 163:16 | 28:2 29:8,15 | **taken** 1:19 87:21 |
| 11:18 70:16 71:3 | **stuff** 36:8 | 30:15 41:4 42:7 | 107:13 153:9 |
| 81:3,18 118:19 | **submit** 52:8 118:4 | 59:15 66:7 67:15 | 169:20 171:10 |
| 169:2,7 170:15 | **submitted** 52:20 | 79:8 87:6,20 | **talk** 107:6 |
| 172:10 173:15 | 53:14 54:12,16 | 93:17 100:6,7 | **talked** 86:21 88:5 |
| **stated** 50:13 55:4 | 121:17 | 112:9 118:11 | 109:12 156:24 |
| 57:13 64:22 | **subscribed** 172:10 | 124:25 127:4 | 161:5 166:15 |
| 134:25 135:2 | 173:14 174:21 | 130:16 146:17 | **talking** 98:5 |
| 136:23 151:4 | **subsequent** 66:1 | 158:21 159:18 | **talks** 71:5 |
| **statement** 87:7 | **substance** 36:11 | 163:22 | **tape** 109:18 |
| 104:1 107:17 | **suburbs** 31:19 | **surprise** 104:10 | **targets** 122:17,22 |
| 163:17 172:13,14 | **suffered** 156:10 | 111:23 | **tasks** 111:25 123:7 |
| 173:19,19 | **suggested** 109:17 | **surprised** 76:4 | **tax** 163:17 |
| **statements** 99:1 | **suggestion** 110:21 | 78:3 111:25 | **taxes** 163:23 |
| 100:19 166:8 | **suggestions** | **surrounding** | **teacher** 14:4 16:12 |
| **states** 1:1 19:3 | 110:11,17,18 | 31:18 | 16:13,16,18 17:13 |
| **stating** 52:2 | **suicide** 32:22 | **survey** 142:8 | 17:24 |
| 133:11 134:12 | **suing** 158:15 | **swap** 17:16 | **teacher's** 17:7 |
| 144:2 | **suitable** 144:3 | **sworn** 5:4 169:10 | **team** 19:25 37:22 |
| **statistic** 32:16 | **suite** 1:21 2:17 | 172:10,13 173:14 | 38:17 39:23 40:4 |
| **statistics** 33:7 | 171:2 | 173:18 174:21 | 77:8,17 78:24 |
| **status** 124:23 | **sullivan** 1:25 | **synopsis** 149:2 | 84:7 113:16 |
| **stay** 10:24 | 130:22 143:14 | **system** 34:22 | **tech** 105:14 |
| **stenotypy** 169:14 | 148:8,13 149:3,5 | 35:11,21,23 | **technique** 43:3 |
| **step** 59:12 | 149:23 150:4 | 150:21 | 59:10,20,22 80:18 |
| **stepped** 59:2 | 152:1 169:6 | **systems** 105:16 | 109:19 |
| **stimuli** 120:9 | 170:14 | | **techniques** 46:2 |
| **stop** 28:3 71:25 | **summary** 40:21 | **t** | 67:21 69:3 71:20 |
| 153:1,4 155:8 | 148:17,22 149:1 | **t** 24:21,25 | 71:24 74:11,23 |
| **stopped** 28:6,8 | **summer** 28:6 | **table** 23:10 36:6,6 | 75:12 102:1 104:6 |
| 49:17 50:7 70:8 | 160:11 | 58:10 78:21 | 104:8 110:12 |
| **strategies** 115:5 | **superior** 171:1 | 113:21,22 | 112:20 113:14 |
| 115:11,18 | **supervisor** 13:2 | **tables** 45:16 | **technology** 36:2 |
| **street** 1:21 2:6,16 | 27:12 117:21 | **take** 16:17 19:4 | 49:19 |
| **stress** 150:20 | 157:25 160:2 | 36:23 46:13 57:20 | **television** 77:14 |
| **stretching** 46:1,4 | 163:12 | 58:13 64:16 71:11 | 104:22,25 146:16 |
| **strike** 122:18 | **support** 98:7 | 71:13 85:22 87:16 | **tell** 8:8,17 10:2,7 |
| **strips** 6:25 | **supposed** 30:22 | 87:19 113:17 | 11:14 22:9 24:1 |
| **stroller** 14:22 | **sure** 8:16,25 11:8 | 122:5 135:23 | 26:23 33:10 37:8 |
| **structured** 162:13 | 11:19 14:7 16:25 | 140:15 153:10 | 37:17 44:6 45:25 |
| 162:14 | 22:14 24:13 25:25 | 155:8,13,17 167:1 | 48:22 63:11 73:24 |

79:1,20 85:7 86:1
87:4 92:17,19
102:19 105:11
108:16 111:19
115:13 128:15
162:5
**telling** 86:3
**ten** 7:25 15:24
16:11 17:10,21
117:1 127:12
**tend** 10:9
**term** 31:4 33:11
33:12 34:22 58:18
71:12
**terminated** 128:21
**terminology** 71:12
**terms** 26:23 33:9
**test** 69:20 70:1
91:18
**testify** 169:10
**testimony** 57:9
61:16 104:5
140:18 163:5
169:13,17 172:6,7
173:6,9,12
**testing** 91:7
**text** 98:5 105:5
**thank** 164:6
**theirs** 35:24
**therapeutic** 37:20
38:2 39:12 57:21
59:9,22 82:7
**therapist** 19:20
23:16 37:19 40:13
48:9 99:8 101:16
119:16 129:23
132:3 133:13
141:11,25 158:10
158:11,25 166:19
**therapists** 20:9
140:20 141:5

**therapy** 21:22
22:3 23:5 26:13
39:4,9,19 40:11,17
42:13 43:23 44:22
44:24 46:15 47:16
56:20 61:12 62:5
62:9 63:1 73:5,7
77:23 78:17,19,25
81:12,17,25 82:22
83:21 84:5,12,15
85:4 117:21
119:21 120:1
129:11 140:21
141:6
**thereabouts**
137:12
**thereof** 81:8
**thing** 103:11
143:13 145:9
154:10
**things** 7:3 11:1
43:8 68:24 71:6
95:22 106:21
108:13 122:15
123:25 124:22
137:7 145:11
147:6 162:11
**think** 9:3 13:3
19:8 20:22 21:12
25:6 31:23 32:1
33:8,21 34:17
42:17 44:3 47:18
50:3 54:11 55:7
56:1 60:13 61:25
63:5 66:18 68:9,9
68:15 72:25 76:12
82:5 84:18 85:12
85:20 86:18 89:1
90:6 92:11,25
93:16 96:9 103:6
104:23 106:20

107:18 109:12,17
114:20,21,25
115:21 120:3
128:1,8,17 134:9
139:10,24 141:15
142:11 151:21
156:12 161:4
162:22 163:2
166:25 167:4
**thinkgk.com** 2:20
2:21
**thinking** 57:10
132:19
**thirty** 171:17
**thon** 14:21
**thought** 50:11
55:8 64:8 84:6
99:8 111:24 149:7
**thoughts** 62:13
**threat** 120:14
**three** 20:11,25
94:5 127:13
128:23 129:1
132:20 142:19
162:14
**throwing** 46:10
**thrown** 129:2
**tim** 130:22,24
143:14 148:8,13
149:10,12,23
150:4,9 152:1
**time** 7:10 16:5,9
17:11,17,18,22
20:5,24 25:3,13
30:25 37:7 39:15
45:19 48:6 49:12
49:13 52:7 54:16
54:22,24 55:23
56:1 58:9 60:7
61:10,21 66:19
68:6 69:10 75:5

75:25 80:15 81:7
82:2,25 93:25
94:8,8 98:6 103:7
106:9 108:2,3
113:3 120:5 124:8
127:20,24 128:4
133:3,19 134:7,10
135:8,14 137:19
138:2,6,10 140:5
141:8,11,18,22
142:1 147:3 150:9
151:3 153:6 154:4
158:19 159:20
165:25 168:15
169:20
**timely** 54:10
**times** 22:13 32:8
34:8 41:14 47:21
61:5 77:6 82:20
84:11,24 85:8
94:3 95:24 115:17
116:20 141:17
**title** 14:3
**today** 5:12,16 6:20
118:3 142:22
147:15 166:15
**told** 32:2 55:12,20
56:2 59:21 64:13
92:24 129:1,10
130:4 134:1
143:21 149:5
164:19
**tom** 125:8,10
126:11,20,25
127:1
**tone** 42:22 115:6
115:13
**tool** 104:18
**top** 13:4 65:18
112:25 146:1

**topaz**  98:4 104:22
  104:24 105:9
**topic**  162:4
**topics**  35:5,16
  36:14,15 131:23
**total**  6:22 10:13
  111:23
**totally**  112:2
  116:13 134:24
**touch**  81:21
  105:25 113:5
**traboulsi**  7:22,24
  8:4 53:23 54:4,15
  90:8,23 92:14
  93:6 121:15
  122:12,16,20
  123:4 124:2
  125:13,19,23
  129:6 135:5
  151:22
**track**  120:17
**trained**  75:12
**trainer**  76:1 113:4
**training**  34:23
  35:6,14 36:12
  46:3 67:13,19
  68:7,17,20,21,22
  69:6,10,14,18,21
  70:3,10,11,18,21
  70:22 71:4,20
  75:9,21,24 76:3
  111:17 112:7,13
  113:8 123:17,20
  123:24 142:20
**transcribed**
  169:16 172:7
**transcript**  3:1
  103:13 168:3,6,9
  168:11,13 171:10
  171:15 172:5,12
  173:5,11,17

**transcription**
  169:17
**transition**  28:25
**transpired**  67:1
**transportation**
  9:13,17 154:25
  155:9
**traveling**  162:18
**treating**  7:23 20:1
  94:17
**treatment**  21:22
  22:3 39:23 40:4
  43:20 47:16 76:21
  77:10,19 78:24
  97:17 104:19
  162:23
**trial**  128:22
  131:24
**tried**  95:8 139:22
  140:2
**trike**  14:21
**trivia**  45:3
**trouble**  164:2
**true**  20:7 32:18
  57:24 69:17 95:22
  122:25 123:1
  169:16
**truth**  169:11,11,12
**truthfully**  5:16
**try**  72:21 102:1
**trying**  11:25 12:2
  60:20 62:23 73:15
  81:19 124:25
  139:24 152:11
**turned**  54:18
  139:5,9
**turns**  71:11,13
**tv**  49:14,22 51:3,8
  52:1,6,14,21 56:6
  64:4,13,20,23
  76:23

**twice**  40:13 55:24
**two**  7:15 17:14,16
  17:17 20:22 26:17
  40:1,2,6 45:19
  66:9 67:11 68:12
  88:25 102:5
  129:15 132:22
  133:8 138:22
  140:20 141:4,16
  161:23
**tyler**  161:23
**type**  20:2 41:22
  42:14 45:12 54:25
  71:25 80:8
**types**  44:25 53:15
  67:23 71:19 111:2
**typical**  14:14
  42:12 73:6 116:14
**typoscope**  108:14
  108:20

**u**

**uh**  4:3,7,15 19:22
  22:1,6 25:16
  26:10 27:8 30:8
  30:12 31:3,8,12
  32:5,9 33:14
  34:16,21 35:7,22
  35:24 36:16,21
  37:2,6 50:25
  51:21 52:7,16
  54:5,25 64:22
  65:24 66:12,17
  68:7 70:19 75:14
  90:12 92:3 96:2
  96:19 97:3,5
  98:22 100:24
  101:9 105:7,11,16
  105:18,25 106:17
  107:6,25 108:8
  109:6,8,21 111:1
  111:17,23 117:3

**117**:10,19 118:15
  121:18,22 124:2
  124:14 125:4,9,25
  126:5,10,20,24
  127:24 130:25
  131:1,5 133:5
  135:8,14 137:16
  137:25 138:5
  140:13 141:9,22
  142:10,17,19
  144:22 150:21
  151:18 155:5
  156:2 159:1
  160:18 161:6
  164:13,17 165:2,7
  165:13 166:7,13
  166:22
**uh's**  23:25 24:11
  28:22 29:7,24
  32:1,20 33:24
  34:1,12 68:17,23
  70:2 93:13 129:12
**ultimate**  120:21
**ultimately**  121:14
  166:17
**unable**  9:4 81:24
  82:3 83:1 96:6
  97:10,15 100:9
  112:1 116:18
**uncertain**  114:22
**undergo**  90:25
**understand**  62:24
  66:8 70:3 105:14
  146:7
**understanding**
  11:13 12:1,3
  37:18 39:3 57:9
  61:16 77:11 86:8
  88:9 127:9 153:12
**understood**  87:5
  136:14

**undertake** 143:19
**unemployment**
140:8 153:8,11,15
153:22,24
**unfounded** 84:9
**uniform** 106:4
**unit** 24:2,4,11 25:2
27:1,10,11 28:4
29:13,22 30:1
33:7 35:18 36:20
38:8 42:10 44:4
44:17 46:16,18
47:17 48:9 70:13
75:4 104:22
107:10 110:3
112:6 119:2 132:4
141:10,25 160:8
161:7,17
**unit's** 161:20
**united** 1:1
**units** 30:12 31:4
**university** 1:8
5:19 18:25 19:18
23:23 149:15
171:6 172:3 173:3
**unrecognized**
61:15
**unsafe** 85:5
**unwanted** 83:1
**unwillingness**
50:1
**update** 43:20
**updated** 146:15
**updates** 43:21
**updating** 152:19
152:20
**upgrade** 105:10
**upset** 79:2 130:17
**upsetting** 59:16
**urine** 91:11

**use** 9:10,14,17
40:14 41:6 51:7
64:23 71:12 74:12
81:16 104:13
106:1,6 109:17
115:5,11,19 125:3
134:7
**uses** 97:21
**usually** 22:20,25
33:12 155:18
**utilize** 74:23 94:15
117:6
**utilizing** 10:10
113:14

**v**

**v** 171:6 172:3
173:3
**vacations** 162:18
**valid** 87:1
**validate** 53:17
**validated** 116:22
**vanessa** 157:19
**variability** 120:23
**variables** 98:8
**various** 40:25 49:4
124:22
**vary** 13:10 41:3
73:8
**verbal** 41:17 42:4
42:21,25 80:9,12
80:25 81:1,3
110:18 111:2,9
113:5
**verbally** 79:19
**verify** 116:21
**veritext** 171:1,7
174:1
**versus** 36:10 71:17
153:10 154:7
**vicinity** 155:16

**victim** 71:10
**violent** 67:12,18
67:25 68:6,16,22
71:14 72:7 73:2
73:14 74:24 75:3
75:8,11 76:8
**violets** 137:4
**vision** 6:2,8,19,23
7:7,10 8:9,10,18
10:3,11,14,19,21
11:7 12:1 72:5,22
73:13,23 74:7
94:21 96:8 100:3
120:25 122:21
123:6 146:22,23
147:4,9,14 151:5
166:24
**visit** 90:7 94:9,13
95:3 97:4 99:4
100:25
**visited** 139:6
**visual** 87:12 97:19
98:10
**visually** 121:10
**vocational** 94:22
143:15 152:4
**voice** 42:23 74:18
115:6,13
**voiced** 61:23 63:23
85:23
**voicemail** 149:2
**voided** 163:15
**volleyball** 46:12
**volume** 36:12,13
**vs** 1:7

**w**

**w** 163:16
**wagner** 160:1,12
**waiting** 144:21
151:14

**waived** 171:12,19
**wake** 42:3,5
**walk** 36:4
**walking** 84:19
85:10
**wall** 6:25
**want** 9:6 58:19
76:11 97:1,22
100:5 118:19
122:5 133:10
135:24 136:1
144:7 148:20
**wanted** 51:1
136:12
**wanting** 31:4
82:17
**ward** 21:20
**warning** 74:22
**washing** 14:19
**watching** 116:4
**way** 8:18 23:4
29:25 47:15 58:21
58:23 62:19 63:2
69:3 71:10 75:17
76:2 126:24
130:16 139:18
143:12 149:7
**ways** 6:5 43:2 44:1
62:3,8 74:19
101:24 103:3
106:12 123:24
**we've** 113:19
131:3 166:15
**wear** 10:8
**website** 131:9
**wednesday** 13:18
**week** 13:17 15:11
15:19 127:13
128:20 132:24
133:7 162:15,15

**weeks** 15:16 65:20 90:7 127:12 151:16

**weigh** 97:2

**went** 29:3,16 34:24 49:2 63:15 64:7 68:8:15 92:21 93:12 95:6 106:10,23 140:24 144:2 162:9

**wheel** 47:4

**whereof** 170:5

**white** 2:5 11:17 51:10 87:18 97:24 100:7 108:19 118:9 122:5 135:21 136:2 143:8 145:21 146:4 147:16 148:18 149:24 160:23 164:3,9 167:5 168:14 171:5

**whiteboard** 109:13,19

**whiteboards** 104:12

**william** 18:15 161:23

**willing** 83:20 107:1

**wise** 32:16

**witness** 164:7 169:9,14,15,18 170:5 171:8 172:1 172:4,11 173:1,4 173:15

**witness's** 168:2

**wondering** 113:11

**woods** 144:14

**word** 47:5 152:10

**wording** 52:5 134:22

**work** 9:7 13:10 14:14,24 37:12,21 39:10 56:8,11 63:4 69:12 89:21 89:23 90:10,13 93:3 96:2 97:3 107:1 108:6 109:10 111:7 117:6 118:1 125:25 135:1,3 139:11 143:3 144:11 149:11,16 150:18 152:5,10 154:8,21 155:13 155:21 157:10

**worked** 12:23 15:20 19:22 27:14 30:17 48:6 72:3 84:7 127:13 130:20 151:2 152:19 155:16

**worker** 20:13 21:10,11 43:18 160:7

**working** 13:16 16:6 17:20 20:15 24:4 28:3,9 29:10 35:17 47:18,23 59:21 98:6,11 127:12 143:15 152:24 153:4 154:16 155:5 162:14

**workplace** 8:12 99:9 105:25 156:21

**workstation** 105:7

**world** 36:19

**worried** 83:20

**worrisome** 64:24

**worse** 10:22 146:23 147:4,10 147:15

**worsening** 8:4

**write** 7:3 22:25 43:9 51:7,8 147:5

**writing** 43:8 51:9 90:12

**written** 14:5 40:3 69:5,9,20 70:7 156:2

**wrong** 89:15 151:7

**wrote** 51:25 89:8 97:16 100:1

### y

**y** 24:25

**yeah** 11:11 20:23 40:24 42:6 82:23 112:25

**year** 7:15 12:24 15:17,18 47:13 130:13 144:8 150:23 163:16,19 163:20,22

**years** 7:15,16,19 8:1,5,9 24:12 49:17 68:13 69:1 77:4 93:15 94:6 98:12 130:21 147:7 151:2

**yoga** 46:2,4

**young** 8:22 15:6,9 15:14,16,20,22 16:6 17:25

**younger** 31:21 48:2 78:7 102:22

### z

**zoom** 98:5 105:5 105:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

03/22/2017  15:56 Cleveland Sight Center - LVC          (FAX)2166588731          P.005/007

02/16/2017 THU 15:58  FAX 216 445 2226 B46J7                    ☑015/025

University Hospitals 2/16/2017 11:58:50 AM  PAGE  6/018  Fax Server

DEFENDANT'S
EXHIBIT

29

CS

Provider's name and business address: __LIDIJA BALCIUNAS, OD__     __1909 E. 101ST St__
__CLEVELAND, OH__
Type of practice / Medical specialty: __OPTOMETRIST__   __CLEVELAND SIGHT CENTER__   __44106__

Telephone: ( __216__ ) __658- 8732__   Fax: ( __216__ ) __658- 8731__

## 2A. MEDICAL FACTS

Approximate date condition commenced: __1976__   Probable Duration of condition: __PERMANENT__

Date(s) you have treated patient for condition in the past 12 months: __N/A__   ( LAST APPOINTMENTS: 3/21/17 AND 1/4/12 )

Was patient admitted for overnight stay in hospital, hospice or residential medical care facility? ____ Yes  __✓__ No
If yes, Inpatient Stay: (Date Admitted) __/__/__

Will the Employee need to have treatment visits at least twice per year due to the condition? ____ Yes  __✓__ No.

Was medication, other than over-the-counter medication, prescribed? ____ Yes  __✓__ No

Was the patient referred to other health care provider(s) for evaluation/treatment (e.g., physical therapist, specialist)?
____ Yes  __✓__ No.  IF so, state the nature and dates of such treatments and expected duration of treatment.

Is the medical condition pregnancy? ____ Yes  __✓__ No  If yes, expected Date of Delivery: __/__/__

If the employer provides a list of the employee's essential functions or a job description, answer these questions based upon that
list. Otherwise, rely on the employee's own description of his/her job functions:

Is the employee unable to perform any of his/her job functions due to the condition: __✓__ Yes   ____ No  If so, identify the
job functions the employee is unable to perform: __FACIAL RECOGNITION + EXPRESSIONS, SIGNING TREATMENT PLANS__
WHEN NOT NEAR CCTV, SEEING IN POOR CONTRAST ENVIRONMENTS, MAY NOT ALWAYS HAVE VISUAL AWARENESS OF
EVERYTHING GOING ON IN A ROOM. USES OTHER CUES TO GATHER INFORMATION

Describe the other relevant medical facts, related to the condition for which the employee seeks leave (such medical facts may
include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment) that are sufficient
to establish the need for the patient to take leave (including any need for the intermittent absences or for work on a part-time or
reduced                                                                                                    schedule).

__MS. DEBORAH MOSS WOULD LIKE TO CONTINUE WORKING - LEAVE WAS__

__RECOMMENDED BY EMPLOYER__

## 2B. AMOUNT OF LEAVE NEEDED (Single Continuous Period, Follow-up & Reduced Schedule, or Intermittent)

Single continuous period of incapacity
Will the employee be unable to perform some or all of his/her job functions for a single continuous period of time due to his/her
medical condition, including any time for treatment and recovery? ____ Yes  ____ No  If so, provide the estimated beginning
and ending dates for the period the employee is expected to be unable to perform some or all of his/her job functions: __/__/__ __+__
__to__ __/__/__   __THE VISUAL CONDITION IS PERMANENT + STABLE, NOT AN ~~ACUTE~~ ACUTE__
__CONDITION IN NEED OF TREATMENT FOR RECOVERY__

Follow-up or Part-time/Reduced Work Schedule
Will it be medically necessary for the employee to take leave to attend follow-up appointments and/or work part time or on a
reduced schedule because of the medical condition? ____ Yes  ____ No

__WITH APPROPRIATE ADAPTATIONS, INCLUDING ACCESS TO TOPAZ CCTV__
2 | P a g e   __HER SPECIALIZED GLASSES + ZOOM TEXT TALKING SOFTWARE, MS. MOSS MAY BE__
__ABLE TO CONTINUE WORKING PART TIME WITH SUPPORT__
__FROM OTHER STAFF MEMBERS WHEN NEEDED. ALL OF THE__
__EMPLOYMENT RELATED VARIABLES CANNOT BE DETERMINED/__
__FULLY ASSESSED ~~AND~~ NECESSARY FACTORS CANNOT BE DETERMINED/__
__BY MY ASSESSMENT. VISUAL ACUITY IS SEVERELY REDUCED,__
__BUT MS. MOSS HAS BEEN WORKING WITH THIS CONDITION FOR__
__MANY YEARS IN HER CURRENT CAPACITY.__

CONFIDENTIAL                                    UH-MOSS 1361

03/22/2017    15:56 Cleveland Sight Center - LVC          (FAX)2166588731          P.006/007

02/16/2017  THU 15:58   FAX 216 445 2226 H4697                                    ⊠016/025

University Hospitals 2/18/2017 11:56:50 AM   PAGE   9/018   Fax Server

If so, provide information sufficient to establish the medical necessity for such leave: _____

If there is a medical necessity for follow-up treatment appointments, what is the estimated treatment schedule, including the dates of any scheduled appointments and the amount of employee time off required for each appointment, including any recovery period:

FOLLOW UP APPOINTMENTS NOT
INDICATED AT THIS TIME WITH ME.
MS. MOSS MAY NEED FOLLOW UP APPOINTMENTS WITH HER GIVI COUNSELLOR TIM SULLIVAN

If there is a medical necessity that the employee work on a part-time or reduced schedule, estimate the part-time or reduced work schedule the employee needs: _____ hour(s) per day; _____ days per week from _____ through _____

MS. MOSS WORKS 24 HRS/WK-  3 TIMES PER WEEK (3 DAYS EACH WEEK)
Intermittent Leave     AND FEELS COMFORTABLE WITH THAT SCHEDULE

Will the condition prevent the employee from performing some or all of his/her essential job functions? _____ Yes
_____ No   AS NOTED, CERTAIN JOB FUNCTIONS ARE CHALLENGING DUE TO LOSS
OF CENTRAL VISION ... SUCH AS FACIAL RECOGNITION + EXPRESSIONS
If so, provide information sufficient to establish the medical necessity for such intermittent leave:   INTERPRETATION

_____

Based upon the employee's medical history and your knowledge of the medical condition, estimate the frequency and the duration of the employee's intermittent inability to perform some or all of his/her job functions over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):
Frequency: _____ times per _____ week(s) _____ month(s):     I AM UNABLE
Duration: _____ hours or _____ day(s) per episode:              TO COMPLETE THIS
                                                                    PORTION IN THE
Estimated duration of the need for intermittent leave: _____      MANNER REQUESTED

Signature of Physician/Practitioner: _____     Date: ___/___/___

Print Name: LIDIJA BALCIUNAS, OD.   Fax #: (216) 658-8731

Field of Specialization: LOW VISION OPTOMETRIST   Phone #: (216) 658-8737

Address: 1901 E 101ST ST     City/State/Zip: CLEVELAND   OH   44106

Please review contact information below and fax this form to the appropriate team member based on the entity of employment:

Should you have any questions please call Disability Management Services at 216-767-8700 and follow the prompts to speak with a team member. Thank you.

13|Page

CONFIDENTIAL          UH-MOSS 1362

Page6 of 7  received on 3/22/2017 2:54:28 PM (Eastern Daylight Time) from 2166588731



**University Circle**
1909 East 101st Street
Cleveland, OH 44106-4110
216-791-8118
clevelandsightcenter.org

**Highbrook Lodge**
12944 Aquilla Road
Chardon, OH 44024

Occupational Therapy Low Vision Evaluation Report

Client: Deborah Moss

DOB: 5/31/65

Occupational Therapist:  Erin St. Denis, OTR/L

Date of Occupational Therapy Visit: 4/5/17

Referral Source: Community Referral, University Hospitals



OT received a referral for Ms. Moss to complete a Functional Low Vision Assessment related to work. Dr. Balciunas, Cleveland Sight Center's low vision optometrist, evaluated Ms. Moss on 3/21/17. Ms. Moss has a vision diagnosis significant for Stargardt' Disease with visual acuities of 1/100 OU and a near visual acuity of J16 aided. Dr. Balciunas reported that, "Stargardt's disease is a condition that permanently diminishes central vision both distance and near. It does not affect peripheral vision. It is a progressive condition, but Ms. Moss is not likely to get much worse at this point of the condition." Ms. Moss also reports postural strain and spinal concerns related to her positioning at her work station. She may benefit from an ergonomic evaluation of her work station.

Ms. Moss has worked for 20 years as a recreation therapy assistant on the geriatric psych floor at the Parma branch of University Hospitals. She reports she has been an employee of University Hospitals since 2014.   She reports that there have been some changes in the population served; now serving a younger geriatric population. While she was previously assessed and accommodation recommendations were made, there are some continued concerns.

OT called and spoke with Georgene Kohlbacher, EAP Counselor, and requested a second visit for OT to observe and further asses how Ms. Moss functions in her daily routine in her work setting. Ms. Kohlbacher reported back that this request was not able to be accommodated due to HIPAA regulations. OT explained report would be completed with information from 4/5/17 visit, she reported this would be fine.

OT assessed Ms. Moss for CCTV technology. Ms. Moss reports that a Topaz CCTV (closed circuit television or "magnifying television") was recommended in the past and she received a Merlin. She reports the contrast of the Merlin model is not as good as the Topaz (she has a Topaz at home). OT assessed patient this date with CCTV technology. Patient uses reverse contrast with font size magnified to 5 inches. Quality of contrast was assessed to be an important variable to crisp edges of letters for

improved ease and speed of reading. The Topaz model with 24" monitor was beneficial. A DaVinci model with audible text mode was also demonstrated and helpful. If considered, Ms. Moss would benefit from further assessment. Ms. Moss reported she used to have a scanner to convert printed materials to audible text. She reported this device was helpful for reading printed materials.

Ms. Moss reported she is a proficient Zoom Text user and has a computer with large monitor and adaptive keyboard at her work station. She reported that Zoom text has not been working well at work and is hopeful with UH software updates, the function of her Zoom Text software will improve. Ms. Moss would benefit from UH's IT department to address Zoom Text compatibility with software. She currently uses volunteers to assist her reading e-mails. Ms. Moss reported that UH may be utilizing iPads in the future. The iPad would offer a high degree of portability between work stations and possibly complete documentation outside of the office. With low vision accessibility features, she would be able to access e-mails with use of audible reading features (i.e. Voice Over) built into the iPad. If medical reports are accessible to the iPad, she may be able to listen to them using Voice Over. She would benefit from training to learn the low vision accessibility features of the iPad, if UH incorporates this technology for staff.

Ms. Moss reported that the new copiers at work have a flat touch screen. She would benefit from bump dots to assist her in orienting to the position of copier functions display.

Ms. Moss is required to sign treatment plans. OT assessed her for writing aids. A typoscope/signature guide was demonstrated and found to be helpful for writing her signature.

Ms. Moss is required to write out daily schedule on a white board as part of "Schedule Awareness." OT problem-solved with Ms. Moss regarding the use of contrast electrical tape to grid off white board fields for the daily schedule. She reports this method has been done and is effective.

Ms. Moss reported that, on occasion, she has bumped into staff when they are wearing dark clothing that poorly contrasted with dark flooring on the unit. She reported this as a mild concern. High contrast-light on dark- helps with improved viewing. Also, it was reported that she has walked into a patient room when being seen by nursing. Use of verbal cues from staff is acceptable etiquette in working with persons with low vision or blindness.

Ms. Moss is required to participate in crisis intervention and staff trainings. Having materials ahead of time for review and partnering with a staff member or trainer who is aware of need for verbal and touch prompts to motor Ms. Moss through any physical components may be beneficial.

It was reported that Ms. Moss has difficulty noticing when patients get up from their seats, need assistance (i.e. during Bingo) or reading patient's facial expressions. Ms. Moss reported she uses auditory compensatory strategies to listen for tone of voice or responsiveness when she initiates a question or interaction. She reports she will also ask other staff/nurses for feedback regarding patient behavior or affect. Otherwise, Ms. Moss is unable to see faces or expressions.

Low vision recommendations:

1. Topaz EZ HD with 24" monitor
2. Assistive technology evaluation for a scanner may be beneficial for reading printed reading materials (not hand written).
3. Work with UH's IT department re: Zoom Text accessibility with UH software
4. Training in low vision accessibility feature of iPad if/when iPads are introduced to be used by staff.
5. Marking of copier with bump dots for improved accessibility to flat display/touch screen for copier functions
6. Typoscope for signatures
7. Verbal prompts when passing in hall or to re-direct out of room if private session with a patient
8. Accessible materials for staff trainings and staff/trainer assistance to motor through any physical components to training
9. Additional optometrist recommendations: 10x LED hand held magnifier for spot reading, continuation of 8x DVI microscopic readers OD (right), +24 binocular AOLITE microscopic reading glasses.
10. Training of staff on Blindness Basics.

Report respectfully submitted by:

Erin St. Denis, OTR/L

Cleveland Sight Center

(216) 658-8783

## Farley, Karen

| | |
|---|---|
| **From:** | Evans, Allison |
| **Sent:** | Friday, May 05, 2017 1:50 PM |
| **To:** | Kohlbacher, Georgene (gkohlba2) |
| **Cc:** | Farley, Karen; Fernandez, Laura; Reese, Jane (Litigation); Fulton-Royer, Jill |
| **Subject:** | RE: f/u  Debbie Moss |

Georgene-

My apologies for the delayed response. Yes, I was able to visit BCOA for a little while on Wednesday. I observed some group and 1:1 patient time. Again, I have not met with Deb to see her in the environment, but here are the observations I made.

It is a very dynamic environment that requires excellent situational awareness and attention to detail. All staff must be able to interpret the affect of multiple patients at once through facial expression and body language, be able to engage patients with various levels of arousal and react to emotional and physical distress.  With limitations in these abilities, the safety and the quality of care for the patients is compromised.  The group atmosphere adds to the complexity of this due to a higher level of activity and distraction in the room for both the employees and the patients, in addition to the fact that there can be as many as 10-12 people in the room at once.  Employees must be able to respond to patients experiencing internal stimuli, those with communication and behavioral issues and patients that pose a safety risk due to fall or elopement risk.

In addition, according to the job description for a recreation therapist, group activities should include community, exercise and recreational tasks.  While some groups can be completed with patients seated together in a circle format, others will need to involve more movement and physicality from the patients and the group leader.  With that there is more risk for falls and increased awareness necessary for tracking patient movements and interaction.

While technology accommodations can facilitate success with documentation and gathering information on patients, aside from limiting all interaction to 1:1, which could still pose a risk, there is little that can be done to accommodate for the variability of a psychiatric patient population for someone with such significant vision deficits.

Please let me know if I can be of further assistance.

Allison

Allison Evans, MHA, OTR/L, CLT
Rehab Supervisor - Inpatient Programming
University Hospitals Parma Medical Center
7007 Powers Boulevard
Parma, Ohio 44124
(o) 440-743-4127
(f) 440-743-4036
Allison.Evans@UHHospitals.org

**From:** Kohlbacher, Georgene (gkohlba2)
**Sent:** Thursday, May 04, 2017 2:56 PM
**To:** Evans, Allison





1

05/23/2017 TUE 11:38 FAX 216 445 2226 H4697 ☑001/001

PAGE 1/1 * RCVD AT 5/23/2017 11:37:40 AM [Eastern Daylight Time] * SVR:UH/RFAX/DLUS7D1/21 * DNIS:2445125 * CSID:216 445 2226 * DURATION (mm-ss):00-30

*dabmoss@aol.com* 

 **Cleveland Clinic**

**Elias I Traboulsi, MD**
Ophthalmology
2022 East 105th St
Cleveland OH 44106
Dept: 216-444-2030

May 23, 2017

Georgene Kohlbacher, LISW-S, CEAP
11100 Euclid Avenue, Mail Stop 6036
Cleveland, Ohio 44106
Fax: 216-983-3038

DEFENDANT'S
EXHIBIT
32
CS
PENGAD 800-631-6989

re:   Deborah A. Moss
CCF 17031449
DOB: 05/31/1965

Dear Ms. Kohlbacher:

Pursuant to our conversation on May 22, 2017 about the ocular health status and contribution of Ms. Moss' poor vision to her function, I would like to provide this summary.

1.  Indeed her condition is unable to improve and has led her to lose her central vision that provides the ability to see details and small targets from a distance and even from near. Her peripheral vision remains unaffected.

2.  I am uncertain about the impact of her poor central vision on her ability to perform individual tasks because I have not observed her in her work and I am not in a good position to make comments about that aspect. I can certainly appreciate that from a distance that she would not be able to recognize faces or expressions on faces that would give queues to particular situations or feelings.

My hope is that Ms. Moss receives the appropriate training and is given a little bit more time and maybe instruction to see if she could meet the necessary requirements to perform this aspect of her work.

I hope these comments are helpful, and I thank you for asking for my opinion.

Sincerely,

Elias I. Traboulsi, M.D., M.Ed.

EIT/sw

cc:   Karen Farley, CNP, MSN, Fax: 216-844-3990

Moss Production 000265

From:                                                    09/11/2017 04:41    #157 P.001/002


*AHN: Emily White*

**University Hospitals**
Parma Medical Center

Sent regular USPS mail and certified mail

September 6, 2017


DEFENDANT'S EXHIBIT 33

Ms. Deborah Moss
63 Salem Court.
Hinckley, OH  44233

**Re: Employment Status**

Dear Deborah:

As you know, you have been in a leave of absence status since February 2017 due to our concerns regarding your ability to safely perform the essential functions of your position as Rehabilitation Therapist, PMC Hanna Pavilion, due to your significant vision impairment.  You currently remain in a leave status.

As you are aware, on February 14, 2017, you were referred to the UH Employee Assistance Program (EAP) for a mandatory fitness for duty due to safety concerns when you were unable to fully participate in de-escalation training which is essential when working with behavioral health/psychiatric patients.  You were placed on paid administrative leave pending the fitness for duty evaluations.

Over the course of the past several months, we have met with you on several occasions as part of the interactive process to discuss and determine your ability to safely perform the essential functions of your position with or without reasonable accommodation.  On June 1, 2017 your manager, your EAP counselor and I met with you.  We specifically discussed that the behavioral health unit is a very dynamic environment that requires excellent situational awareness and attention to detail.  Staff must have the ability to interpret the affect of multiple patients at once through facial expression and body language.  You acknowledged the legitimacy of our safety concerns, the increase in patient acuity, increased severity of psychiatric issues, the change in patient demographics, increased code violets, and fewer staff to monitor patient activities and to deliver assistance during patient outbursts.  All of these factors contribute to an increased risk to you, patients, and other staff members.  We discussed the possibility of other positions in University Hospitals that would be a better fit with your visual deficiencies and encouraged you to investigate other opportunities and reach out to UH Pathways Career Coach, Faye Naftzger, who could also be of assistance.

On June 9, 2017, I informed you that based on our June 1, 2017 meeting and discussion, we were not able to identify any reasonable accommodation that would allow you to safely perform the essential functions of your job and return to your position at which time you had no suggestions for a reasonable accommodation.  I also informed you that Administrative pay would cease but that you could utilize your paid time off/PTO (vacation pay).  Most importantly, I informed you that your manager had initiated a Medical Leave of Absence (MLOA), and that you

*B42*

From:                                        09/11/2017 04:42    #157 P.002/002

would be receiving medical certification paperwork from UH's Disability Management Services. An approved MLOA allows for employees to remain on role for up to 52 weeks.

On June 20, 2017, you called me with questions regarding the MLOA paperwork that you had received and I referred you to Kara Ladaika, Disability Management Services.  I also reinforced that an approved MLOA allows for employees to remain on role for up to 52 weeks.

On August 7, 2017, I called you and you confirmed that you had not completed or returned the MLOA paperwork to Disability Management Services.  You stated you didn't feel it would help you and that you had not applied for any other positions at UH.  You also indicated that you intended to allow your PTO to run out.  We discussed the need to bring closure to this matter.

At this juncture, the majority of your PTO will run out as of September 16, 2017 which will be paid out on September 21, 2017.  Any remaining PTO will be paid out the following pay date. Your manager is initiating a Personal Leave for you until December 31, 2017.  PTO will not accrue during this time, however, you may apply for as many open UH positions as you are qualified. If you are unable to secure another position, your employment will be terminated effective January 1, 2018.

I strongly encourage you to reach out to UH Pathways Career Coach, Faye Naftzger who can be reached at 216.767.8363.  Also, I am available for any questions by contacting me at 440.743.4052.

Sincerely,

Deborah Sheldon
HR Generalist
University Hospitals Parma Medical Center

Cc: Kathryn Holley, Manager, PMC Hanna Pavilion

B4B/

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Application

**Participant**   Moss, Deborah (Debra) A.                                    **Participant ID**   109128
**Caseload**      VI-AKR1-3 - Sullivan, Tim

## 1. Basic

**Application Date**                     01/05/2017
**Primary Staff at Application**         Sullivan, Tim
**Living Arrangement at Application**    Private residence
**Voter Registration Outcome**          Currently registered
**County at Application**                Medina
**Zip Code at Application**              44233

**Marital Status**                      Married
**United States Citizen?**               Yes
**If no, legal status to work in the**   Permanent Resident

DEFENDANT'S
EXHIBIT
34
PENGAD 800-631-6989

Referral Information
**Referral Date**                        01/03/2017
**Referral Source**                      Self-Referred Person
**Referral Source Detail**

**Organization Name**
**Last Name**
**First Name**
**Middle**
**Honorific**

**Address**
**Address Line 2**
**Address Line 3**
**City**                                 **State**   OH        **Zip**

**Primary Phone**              **Voice**   No    **TDD**   No    **Fax**   No
**Second Phone**              **Voice**   No    **TDD**   No    **Fax**   No
**E-Mail Address**

**Comments**

Moss Production 000941

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Application

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Sullivan, Tim | | |

## 2. Financial

### Income and Household Information

**Primary Source of Support**      Family and Friends

### Public Support

| | |
|---|---|
| **Public Support Available** | No |
| **SSDI Status** | Benefits Discontinued or Terminated |
| **SSI Status** | Applicant - Denied Benefits |
| **Presumption of Eligibility Possible** | No |
| **Presumption of Eligibility Rationale** | |
| **Will Exhaust TANF Benefits Within 2 Years** | |
| **SSI Aged** | $0.00 |
| **SSI Blind** | $0.00 |
| **SSI Disabled** | $0.00 |
| **SSDI Disabled** | $0.00 |
| **VA** | $0.00 |
| **TANF** | $0.00 |
| **General Assistance** | $0.00 |
| **Worker's Compensation** | $0.00 |
| **Other Disability** | $0.00 |
| **Other** | $0.00 |

## 3. Medical Insurance Information

**Medical Insurance at Application**
Private insurance through own employment

## 4. Employment

**Date Last Employed**
**Participant is Requesting Services to Maintain Employment**      Yes
**Employment within one week of Application**

| | |
|---|---|
| **Work Status at Application** | Competitive Integrated Employment |
| **Job Title** | Recreational Therapists (29112500) |

Moss Production 000942

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Application

**Participant**  Moss, Deborah (Debra) A.                    **Participant ID**  109128
**Caseload**    VI-AKR1-3 - Sullivan, Tim

| | | |
|---|---|---|
| **Hours Worked per Week** | 24 | |
| **Salary** | | $599.28  Weekly |
| **Hourly Wage** | | $24.97 |

### Work History

**Name**            Parma Community General Hospital
**Address**         7007 Powers Boulevard
**Address Line 2**
**City**            Parma            **State**  OH    **Zip Code**  44129-5495

**Job Title**       Recreation Therapist
**Job Duties**      Facilitating therapy groups for senior citizens w/ various mental health
                    disorders.  Develops program and monitors their activitiy and then case notes
                    all encounters.

                    Current position and she wishes to remain working for this employer

                    Consumer is now working 30 hours per week (2/21/14) Aware adjusted

| | | |
|---|---|---|
| **Hours Worked per Week** | 30 | |
| **Salary** | $828.00  Weekly | |
| **Hourly Wage** | $27.60 | |
| **Start Date** | 12/1996 | **End Date** |

**Reason for Leaving**

**Other Comments**
Has insurance benefits through her husband.

Likes:
enjoys helping people of all ages especially babies and elderly

Dislikes:
Not able to use comp[uter system now as a result of the software changes.  She can no longer use
the computer independently.

---

Moss Production 000943

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
## Application

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Sullivan, Tim | | |

My disability makes completing some of my tasks difficult.  Takes longer to complete my work tasks.  I also cannot travel alone by myself now.

| | | | | | |
|---|---|---|---|---|---|
| **Name** | Deborah Moss | | | | |
| **Address** | P.O. Box 181 | | | | |
| **Address Line 2** | | | | | |
| **City** | Hinkley | **State**  OH | **Zip Code**  44233 | |

| | |
|---|---|
| **Job Title** | Baby Sitter |
| **Job Duties** | Had to watch a 6th month old baby. |
| | Was not permitted to leave the house while the parents are away. |
| | Likes:<br>Got to play Mom for a baby - reported I love babies. |
| | Dislikes:<br>The Family did not want her leaving their home - did not like being inside all day. |
| | Did not feel her disability impacted her ability to care for a baby. |

| | | |
|---|---|---|
| **Hours Worked per Week** | 40 | |
| **Salary** | $120.00  Weekly | |
| **Hourly Wage** | $3.00 | |
| **Start Date** | 01/1995 | **End Date**  01/1996 |

**Reason for Leaving**
Left to take a job in her field

**Other Comments**

| | | | |
|---|---|---|---|
| **Name** | BWC | | |
| **Address** | 10524 Euclid Avenue | | |
| **Address Line 2** | | | |
| **City** | Cleveland | **State**  OH | **Zip Code**  44195 |

Moss Production 000944

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
## Application

| Participant | Moss, Deborah (Debra) A. | Participant ID | 109128 |
| --- | --- | --- | --- |
| Caseload | VI-AKR1-3 - Sullivan, Tim | | |

| | |
| --- | --- |
| **Job Title** | Rec Therapist for injured workers |
| **Job Duties** | Taught the injured workers activities they could use to help keep their recovery on track.  Taught landbased and aquatic activities.  Developed and implimented programs through BWC. |

Likes:
Could use their facility to stay in shape and gt paid for it at the same time.

Dislikes:
She had to travel a long way to work and it was difficult and stressful

Had difficulty charting and reading paperwork and reviewing notes took a lot of time and as her vision continued to decline she had more difficulty.

| | | | |
| --- | --- | --- | --- |
| **Hours Worked per Week** | | 40 | |
| **Salary** | | $440.00  Weekly | |
| **Hourly Wage** | | $11.00 | |
| **Start Date** | 01/1989 | **End Date** | 12/1994 |

**Reason for Leaving**

Facility was closed and was privatized - everyone lost their jobs

**Other Comments**

## 5. RSA-911 Programs

| | |
| --- | --- |
| **Veteran** | No |
| **Migrant or Seasonal Farmworker** | 1. Not a migrant or seasonal farmworker |
| **Projects with Industry** | No |

## 6. Disabilities

### Disability Documentation

| Number 1 | Primary | Yes | Secondary | No | Onset Date | |
| --- | --- | --- | --- | --- | --- | --- |

| | |
| --- | --- |
| **Impairment** | Visual Impairment Leading to Legal Blindness |
| **Impairment Due To** | Macular Degeneration |
| **Specific Impairment** | Losing Vision |

Moss Production 000945

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Application

**Participant**  Moss, Deborah (Debra) A.
**Caseload**  VI-AKR1-3 - Sullivan, Tim

**Participant ID**  109128

**ICD-9 Code**
**ICD-9 Description**

**Other Comments**
Vision is getting worse and her vision now requires bigger and darker (more contrast) than before.
She is also no longer able to read the copier controls (will likely need bump dots installed).

Glare is an issue and she has to work in the Dark to minimize glare and reflection.  Re[ports the
CCTV and Computer monitor looks gritty to her.

**Last Updated**

---

**Disability Documentation**

**Number**  2          **Primary**  No          **Secondary**  Yes          **Onset Date** 01/2012

**Impairment**              Other physical impairments
**Impairment Due To**       Physical Disorders/Not Elsewhere Classified
**Specific Impairment**     Restless Leg Syndrome

**ICD-9 Code**
**ICD-9 Description**

**Other Comments**
Takes meds and it seems to help but her sleep is off - Tamazipam (was on Gabapentin).  Can
only sleep 4 hours at a time and then tosses and turns the rest of the night.

**Last Updated**

---

**Disability Documentation**

**Number**  3          **Primary**  No          **Secondary**  No          **Onset Date**

**Impairment**              Psychosocial impairments
**Impairment Due To**       Anxiety Disorder
**Specific Impairment**     Has issues w/ worry about being able to work

**ICD-9 Code**

---

Moss Production 000946

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Application

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Sullivan, Tim | | |

**ICD-9 Description**

**Other Comments**

Has anxiety with work and worry about getting her work done and then sometimes at home. Her Doctor knows but with her other meds does not want to take any more meds than required.

**Last Updated**

## 7. Special Programs

### Other Agencies and Services

Individuals, Agencies, and Other Entities Participant Has Been Referred To

| Referred To | Referral Date |
|---|---|

Other Service Providers and Funding Sources Providing Services or Funding to Participant

| Involved With | Begin Date | End Date |
|---|---|---|

### Case Fund Eligibility

## 8. Documentation

**What does the participant expect from VR to gain or maintain employment?**

Consumer reports needing assistance with her CCTV and Computer Access. Will also need help with marking the copy machines as well. The consumer has tried to obtain assistance with the purchase of another CCTV as the one she has is not working for her.   She has worked with her employer but is frustrated as she has provided her EOR w/ info and it has been since August.

**Describe employment needs**

**Describe the next steps in establishing eligibility**

Will need to review prior case and as her disability is not one that will get better over time this information gained from the prior case is still valid.  Additional medical information.

Moss Production 000947

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Application

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Sullivan, Tim | | |

Other participant information or comments.

# 9. Employment Impediments

**Poor Work History**

1. Does NOT have poor work history

**Lack of Educational or Occupational Skills Attainment**

1. Does NOT lack educational or occupational skills

**Limited English Proficiency**

1. Does NOT have limited English skills

**Limited Literacy Skills**

1. Does NOT have limited literacy skills

**Cultural Barriers**

1. Cultural barriers do NOT inhibit ability to work

**Basic Skills Deficient**

1. Is NOT basic skills deficient

**Dislocation from High-Wage and High-Benefit Employment**

1. NOT dislocated from high-wage/benefit employment

**Single Parent**

1. NOT a single parent

**Displaced Homemaker**

1. NOT a displaced homemaker

**Low Income**

1. NOT low income

**Dislocated Worker**

1. NOT a dislocated worker

**Foster Care Youth**

1. NOT ever been in foster care

Moss Production 000948

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
**Opportunities for Ohioans with Disabilities**

# Case Notes

| | |
|---|---|
| **Participant** | Moss, Deborah (Debra) A. |
| **Caseload** | VI-AKR1-3 - Vacant, Akron |
| | BSVI 1 |

**Participant ID**   109128

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Comprehensive Assessment |
| **Share Note** | Yes |



## 2. Note

| | |
|---|---|
| **Summary** | Complete |

Started 5/22

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Initial Interview |
| **Share Note** | Yes |

## 2. Note

| | |
|---|---|
| **Summary** | Pasted in from Word |

See Attachment

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Medical Records |

Moss Production 000793

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 – Vacant, Akron BSVI 1 | | |

**Share Note**      Yes

## 2. Note

**Summary**      DR. M. FRANZ

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

**Summary**      NO MED ON FILE-COLE EYE/DR. TRADOLSI

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

**Summary**      FROM CSC - JAN'12 - CLVA

Moss Production 000794

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Participant Acknowledgment |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Signed Participant Acknowledgment_LP | **Generated Letter** | Yes |

Signed PA Form is Attached

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Application for Services |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Signed App for VR Services_AP_LP | **Generated Letter** | Yes |

See Attached App Form

## 3. Activities Provided

Contact with Consumer

Moss Production 000795

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 – Vacant, Akron BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Fact Sheet - App and Elig Ind Rights and Duties_LP | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Fact Sheet - App and Elig Ind Rights and Duties_LP | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |

Moss Production 000796

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

**Share Note**     No

## 2. Note

| **Summary** | Consent Form - Obtain & Release_LP | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 01/05/2017 |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | Consent Form - Obtain & Release_LP | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 01/05/2017 |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | Consent Form - Obtain & Release_LP | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

Moss Production 000797

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron<br>BSVI 1 | | |

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/27/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Release Form |
| **Share Note** | No |

## 2. Note

**Summary**   Signed Med Rel Deb Moss Dr. Traboulsi

Signed Med Rel Form Attached -- Please Send Both Release Forms
Deb Moss Signed CCF Cole Eye

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 01/27/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Release Form |
| **Share Note** | No |

## 2. Note

**Summary**   Signed Med Rel Dr. Ormsby

Signed Med Rel - Deb Moss Signed Med Rel Dr. Ormsby

## 3. Activities Provided

Contact with Consumer

## 1. General

Moss Production 000798

*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\**
**Opportunities for Ohioans with Disabilities**
## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Entry Date** | 01/27/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Release Form |
| **Share Note** | No |

### 2. Note

| | |
|---|---|
| **Summary** | Deb Moss Signed Med Rel Dr. Bures |

Signed Med Rel – Deb Moss Signed Med Rel Dr. Bures

### 3. Activities Provided

Contact with Consumer

### 1. General

| | |
|---|---|
| **Entry Date** | 01/27/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Release Form |
| **Share Note** | No |

### 2. Note

| | |
|---|---|
| **Summary** | Deb Moss Signed Med Rel CCF Cole Eye |

See Signed Med Rel – Deb Moss Signed CCF Cole Eye

### 3. Activities Provided

Contact with Consumer

### 1. General

| | |
|---|---|
| **Entry Date** | 01/31/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

Moss Production 000799

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
## Case Notes

**Participant**    Moss, Deborah (Debra) A.        **Participant ID**    109128
**Caseload**    VI-AKR1-3 - Vacant, Akron
              BSVI 1

### 2. Note

**Summary**      call to Confirm Appt on Thursday

TC to Consumer to confirm our appointment on Thursday - request a call back.

### 3. Activities Provided

Contact with Consumer

### 1. General

| | |
|---|---|
| **Entry Date** | 02/01/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

### 2. Note

**Summary**      Records Request - Cole Eye Institute      **Generated Letter**    Yes

### 3. Activities Provided

No items selected

### 1. General

| | |
|---|---|
| **Entry Date** | 02/01/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

### 2. Note

**Summary**      Records Request - Dr. Bures      **Generated Letter**    Yes

### 3. Activities Provided

Moss Production 000800

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/01/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Records Request - Dr. Ormsby | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/01/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Records Request - Dr. Traboulsi | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/02/2017 |
| **Author** | Sullivan, Tim |

Moss Production 000801

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | TC to Consumers Work Number |

TC to Consumer's Work Number to alert her she was being found eligible for services and that I would like to meet with her and draft her plan tomorrow as she had to work today (normally her day off).  Left VM for her.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/02/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Eligibility & OOS Letter_LP | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/02/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Comprehensive Assessment |
| **Share Note** | Yes |

Moss Production 000802

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 2. Note

**Summary**  Draft In Word

Draft in Word and work underway to complete it.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/02/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

**Summary**  TC to Consumer

TC to Consumer confirming and discussing plan for her IPE Services.  Will meet with her tomorrow to draft plan and get her started.  Consumer shared she still has tomorrow off and 10:00 is the preferred time to meet.  VRC will meet her at her residence tomorrow.

We discussed vendors again before I finalized the CA and she would like to use the same vendors as last time - Cleveland Sight Center, KDL, her Doctor's and has no interest in travelling to Akron.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/03/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Comprehensive Assessment |
| **Share Note** | Yes |

Moss Production 000803

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 2. Note

**Summary**      Final CA

See Attached

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/03/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Consent Rel  - Signed Rel for Employer | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/03/2017 |
| **Author** | Sullivan, Tim |
| **Category** | IPE - Signed |
| **Share Note** | No |

## 2. Note

**Summary**      Signed Orig IPE

See attached scan

Moss Production 000804

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/15/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Records Request - Cole Eye Second Request | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/15/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Records Request - Dr. Bures Second Request | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/15/2017 |

Moss Production 000805

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| Participant | Moss, Deborah (Debra) A. | | Participant ID | 109128 |
|---|---|---|---|---|
| Caseload | VI-AKR1-3 – Vacant, Akron BSVI 1 | | | |

| Author | Withrow, Tara |
|---|---|
| Category | Correspondence |
| Share Note | No |

## 2. Note

| Summary | Records Request - Dr. Ormsby Second Request | Generated Letter | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| Entry Date | 02/15/2017 |
|---|---|
| Author | Withrow, Tara |
| Category | Correspondence |
| Share Note | No |

## 2. Note

| Summary | Records Request - Dr. Traboulsi Second Request | Generated Letter | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| Entry Date | 02/21/2017 |
|---|---|
| Author | Sullivan, Tim |
| Category | Phone Call |
| Share Note | No |

## 2. Note

| Summary | VM from Consumer |
|---|---|

Moss Production 000806

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

VM from consumer asking that I give her a call so she can upd me on the situations.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/21/2017 |
| **Author** | Finnerty, Mary Anne |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

| | |
|---|---|
| **Summary** | Univ. Hosp. Record |

From: RightFax E-mail Gateway [rfax@rscadfs.rscad.state.oh.us]
Sent: 2/21/2017 12:51 PM
To: OOD NE Medical Fax

A fax has arrived from remote ID 'University Hosptials'.
----------------------------------------------------------
Account: 9857840
----------------------------------------------------------
2/21/2017 12:47:58 PM Transmission Record
        Received from remote ID: University Hosptials
        Inbound user ID NE_MEDICAL, routing code 9857840
        Result: (0/352;0/0) Success
        Page record: 1 - 6
        Elapsed time: 02:52 on channel 11

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/22/2017 |

Moss Production 000807

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| Participant<br>Caseload | Moss, Deborah (Debra) A.<br>VI-AKR1-3 - Vacant, Akron<br>BSVI 1 | Participant ID | 109128 |
|---|---|---|---|

| | |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | TC from consumer left VM |

TC from Consumer sharing she has been placed on Mandatory Medical Leave - while they make sure she is able to perform her Job.  She has been sent to her POR, and will be sent to her Eye Specialist soon.  She reports that she is okay with all of this as it might be a way for her to get the items she needs documented.  This all came about when University Hospitals absorbed Parma Hospital where she works.

She will keep VRC in the loop.  She is to contact this VRC before going to her eye doctor.  She has not seen an eye specialist since her last case with us.
VRC explained I cannot provide funding after the fact.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 02/22/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Initial Interview |
| **Share Note** | Yes |

## 2. Note

| | |
|---|---|
| **Summary** | New Intake 2017 AWARE GEN |

See Attached

## 3. Activities Provided

Contact with Consumer

Moss Production 000808

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***

Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 02/22/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Forms - Referral to CRP | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/28/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Records Request - Second Request | **Generated Letter** | Yes |

CA spoke to Pamela at the Cleveland Clinic Cole Eye Institute. Pamela states they never received a request for records from our agency. She then requested the record request be resent.

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 02/28/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | Case Note General |

Moss Production 000809

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| Participant | Moss, Deborah (Debra) A. | Participant ID | 109128 |
| Caseload | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

**Share Note**    No

## 2. Note

**Summary**      Record request follow up

CA spoke with Dr. Ormsby who stated he has received the request for records from our agency. Dr.Ormsby states he hopes to have a completed and faxed back to our agency by 3/3/17 CA provided fax number.

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 03/09/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      update

From: Debbie Moss [dabmoss@aol.com]
Sent: 3/9/2017 11:08 AM
To: Sullivan, Timothy

Hi Tim,

Well, apparently the new keyboard was delivered. I guess they have definitely turned over to UH system as my coworker just called asking questions as they are having trouble with the system. "woo hoo!!" I don't have to deal with that stress at this time. I am enjoying my "20 year sabbatical" Getting lots of things done.

My eye Dr. refered to low vision clinic at sight center and they are certainly all on worng pages. I have an appointment that was made over 2 weeks ago and not until the 21st. Then we'll see ehat happens from there.

I'll keep you posted.

Moss Production 000810

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| Participant | Moss, Deborah (Debra) A. | | |
|---|---|---|---|
| Caseload | VI-AKR1-3 - Vacant, Akron BSVI 1 | **Participant ID** | 109128 |

Debbie

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 03/09/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     RE: update

From: Sullivan, Timothy
Sent: 3/9/2017 11:14 AM
To: 'Debbie Moss'

Good Morning,


Thank you for keeping me in the loop.


I kinda thought you would not sit around for long.  Do you mean the new ZoomText Keyboard was delivered and they are having trouble with the ZoomText and the UH Computer System?  Maybe we could help your employer get the kinks worked out?  What do you think?


Let me know,

---

Moss Production 000811

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Tim

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 03/14/2017 |
| **Author** | Finnerty, Mary Anne |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

**Summary**   Dr. Ormsby/HealthSource, Records

From: RightFax E-mail Gateway [rfax@rscadfs.rscad.state.oh.us]
Sent: 3/14/2017 3:43 PM
To: OOD NE Medical Fax

A fax has arrived from remote ID '3302206115'.
-----------------------------------------------------------
3/13/2017 4:00:28 PM Transmission Record
        Received from remote ID: 3302206115
        Inbound user ID NE_MEDICAL, routing code 9857840
        Result: (0/352;0/0) Successful Send
        Page record: 1 - 43
        Elapsed time: 50:31 on channel 1

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 03/22/2017 |
| **Author** | Withrow, Tara |
| **Category** | Report |

Moss Production 000812

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
**Opportunities for Ohioans with Disabilities**

## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| **Share Note** | No |
|---|---|

## 2. Note

| **Summary** | Moss RT Mar 1949152 03-20-17 |
|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 03/30/2017 |
|---|---|
| **Author** | Withrow, Tara |
| **Category** | Report |
| **Share Note** | No |

## 2. Note

| **Summary** | CSC - Low Vision Clinic Report |
|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 04/03/2017 |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| **Summary** | update. |
|---|---|

From: Debbie Moss [dabmoss@aol.com]
Sent: 4/3/2017 12:02 PM

Moss Production 000813

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

To: Sullivan, Timothy; Sullivan, Timothy

Hi Tim,

I have 2 emails, not sure which is correct so I sent to both.

Anyway, "Time Marches On". So had low vision with Dr. on 22. Now apparently have to meet with OT at sight center on Wed. for "work assessment" based eval as a referral from original appointment. Also supposed to hear results of initial eval from UH wither later today or on Wed.

Also met with Bill and sounds like he wants me to upgrade to windows 10 as new zoomtext upgrade is also available at no cost. My speech isn't working when I write emails and hasn't for awhile and Zoomtext support hasn't been able to figure it out. Frustrating when not reading or screen not moving. So I apologize for any errors.

Debbie

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 04/20/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      update

From: Debbie Moss [dabmoss@aol.com]
Sent: 4/20/2017 8:38 AM
To: Sullivan, Timothy; Sullivan, Timothy

Hi Tim,

Hope you are well. I seem to have just developed spring allergies, itchy eyes...

Anyhow, still no word on work. Thought I'd hear something by now but last contact was a week

Moss Production 000814

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
## Case Notes

| | |
|---|---|
| **Participant** | Moss, Deborah (Debra) A. |
| **Caseload** | VI-AKR1-3 - Vacant, Akron |
| | BSVI 1 |

**Participant ID**  109128

ago Wed. when called to get verbal permission to talk to UH OT as they recommnended a worksite eval (which is what I asked for as well for posturing...,). Who knows.  2 months, it's going to be like starting a new job.  They have been doing some reconstruction with fire sprinklers (yes, believe it or not they did not have sprinlkers in parts of the floor which included my office.

My home computer is acting up this week.  Had to reboot twice this morning and I keep getting a pop up for "advanced pc care" and it won't go away.  Blocks my screen in certain areas where I can't read what was typed and of course, my reader hasn'tbeen working for months.   Bill just waiting to get go ahead from you to have computer serviced.

I'll keep you posted.

Debbie  Moss

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 04/20/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     RE: update

From: Sullivan, Timothy
Sent: 4/20/2017 8:55 AM
To: 'Debbie Moss'

Okay,

Thanks for the update…

Moss Production 000815

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| Participant | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| Caseload | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Me too – my allergies have not been like this in a couple of years… Today I am wheezing as well…. Ugh… yuck….

Okay will get KDL auth released – please take this time to practice so you don't lose the computer skills you have (I mean after the computer gets squared away.

Thank you again for the update…. If you hear anything at all let me know.

Tim

Akron BSVI Counselor for the Akron Office of BSVI.

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 04/24/2017 |
| **Author** | Grair, Marcia |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

| **Summary** | MOSS MED REC CLEVE CLINIC & IOD INVOICE 4-24-17 |

## 3. Activities Provided

No items selected

Moss Production 000816

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 04/25/2017 |
| **Author** | Withrow, Tara |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | D Moss - Dr. Traboulsi CCF - Response to Rec Req |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 05/02/2017 |
| **Author** | Grair, Marcia |
| **Category** | Medical Records |
| **Share Note** | Yes |

## 2. Note

| | |
|---|---|
| **Summary** | MOSS MED REC CLEV CLINIC CCF MAIN CAMPUS. |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 05/10/2017 |
| **Author** | Sullivan, Tim |

---

Moss Production 000817

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron<br>BSVI 1 | | |

| | |
|---|---|
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | update |

From: Debbie Moss [dabmoss@aol.com]
Sent: 5/10/2017 12:01 PM
To: Sullivan, Timothy

Hi Tim,

Still no word on work.  Spoke to EAP lady today and even she doesn't know what  the hold up is.
It all seems to be over my request to have posture eval at work station.  That can be done when I
get back.  They're apparently saying something about an OT observing what I would be doing if I
were there.  Seems like people at Parma are just dragging their feet.  Now eating vacation time
and my life seems to be on hold regarding some plans.

Anyway, Bill just called and wants in writing that it is ok to have my computer serviced.  He didn't
want to bug you Monday as I guess you were in a meeting.

Thanks, Debbie

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/01/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | update |

From: Debbie Moss [dabmoss@aol.com]

Moss Production 000818

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Sent: 6/1/2017 7:22 PM
To: Sullivan, Timothy; Sullivan, Timothy

Hi Tim,

Not sure if you got my phone message this afternoon but it is sounding like my options are;
1. resign
2. be terminated
3. return to work if they decide and "micro manage" me and then terminate if not working out.

They might check into other positions at the hospital totally unrelated to what I do, but could be option.

My parents are in town so if you can't reach me, you can try my husband's cell and he can get a hold of me.  Running around.
330-591-0766.


Thanks, Debbie

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/02/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     RE: update

From: Sullivan, Timothy
Sent: 6/2/2017 8:52 AM
To: 'Debbie Moss'

Good Morning,

Moss Production 000819

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Hmmmm….

Who gave you these options?  HR?

Do you have a time frame?  We can always add some services to your vocational plan for Job Placement and Development.  I know it is likely not what you wanted to do – but that is another option you also have.

I will try and call you this afternoon in between appointments.

Thank you for the update…

Hang in there….

Tim

Vocational Rehabilitation Counselor for the Akron Office of OOD.

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/02/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

Moss Production 000820

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Case Notes

| Participant | Moss, Deborah (Debra) A. | Participant ID | 109128 |
| --- | --- | --- | --- |
| Caseload | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

## 2. Note

**Summary**     Re: update

From: Debbie Moss [dabmoss@aol.com]
Sent: 6/2/2017 9:43 AM
To: Sullivan, Timothy

Hi Tim,

Yes it was HR.  I may be out and about this afternoon leaving sometime after noon and back by 3ish if I do go out.  Hope we connect.


Debbie




-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss < dabmoss@aol.com>
Sent: Fri, Jun 2, 2017 8:52 am
Subject: RE: update


Good Morning,


Hmmmm....


Who gave you these options?  HR?


Do you have a time frame?  We can always add some services to your vocational plan for Job Placement and Development.  I know it is likely not what you wanted to do -- but that is another

---

Moss Production 000821

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

option you also have.

I will try and call you this afternoon in between appointments.


Thank you for the update…


Hang in there….


Tim

Vocational Rehabilitation Counselor for the Akron Office of OOD.

## 3. Activities Provided

No items selected


## 1. General

| | |
|---|---|
| **Entry Date** | 06/08/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Referral to KDL | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected


## 1. General

Moss Production 000822

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Entry Date** | 06/08/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Referral to ULVA | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/10/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      work property

From: Debbie Moss [dabmoss@aol.com]
Sent: 6/10/2017 9:53 AM
To: Sullivan, Timothy; Sullivan, Timothy

Hi Tim,

Well a new chapter is beginning.  I did want to verify before I go to pick up my personal beongings from work what is mine.
I know the closed circuit tv and zoomtext software and keyboards (particularly the one that was just ordered in Feb?)
Is the computer monitor mine too?
Hopefuly we can talk Monday morning to discuss next steps.
Thanks again for all your help along the way.

Moss Production 000823

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

Debbie

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/12/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Documentation |
| **Share Note** | No |

## 2. Note

**Summary**      Reviewed Purchases

Reviewed purchases per her last 2 cases and will call her to consult on what is happening now with her job - it appears from her e-mail she may have resigned.  VRC will get details per a call I will make next.

She needs to bring home the following:
CCTV, Monitor, and ZoomText Keyboard

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/12/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

**Summary**      TC to Debbie per her request

Moss Production 000824

***CONFIDENTIAL FOR AGENCY USE ONLY***

**Opportunities for Ohioans with Disabilities**

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

TC to Debbie per her request in her e-mail from late on Friday.  Her parents were leaving when I called and so she asked that I call her back in about 10-15 min.

She did say a lot had happened and she needed to discuss this with me.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 06/12/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | Blank Letter - Fill In Signature_LP | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/12/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      Here are the items we discussed this am

From: Sullivan, Timothy
Sent: 6/12/2017 6:25 PM
To: Debbie Moss (dabmoss@aol.com)

Moss Production 000825

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Good Evening,

Here are the Job Placement and Development Vendors and the loan lease info for you.

Okay – I could only go back so far as the prior cases have been destroyed.  You will need to check on the Serial number for the ZoomText Upgrade.  If you have a large Monitor at home your employer may have provided the other one.

Thanks Tim – questions call me --- Thanks

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/26/2017 |
| **Author** | Grair, Marcia |
| **Category** | Report |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | MOSS EQUIP JUN 2012401 6-26-17 |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/29/2017 |

Moss Production 000826

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | Forms - Loan/Lease Agreement | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/29/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| **Summary** | Question |
|---|---|

From: Sullivan, Timothy
Sent: 6/29/2017 9:21 AM
To: Bill Merholz (wmerholz@gmail.com)

Good Morning Bill,

Did you get the keyboard and software for Deb M?  Please let me know so I can process her billing to ULVA.

Thanks and have a great day...

---

Moss Production 000827

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron<br>BSVI 1 | | |

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/29/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Re: Question

From: wmerholz@gmail.com [wmerholz@gmail.com]
Sent: 6/29/2017 11:45 AM
To: Sullivan, Timothy

Yes...have a great day.

From: Timothy.Sullivan@ood.ohio.gov < mailto:Timothy.Sullivan@ood.ohio.gov>
Sent: Thursday, June 29, 2017 9:21 AM
To: mailto:wmerholz@gmail.com
Subject: Question

Good Morning Bill,

Did you get the keyboard and software for Deb M?  Please let me know so I can process her
billing to ULVA.

Moss Production 000828

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

< https://na01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.avg.com%2Femail-signature%3Futm_medium%3Demail%26utm_source%3Dlink%26utm_campaign%3Dsig-email%26utm_content%3Demailclient& data=02%7C01%7CTimothy.Sullivan%40ood.ohio.gov%7Ce0c1c8877424404153d708d4bf05e89e%7C50f8fcc494d84f0784eb36ed57c7c8a2%7C0%7C0%7C636343479470329626& sdata=4FYFlOl1ul5DCl%2FmI55%2BC8TccDsCOWHsJadvt6ac8FM%3D& reserved=0> Virus-free. www.avg.com < https://na01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.avg.com%2Femail-signature%3Futm_medium%3Demail%26utm_source%3Dlink%26utm_campaign%3Dsig-email%26utm_content%3Demailclient& data=02%7C01%7CTimothy.Sullivan%40ood.ohio.gov%7Ce0c1c8877424404153d708d4bf05e89e%7C50f8fcc494d84f0784eb36ed57c7c8a2%7C0%7C0%7C636343479470329626& sdata=4FYFlOl1ul5DCl%2FmI55%2BC8TccDsCOWHsJadvt6ac8FM%3D& reserved=0>

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 06/29/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

Moss Production 000829

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 – Vacant, Akron BSVI 1 | | |

**Summary**      Serial Number Needed

From: Sullivan, Timothy
Sent: 6/29/2017 12:28 PM
To: 'lindam@ulva.com'

Good Afternoon,

I need the serial number for the IRIS Software provided to Deb M…

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 07/11/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      DM Auth#: 2012391

Moss Production 000830

\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\*

**Opportunities for Ohioans with Disabilities**

# Case Notes

| | |
|---|---|
| **Participant** | Moss, Deborah (Debra) A. |
| **Caseload** | VI-AKR1-3 - Vacant, Akron |
| | BSVI 1 |

**Participant ID**   109128

From: wmerholz@gmail.com [wmerholz@gmail.com]
Sent: 7/11/2017 3:38 PM
To: Sullivan, Timothy

Tim,

Is it possible to extend this authorization through today 7/11?

Thanks,
Bill

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 07/11/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**   RE: DM Auth#: 2012391

From: Sullivan, Timothy
Sent: 7/11/2017 4:56 PM
To: 'wmerholz@gmail.com'

Bill,

I have made the request and asked you be sent an Amended Authorization.

Thanks and have a great day...

Moss Production 000831

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 07/11/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      Re: DM Auth#: 2012391

From: wmerholz@gmail.com [wmerholz@gmail.com]
Sent: 7/11/2017 5:38 PM
To: Sullivan, Timothy

Thank you.

Sent from my iPhone

On Jul 11, 2017, at 4:56 PM, "Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> " < Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> > wrote:

        Bill,

    I have made the request and asked you be sent an Amended Authorization.

Moss Production 000832

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant Caseload** | Moss, Deborah (Debra) A. VI-AKR1-3 - Vacant, Akron BSVI 1 | **Participant ID** | 109128 |

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 07/12/2017 |
| **Author** | Pruchniewicz, Allison |
| **Category** | Report |
| **Share Note** | No |

## 2. Note

**Summary**        Moss RT July 2012391 07-12-17

-----Original Message-----
From: Akron5.Scan@OOD.ohio.gov [mailto:Akron5.Scan@OOD.ohio.gov]
Sent: Wednesday, July 12, 2017 11:51 AM
To: OOD NE Invoicing Fax
Subject: Moss RT July 2012391 07-12-17

FROM=
TO=
DATE=07/12/2017
TIME=10:50:02
TIMEZONE=-05:00
FCODE=

Moss Production 000833

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 07/16/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Documentation |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Job Description |

See Attached - Parma Gen prior position and accommodation form

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 07/18/2017 |
| **Author** | Race, Rebecca |
| **Category** | Case Note General |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Loan Agreement/Release Statement |

## 3. Activities Provided

No items selected

## 1. General

---

Moss Production 000834

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| Participant | Moss, Deborah (Debra) A. | Participant ID | 109128 |
|---|---|---|---|
| Caseload | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| Entry Date | 08/03/2017 |
|---|---|
| Author | Sullivan, Tim |
| Category | E-Mail |
| Share Note | No |

## 2. Note

| Summary | E_M Vendor Placements |
|---|---|

See Attached - highlighted in green recommendations.

2nd time...

Also Sent Job Description and forwarded prior e-mail with the Vendors.

## 3. Activities Provided

Contact with Consumer

## 1. General

| Entry Date | 08/03/2017 |
|---|---|
| Author | Sullivan, Tim |
| Category | E-Mail |
| Share Note | No |

## 2. Note

| Summary | FW: Here are the items we discussed this am |
|---|---|

From: Sullivan, Timothy
Sent: 8/3/2017 11:30 AM
To: Debbie Moss (dabmoss@aol.com)

Good Morning,

Here you go the e-mail I sent you before.  I will send the next e-mail with the job description attached.

Moss Production 000835

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | |
|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID**   109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | |
| | BSVI 1 | |

Let me know who you would like to use for help with finding work – once I know which one you want to use I can add that to your plan.

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

From: Sullivan, Timothy
Sent: Monday, June 12, 2017 6:26 PM
To: Debbie Moss (dabmoss@aol.com) < dabmoss@aol.com>
Subject: Here are the items we discussed this am

Good Evening,

Here are the Job Placement and Development Vendors and the loan lease info for you.

Okay – I could only go back so far as the prior cases have been destroyed.  You will need to check on the Serial number for the ZoomText Upgrade.  If you have a large Monitor at home your employer may have provided the other one.

Thanks Tim – questions call me --- Thanks

Moss Production 000836

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***

**Opportunities for Ohioans with Disabilities**

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/03/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Job Description |

From: Sullivan, Timothy
Sent: 8/3/2017 11:34 AM
To: Debbie Moss (dabmoss@aol.com)


Good Morning again,


Here is the Job Description...


Thanks and have a great day...


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

---

Moss Production 000837

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/03/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**    Re: Job Description

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/3/2017 12:28 PM
To: Sullivan, Timothy

Thanks!!!

I will be calling the 2 vendors this afternoon.  Don't know how I missed these attachments.

Thanks again,
Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss (dabmoss@aol.com) < dabmoss@aol.com>
Sent: Thu, Aug 3, 2017 11:35 am
Subject: Job Description

Good Morning again,

---

Moss Production 000838

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| Participant | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| Caseload | VI-AKR1-3 - Vacant, Akron |
| | BSVI 1 |

Here is the Job Description…

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/11/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Re: Here are the items we discussed this am

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/11/2017 6:35 PM
To: Sullivan, Timothy

Hi Tim,

Both voc. specialists returned my calls this week.  They both seem very good.
Do you have a preference of either Kimberly (voc. wirks) or Lisa with voc. resources?  Have you had better luck with either?  Let me know your thoughts.

Moss Production 000839

***CONFIDENTIAL FOR AGENCY USE ONLY***

**Opportunities for Ohioans with Disabilities**

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Thanks,
Debbie



-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss (dabmoss@aol.com) < dabmoss@aol.com>
Sent: Thu, Aug 3, 2017 11:30 am
Subject: FW: Here are the items we discussed this am


Good Morning,


Here you go the e-mail I sent you before.  I will send the next e-mail with the job description
attached.


Let me know who you would like to use for help with finding work – once I know which one you
want to use I can add that to your plan.


Thanks and have a great day…


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

---

Moss Production 000840

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

From: Sullivan, Timothy
Sent: Monday, June 12, 2017 6:26 PM
To: Debbie Moss (dabmoss@aol.com < mailto:dabmoss@aol.com> ) < dabmoss@aol.com <
mailto:dabmoss@aol.com> >
Subject: Here are the items we discussed this am

Good Evening,

Here are the Job Placement and Development Vendors and the loan lease info for you.

Okay – I could only go back so far as the prior cases have been destroyed.  You will need to
check on the Serial number for the ZoomText Upgrade.  If you have a large Monitor at home your
employer may have provided the other one.

Thanks Tim – questions call me --- Thanks

### 3. Activities Provided

No items selected

### 1. General

| | |
|---|---|
| **Entry Date** | 08/14/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

### 2. Note

| | |
|---|---|
| **Summary** | RE: Here are the items we discussed this am |

From: Sullivan, Timothy
Sent: 8/14/2017 9:20 AM

Moss Production 000841

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

To: 'Debbie Moss'

Good Morning,

Both are very good Voc Works (Kimberley) has a background working with Injured Workers and in my opinion works a little faster.  They have helped place more for me this year.

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/15/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Job Placement |

From: Sullivan, Timothy
Sent: 8/15/2017 10:06 AM
To: 'Debbie Moss'

Good Morning,

Moss Production 000842

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Okay will work on the paperwork and we may need to meet are our free tomorrow?

Thanks and have a great day...

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/15/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Re: Job Placement

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/15/2017 8:56 PM
To: Sullivan, Timothy

Hi Tim,

After checking out Ohio Means Jobs, looks like it is used as part of package with voc job searching.
Wed. before 11:30 is good or Thurs//fri. before noon.

Moss Production 000843

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss < dabmoss@aol.com>
Sent: Tue, Aug 15, 2017 10:07 am
Subject: Job Placement

Good Morning,

Okay will work on the paperwork and we may need to meet are our free tomorrow?

Thanks and have a great day...

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

**Entry Date**      08/22/2017

Moss Production 000844

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Re: Here are the items we discussed this am

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/22/2017 11:58 AM
To: Sullivan, Timothy

Hi Tim,

I guess when you work with voc specialist, they have you sign up with Ohiomeans jobs. It is also mandated with unemployment.
It would probably still be best to work with Kimberly.  This week I am free on Wed. and Friday all day, Thursday before 11:30 or possibly after 3.

Thanks,
Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss < dabmoss@aol.com>
Sent: Mon, Aug 14, 2017 9:20 am
Subject: RE: Here are the items we discussed this am

Good Morning,

Both are very good Voc Works (Kimberley) has a background working with Injured Workers and in my opinion works a little faster.  They have helped place more for me this year.

Moss Production 000845

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/22/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      RE: Here are the items we discussed this am

From: Sullivan, Timothy
Sent: 8/22/2017 1:18 PM
To: 'Debbie Moss'

Good Afternoon,

That is correct… it is one of the things our agency has made mandatory.  Would Friday Sept 1st work for you?

Thanks and have a great day…

Moss Production 000846

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

From: Debbie Moss [mailto:dabmoss@aol.com]
Sent: Tuesday, August 22, 2017 11:58 AM
To: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov>
Subject: Re: Here are the items we discussed this am

Hi Tim,

I guess when you work with voc specialist, they have you sign up with Ohiomeans jobs. It is also mandated with unemployment.
It would probably still be best to work with Kimberly.  This week I am free on Wed. and Friday all day, Thursday before 11:30 or possibly after 3.

Thanks,
Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov < mailto:Timothy.Sullivan@ood.ohio.gov> >
To: Debbie Moss < dabmoss@aol.com < mailto:dabmoss@aol.com> >
Sent: Mon, Aug 14, 2017 9:20 am
Subject: RE: Here are the items we discussed this am

Good Morning,

Both are very good Voc Works (Kimberley) has a background working with Injured Workers and in

Moss Production 000847

*** CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

my opinion works a little faster.  They have helped place more for me this year.


Thanks and have a great day…


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 08/22/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**      Re: Here are the items we discussed this am

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/22/2017 3:03 PM
To: Sullivan, Timothy

Sure.  I just have piano tuner coming at noon.


Debbie

Moss Production 000848

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 – Vacant, Akron | | |
| | BSVI 1 | | |

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss < dabmoss@aol.com>
Sent: Tue, Aug 22, 2017 1:31 pm
Subject: RE: Here are the items we discussed this am

Good Afternoon,

That is correct… it is one of the things our agency has made mandatory.  Would Friday Sept 1st work for you?

Thanks and have a great day…

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

From: Debbie Moss [mailto:dabmoss@aol.com < mailto:dabmoss@aol.com?> ]
Sent: Tuesday, August 22, 2017 11:58 AM
To: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov < mailto:Timothy.Sullivan@ood.ohio.gov> >
Subject: Re: Here are the items we discussed this am

Hi Tim,

I guess when you work with voc specialist, they have you sign up with Ohiomeans jobs. It is also mandated with unemployment.

---

Page 57 of 87

Moss Production 000849

***CONFIDENTIAL FOR AGENCY USE ONLY***

**Opportunities for Ohioans with Disabilities**

# Case Notes

| | | |
|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID**   109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | |
| | BSVI 1 | |

It would probably still be best to work with Kimberly.  This week I am free on Wed. and Friday all day, Thursday before 11:30 or possibly after 3.

Thanks,
Debbie


-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> >
To: Debbie Moss < dabmoss@aol.com < mailto:dabmoss@aol.com> >
Sent: Mon, Aug 14, 2017 9:20 am
Subject: RE: Here are the items we discussed this am

Good Morning,


Both are very good Voc Works (Kimberley) has a background working with Injured Workers and in my opinion works a little faster.  They have helped place more for me this year.


Thanks and have a great day...


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089


## 3. Activities Provided

No items selected


## 1. General

**Entry Date**      08/22/2017

Moss Production 000850

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
## Case Notes

| | |
|---|---|
| **Participant** | Moss, Deborah (Debra) A. |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 |

**Participant ID**  109128

| | |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**  Re: Time

From: Debbie Moss [dabmoss@aol.com]
Sent: 8/22/2017 3:28 PM
To: Sullivan, Timothy

Sounds good.  See you then.


Debbie




-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov>
To: Debbie Moss < dabmoss@aol.com>
Sent: Tue, Aug 22, 2017 3:25 pm
Subject: Time


Hello Again,


Will 10:00 work for you?


Thanks and have a great day…


Tim

Moss Production 000851

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Vocational Counselor for the Akron Office of OOD

330/641-4089

From: Debbie Moss [mailto:dabmoss@aol.com < mailto:dabmoss@aol.com?> ]
Sent: Tuesday, August 22, 2017 3:03 PM
To: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov < mailto:Timothy.Sullivan@ood.ohio.gov> >
Subject: Re: Here are the items we discussed this am

Sure.  I just have piano tuner coming at noon.

Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> >
To: Debbie Moss < dabmoss@aol.com < mailto:dabmoss@aol.com> >
Sent: Tue, Aug 22, 2017 1:31 pm
Subject: RE: Here are the items we discussed this am

Good Afternoon,

That is correct... it is one of the things our agency has made mandatory.  Would Friday Sept 1st
work for you?

Thanks and have a great day...

Moss Production 000852

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| Participant Caseload | Moss, Deborah (Debra) A. VI-AKR1-3 - Vacant, Akron BSVI 1 | Participant ID | 109128 |
|---|---|---|---|

Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

From: Debbie Moss [mailto:dabmoss@aol.com < mailto:dabmoss@aol.com?> ]
Sent: Tuesday, August 22, 2017 11:58 AM
To: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov < mailto:Timothy.Sullivan@ood.ohio.gov>
>
Subject: Re: Here are the items we discussed this am

Hi Tim,

I guess when you work with voc specialist, they have you sign up with Ohiomeans jobs. It is also mandated with unemployment.
It would probably still be best to work with Kimberly.  This week I am free on Wed. and Friday all day, Thursday before 11:30 or possibly after 3.

Thanks,
Debbie

-----Original Message-----
From: Timothy.Sullivan < Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> >
To: Debbie Moss < dabmoss@aol.com < mailto:dabmoss@aol.com> >
Sent: Mon, Aug 14, 2017 9:20 am
Subject: RE: Here are the items we discussed this am

Good Morning,

Both are very good Voc Works (Kimberley) has a background working with Injured Workers and in

Moss Production 000853

***CONFIDENTIAL FOR AGENCY USE ONLY***
## Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

my opinion works a little faster.  They have helped place more for me this year.


Thanks and have a great day…


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 09/06/2017 |
| **Author** | Sullivan, Tim |
| **Category** | IPE - Signed |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Signed IPE 2 |

See Attached

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 09/13/2017 |
| **Author** | Sullivan, Tim |

Moss Production 000854

\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\*
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Referral to VocWorks | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 09/29/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**    follow up

From: Debbie Moss [dabmoss@aol.com]
Sent: 9/29/2017 4:13 PM
To: Sullivan, Timothy

Hi Tim,

Just wondering what you found out about voc. specialist and Ohio means jobs.

Thanks,
Debbie

## 3. Activities Provided

No items selected

## 1. General

Moss Production 000855

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Entry Date** | 10/10/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Email to JD |

Good morning Amy,
I hope you had a very nice weekend. I am currently trying to set up the Job Placement and Development Meetings for Tim this month do you and Deb Moss have a meeting set up for either the week of the 23rd or the week of the 31st that he may be able to attend. If so could you please send me the date and time as well is a meeting place so I may place it on his calendar. Just letting you know he has an all-day meeting on 24 October and will be unavailable for any meetings that day. Thank you in advance for your cooperation with my request. I look forward to seeing you soon.
Best,

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 10/12/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | TC to Deb |

VRC called the consumer regarding the job fair and explained to her that we are in the process of sending out packets and that she was on the list for the Job Fair already.

Her first meeting w/ the Job D went well - she reported she just has a lot of things to get done, between that meeting an getting Jobs and Family Services paperwork (Unemployment). She will be on vacation starting Saturday for a week.

Moss Production 000856

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

VRC asked about her Technology and she shared she is having a little bit of difficulty and will be calling ZoomText to get assistance.  VRC shared if she is having difficulty after talking with them to call me and I would see what I could do - maybe send out KDL to make sure her system is working correctly.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 10/26/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Email packet for job fair |

Good afternoon Deborah,
I hope you're having a nice day. I have attached the information for the Cleveland Job Fair on November 2. If you have any questions do not hesitate to contact me.
Best,

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 10/30/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | Case Note General |
| **Share Note** | No |

## 2. Note

Moss Production 000857

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

**Summary**    Phone call with Debra/job fair

CA spoke to Deborah who stated she is planning on attending the job fair on November 2 from 12 to 2:30 PM at the Holiday Inn. CA went over appropriate dress as well as to bring copies of her resume. Debra stated she understood Debra then asked CA about the showcase beginning at 11:30 AM. CA did her best to answer questions with the information provided in the letter.

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 10/30/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**    E-Mail From Consumer

From: Debbie Moss [mailto:dabmoss@aol.com]
Sent: Monday, October 30, 2017 1:57 PM
To: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov>
Subject: job fair

Hi Tim,

I didn't know if I might catch a ride to job fair with you on Thursday.  I'm having a hard time finding a ride.


Debbie

## 3. Activities Provided

Contact with Consumer

## 1. General

Moss Production 000858

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| Participant | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
|---|---|---|---|
| Caseload | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| **Entry Date** | 10/30/2017 |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

**Summary**     TC to Debbie

Shared she may have a ride w/ an Uncle she will know tomorrow... She will call me in the am if she does not.

## 3. Activities Provided

Contact with Consumer

## 1. General

| **Entry Date** | 11/01/2017 |
|---|---|
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Email with JD

Good morning Amy,
I enjoyed talking with you this morning. Could I please have the date and time of your next Job development meeting with Deb Moss so that I may attend by phone this meeting if it works in our schedules.
Thanks,

CA also spoke with JD this morning and laid the groundwork for attending the meeting by phone.

## 3. Activities Provided

No items selected

Moss Production 000859

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 11/13/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | Case Note General |
| **Share Note** | No |

## 2. Note

**Summary**   Phone calls/meeting with JD

CA met with Deb Moss and her Job Developer Amy Rumrill. Amy and Deb stated they are through most of tier 1 and a registered with OMJ. Deb stated she registered with OMJ back in August and frequently follows up on job leads provided from them. Debra also attended the job fair in Cleveland and followed up with several nursing homes including Dan Barry and Evergreen for Activity Director Positions she also has a contact Sam at Silver Meadows Rehab that both Amy and Deb have followed up with. Amy and Deb stated since they've been meeting once a week they have filled out 4 to 5 job applications. Deb stated prior to that she was filling out to job applications a week. Amy then stated transportation may become an issue has Deb past to stay within the county Amy stated this may require a little creative thinking on her part. Amy also stated that may be overqualified for activity Dir. positions which may be why she is not receiving calls back. Debra also told CA she is utilizing a LinkedIn profile but is not sure how to use the profile to the fullest potential. CA ask if JD could help with this how also pose the same question to the VRC. Deb states she utilizes a job log in her notebook to keep track of the position she's applied for, and follows up with either a phone call or an email within 3 to 4 days of submitting an application. Deb states she may need her VRC to help her figure out transportation in the future. Amy stated Deb is very prompt and efficient with keeping appointments and schedules their appointments in a timely fashion. CA asked for Devon Amy within the next two business days to send an email confirmation of registration with OMJ.

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 11/14/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

Moss Production 000860

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron<br>BSVI 1 | | |

## 2. Note

**Summary**      Email OMJ registration

Hello below is Deb Moss' ohiomeansjobs registration verification. Thanks.

Amy Rumrill, M.Ed., CRC
Vocational Specialist
330-472-9149 Phone
1-855-643-0423 Fax


-----Original Message-----
From: Debbie Moss [mailto:dabmoss@aol.com]
Sent: Monday, November 13, 2017 8:02 PM
To: Rumrill, Amy
Subject: Fwd: Welcome to OhioMeansJobs!


Debbie Moss


-----Original Message-----
From: omjseekerhelp < omjseekerhelp@monster.com>
To: dabmoss < dabmoss@aol.com>
Sent: Tue, Aug 15, 2017 05:46 PM
Subject: Welcome to OhioMeansJobs!


Welcome to OhioMeansJobs
Hi Deborah,
Welcome to OhioMeansJobs.com! We've partnered with Monster.com to help you find the right
job and get your career on track. You can log into your account with either your username or your
email address.
The job you want is out there.
Get closer to it with these tips.
Post your resume - double your chances of finding a job Hear about positions directly from
employers and double your chances of landing a job.
Write a compelling resume headline
When you post your resume, it's important for it to have an attention-grabbing headline. This is

Moss Production 000861

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

what employers will see when your resume appears in their searches. To write a compelling resume headline, include your desired job title and also other keywords that employers may search for.

Click the button below to post your resume, set your career goals and access job search tools to help you find your next job.

GET STARTED

Best of luck in your job search,

The OhioMeansJobs - Monster Team

Questions? Please do not reply to this email, contact us here.

To read the OhioMeansJobs.com Terms of Use, visit

https://jobseeker.ohiomeansjobs.monster.com/UsageTerms.aspx

To read the Monster Privacy Commitment, visit http://inside.monster.com/privacy/home.aspx.

If you have any doubt about the authenticity of this email, simply open a new web browser, type in http://jobseeker.ohiomeansjobs.monster.com/,

log in to your account safely and securely and then perform the requested activity.

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the information is privileged and/or confidential. It is intended only for the use of the individual or entity to which it is addressed. If you have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

----------------------------------------------------------------------

This message was secured by ZixCorp(R).

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 11/24/2017 |
| **Author** | Bradley, Kimberly S. |
| **Category** | Report |
| **Share Note** | No |

Moss Production 000862

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

## 2. Note

**Summary**    Moss INTAKE Oct 2070496 11-22-17

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 11/29/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**    DM

From: Rumrill, Amy [Amy.Rumrill@VocWorks.com]
Sent: 11/29/2017 6:28 AM
To: Sullivan, Timothy

This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>

Hello Tim, could I call you today sometime about Deb Moss?  Thanks.

Amy Rumrill, M.Ed., CRC

Vocational Specialist

330-472-9149 Phone

1-855-643-0423 Fax

Moss Production 000863

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the information is privileged and/or confidential. It is intended only for the use of the individual or entity to which it is addressed. If you have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

-------------------------------------------------------------------

This message was secured by ZixCorp < http://www.zixcorp.com> (R).

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 12/04/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | Email with JD |

Good afternoon Amy,
I hope you had a very nice weekend. I'm covering the job placement and development meetings for Tim for December. I was wondering when your next meeting with Deborah Moss is so that I may attended by phone. Please let me know as soon as possible so I can place it on my calendar. Please provide a phone number where you can be reached for the meeting.
Best,

## 3. Activities Provided

No items selected

Moss Production 000864

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 12/05/2017 |
| **Author** | Flickinger, Danielle |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**     Email from JD

Danielle, my next meeting with Deb Moss is on Tues 12/5 at 12:30 p.m.  If you would like to call in, my number is 330-472-9149.  I spoke with Tim about this case on 11/30.  I am uncertain about the direction of the case due to the following circumstance:  Deb will be receiving unemployment of $20 per hour until next August, 2018 and she is unwilling to accept a job earning less than that. I discussed with Tim that the market for recreational therapists is small and Deb is applying for all available jobs but other than that we are not sure of jobs to apply to that would have earnings that will meet her needs.  I am copying Tim here to see if he has spoken to Deb to see what we are going to do now.  If you do call into the meeting on 12/5 Danielle I will talk to you then. Thanks.

Amy Rumrill, M.Ed., CRC
Vocational Specialist
330-472-9149 Phone
1-855-643-0423 Fax

From: Danielle.Flickinger@ood.ohio.gov [mailto:Danielle.Flickinger@ood.ohio.gov]
Sent: Monday, December 04, 2017 2:59 PM
To: Rumrill, Amy
Subject: RSCsecure

This message was sent securely using ZixCorp.

Good afternoon Amy,
I hope you had a very nice weekend. I'm covering the job placement and development meetings for Tim for December. I was wondering when your next meeting with Deborah Moss is so that I may attended by phone. Please let me know as soon as possible so I can place it on my calendar. Please provide a phone number where you can be reached for the meeting.
Best,

Danielle Flickinger

Moss Production 000865

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

Caseload Assistant
Opportunities for Ohioans with Disabilities
234-206-4196
161 South High Street # 103
Akron, OH 44308

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the
information is privileged and/or confidential. It is intended only for
the use of the individual or entity to which it is addressed. If you
have received this communication in error, please notify the sender at
the reply e-mail address and delete it from your system without copying
or forwarding it. If you are not the intended recipient, you are hereby
notified that any retention, distribution, or dissemination of this
information is strictly prohibited. Thank you.

---------------------------------------------------------------------

This message was secured by ZixCorp(R).

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the
information is privileged and/or confidential. It is intended only for
the use of the individual or entity to which it is addressed. If you
have received this communication in error, please notify the sender at
the reply e-mail address and delete it from your system without copying
or forwarding it. If you are not the intended recipient, you are hereby
notified that any retention, distribution, or dissemination of this
information is strictly prohibited. Thank you.

---------------------------------------------------------------------

This message w

## 3. Activities Provided

No items selected

## 1. General

**Entry Date**      12/05/2017

Moss Production 000866

**\*\*\*CONFIDENTIAL FOR AGENCY USE ONLY\*\*\***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | TC to Deb |

TC to Deb to discuss her Job Search and to touch base with her on how she and the Job Developer are getting along.

VRC and consumer had conversation regarding her unemployment and job search. Deb is earning nearly what she was getting paid when working for Parma Gen. Hosp. The unemployment benefits will not expire until next Sept. She will also have healthcare at no cost until then as well. Deb lives in a rural area that does not really have transportation to areas that would have a job that pays in this range. As a result, Deb shared she will not take a job that does not pay at least what she was being paid on unemployment which is in the $20.00/hour range. Her wage at Parma was $26.20 per hour. Deb also shared she wanted to work only part-time which further limits her opportunities. Consequently, we will close her case as this counselor feels this is not a wise use of resources. She asked if she could call us back and this counselor shared she could but she would have to be prepared to accept an appropriate job with likely a reduced wage based on her location. She was also encouraged to make sure she practices with her computer to retain her computer skills in preparation for her job search next Summer/Fall.

## 3. Activities Provided

Contact with Consumer

## 1. General

| | |
|---|---|
| **Entry Date** | 12/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Phone Call |
| **Share Note** | No |

## 2. Note

| | |
|---|---|
| **Summary** | TC to Job Developer |

TC to Amy sharing what we had discussed and what Bed wanted to do - Amy also was in

Moss Production 000867

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

agreement to close her case now as she has not been open to any job offers for less than $20.00 per hour.   Amy shared they had found nothing even close.  even looking outside of her local area they had not found anything in that pay range.
She was instructed to cancel her appointment for later this afternoon.

Amy shared she will have a Closure report to me this afternoon.

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 12/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | Closure w/o Employment Outcome | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 12/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**   RE: RSCsecure

From: Rumrill, Amy [Amy.Rumrill@VocWorks.com]

Moss Production 000868

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

Sent: 12/5/2017 11:12 AM
To: Flickinger, Danielle
Cc: Sullivan, Timothy

This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>

Danielle Tim is going to close Deb Moss' case today so we won't be meeting so you don't need to call me at 12:30 since I won't be meeting her. Thanks.

Amy Rumrill, M.Ed., CRC

Vocational Specialist

330-472-9149 Phone

1-855-643-0423 Fax

From: Danielle.Flickinger@ood.ohio.gov [mailto:Danielle.Flickinger@ood.ohio.gov]
Sent: Tuesday, December 05, 2017 8:06 AM
To: Rumrill, Amy
Subject: RE: RSCsecure

This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>

Good morning Amy,

I hope you had a nice evening. I placed the meeting on my calendar for today at 12:30 PM. Talk to you then.

Best,

Danielle

Moss Production 000869

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

## Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

From: Rumrill, Amy [mailto:Amy.Rumrill@VocWorks.com]
Sent: Monday, December 04, 2017 7:17 PM
To: Flickinger, Danielle < Danielle.Flickinger@ood.ohio.gov <
mailto:Danielle.Flickinger@ood.ohio.gov> >
Cc: Sullivan, Timothy < Timothy.Sullivan@ood.ohio.gov <
mailto:Timothy.Sullivan@ood.ohio.gov> >
Subject: RE: RSCsecure


This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>


Danielle, my next meeting with Deb Moss is on Tues 12/5 at 12:30 p.m. If you would like to call
in, my number is 330-472-9149. I spoke with Tim about this case on 11/30. I am uncertain about
the direction of the case due to the following circumstance: Deb will be receiving unemployment
of $20 per hour until next August, 2018 and she is unwilling to accept a job earning less than that.
I discussed with Tim that the market for recreational therapists is small and Deb is applying for all
available jobs but other than that we are not sure of jobs to apply to that would have earnings that
will meet her needs. I am copying Tim here to see if he has spoken to Deb to see what we are
going to do now. If you do call into the meeting on 12/5 Danielle I will talk to you then. Thanks.


Amy Rumrill, M.Ed., CRC

Vocational Specialist

330-472-9149 Phone

1-855-643-0423 Fax


From: Danielle.Flickinger@ood.ohio.gov < mailto:Danielle.Flickinger@ood.ohio.gov>
[mailto:Danielle.Flickinger@ood.ohio.gov]
Sent: Monday, December 04, 2017 2:59 PM
To: Rumrill, Amy
Subject: RSCsecure

Moss Production 000870

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>

Good afternoon Amy,

I hope you had a very nice weekend. I'm covering the job placement and development meetings for Tim for December. I was wondering when your next meeting with Deborah Moss is so that I may attended by phone. Please let me know as soon as possible so I can place it on my calendar. Please provide a phone number where you can be reached for the meeting.

Best,


Danielle Flickinger

Caseload Assistant

Opportunities for Ohioans with Disabilities

234-206-4196

161 South High Street # 103

Akron, OH 44308


CONFIDENTIALITY NOTICE: This is an e-mail transmission and the information is privileged and/or confidential. It is intended only for the use of the individual or entity to which it is addressed. If you have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

Moss Production 000871

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | |
|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID**  109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | |
| | BSVI 1 | |

---

-------------------------------------------------------------------------
This message was secured by ZixCorp < http://www.zixcorp.com> (R).

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the
information is privileged and/or confidential. It is intended only for
the use of the individual or entity to which it is addressed. If you
have received this communication in error, please notify the sender at
the reply e-mail address and delete it from your system without copying
or forwarding it. If you are not the intended recipient, you are hereby
notified that any retention, distribution, or dissemination of this
information is strictly prohibited. Thank you.

-------------------------------------------------------------------------
This message was secured by ZixCorp < http://www.zixcorp.com> (R).

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the
information is privileged and/or confidential. It is intended only for
the use of the individual or entity to which it is addressed. If you
have received this communication in error, please notify the sender at
the reply e-mail address and delete it from your system without copying
or forwarding it. If you are not the intended recipient, you are hereby
notified that any retention, distribution, or dissemination of this
information is strictly prohibited. Thank you.

-------------------------------------------------------------------------
This message was secured by ZixCorp < http://www.zixcorp.com> (R).

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the
information is privileged and/or confidential. It is intended only for
the use of the individual or entity to which it is addressed. If you

Moss Production 000872

***CONFIDENTIAL FOR AGENCY USE ONLY***
**Opportunities for Ohioans with Disabilities**
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

-------------------------------------------------------------------------

This message was secured by ZixCorp < http://www.zixcorp.com> (R).

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 12/05/2017 |
| **Author** | Sullivan, Tim |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**    RE: DM

From: Rumrill, Amy [Amy.Rumrill@VocWorks.com]
Sent: 12/5/2017 11:19 AM
To: Sullivan, Timothy

This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>

Tim see attached closure report.

Amy Rumrill, M.Ed., CRC

Vocational Specialist

Moss Production 000873

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| Participant | Moss, Deborah (Debra) A. | Participant ID | 109128 |
| --- | --- | --- | --- |
| Caseload | VI-AKR1-3 – Vacant, Akron BSVI 1 | | |

330-472-9149 Phone

1-855-643-0423 Fax


From: Timothy.Sullivan@ood.ohio.gov [mailto:Timothy.Sullivan@ood.ohio.gov]
Sent: Tuesday, December 05, 2017 11:08 AM
To: Rumrill, Amy
Subject: DM


This message was sent securely using ZixCorp. < http://www.zixcorp.com/get-started/>


Hello,


I just spoke to DM again and she reports she is going to not take any job that will pay her less than the Parma / Unemployment Rate is paying her.  At this point it is not feasible to look only for jobs paying that rate and I don't think it is a wise expenditure of resources.  Consequently, we will close her case until June-July and then likely reopen her case if she is not working.


Thanks for alerting me to the situation…


Tim

Vocational Counselor for the Akron Office of OOD

330/641-4089

Moss Production 000874

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

# Case Notes

| | |
|---|---|
| **Participant** | Moss, Deborah (Debra) A. |
| **Caseload** | VI-AKR1-3 - Vacant, Akron |
| | BSVI 1 |

**Participant ID**    109128

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the information is privileged and/or confidential. It is intended only for the use of the individual or entity to which it is addressed. If you have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

----------------------------------------------------------------------

This message was secured by ZixCorp < http://www.zixcorp.com> (R).

CONFIDENTIALITY NOTICE: This is an e-mail transmission and the information is privileged and/or confidential. It is intended only for the use of the individual or entity to which it is addressed. If you have received this communication in error, please notify the sender at the reply e-mail address and delete it from your system without copying or forwarding it. If you are not the intended recipient, you are hereby notified that any retention, distribution, or dissemination of this information is strictly prohibited. Thank you.

----------------------------------------------------------------------

This message was secured by ZixCorp < http://www.zixcorp.com> (R).

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 12/06/2017 |
| **Author** | Grair, Marcia |
| **Category** | Correspondence |
| **Share Note** | No |

Moss Production 000875

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities
# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

## 2. Note

| **Summary** | BILLING NOTIFICATION 2068084 | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 12/06/2017 |
|---|---|
| **Author** | Grair, Marcia |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | BILLING NOTIFICATION 2068093 | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| **Entry Date** | 12/20/2017 |
|---|---|
| **Author** | Grair, Marcia |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | BILLLING NOTICE 2068093 | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

Moss Production 000876

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

## 1. General

| | |
|---|---|
| **Entry Date** | 12/22/2017 |
| **Author** | Pruchniewicz, Allison |
| **Category** | Report - Job Search |
| **Share Note** | No |

## 2. Note

**Summary**     Moss Tier I Oct/Nov 2068093 12-22-17

From: Banks, Angela [mailto:Angela.Banks@CareWorks.com]
Sent: Friday, December 22, 2017 11:07 AM
To: OOD NE Invoicing Fax < OOD.NEInvoicingFax@ood.ohio.gov>
Subject: Moss Tier I Oct/Nov 2068093 12-22-17

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/17/2018 |
| **Author** | Grair, Marcia |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| | | | |
|---|---|---|---|
| **Summary** | BILLING NOTICE 2077978 | **Generated Letter** | Yes |

## 3. Activities Provided

No items selected

## 1. General

Moss Production 000877

***CONFIDENTIAL FOR AGENCY USE ONLY***

Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron BSVI 1 | | |

| | |
|---|---|
| **Entry Date** | 03/05/2018 |
| **Author** | Grair, Marcia |
| **Category** | Correspondence |
| **Share Note** | No |

## 2. Note

| **Summary** | POST 90-DAY INVOICE LETTER 2077978 | **Generated Letter** | Yes |
|---|---|---|---|

## 3. Activities Provided

No items selected

## 1. General

| | |
|---|---|
| **Entry Date** | 01/15/2019 |
| **Author** | Osborne, Daniel |
| **Category** | E-Mail |
| **Share Note** | No |

## 2. Note

**Summary**  Case information request

From: Johnson, Shannon
Sent: 1/15/2019 10:22 AM
To: Osborne, Daniel

Hello, please read below.

Thank you!

Shannon Johnson, AP1
Opportunities for Ohioans with Disabilities
14650 Detroit Ave., Suite 200
Lakewood, Ohio 44107
216-227-3250
Shannon.Johnson@ood.ohio.gov

---

Moss Production 000878

***CONFIDENTIAL FOR AGENCY USE ONLY***
Opportunities for Ohioans with Disabilities

# Case Notes

| | | | |
|---|---|---|---|
| **Participant** | Moss, Deborah (Debra) A. | **Participant ID** | 109128 |
| **Caseload** | VI-AKR1-3 - Vacant, Akron | | |
| | BSVI 1 | | |

-----Original Message-----
From: Debbie Moss [mailto:dabmoss@aol.com]
Sent: Monday, January 14, 2019 4:19 PM
To: OOD NE Medical Fax < ood.NEMedicalFax@ood.ohio.gov> ; ewhite@dannlaw.com
Subject:

Hello

I am writing to request my closed file be faxed to

Emily White (lawyer)
216-373-0536

This matter is urgent as I am in the process of litigation against my former employer and their lawyers are requesting information.
I only need file from JAN. 2015 to present which my case was closed maybe in April of 2018 or earlier.

I had sent an email to Tim Sullivan on Monday, January 7, 2018 not realizing he is no longer employed with OOD.

My phone (home) 330-225-9597
email   daabmoss@aol.com

Thank you for your cooperation in this urgent matter.
Deborah Moss

## 3. Activities Provided

No items selected

Moss Production 000879



P.O. Box 182848
Columbus, Ohio 43218-2848

## Exit-Closure Report

**To:**      Tim Sullivan, OOD

**From:**      Amy Rumrill, , Vocational Specialist
**Telephone:**      330-472-9149

**Date:**      12/5/17

**Consumer Name:** Deborah Moss

**Date of Referral:** 9/28/17

**Services Provided:** Job
Development/Placement

### Return to Work Status (check all that apply)

☐ RTW ☐ Authorized Service Completed ☐ Skills Training
☐ No Contact From Consumer ☐ Medical/Psychological ☐ Transfer Other Vendor
Instability
☐ No Current Authorization ☒ Other  Consumer and VRC agreed about case closure today since
consumer will be receiving unemployment benefits until August, 2018.  When she looks for a job she will
need to make at least what she is earning on these benefits.  This will be difficult to do unless she
secures a job as a recreational therapist.  Recreational therapist jobs are not abundant in the labor
market and especially in the county that she lives in.  Consumer needs to work in Medina county only due
to transportation.

### Additional Comments/Recommendations:

Thank you for this referral.  Please let me know if additional services are needed in the future.

Moss Production 000393


**University Hospitals**
Parma Medical Center

Sent regular USPS mail and certified mail

January 18, 2018

DEFENDANT'S
EXHIBIT
36
PENGAD 800-631-6989
/ S

Ms. Deborah Moss
63 Salem Court.
Hinckley, OH  44233

**Re: Employment Status**

Dear Deborah:

This is a follow up to our phone conversation this week and of the letter dated September 6,
2017 regarding your employment status.

The letter dated September 6, 2017 summarized our concerns regarding your ability to safely
perform your job, your leave status, the exhaustion of your paid time off (PTO), our
encouragement for you to seek other positions within UH and to utilize the services of UH
Pathways Coach, Faye Naftzger, as well as notification that your leave status would end
December 31, 2017.

As you have not secured another position within UH and you have confirmed to me that you
have not applied for other jobs in the healthcare system, this confirms we have processed the
termination of your employment effective January 1, 2018.

Per our conversation, you indicated that you had personally owned software at Parma Medical
Center and I have advised Kathryn Holley, Manager, to contact you regarding this.

If you have further questions or concerns, please don't hesitate to contact me.

Sincerely,

Deborah Sheldon
HR Generalist
University Hospitals Parma Medical Center
440-743-4052
Deborah.sheldon@uhhospitals.org

Cc: Kathryn Holley, Manager, PMC Hanna Pavilion
File