IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEBORAH MOSS, | Case No. 1:18CV02257 |
| Plaintiff, | JUDGE JAMES GWIN |
| v. | |
| UNIVERSITY HOSPITALS HEALTH SYSTEMS, INC., | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by and through Counsel, hereby submits her brief in opposition to Defendant's Motion for Summary Judgment.  For the reasons set forth in the attached memorandum of law and supporting affidavits, exhibits, and deposition testimony the motion should be denied because genuine issues of material fact exist and Defendant is not entitled to judgment as a matter of law.

Respectfully submitted,

/s/ Emily White
Emily White (0085662)
Marc E. Dann (0039425)
DANNLAW
P.O. Box 6031040
Cleveland, Ohio 44103
Telephone: (216) 373-0539
Facsimile: (216)373-0536
*notices@dannlaw.com*
*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEBORAH MOSS,

        Plaintiff,

    v.

UNIVERSITY HOSPITALS HEALTH
SYSTEMS, INC.,

        Defendant.

Case No. 1:18CV02257

JUDGE JAMES GWIN

## **<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS……………………………………………………...  ii
TABLE OF AUTHORITIES…………………………………………………..  iii
INTRODUCTION AND STATEMENT OF THE CASE…………………………  1
STATEMENT OF FACTS…………………………………………………….  2
STANDARD OF REVIEW…………………………………………………….  8
LAW AND ARGUMENT…………………………………………………….  8
    A. A reasonable trier of fact could conclude that Ms. Moss is a qualified
    worker with a disability…………………………………………………...  9
    B. A reasonable trier of fact could conclude that UH's medical inquiries
    were unjustified and overly broad……………………………….................  10
        1. UH's medical inquiry was not justified……………………………..  11
        2. UH's medical inquiry was overly broad……………………………..  13
    C. UH's termination of Moss was unjustified……………………………..  13
    D. Assuming arguendo that UH prevails in its argument that Moss could no
    longer…………………………………………………………………...  16
CONCLUSION………………………………………………………………...  17
CERTIFICATE OF SERVICE………………………………………………...  18
CERTIFICATE OF COMPLIANCE…………………………………………..  18

# TABLE OF AUTHORITIES

**CASES**

*DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)…………………………………… 9

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d. 344, 349
(6th Cir. 1998)……………………………………………………………………… 8

*Kleiber v. Honda of America MFG., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)………….. 17

*Smith v. Midland Brake, Inc.*, 180 F. 3d 1154, 1167…………………………………..... 17

*Sullivan v. River Valley School Dist.*, 197 F. 3d 804, 811 (6th Cir. 1999)……………… 11

**RULES**

29 C.F.R. § 1630.2…………………………………………………………………….. 13, 14

29 C.F.R. § 1630.4…………………………………………………………………… 14

29 C.F.R. § 1630.13…………………………………………………………………........ 11

29 C.F.R. § 1630.14…………………………………………………………………........ 11

42 U.S.C. § 12111(9)(A),(B)…………………………………………………………........ 14

42 U.S.C. § 12112(D)(4)(A)…………………………………………………………........ 11

Fed. R. Civ. P. 56(a)…………………………………………………………………… 8

## INTRODUCTION AND STATEMENT OF THE CASE

For twenty years, Deborah Moss worked as a recreational therapist on a locked, in-patient geriatric psychiatric ward at a hospital in Parma. Moss was responsible for providing therapeutic recreational programming to patients on the ward as a member of the interdisciplinary treatment team. For each and every year of her twenty years of employment, Moss received excellent annual performance ratings and commendations, and was judged by her supervisors over the years to meet or exceed expectations in every aspect of her job. During her lengthy tenure of employment, Moss was never disciplined, nor did her managers ever raise any concerns regarding her performance or safety on the job prior to the events that gave rise to this lawsuit.

Throughout her employment, Moss has had a vision impairment due to Stargardt's disease, a condition that has diminished her central vision, but does not affect her peripheral vision.  Due to her disability related limitations, Moss has difficulty reading facial expressions from a distance, and some minor issues with mobility in low-contrast settings, and difficulty reading small print. At work, Moss used assistive technology, auditory compensation techniques, verbal cues, workplace modifications, and natural supports to address these limitations.

Two years after her hospital was acquired by University Hospitals (UH), and one year after a new supervisor was assigned to her unit, Moss requested that UH update assistive technology that she had already been using for years without issue.  A few months later, before UH responded to her request, Moss was suddenly removed from her position and ordered to submit for a mandatory medical fitness for duty examination. Prior to the request for updated technology, no serious concerns had <u>ever</u> been raised to Moss about her safety or her performance at work.

Moss was placed on involuntary leave, ordered to submit to a fitness for duty examination, she was not permitted to return to her position, and she was ultimately terminated.  UH's evaluation of Moss's disability and reasonable accommodations was deeply flawed. The fitness for duty inquiry

1

was broad and personally intrusive.  UH demanded a full drug and alcohol screen and a psychosocial evaluation in which UH staff questioned Moss about her family, social, financial, legal, and sexual history.  UH failed to consider accommodations proposed by Moss' medical providers with expertise in reasonable accommodations for individuals with low vision, instead relying on an assessment by one of its own employees who never spoke with Moss and didn't review or consider the accommodations Moss had been successfully utilizing for years.  At the conclusion of the fitness for duty process, UH decided not to permit Moss to return to her job due to her disability. UH asserted that Moss could no longer perform the essential functions of her job due to her vision impairment.

Genuine issues of material fact preclude summary judgment on Moss's disability discrimination claims.  Based on the evidence and testimony by key UH decision makers, a reasonable trier of fact could conclude that UH had no objective factual basis before, during, or after the fitness for duty examination to conclude that Moss could no longer perform the essential functions of the job that she had held for more than two decades. Additionally, a reasonable trier of fact could conclude that UH's fitness for duty process was not justified in the first instance, and included overly broad and intrusive demands for information. UH's decision to terminate Moss was based on flawed assessments and assumptions by key UH managers, and did not include adequate consideration of reasonable accommodations proposed or used by Moss.

### STATEMENT OF FACTS

The following facts are undisputed, except where noted.

Deborah Moss is a person with a visual impairment due to Stargardt's disease.  (Moss Aff. at ¶ 1.)  Moss's vision impairment makes it difficult for her to read materials in small print and facial expressions from a distance.  (Moss Aff. at ¶ 8.)  Moss's vision impairment began when she was a child, stabilized in adulthood, and is unlikely to change.  (Moss Aff. at ¶ 3.)  Although Moss's central

vision is diminished, she retains her peripheral vision, and she is able to see movement and general environmental cues. (Moss Aff. at ¶ 7.)

For decades, Moss has effectively used assistive technology, auditory compensation techniques, verbal cues, modifications, and natural supports to address her visual limitations both at home and work. (Moss Aff. at ¶ 5-8.) Moss uses magnification and voice-over technology to read printed materials. (Moss Aff. at ¶ 6.) In communications and interactions with people, Moss uses her residual peripheral vision, verbal cues, and sometimes touch and tactile prompts to assess mood and engagement, skills she has utilized successfully to raise her children, in her community, and at work. (Moss Aff. at ¶ 8.)

For more than two decades, Moss pursued a career as a recreational therapist. Since 1989 Moss has been certified by the National Council on Therapeutic Recreation as a Therapeutic Recreation Specialist. (Moss Aff. at ¶ 9.) From 1996 through February 2017, Moss was employed as a Rehabilitation Therapist for an in-patient geriatric behavioral health unit in Parma, Ohio that was acquired by University Hospitals in 2015. (Moss Aff. at ¶ 10.)

In her position as a Rehabilitation Therapist, Moss was responsible for providing therapeutic programming to psychiatric patients aged fifty-five and older. Moss's job duties included assessing the functional and rehabilitative needs of patients, planning and providing appropriate therapies, and supporting and working with the patient's treatment team and family. (Moss Dep. 37-48.) Moss participated in daily team interdisciplinary treatment team meetings with doctors and nurses, and independently conducted two group recreational therapy sessions with twelve to fourteen patients every day. Moss was also required to maintain her professional certification as a recreational therapist and to complete non-violent crisis intervention training.

Moss received excellent annual performance evaluations for every year of her twenty years of employment. In every performance evaluation, Moss was found by her supervisor to have

demonstrated the knowledge, skills, and abilities necessary to do her job, and she was deemed an effective contributor to the team.   (Moss Aff. at ¶ 15; Sheldon Dep. 18-19.)   Moss was never disciplined at work or found not to meet performance expectations.  (Sheldon Dep. 19.)   Moss was recognized by her supervisors and coworkers for her skill in engaging patients and working effectively with the interdisciplinary treatment team to maintain patient safety.   (Moss Aff. at ¶ 15, 16.)  Moss was never injured on the job, nor was she responsible for an instance of patient self harm, patient injury to others, a patient fall, or patient elopement.  (Moss Aff. at ¶ 18.)

Throughout her employment, Moss' employer and supervisors were aware of her disability and she utilized reasonable accommodations including assistive technology to safely and effectively perform the essential functions of her job.  (Moss Aff. at ¶ 21.)  Moss used a closed circuit television to magnify printed documents including treatment plans.  A coworker read her emails aloud.  Moss effectively used her peripheral vision, auditory compensation strategies, and sometimes physical touch to assess and engage with patients.  (Moss Aff. at ¶ 21; Moss Dep. 40-44.)  Moss also constantly communicated with other staff and members of the treatment team to ensure that she was aware of and appropriately attentive to patients who posed a higher risk of harm to self, harm to others, and who had a higher risk of falls or elopement.  (Moss Aff. at ¶ 23.)

Prior to October 2016, Moss's accommodations were provided without issue.  (Moss Aff. at ¶ 21.)  Shortly after Ms. Moss joined the geriatric psychiatry unit in the late 1990's, her supervisors and managers agreed to be interviewed for a video produced by the Cleveland Sight Center featuring successful employment of people with vision impairments.  The video was filmed on the unit, and the program director at the time, Jay Kortemeyer, made the following assessment of Moss' workplace performance:

> She's been a very good employee.  She gives one hundred and ten percent.  She's really exceeded all of our expectations and really eliminated any concerns we had as far as her visual impairment in how her performance has been on the job.

(Moss Aff. ¶ 4, Ex. 3, Beyond Boundaries, Cleveland Sight Center.)  The video also included a demonstration of how Moss used her CCTV system at work to review and sign treatment plans.  (*Id.*) After UH took over the Parma facility, its existing accommodations plans for its employees with disabilities became inaccessible to UH's human resources generalist at Parma.  (Sheldon Dep. 13-14.)

In January 2016, a year after UH acquired the facility, Kathryn Holley joined the unit as the Nurse Manager and became Moss's new supervisor.  Prior to joining the unit, Holley had never supervised an employee with a disability.  (Holley Dep. 9:10-14.)  Holley testified that she had no prior experience identifying reasonable accommodations, and had never engaged in the interactive process to identify reasonable accommodations for an employee with a disability.  (Holley Dep. 9.)

In March 2016, Holley met with Moss to assess her workplace performance, and determined that Moss was an effective contributor who "demonstrated the knowledge, skills, and abilities necessary to do the job."  (Moss Aff., Ex. 4; Holley Dep. 45-49.)  Holley also found that Moss "[p]erformed according to the established goals, behaviors and UH values" and she included the following comments:

> Deb is a valued member of the team and has worked in conjunction with her programming teammate to enhance the documentation for their area.  She engages the patients and has worked to develop different groups for higher functioning patients.

(Moss Aff., Ex. 4.)

Holley was aware of Moss's visual impairment, but UH had not informed her about Moss's specific accommodations when Holley joined the unit.  (Holley Dep. 32-35.)  However, beginning in January 2016 at daily interdisciplinary team meetings Holley observed team members using a high contrast pen to mark written documents so that Moss could see to sign them.  (Holley Dep. 32:11-5.) Holley also knew that Moss had a computer monitor to enlarge documents.  (Holley Dep. 33:6-12.) Holley also had private conversations about Moss with other staff members about Moss's vision impairment and their alleged concerns about Moss working alone with patients.  (Holley Dep. 40-45;

85-87.)  However, Holley admits that Moss did not ask Holley never to be left alone with patients, (Holley Dep. 43), and Holley did not directly discuss with Moss her private discussions about Moss with other staff prior to October 2016, (Holley Dep. 44:3-24).

In late September 2016, Moss advised Holley that she needed to replace her CCTV because the model she had was no longer functioning effectively.  (Moss Aff. ¶ 29.)  Holley told Moss that she would have to make a written request for accommodations.  Moss prepared a letter making her request and specifying the equipment she preferred to replace her existing unit.  (Moss Aff. ¶ 30.)  Even though UH human resources staff were aware that Moss was replacing an existing piece of equipment (Sheldon Dep. 20-26, 37-38), UH insisted that Moss submit new disability accommodations forms and obtain documentation from her doctors supporting the request (Sheldon Dep. 28-29).

UH never provided the updated CCTV.  (Moss Aff. ¶ 31-32; Holley Dep. 70-72.)  Instead, after the request was made, Holley and other UH HR staff began internal discussions about whether Moss was able to perform the essential functions of her job due to her vision impairment.  (Sheldon Dep. 28-31.)  Holley cited concern about an instance in which Holley observed Moss bump and a colleague bump into each other as they each passed in opposite directions in the hallway.  (Holley Dep. 54-55.)  Holley also cited an instance in which she responded to a code called for a patient choking and found other staff clearing tables and chairs and providing verbal prompts to help Moss out of the room.  (Holley Dep. 74-80.)  Although Holley testified that each of these instances occurred in spring or summer 2016 (Holley Dep. 75), she did not discuss any of these incidents with Moss at the time or otherwise document her observations (Holley Dep. 80-81).

In early February 2017, Holley and other UH management had a phone call to discuss Moss' pending request for accommodations and Holley's concerns about Moss' visual impairment.  (Sheldon Dep. 47-56.)  The group noted that Moss was due to participate in a crisis intervention training, and the team decided to monitor Moss' performance more closely and observe her performance at the

crisis intervention training.  (Holley Dep. 134-149.)  Although the group anticipated that the training format may pose issues for Moss due to her visual impairment, no one initiated any discussion with Moss about reasonable accommodations for the training.  (Sheldon Dep. 53-55.)

Moss completed the February 2017 crisis intervention training.  (Moss Aff. ¶ 34-35.)  Moss had successfully completed similar trainings over a dozen times during her twenty years in her position.  (Sheldon Dep. 86-87.)    Unlike prior trainings, UH's training featured inaccessible visual demonstrations, but as she had in past trainings, Moss worked with a partner who provided verbal and touch prompts so that Moss could learn and practice nonviolent de-escalation techniques.  (Moss Aff. ¶ 35.)

On Valentine's Day 2017, Moss was summoned to a meeting and informed that she was being removed from work and referred to a mandatory fitness for duty examination to be conducted by UH's Employee Assistance Program.  Moss was told that the reason for the referral was Holley's concerns about Moss' vision impairment, specifically Moss' ability to read documents and to assess patients.  (Moss Aff. ¶ 37-38.)  The following day, Moss was ordered to submit to a drug and alcohol screen (Kohlbacher Dep. 24-26), and a UH nurse asked her wide ranging and intrusive personal questions about her marital history, children, legal history, medical and prescription drug history.  (Moss Aff. ¶ 41.)  She was also asked about whether she had a history of psychiatric treatment, domestic violence, sexual abuse, child abuse, and whether she had suicidal or homicidal ideation.  (*Id*; Kohlbacher Dep. 24-26, 47-48.)

Moss was cleared to return to work by her treating physician.  (Moss Aff. ¶ 45.)   Moss' opthamologist confirmed that her visual acuity was stable, and noted that a functional assessment would be necessary to determine how Moss' visual limitations would impact her ability to perform her job duties.  Dr. Balciunas noted that Moss had been employed with accommodations for many years.  (Moss Aff. ¶ 46.)  Erin St. Denis, an occupational therapist at the Cleveland Sight Center prepared a

detailed low vision report identifying reasonable accommodations that could address the concerns raised by Holley, many of which Moss had already been utilizing for years.  (Moss Aff. ¶ 46.)  UH's EAP staff failed to provide the full Cleveland Sight Center report to its own key employees, including Deborah Sheldon and Kathryn Holley, as well as UH's own occupational therapist, Allison Evans. (Sheldon Dep. 107-28.)  Evans concluded that Moss was unable to safely perform her job duties due to a vision impairment; however, Evans did not meet with Moss or have access to her performance evaluations or prior workplace accommodations in making her report.  (Sheldon Dep. 99-103.) Sheldon and Holley did not consider or discuss with Moss whether she could safely return to work utilizing the accommodations identified by the Cleveland Sight Center.  (Sheldon Dep. 136-57.)

In June 2017, UH informed Moss that she would not be permitted to return to her position. Moss requested to be considered for reassignment to another vacant position, but UH did not offer Moss any other position, nor did UH make any effort to identify another suitable position.  (Moss Aff. ¶ 58.)

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, the Court must view all facts and reasonable inferences from those facts in the light most favorable to the non-moving party.  *C.*  Summary judgment must be denied if genuine issues of material fact remain for trial.  *Id.*

## LAW AND ARGUMENT

University Hospital's motion for summary judgment must be denied because there are genuine issue of material fact and UH is not entitled to judgment as a matter of law.  A reasonable trier of fact could conclude that (1) Moss is a qualified worker with a disability who was able to safely perform the

essential functions of her job with accommodations; (2) UH's medical inquiry was unjustified and improper;  (3) that UH's termination of Moss was unjustified; and (4) that UH failed to reasonably accommodate Moss by reassigning her to a vacant position.

## A. A reasonable trier of fact could conclude that Ms. Moss is a qualified worker with a disability

Title I of the Americans with Disabilities Act prohibits an employer from discriminating against qualified workers with disabilities who are able to perform the essential functions of their job. In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that the employer is subject to the ADA; (b) that the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (c) that the plaintiff was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (d) that the employee has requested an accommodation; and (e) that the employer failed to provide the necessary accommodation.  *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004).

 "The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).  The ADA's implementing regulations further provide that current and past work experience of either the individual or other incumbents in similar jobs is evidence of whether a particular job function is essential:

Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. 1639.2(n)(3).

Moss successfully and safely performed her job for twenty years. She had excellent performance evaluations every year, both before and after her hospital was acquired by UH. Moss maintained her professional certification as a rehabilitation therapist, and successfully completed continuing education training including nonviolent crisis intervention training. (Expert Report of Dr. Peter Blanck, 61-62.) In her performance evaluations both before and after UH acquired her hospital, Moss' supervisors consistently noted her abilities to engage with patients and work with the interdisciplinary team. As part of UH's employee appreciation program, Moss's colleagues and supervisors praised her for her ability to engage patients and for her response to patient behavioral issues on the unit. (Moss Aff. Ex. 2.) Moss was never injured on the job, nor was she responsible for any injury to patients or staff.

Viewing this evidence in the light most favorable to Moss, a reasonable trier of fact could conclude that Moss is a qualified employee with a disability who is able to safely perform the essential functions of her job with reasonable accommodations.

## B. A reasonable trier of fact could conclude that UH's medical inquiries were unjustified and overly broad

UH's intrusive fitness for duty examination was not justified in the first instance. Additionally, it was both overinclusive and underinclusive: UH demanded intrusive and personal information completely unrelated to any of its purported concerns, and yet the inquiry failed to properly consider the relevant information Ms. Moss supplied.

10

1. **UH's medical inquiry was not justified**

The ADA prohibits an employer from requiring a medical examination or inquiry of an employee with a disability, 42 U.S.C. § 12112(D)(4)(A) and 29 C.F.R. § 1630.13(b), unless the inquiry is job-related and consistent with business necessity, 29 C.F.R. § 1630.14.  The Sixth Circuit has cautioned that an employer's medical inquiry "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance" and cautioned that:

> for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.'

*Sullivan v. River Valley School Dist.*, 197 F. 3d 804, 811 (6th Cir. 1999).

There is a genuine issue of material fact whether UH's medical inquiry was justified in the first instance.  In February 2017, Moss had a twenty-year record of successful employment and her most recent performance evaluation concluded that she was effectively performing her job. The medical inquiry began more than four months after Moss made a request to replace a piece of assistive technology that Moss had already been using without issue for years.  As part of that process, Moss had supplied recent medical documentation supporting her request and her need for the accommodation. At the time of the inquiry Moss had never been disciplined at work, and there was never an instance in which her employer found she had failed to perform her job duties.  (Sheldon Dep. 19.)  Moss had never been injured, nor had she been responsible for any injury to a patient or staff member in the twenty years she worked on the unit.

A number of the concerns that formed the basis of the fitness for duty referral would have been clearly addressed by Moss' pending accommodations request, and no further medical information was required.  For instance, Holley stated concerns about Moss's ability to read treatment

plans and complete documentation—these issues were clearly addressed by the CCTV which Moss had been utilizing at work for years, and which Moss had recently requested to replace.

Other concerns that precipitated the referral were based on speculation and fear that was not grounded in any objective facts.  (Blanck, 44-51.)  These include Holley's alleged concerns that Moss could not assess patient attention levels, patients in distress, and alleged overall loss of visual cues. However, Holley could point to no specific instances of Moss failing to identify patients experiencing hallucinations (Holley Dep. 165:18-166:5), patients engaging in self-harm (Holley Dep. 160:21-25), or failure to assess the attention or engagement of a patient, (Holley Dep. 155-57.)

The remaining incidents cited by Holley as the basis for her safety concerns were minor, isolated, or were based on speculation and misunderstandings that could have been easily addressed had Holley timely raised them with Moss.  The fact that the incidents were minor is evidenced by the fact that although Holley testified that although instances occurred in spring and summer 2016, she did not contemporaneously document them in writing and she chose to wait until February 2017 to share her concerns directly with Moss.  (Holley Dep. at 75.)  Holley's allegations that Moss had failed to recognize a patient trying to get her attention and that she had failed to recognize a patient with behavioral issues are contradicted by Moss' testimony, as Moss explained that in neither instance did she fail to perceive what was happening and her responses were appropriate.  (Moss Aff. ¶ 38.)  During precisely the same time period in which Holley was allegedly concerned about Moss' interactions with patients during incidents, Holley and Moss's colleagues were praising Moss' performance engaging patients and responding as a team to incidents on the unit.  (Moss Aff., Ex. 2.)

Viewing this evidence in the light most favorable to Moss, a reasonable trier of fact could conclude that UH was not justified in requiring Moss to undergo a medical inquiry in the first instance.

### 2. UH's medical inquiry was overly broad

UH's medical inquiry was overly broad and included demands for information that was not job related or consistent with business necessity.  Moss was instructed that her participation in the medical inquiry was mandatory and that she would be terminated if she failed to fully cooperate.

While the ostensible purpose of the medical inquiry was concerns about Moss' visual acuity, UH demanded that Moss submit to a complete psychosocial evaluation and medical interview.  UH staff asked Moss intrusive personal questions about her marital history, her children, her legal history, and her history of medical treatments and prescriptions.  Moss was also asked if she had a history of psychiatric treatment, domestic violence, sexual abuse, child abuse, and whether she had suicidal or homicidal ideation.  (Moss Aff, Ex. 7.)  Under threat of termination, Moss complied with UH's demands and answered the questions she was asked.

UH also ordered Moss to submit to alcohol and drug tests, when there was no suggestion that Moss was impaired and other employees without disabilities were not required to submit to similar drug screens.  (Kohlbacher Dep. 24-25.)  Under threat of termination, Moss supplied a urine sample and participated in a breathalyzer screen, both of which were clear.  None of this information was relevant to the ostensible purpose of the examination, which was the impact of Ms. Moss's visual impairment on her ability to safely perform her job.  Indeed, Holley testified that she had no suspicion that Moss was under the influence of drugs or alcohol, nor did she believe that Moss had any social or psychological impairment that would impact her work.  (Holley Dep. 154.)

### C.     UH's termination of Moss was unjustified

An employer is only permitted to exclude an employee from a job for safety reasons related to disability if the individual's disability related limitations pose a direct threat to harm to self or others that cannot be reduced or eliminated through reasonable accommodations.  29 C.F.R. § 1630.2(r).  The determination must be based on objective, factual evidence.  In assessing whether an individual

can safely perform a job, the employer must consider: (1) the duration of the potential risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. The harm must not be remote, or speculative, and an employer must determine whether the threat may be reduced or eliminated through reasonable accommodations. 29 C.F.R. § 1630.2(r).

A "reasonable accommodation" includes "acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(A), (B); 29 C.F.R. § 1630.4(a)(vii). To identify reasonable accommodations, an employer must engage in an interactive process with the individual with a disability:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).

The EEOC has cautioned that "[w]hen it comes to safety concerns, an employer should be careful not to act on the basis of myths, fears, or stereotypes about vision impairments. Instead, the employer should evaluate each individual on her skills, knowledge, experience, and how the visual disability affects her." U.S. Equal Employment Opportunity Commission, Questions & Answers About Blindness and Visual Impairments in the Workplace and the Americans with Disabilities Act, available at: https://www.eeoc.gov/eeoc/publications/qa_vision.cfm#_edn32.

UH's decision to terminate Moss from her position was based on unfounded fears and speculative risk rather than objective facts. UH failed to adequately engage in the interactive process to identify and consider reasonable accommodations that would permit Moss to remain employed in

14

the job she had safely and successfully performed for twenty years.  (Expert Report of Dr. Peter Blanck, 33-56.)

UH did not engage in any interactive process, or consider existing accommodations prior to removing Moss from work and ordering her to submit to a fitness for duty examination in February 2017.  Until that point, Moss had no indication that anyone at UH had any concerns about her safety or her performance at work.  As soon as she learned of Holley's concerns, Moss promptly and fully cooperated in the fitness for duty process and worked with her medical providers to identify numerous reasonable accommodations that would permit her to safely do her job, many of which she had been safely and effectively utilizing for years.

A reasonable trier of fact could conclude that Moss was able to safely perform her job with accommodations.  Moss' primary care physician quickly cleared her to return to work, and her ophthalmologist referred her for a functional assessment, noting that her vision impairment was stable that Moss had been successfully performing her job for years with her vision impairment.  Erin St. Denis, an occupational therapist from the Cleveland Sight Center, met with Moss and prepared a detailed low vision evaluation report that addressed each of the concerns raised by Holley.  The report's recommendations included high contrast flooring for mobility, assistive technology for reading and signing documents, and the use of auditory compensation strategies and verbal cues for interactions with patients and staff and workplace trainings.  Erin St. Denis requested to visit Moss' workplace as part of her evaluation process, but the request was denied by UH due to purported privacy concerns.

Neither Kathryn Holley nor Deborah Sheldon reviewed the full Cleveland Sight Center report during UH's decision making process, and therefore UH's key decision makers never considered many of the accommodations recommended by Moss' providers, nor did anyone from UH discuss with Moss whether she could continue to safely perform her job with those accommodations.  UH assigned

its own employee, Allison Evans to visit the unit and conduct an assessment, but that assessment was deeply flawed. (Blanck 25-27; 38-43.) It is not apparent that Evans had any knowledge or experience identifying reasonable accommodations for employees with visual impairments. (Blanck, 38-43.) In making her assessment, Evans did not speak with Moss, and Evans also failed to review or respond to the detailed low vision report and accommodations proposed by the Cleveland Sight Center, and many of her conclusions are based on generalized assumptions about people with visual impairments rather than an individualized determination based on direct observation by a person with knowledge and experience of effective workplace accommodations for people with visual impairments. (Blanck 54-59.)

None of the supposed safety risks UH identified had ever materialized during Moss' long career working with geriatric psychiatric patients. As discussed in further detail above, neither Moss, nor any patient or colleague had ever been injured on the job due to Moss' visual impairment. Nor did UH consider whether the risks it had identified could be reduced or eliminated through reasonable accommodations. (Blanck 50-51.) A reasonable trier of fact could conclude that UH's purported safety concerns were speculative or minor, and did not rise to the high standard necessary to justify terminating an employee because of disability.

Viewing the evidence in the light most favorable to Moss, a reasonable trier of fact could conclude that UH discriminated against Moss by failing to engage in the interactive process and terminating her from her position without justification.

**D.  Assuming arguendo that UH prevails in its argument that Moss could no longer perform her job duties, UH failed to reasonably accommodate Moss by failing to make any effort to locate another suitable position for Moss**

UH claims it is entitled to summary judgment on Moss' claim that UH failed to reasonably accommodate her by reassigning her to a vacant position, but a reasonable trier of fact could find UH

16

failed to make this accommodation in light of Moss' repeated requests for reassignment combined with UH's failure to make any effort to locate a suitable position.

Reassignment to a vacant position is a reasonable accommodation that must be considered where an employer has established that an employee can no longer perform the essential functions of the job due to disability.  42 U.S.C. § § 12111(9)(B).  *Smith v. Midland Brake, Inc.*, 180 F. 3d 1154, 1167 ("We conclude that reassignment of an employee to a vacant position in a company is one of the range of reasonable accommodations which must be considered and, if appropriate, offered if the employee is unable to perform his or her existing job.")  "Where the requested accommodation is a job transfer, employers have a duty to locate suitable positions for employees with disabilities." *Kleiber v. Honda of America MFG., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (internal citations omitted).

Here, once it became clear that UH would not permit her to return to her job, Moss repeatedly requested that UH reassign her to another position.  There is no evidence that UH ever considered Moss for another open position.  There is also no evidence that further input from Moss was necessary for UH to identify another position, as UH was aware of Moss' job skills due to her twenty-year employment history and the information gathered in the fitness for duty process.  A reasonable trier of fact could conclude that UH failed to reasonably accommodate Moss by failing to undertake any efforts to locate another suitable position for her.

## CONCLUSION

University Hospital's motion for summary judgment must be denied because there are genuine issue of material fact and UH is not entitled to judgment as a matter of law.

Respectfully submitted,

/s/ Emily White
Emily White (0085662)
Marc E. Dann (0039425)
THE DANN LAW FIRM
P.O. Box 6031040

17

Cleveland, Ohio 44103
216-373-0539 Telephone
216-373-0536 Fax
notices@dannlaw.com
Counsel for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2019, a copy of the foregoing *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Donald C. Buela (0084158)
Kerin Kyn Kaminski (0013522)
Giffen & Kaminski, LLC
1300 East Ninth Street, Suite 1600
Cleveland, OH 44114
dbulea@thinkgk.com
kkaminski@thinkgk.com

/s/ Emily White
Emily White (0085662)


## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum adheres to the page limitations set forth in Local Rule

7.1(f). This case is assigned to the standard track.

/s/ Emily White
Emily White (0085662)

18