STATE OF OHIO                 :

                                      :          **Affidavit of Deborah Moss**

COUNTY OF CUYAHOGA      :

Now comes Deborah Moss, who being first sworn according to law states as follows:

1.      I, Deborah Moss, am over eighteen, and competent to testify to the following statements.

2.      I have a visual impairment due to Stargart's disease, that substantially limits my ability to see facial expressions from a distance and to read small printed materials.  Although my central vision is diminished, I still have my peripheral vision.

3.      My vision impairment started when I was a child, and stabilized when I became an adult.  My visual acuity has not changed in recent years.  I understand that my vision is not likely to either substantially improve or significantly diminish at this point, and I am not receiving medical treatment or therapy related to my vision.

4.      My visual impairment has not prevented me from living a full and active life.  I have been married to my husband for more than two decades and we have raised our sixteen year old and twenty-one year old sons together in the far southwestern suburbs of Cleveland.  I am an active member of my church and the Hinckley Women's Club, and my husband is a custodian in the Parma City Schools.  I safely managed childcare responsibilities for both of my sons from infancy to (near) adulthood, and I independently handle household chores including laundry, shopping, and cooking.  I have worked outside the home for most of my entire adult life.

1

5.     Throughout my life, I have used assistive technology, auditory compensation techniques, verbal cues, modifications, and natural supports to address my visual limitations both at home and at work.

6.     For decades I have used magnification equipment and software to read printed materials.  I utilize a closed circuit television to magnify documents.  I use a software program called Zoom text to enlarge print on the computer and voiceover technology to read inaccessible printed and digital material aloud.  Throughout my career I have worked with the state vocational rehabilitation agency, Opportunities for Ohioans with Disabilities, which has provided technical advice and financial support for assistive technology I use at work.

7.     My peripheral vision is not impaired, and I am able to see movement and general environmental cues.  I travel independently by foot and by bus, though I do have some minor difficulty with mobility in low-contrast and low-light settings and I do not operate motor vehicles.

8.     Although my visual impairment limits my ability to read facial expressions at a distance, when I interact and communicate with people I effectively use my residual peripheral vision, verbal cues, and sometimes touch and tactile prompts.  Using these skills, I have safely raised my children from infancy, and formed deep and meaningful personal connections and fulfilled personal responsibilities to my family, friends, community, and at work.

9.     I have successfully and safely worked outside the home for most of my entire adult life.  Since 1989, I have been certified by the National Council on Therapeutic Recreation as a Therapeutic Recreation Specialist.

10.     For more than twenty years, until February 2017, I worked as a Recreational Therapist in an in-patient geriatric psychiatric ward at Parma Medical Center, which was acquired by University Hospitals in 2015.

11.     As a certified recreation therapist, I work with geriatric psychiatric patients aged fifty-five and older to provide therapeutic programming.  My job duties include interacting with patients and assessing their functional and rehabilitative needs, planning and providing appropriate therapies, and supporting and working with the patient's treatment team on the unit.

12.     My patients have always had a wide range of psychiatric disabilities, including schizophrenia, bipolar disorder, depression, anxiety, anxiety disorder, and dementia.  In my final two years at UH, there was a slight decrease in the age range of the average patient on the floor, but the ward continued to serve patients fifty-five and older with a wide range of psychiatric disabilities, and I do not believe that the changes in population impacted my ability to safely do my job.

13.     My daily responsibilities at work included participating in treatment team meetings with doctors, nurses, and other staff, conducting assessments of new patients to determine their recreational therapy needs, and planning and implementing group recreational therapy sessions for groups of 12 to 14 patients twice daily.

14.     I had a part-time schedule, typically working a long shift three days per week.  I received medical and retirement benefits, employer retirement contributions, paid time off, and regular pay increases.

15.     With accommodations and support, I safely and successfully performed my job duties.  Every year, I received excellent annual performance evaluations at work.  Every year my

supervisors determined that I met or exceeded all performance expectations.  Every year, my supervisors specifically determined that I met expectations for assessing patient needs and developing and implementing appropriate interventions. My supervisors regularly noted that I was a valuable member of the treatment team, and my evaluations consistently recognized my work creating engaging patient programming for a wide and diverse patient population.  Attached is a true and accurate copy of my annual performance evaluations.  (Performance evaluations, attached hereto as Exhibit 1.)

16.     My managers and colleagues also recognized my workplace contributions through University Hospitals' "Going the Extra Mile Award" employee recognition system.  (Going the Extra Mile, attached hereto as Exhibit 2.)

17.     In my decades of work at UH, I was never written up or disciplined, and I was never found not to meet performance expectations.

18.     I have never been injured on the job, nor have I been responsible for any instance of patient self-harm, patient harm to others, patient falls, or patient elopement.

19.     There have been a few isolated incidents in which I have bumped into colleagues in the hallway, but these instances were rare and of minor concern.  In recent years, the light colored floors of the unit were replaced with a darker wood color, which has decreased contrast and made it slightly more difficult for me to see, particularly when other staff are wearing darker clothing.

20.     Throughout my employment I have maintained my professional certification as a practitioner in my field.  I have successfully completed continuing education and professional training on crisis intervention and other topics related to my field and required in my profession.

21.     My visual impairment was known to my employer, manager, and colleagues throughout my employment, and until October 2016, reasonable accommodations were provided without issue, and without formal documentation.

22.     From the beginning of my employment, I utilized assistive technology at work, including a CCTV, a modified keyboard and computer, and assistance reading emails.  Throughout my employment I used verbal and sometimes physical cues in communicating with staff about patient needs, particularly when I worked with patients who were agitated or otherwise posed a specific concern.

23.     Verbal cues about patient behavior were not only provided to me.  In fact, all staff on the treatment team remained in constant communication with each other about patient safety, sharing updates and information about patients' mood and particular behavioral concerns.  I participated in these discussions as well.

24.     Shortly after I joined the unit, my supervisors and managers agreed to be interviewed for a video produced by the Cleveland Sight Center featuring successful employment of people with disabilities.  In the video, which was filmed at my workplace, my program director at the time, Jay Kortemeyer, made the following assessment of my workplace performance:

> She's been a very good employee.  She gives one hundred and ten percent.  She's really exceeded all of our expectations and really eliminated any concerns we had as far as her visual impairment in how her performance has been on the job.

(Beyond Boundaries, Cleveland Sight Center, attached hereto as Exhibit 3.)

25.     In 2014, my hospital was acquired by University Hospitals.  After the merger, there were some staffing changes, but my job responsibilities remained the same, and I continued to receive excellent annual performance evaluations.

5

26.     In January 2016, Kathy Holley joined the unit as my new supervisor.

27.     In March 2016, almost three months after joining the unit, Ms. Holley completed her first evaluation of my performance as an employee, and concluded that I met workplace all expectations.  (2016 Performance Evaluation, attached hereto as Exhibit 4.)

28.     Ms. Holley did not raise any concerns about my work performance or safety prior to, during, or immediately after the annual performance evaluation process.  Ms. Holley did inquire briefly about whether she needed to be aware of any other workplace accommodations, but because I did not have any issues with my existing accommodations, I advised her of that fact, and Ms. Holley did not raise the issue directly with me again until after I made an accommodations request in late 2016.

29.     In late September 2016, I made a request for an updated CCTV because the existing machine I had been utilizing at work was no longer functioning as well as it had, and I believed a newer model was necessary for me to continue to read treatment plans and other printed materials at work.

30.     I first requested the equipment in a conversation with Ms. Holley, who asked me to make a written request.  Immediately after the conversation, wrote up my request and submitted it to Kathy Holley.  Attached is a true and correct copy of my request to Ms. Holley.  (October 2016 accommodations request, attached hereto as Exhibit 5.)

31.      On October 4, 2016, Kathy Holley sent me a letter and accommodations form, and advised that I would have to submit an additional accommodations request form, a medical release, and documentation from my medical provider in order for UH to consider my request for a new

CCTV.   Attached is a true and correct copy of the letter I received from Ms. Holley.  (October 4, 2016 letter, attached hereto as Exhibit 6.)

32.     In early October 2016, I signed and returned UH's medical release, the accommodations request form, and submitted medical documentation supporting my request for a new CCTV.  However, UH did not agree to provide the updated equipment, nor did I hear anything further from UH about my request in November 2016, December 2016, or January 2017.

33.     Prior to my accommodations request, Ms. Holley had never expressed any concern to me that she believed my job performance or workplace safety was an issue.  However, after I made my accommodations request, I noticed that Ms. Holley began observing my work more closely, though she did not discuss her behavior with me, nor did she ever raise any specific concerns or questions while I was at work.

34.     In early February 2017, I participated in a workplace crisis intervention training.  I had successfully completed crisis intervention trainings approximately every other year throughout my employment as a recreational therapist.  In each training, I was paired with a partner who provided physical and verbal prompts to demonstrate de-escalation techniques.

35.     Unlike past trainings, the instructor who led the February 2017 training relied solely on visual demonstrations of de-escalation techniques, but my partner provided physical and verbal prompts similar to what I had utilized in past trainings.   No one from UH discussed accommodations for the training, and no one indicated to me during or immediately after the training that my performance posed any issue.

36.     At the end of January, Ms. Holly informed me that she and I would be meeting with Deb Sheldon at 3pm. During that meeting, I was presented with my job description and discussed

the essential job functions. I was informed that my request for accommodations is not an issue, rather the inability to perform my essential job functions was the main concerns. Ms Holly was concerned that I was unable to perform most of the job functions, but I disagreed with her. On Valentines Day, February 14, 2017, I was summoned for a meeting with my supervisor Ms. Holley and Deborah Sheldon, UH's HR director for the building.  At the meeting, I was told that I was being removed from work effective immediately, and placed on a mandatory Tier I Fitness for Duty Referral.  I was told that the reason for the referral was Kathy Holley's concerns about my ability to safely perform my job.

37.     At the meeting, Ms. Holley stated that she was concerned about my ability to read treatment documents outside my office and about my ability to write on the treatment board used by the team.  However, these alleged concerns could have been addressed through the reasonable accommodations and assistive technology I had been successfully utilizing for years, and which was the subject of my still-pending accommodations request.

38.     Ms. Holley also said she was concerned that I may not be able to adequately perform assessments of patients due to my visual impairment, and she cited a handful of instances in which she believed I had been unable to see patients or staff.  However, Ms. Holley had never shared any of her concerns about these observations at the time they occurred or prior to the February 2017 meeting, and many of her concerns were based on unwarranted assumptions and misinterpretations by Ms. Holley.  For instance, Ms. Holley cited an incident in which a nonverbal patient sought my attention during a bingo game in one of my group sessions.  Contrary to Ms. Holley's assumption that I was not able to see the patient, I did in fact perceive that he was trying to get my attention for assistance with his bingo card.  I was occupied instructing the group as a whole at the time he sought attention and I chose to complete my instructions before breaking to

8

provide individual assistance.  Another patient ended up helping him with his bingo card, which resolved his concern.  No safety concern was implicated, and I knew from my interactions with this patient that his concerns were not sufficiently urgent that they required interrupting my focus on the group as a whole.

39.     The Fitness for Duty referral and the concerns raised at the February 14, 2017 meeting came as a complete shock to me despite the issues addressed in the late January meeting. My October 2016 request for accommodations remained pending despite Deb Sheldon stating that it was not an issue.

40.     I was ordered to report to UH's Employee Assistance Program on February 15, 2017 to begin the mandatory Tier 1 Fitness for Duty Examination.  I was informed that my cooperation in the process was mandatory and that I would be terminated if I failed to fully participate.

41.     On February 15, 2017 I was ordered to submit to a complete psychosocial evaluation and medical interview.  UH staff asked me wide ranging and intrusive personal questions about my marital history, my children, my legal history, and my history of medical treatments and prescriptions.  I was asked if I had a history of psychiatric treatment, domestic violence, sexual abuse, child abuse, and whether I had suicidal or homicidal ideation.  (EAP intake form, attached hereto as Exhibit 7.)

42.     UH also demanded that I submit to a drug and alcohol screen.  I was required to provide a urine sample and UH staff measured the temperature of the sample to verify that it was fresh.  I also had to take a breathalyzer test.  UH demanded that I sign a form acknowledging that

UH staff was concerned that I was under the influence of drugs or alcohol, when in fact there were no such concerns.  (Drug and alcohol screens, attached hereto as Exhibit 8.)

43.     I submitted to each and every demand that UH made in the fitness for duty process, though many of the requests were humiliating and unrelated the alleged concerns raised by Ms. Holley, because UH made clear that I would be terminated if I failed to fully submit to the demands for information.

44.     On February 23, 2017, UH EAP staff wrote to my primary care physician and my opthamologist requesting an evaluation of my ability to perform my job.  In the referral letter, UH stated that "there were concerns raised by the supervisor about her abilities to function on the unit although there has been past accommodation in the department for her vision issues" and requested that my providers comment on my physical and mental ability to perform my job duties.  (Letter to Medical Providers, attached hereto as Exhibit 9.)

45.     On February 24, 2017, my treating primary care physician Dr. Bures cleared me to return to work, writing "In my opinion if she wants to work, I feel she can."  (Dr. Bures email, attached hereto as Exhibit 10.)

46.     On March 22, 2017, following a visit and meeting with me, my ophthalmologist Dr. Balciunas submitted UH's fitness for duty form.  In her response, Dr. Balciunas confirmed that I have a visual impairment that impacts my ability to sign treatment plans and read facial expressions, but she specifically noted that I had been working with my impairment for many years with accommodations.  Dr. Balciunas was not asked to give her opinion on whether I could do my job with accommodations, or to identify accommodations, and she advised UH that a functional assessment was necessary.  (Dr. Balciunas report, attached hereto as Exhibit 11.)

47.     Dr.  Balcuinas referred me to an occupational therapist with the Cleveland Sight Center, Erin St. Denis, for a Low Vision Evaluation Assessment, to explore and identify assistive technology and reasonable accommodations that would address the specific work concerns raised by Kathy Holley.

48.     Although Erin St. Denis contacted UH to request permission to visit my workplace to conduct an assessment, her request was refused by UH.

49.     Erin St. Denis met me with for an interview to discuss my workplace duties and existing accommodations, and she prepared a report identifying workplace accommodations to address each of the concerns raised by Kathy Holley.  The recommended accommodations included the following:

- Assistive technology to magnify and read printed material
- A signature guide for signing treatment plan.
- Higher contrast materials in the workplace
- Verbal cues from staff when entering an occupied room
- Auditory compensation strategies (reading patient's' tone of voice or responsiveness to questions)
- Natural supports including verbal feedback from other staff about patient behavioral issues.

With respect to crisis intervention training, Erin St. Denis recommended providing the materials in advance, and providing a partner or staff member who is aware of my need for verbal and touch prompts for physical components of training.  I had already been utilizing many of the accommodations and assistive technology recommended by the Cleveland Sight Center without issue for years.  (Cleveland Sight Center Report, attached hereto as Exhibit 12.)

50.     I understand that UH had a staff member named Allison Evans conduct an assessment of my ability to perform my job.  However, in completing her assessment, Ms. Evans had no contact, communication, or input from me.

51.     In June 2017, I was summoned for a meeting with UH human resources. I was informed that I would not be permitted to return to my job.  UH told me that the accommodations I had requested by the sight center had been rejected.  At the meeting I requested to be considered for other positions at UH.

52.     After UH decided I would not be permitted to return to work, Deb Sheldon and Kathy Holley asked me to complete paperwork to request to take a medical leave of absence.  I declined to do so for two reasons: first, the paperwork required me to produce medical documentation from my doctors documenting that I am unable to perform my job, which I believe is untrue. It contradicts what the doctor stated in the return to work forms (fitness for duty). Second, I understand that the medical leave would have required me to pay an additional insurance premium because I was a part time employee.

53.     As soon as it became clear that I would not be permitted to return to my job, I began a job search.  I contacted my vocational rehabilitation counselor with Opportunities for Ohioans with Disabilities and I reopened my case file with that agency.  I was assigned to a job developer with whom I met on a weekly basis to identify and apply for other jobs that would be a good fit for my experience and skills.  With her assistance, I applied for dozens of jobs over many months, with limited success.

54.     My job search was difficult for a number of reasons.  First, and most important, almost every potential employer requested to know why I had been separated from my position with UH.  My truthful responses, no matter how carefully framed, concerned potential employers.

55.     Second, the job search was difficult because of my disability.  Most job applications and even interviews involved inaccessible printed materials, and I often had to request

12

accommodations for my vision impairment in the interview process itself.  Many potential employers have limited experience working with employees with disabilities, and are particularly wary of employing people with vision impairments, not realizing that many tasks such as reading and writing can be easily performed with assistive technology.

56.    Third, the job search was difficult because of my limited transportation options. Many jobs required a valid drivers license. Due to my visual impairment I do not drive, and because of cuts to public transportation availability in my community, I rely on friends and family for transportation.  I had worked out a system for transportation to and from my workplace in Parma three times per week, but my field of potential employment was limited to when and where I could arrange transportation relatively close to my home in Hinckley.  I limited my job search to part time positions to reduce the number of total weekly trips I would have to arrange for work.

57.    Although I expressed interest in reassignment to another position at UH throughout the summer of 2017 in numerous meetings and phone calls with Deborah Sheldon, UH never identified or offered me any other position.  Instead, Deborah Sheldon insisted that I would have to initiate contact with a career coach at UH for help finding a new job.  I lacked confidence that UH was serious about helping me find a job for a number of reasons.  First, I was frustrated with how UH had handled my request for accommodations and the fitness for duty process.  Both processes involved burdensome paperwork demands, lack of clear and adequate communication among various UH departments, and months of delay.  I also believed that UH already had all of the information it needed from me in order to identify another position, as it had just completed an intrusive and thorough medical and vocational examination of my job abilities.  Second, at the time Deborah Sheldon requested that I contact UH's career coach, I had already engaged a job

developer with OOD with whom I had established a good rapport, and we had already initiated a thorough job search.

58.     Despite my attempts to find another comparable job, I have not been able to find another position that pays as well or which offers similar benefits.

59.     Currently I am working as a child care provider on call. I work between fifteen and twenty hours per week at a far lower hourly wage. I have no paid time off, no medical benefits, and no employer retirement contribution. The work is physically exhausting, as it involves frequent movement, lifting, standing, and bending.

60.     There are many similarities between my former and current job duties. Both positions require assessment of mood, affect, and need for recreational activities. Both positions involve some interaction with nonverbal individuals who pose a risk of self-harm, harm to others, or elopement. Both populations can experience and interact with non-existent internal stimuli such as imaginary playmates or invisible puppies. Both populations can include individuals who are agitated and experience a wide range of moods.

61.     As I did in my former work as a recreational therapist, as a childcare provider I utilize the same set of assistive technology and reasonable accommodations to safely and successfully perform the essential functions of my job. These include magnification software for reading, and the use of verbal cues, natural supports, and auditory compensation strategies.

**Further Affiant Sayeth Naught.**

Deborah Moss

14

Sworn to and subscribed before me by Debora Moss, May 12 , 2019.

[seal]

_Yashdeep sandhu_
Notary Public

State of OHIO
County of Cuyahoga

YASHDEEP SANDHU
Notary Public, State of Ohio
My Comm. Expires 03/21/2024
Recorded in Cuyahoga County

15