**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

DEBORAH MOSS,

      Plaintiff,

    vs.

UNIVERSITY HOSPITALS HEALTH
SYSTEMS, INC.,

      Defendant.

**Case No.: 1:18-CV-02257**

**DECLARATION AND**
**EXPERT REPORT OF**
**PETER BLANCK, Ph.D., J.D.**

**<u>DECLARATION AND EXPERT REPORT OF PETER BLANCK, Ph.D., J.D.</u>**

**TABLE OF CONTENTS**

I.          **QUALIFICATIONS AS AN EXPERT**

II.         **CASE BACKGROUND AND ASSIGNMENT**

III.        **METHODOLOGY FOR REVIEW AND ANALYSIS**

IV.         **OPINIONS**

V.          **CONCLUSION**

VI.         **APPENDICES**

          APPENDIX 1 – CURRICULUM VITAE

          APPENDIX 2 – PRIOR TESTIMONY IN THE LAST FOUR YEARS

          APPENDIX 3 – FEE RATE IN THIS MATTER

          APPENDIX 4 – PRIMARY DOCUMENTS REVIEWED

*I, Peter Blanck, hereby submit the following report pursuant to Federal Rule of Civil*

*Procedure 26(A)(2).*

## I.     QUALIFICATIONS AS AN EXPERT

I hold the rank of University Professor at Syracuse University, which is the highest faculty rank at the University.[1] I am the Chairman of the Burton Blatt Institute ("BBI"), which works to advance the civic, economic, and social participation of persons with disabilities across the life course.[2] I received a Ph.D. in Social Psychology from Harvard University and a Juris Doctorate from Stanford University, where I served as President of the *Stanford Law Review*.

I have published more than 200 articles and books on the Americans with Disabilities Act ("ADA"), and related disability laws, policies, and practices, including *Disability Civil Rights Law and Policy*.[3] My articles and books are published in peer-reviewed journals, law reviews, and other scholarly venues. I serve on the editorial boards of leading journals and as referee for manuscripts submitted to peer-reviewed journals. In these roles, I evaluate the research methods and substantive content of manuscripts in the area of disability policy and practice.

I teach courses on research methods, psychology, disability, and the law. I speak across the country and internationally, and before U.S. federal and state governmental agencies, on issues facing persons with disabilities in such areas as employment practices, organizational culture, attitudes and stigma, and reasonable accommodations. I have testified before Congress,

---

[1] I hold other appointments at Syracuse University in the Colleges of Education, Law, and Arts and Sciences, and in the Falk College and the Maxwell School of Public Policy.

[2] *See* http://bbi.syr.edu/.

[3] *See generally* Peter Blanck et al., *Disability Civil Rights Law and Policy; Cases and Materials* (3d ed. 2014); Peter Blanck et al., *Legal Rights of Persons with Disabilities, An Analysis of Federal Law* (2d ed. 2013).

the Equal Employment Opportunity Commission ("EEOC"), state legislatures, and administrative bodies on disability policy and practice.

As a professor, researcher, and practitioner, I engage with employers and employees, policymakers, health care professionals, researchers, and others on disability policies, procedures, and effective practices in the ADA accommodation process.[4] I advise employers, health care administrators and professionals, ADA and human resource coordinators, and others on reasonable accommodations and the associated "interactive process" (e.g., good faith dialogue among the parties) in the employment of individuals with visual and other disabilities.[5]

I have published in the leading peer-reviewed journal *Ophthalmology* on issues involving visual impairment, employment, and accommodations under the ADA.[6] I study and evaluate the development and implementation of essential job functions and individual qualifications under the ADA. I examine issues of reasonable accommodation and the safety of individuals with visual and other disabilities, and of others, in the workplace.[7] I study employers' beliefs, assumptions, and misconceptions, and practices, in relation to individual job qualifications,

---

[4] *See, e.g.,* Lisa Schur, Douglas Kruse, Joseph Blasi, & Peter Blanck, *Is Disability Disabling in All Workplaces? Disability, Workplace Disparities, and Corporate Culture*, *Industrial Relations,* 48, 381-410 (2009).

[5] *See, e.g.,* Peter Blanck, Jill Anderson, Eric Wallach, & James Tenney, Implementing reasonable accommodations using ADR under the ADA: A case of a white collar employee with bipolar mental illness, *Mental & Physical Disability Law Reporter*, 18(4), 458-64 (1994).

[6] Peter Blanck & Robert Folberg, The Americans with Disabilities Act: Emerging issues for ophthalmologists, *Ophthalmology*,101, 1635-40 (1994).

[7] *See, e.g.,* Craig Zwerling, et al., Workplace Accommodations for People with Disabilities: National Health Interview Survey Disability Supplement, 1994-5, *Journal of Occupational and Environmental Medicine*, 45, 517-525 (2003); D.J. Hendricks, et al., Cost and Effectiveness of Accommodations in the Workplace: Preliminary Results of a Nationwide Study, 25 *Disability Studies Quarterly* (2005); Helen Schartz, et al., Workplace Accommodations: Empirical Study of Current Employees, *Mississippi Law Journal*, 75, 917-43 (2006); Helen Schartz, et al., Workplace Accommodations: Evidence-Based Outcomes, *Work*, 27, 345–354 (2006); Lisa Schur, et al., Accommodating Employees with and without Disabilities, *Human Resource Management*, 53, 593-621 (2014).

reasonable accommodation, safety and "direct threat" issues that employees with disabilities may pose to themselves or others in the workplace.

I examine instances in worksites where there may be unwarranted beliefs and reasons for the exclusion of qualified individuals from employment on the basis of their visual and other disabilities, particularly when there are deficiencies in the reasonable accommodation and interactive process.[8] I study individualized (e.g., as applied or adapted to a particular individual[9]) determinations in the reasonable accommodations process, which may enable qualified individuals with visual and other disabilities to perform essential job functions.[10]

My colleagues and I, including researchers at the Job Accommodation Network ("JAN"),[11] conduct studies of reasonable accommodations and the interactive process.[12] We examine accommodation requests, assessments, and effective provision (e.g., involving assistive

---

[8] *Compare* Peter Blanck, Ross Buck, & Robert Rosenthal, General introduction: Nonverbal communication in the clinical context. In Peter Blanck, Ross Buck, & Robert Rosenthal (eds.), *Nonverbal communication in the clinical context*, 1-12 (1986); Peter Blanck, et al., Therapists' tone of voice: Descriptive, psychometric, interactional, and competence analyses, *Journal of Social & Clinical Psychology*, 4, 154-78 (1986).

[9] *See, e.g.,* Merriam Webster Dictionary; at https://www.merriam-webster.com/dictionary/individualize ("to adapt to the needs or special circumstances of an individual").

[10] *See, e.g.,* Lisa Schur, Douglas Kruse, Joseph Blasi, & Peter Blanck, *Is Disability Disabling in All Workplaces?: Disability, Workplace Disparities, and Corporate Culture*, 48 *Industrial Relations: A Journal of Economy and Society*, 48, 381-410 (2009); Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture (Dec. 19, 2008) (available at: http://www.dol.gov/odep/research/CorporateCultureFinalReport.pdf).

[11] The Job Accommodation Network (JAN) is a leading source of guidance on accommodations and a service of the U.S. Department of Labor. *See, e.g.*, http://askjan.org/links/about.htm.

[12] *See, e.g.*, Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture (December 19, 2008) (*available at*: http://www.dol.gov/odep/research/CorporateCultureFinalReport.pdf); Lisa Schur, Douglas Kruse, & Peter Blanck, *People with Disabilities: Sidelined or Mainstreamed?* 75-79 (2013). *See also* EEOC Policy Guidance on Executive Order 13164: Establishing Procedures to Facilitate the Provision of Reasonable Accommodation, EEOC Directives Transmittal, No. 915.003 (Oct. 20, 2000); *available at*: http://www.eeoc.gov/policy/docs/accommodation_procedures.html; Helen Schartz, et al., Workplace Accommodations: Empirical Study of Current Employees, 75 *Miss. L.J.* 917 (2006); Helen Schartz, et al., Workplace Accommodations: Evidence-Based Outcomes, 27 *Work: A Journal of Prevention, Assessment and Rehabilitation* 4, 345 (2006).

technologies and other means[13]) for thousands of people with visual and other disabilities in the workplace.[14] Our studies show that many employers effectively accommodate individuals with visual and other disabilities, using a variety of accommodation strategies, in ways that enable qualified employees to retain and advance in their jobs.[15]

My colleagues and I have explored the attitudes and experiences of employees with disabilities using a dataset with nearly 30,000 employee surveys from fourteen companies.[16] The findings include that employees with disabilities generally face disparities at work, including lower levels of job retention and training. These "disability gaps" vary substantially across companies and worksites, suggesting organizational culture and attitudes, along with employer policies and practices, play a strong role in how employees with disabilities are treated, retained, and accommodated. Employees with disabilities fare much better in companies with workplace cultures, and policies and practices, that are objective and responsive to their individual needs.

My research examines the short- and longer-term effects of adverse employment actions

---

[13] *See, e.g.,* Peter Blanck, Flattening the (In-Accessible) Cyber World for People with Disabilities, *Assistive Technology Journal*, 20, 175-80 (2008); Peter Blanck, "The Right to Live in the World": Disability Yesterday, Today, and Tomorrow, *Texas Journal on Civil Liberties and Civil Rights*, 13, 367-401 (2008); Peter Blanck, *eQuality: The Struggle for Web Accessibility by Persons with Cognitive Disabilities* (2014); Peter Blanck, *Communications Technology for Everyone: Implications for the classroom and beyond*, Annenberg Washington Program (1994); Peter Blanck, *Communicating the Americans with Disabilities Act, Transcending Compliance: Case Report on Sears, Roebuck and Co.*, Annenberg Washington Program (1994).

[14] *See, e.g.,* Peter Blanck, Americans with Disabilities and their Civil Rights, *University of Pittsburgh Law Review*, 66, 687-719, at 687-719, 706-707 (2005).

[15] *See, e.g.,* Peter Blanck & Helen Schartz, Special Issue: Corporate Culture and Disability, *Behavioral Sciences and the Law* 23: 1–2 (2005); Lisa Schur, Douglas Kruse, & Peter Blanck, Corporate Culture and the Employment of Persons with Disabilities, *Behavioral Sciences & the Law*, 23(1), 3-20 (2005); Leonard Sandler & Peter Blanck, Accessibility as a Corporate Article of Faith at Microsoft: Case Study of Corporate Culture and Human Resource Dimensions, *Behavioral Sciences & the Law*, 23(1), 39-64 (2005); David Klein, James Schmeling, & Peter Blanck, Emerging Technologies and Corporate Culture at Microsoft: A Methodological Note, *Behavioral Sciences & the Law*, 23(1), 65-96 (2005); Phoebe Ball, et al., Disability as Diversity in Fortune 100 Companies, *Behavioral Sciences & the Law*, 23(1), 97-121 (2005).

[16] Lisa Schur, Douglas Kruse, Joseph Blasi, & Peter Blanck. (2009). Is Disability Disabling in All Workplaces? Disability, Workplace Disparities, and Corporate Culture, *Industrial Relations*, 48(3), 381-410, July.

and the lack of effective accommodation for persons with visual and other disabilities. I study organizational policies and practices that lessen the negative effects of attitudinal and structural discrimination, and stereotypes and bias towards employees with visual and other disabilities.[17]

I have served as a court-appointed officer for a U.S. District Court in class action litigation to ensure community services and accommodations in accord with the ADA for older adults and individuals with psychiatric and cognitive disabilities, and services for the staff of such facilities, such as recreational therapists.[18] I am a former member of the President's Committee on Employment of Persons with Disabilities. I have served as chair of the American Psychological Association's Committee on Standards in Research, and as Commissioner on the American Bar Association's Commission on Mental and Physical Disability Law.

I have received grants from federal agencies, including the U.S. Departments of Labor, Health and Human Services, Education, and Veterans Affairs, the National Council on Disability, and from foundations such as the Annenberg Washington Program, to examine ADA accommodations and supports for persons with visual and other disabilities.

My work is cited in government reports, such as by the U.S. Department of Labor's Interagency Committee on Disability Research, in its report "Employer Perspectives on Workers

---

[17] *See, e.g.,* Larry Logue & Peter Blanck, *Heavy Laden: Union Veterans, Psychological Illness, and Suicide* (2018). I am Principal Investigator on national study commissioned by the American Bar Association investigating the workplace accommodation process and bias and stigma faced by persons with visual and other disabilities.

[18] I was appointed Facilitator by the U.S. District Court of Wyoming in the settlement of the class action lawsuit Chris S. et al. v. Jim Geringer et al. involving hospital and community-based treatment programs and care for persons with psychiatric disabilities. 2:94-CV-00311-ABJ (D.Wyo. Dec. 29, 1994). I also was appointed by the U.S. District Court of Wyoming as Chairman of the Quality Assurance Committee, and as a member of the Compliance Advisory Board in the resolution of the class action *Weston v. Wyoming State Training School*, 2:90-CV-0004 (D.Wyo. Apr. 27, 1994) (community integration for individuals with disabilities).

with Disabilities: A National Summit to Develop a Research Agenda."[19] The U.S. Department of Labor's Office of Disability Employment Policy has engaged me and my colleagues to develop a methodology and conduct case study research to identify ways in which organizational structures, policies, and practices facilitate equal employment opportunity for people with disabilities.[20] This program of study benchmarked effective policies and strategies in the hiring, retention, training, promotion, and accommodation of persons with disabilities.[21]

In 2015, I was honored to receive the National Distinguished Disability Service Award from NARRTC (formerly known as the National Association of Rehabilitation Research and Training Centers). NARRTC promotes the inclusion of persons with disabilities in American society through applied research and training. The NARRTC award is given to individuals who have made contributions to the field of disability.[22] It is given for sustained and an accumulation of life-time achievement, and is the highest recognition conferred by NARRTC.

A copy of my *curriculum vitae* is attached as Appendix 1. A list of cases in which I have testified during the previous four years is attached as Appendix 2. My hourly rate for my services

---

[19] U.S. Department of Labor, Interagency Committee on Disability Research, Employer Perspectives on Workers with Disabilities: A National Summit to Develop a Research Agenda, Washington, D.C. (Sept. 2007); http://www.icdr.us/documents/ISE_Report-Employer-Perspectives.pdf ("Organizational culture is the values and beliefs of those in the organization, from the highest levels of decision-making on down, reflected in both formal and informal policies and practices. This culture can have a positive or negative impact on employment, advancement prospects, and the day-to-day experience in the workplace of people with disabilities." *Id.* at 29. *Citing* Blanck: "… conducting demand-side research on the employment of people with disabilities that is scientifically rigorous, evidence-based, and relevant to employers. This project involves a nationwide collaboration of economists, statisticians, and leading experts in law, public and disability policy, corporate culture, applied life studies, technology, and education."

[20] Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture, *supra*.

[21] *Id.* at Appendix A: Inclusive Employment Benchmarks (available at: http://www.dol.gov/odep/research/CorporateCultureAppendixA.pdf).

[22] *See* BBI Chairman Peter Blanck to Receive 2015 National Distinguished Disability Service Award; *available at*: http://bbi.syr.edu.

in this matter is listed in Appendix 3. Appendix 4 provides reference to documents presented to me by Plaintiffs' counsel that I have reviewed in this matter. Additional research reports, articles, policies, and publicly available materials are referenced in this Report.

## II.   CASE BACKGROUND AND ASSIGNMENT

### A.  Case Background and Analysis

I am retained by Plaintiff's counsel in this matter to review and evaluate circumstances surrounding Ms. Moss's ("Plaintiff" or "Moss") claims of disability discrimination against the University Hospitals at Parma Medical Center ("Defendant" or "University Hospitals").

I was asked to provide expert opinions based on my research, knowledge, and experience. I was asked to examine materials pertaining to Plaintiffs' allegations of disability discrimination in violation of the ADA Title I's employment provisions. My understanding of the issues in this matter is based on case filings by the parties, such as discovery production and deposition transcripts, Plaintiff's employment and medical records, Defendant's policies and procedures, and materials made available to me to date, as well as on research and publicly available materials, and an interview with Moss.[23]

As I understand this matter based on my review to date, Moss brings this case to remedy University Hospitals' alleged disability discrimination in violation of the ADA Title I alleging

---

[23] My notes from my interview with Ms. Moss are incorporated into this Report [hereinafter "Moss Interview"]. I interviewed Moss on May 9, 2019, in person. I organized interview topics based on my review of case and other materials referenced herein. In accord with my research, writings, and experiences (described *supra*), and with social science interview methods, the purpose of the interview with Moss was to understand and assess the reliability and credibility of her views and "voice" in regard to the present matter. For that reason, the general topics of the questions below was fluid and meant to foster open, honest, and constructive dialogue.

that it failed to reasonably accommodate her employment.[24]

From the year 1998, for twenty years following, Moss was employed at University Hospitals, and its predecessor entity, Parma Medical Center,[25] as a Rehabilitation Therapist in the Behavioral Health Unit. Since 1989, Moss has been certified by the National Council on Therapeutic Recreation and has worked as a Therapeutic Recreation Specialist.[26]

Moss has Stargardt's disease, which is a visual impairment that has diminished her central vision, but not her peripheral vision. Moss's visual impairment substantially limits her major life activity of seeing. Moss has difficulty reading facial expressions from certain distances and small printed materials. Moss uses assistive technology, auditory compensation techniques, verbal cues, and other reasonable accommodations in her work at University Hospitals.[27]

During her years of employment at University Hospital, Moss contends she performed the essential functions of a Therapeutic Recreational Therapist, with the reasonable accommodations mentioned above. As a certified Therapeutic Recreation Specialist, among other duties, Moss was assigned to interact with patients to assess their functional and

---

[24] *E.g.,* my review and summary of the facts as relevant to my assignment in this Report is derived from Plaintiff's Complaint and Defendant's answer thereto, among other file documents. *See infra* (Appendix 4).

[25] Parma Hospital merged with University Hospital in 2016. *See also* Moss Deposition Testimony (Apr. 8, 2019) [Hereinafter "Moss Depo at __."; and deposition testimony referenced as "_____ Depo at __."].

[26] *See* Moss National Council for Therapeutic Recreation Certification ("CTRS"), case file (1996, 1997 et seq.). *See also* National Council for Therapeutic Recreation Certification ("NCTRC") ("premier credentialing organization for the profession of Therapeutic Recreation"), at: https://www.nctrc.org/about-certification/national-job-analysis/ *See, e.g.,* 2014 CTRS® Job Analysis Report, National Council for Therapeutic Recreation Certification®, Protecting and Promoting Since 1981 CTRS®–The Qualified Provider NCTRC Report on the International Job Analysis of Certified Therapeutic Recreation Specialists ("RATIONALE: A benchmark for any profession is its ability to routinely monitor its own practice through an ongoing process of self-regulation. Paramount to this process is the creation of a credentialing program that enables the profession to safeguard consumers by stating who is competent to practice. The establishment of a valid job analysis is essential to the integrity of a credentialing program and its associated exam program. The job analysis translates practice into a usable format for test development. It delineates the important tasks and knowledge deemed necessary for competent practice.").

[27] Moss Interview.

rehabilitative needs, and to plan and provide them appropriate therapies.[28] Moss works with the

patient treatment team on the Behavioral Health Unit.[29]

According to University Hospital's Job Description for Moss, the summary/essential duties

for the position of Rehabilitation Therapist are as follows: "Organizes and conducts daily

therapeutic programs to facilitate rehabilitation of people with psychosocial illnesses; assesses,

maintains and develops programs to enhance social, cognitive, physical and emotional

functioning of patients."[30] The Job Description provides that a Rehabilitation Therapist is to

have: "Special Skills & Equipment Knowledge: Professional initiative, objectivity, good time

management and interpersonal skills, commitment to interdisciplinary patient care delivery.

Physical, cognitive, and perceptual ability to provide appropriate patient therapies."[31]

According to the Job Description, the position's required credentials include "Certification or

licensure in respective field," and "Non-violent crisis prevention training within 3 months of

employment." The "Experience and Knowledge" required include: "Knowledge of therapeutic

processes, growth and development, limit setting, behavior management and

establishing/maintaining therapeutic relationships and boundaries appropriate to age of patient

---

[28] Moss Interview.

[29] *See* Complaint at 3 (Moss's Job Description attached as Exhibit A to the Complaint).

[30] *See* Complaint at 3 (Moss's Job Description attached as Exhibit A to the Complaint) ("Position Summary/Essential Duties: Organizes and conducts daily therapeutic programs to facilitate rehabilitation of people with psychosocial illnesses; assesses, maintains and develops programs to enhance social, cognitive, physical and emotional functioning of patients. Essential duties include: 1. Perform assessment for functional and rehabilitative needs that may include activities of daily living; community living skills; social, leisure and vocational skills; self care. 2. Provide quality therapeutic recreational and expressive therapy in group or individual setting. 3. Educate patient/family/caregiver in skills applicable for discharge plan. 4. Participate in the interdisciplinary care process. 5. Perform other department activities such as, but not limited to documentation, billing, support of department operations, etc.").

[31] *See* Complaint at 3 (Moss's Job Description attached as Exhibit A to the Complaint) (emphasis added). *See also* Defendant University Hospitals Health Systems, Inc.'s Motion for Summary Judgment, at 3 (Filed 4/15/19) (with emphasis added, referencing Sheldon Declaration Para. 5, referencing Job Description).

population served. Previous mental health experience or related services in health care facility preferred."

"Special Skills & Equipment Knowledge" required for the position include: "Professional initiative, objectivity, good time management and interpersonal skills, commitment to interdisciplinary patient care delivery. Physical, cognitive and perceptual ability to provide appropriate patient therapies." In my research and experience, "perceptual" is associated with "perception especially in relation to immediate sensory experience."[32] I examine perceptual capabilities to include visual (e.g., nonverbal facial expressions, body movements), verbal (e.g., linguistic, nonverbal tone of voice), and other forms of sensory experience.

Attached to the job description are aspects for a job performance appraisal, such as the position competencies and validation. Among the "Critical Behaviors" identified: "Assesses patient risk, e.g., violence, self-harm, falls, etc."[33] The "Validation of Competency" for this "critical," or essential job function, is stated as "observation." Presumably, this includes the ability to "observe" patient and staff activities and interactions during the recreational therapeutic interaction. For example, the recreational therapist must perform patient "assessments for functional and Rehabilitative needs that may include activities of daily living; community living skills; social, leisure and vocational skills; self care."

Among "Expected Behaviors" in the job description is to "Intervene[] to mitigate risks." The "Validation of Competency" for this job behavior is "observation." Under this category, there are "Exemplary Behaviors," such as "Explores new method/tools to better assess patient functioning

---

[32] *See, e.g.,* Merriam-Webster Dictionary, at: https://www.merriam-webster.com/dictionary/perceptual.
[33] A second such example may be the "Critical Behavior" of "Aware of and adheres to precautions based on diagnosis, history and interdisciplinary team recommendations").

and rehabilitative needs." The "Validation of Competency" for this exemplary job behavior is "observation."[34]

The job performance appraisal form identifies other job competencies, such as: "Provides quality therapeutic recreational and expressive therapy in group or individual setting;" "Educates patient/family/caregiver in skills applicable for discharge plan; Communicates Effectively;" and "Participates in the interdisciplinary care process." "Validation of Competency" across "critical," "expected" and "exemplary" job functions is "observation."[35]

A rehabilitation therapist provides "quality therapeutic recreational and expressive therapy in group or individual setting," with "Expected Behaviors," such as "Communicates any unusual or inappropriate behavior exhibited during therapy to RN/Physician." The "Validation of Competency" for this job behavior is "observation."[36] In the Opinions section of this report, I consider the validity of Moss's job appraisal over the relevant time period while she was working at University Hospitals.

---

[34] For each Validation of Competency, the same criteria appear, which are: "Observation, Chart Reviews, Peer Evaluation, Patient Outcome Quality Data, ITP/Family Meeting Attendance/Participation, and Patient Satisfaction Surveys." *See* Complaint at 3 (Moss's Job Description attached as Exhibit A to the Complaint).

[35] For each Validation of Competency, the same criteria appear, which are: "Observation, Chart Reviews, Peer Evaluation, Patient Outcome Quality Data, ITP/Family Meeting Attendance/Participation, and Patient Satisfaction Surveys." *See* Complaint at 3 (Moss's Job Description attached as Exhibit A to the Complaint).

[36] In the performance appraisal there are other assessment of job competencies, such as "Check Items Which Are Major Strong Points/Achievements, Asterisk Items Where improvement Needs Exist." With checklists including items such as "8. __ Clinical Assessment Skills;" "14. __ Patient Focus." Hospital managers are provided "a non-exhaustive list of sources for validation of competency. A manager may look to this list in helping to evaluate an employee. These examples may be used to validate the universal as well as job-specific competencies." These include: "Direct observation of performance, Observed contributions to group activities (attendance at Interdisciplinary Rounds/Team Meetings), Patient Survey Results, Formal Peer Review tool, Interviews with patients, Review of treatment plans, Skills Check Lists, Anecdotal notes/records, Commendations, Corrective actions, Recognition certificates, Patient Satisfaction Surveys, Meeting notes, Suggestions submitted by the employee, Department orientation checklist, Budget performance, In-service attendance, Attendance records, Goal setting and attainment, Project completion, Objective measures of productivity, Self-evaluation [sic], Chart review, Documentation of participation in care conference, Membership in professional organizations (to document professional development), Computer system records/reports."

During Moss's employment at University Hospitals as a recreational therapist, her supervisors and coworkers were aware of her vision impairment. Moss contends during her employment period she performed the essential job functions of her position, with reasonable accommodation (e.g., assistive technology).[37]

In the performance of her job, and as accommodation for her visual impairment, beginning in 1998, Moss was provided and used assistive technology via a closed circuit TV ("CCTV") to access smaller printed materials. During her employment, Moss states that as reasonable accommodations her supervisors and coworkers provided written materials in advance of meetings, and used verbal and physical cues to communicate with Moss. On occasion, staff and nurses verbally alerted Moss about patients who were agitated.[38] For years during her employment at University Hospitals, the reasonable accommodations provided to Moss were not committed to writing, but were known and implemented by staff.

Moss contends that, with her peripheral vision, she was able to move appropriately in the hospital unit, and was able to respond to staff and patient "call lights" (e.g., signaling staff to patient needs).[39] As an individual with a visual impairment, Moss acknowledges there were instances in which she "bumped into colleagues wearing dark clothing in the dark hallway on the unit, but these instances were not serious or frequent."[40]

Since beginning employment at University Hospitals, Moss completed written "workplace trainings on crisis intervention, involving instruction in both verbal and physical de-escalation

---

[37] *See* Complaint at 3.
[38] *See* Complaint at 3.
[39] Moss Interview ("I could always see the call lights).
[40] *See* Complaint at 3.

techniques on topics such as how to divert a punch and how to respond to hair pulling, choking, or kicking."[41] Moss has good job performance appraisals and evaluations, with commendations for her work.[42]

Moss's performance appraisals for 2014 and 2015 report that she met or exceeded her performance objectives.[43] In Moss's 2014 job appraisal, the reviewer's comments were:

> Debbie has grown in her role as a Recreational Therapist over the past year. She recently has stepped up in the absence of a full time therapist to make sure the unit had adequate coverage. Debbie will continue to grow with the Rehabilitation Therapy program. She should focus on program development and creative groups in the future.

In Moss's 2015 appraisal, the reviewer's comments were:

> Deb is an important part of our team. She works hard to engage the patients in activities during their stay on the unit. Throughout the year, Deb has been able to adapt to documentation changes and has done a good job. Her input has been helpful in making the Rehabilitation Therapy documentation meaningful. Moving forward, Deb should continue to challenge herself with coming up with new ideas

---

[41] *See* Complaint at 3.

[42] *See, e.g.* Complaint at 3 (Exhibits B, C, D). *See also*, for example, Parma Community General Hospital, Addendum to Job Description and Performance Evaluation for all Patient Care Positions, Age Specific Criteria; Bates 1111, 1536 (rating Moss as meeting all relevant job competencies); Performance Appraisal and development Form (10/7/2010), Bates 1096-98 ("Debbie … has an amazing ability to connect with her patients and families. She's very creative with the activities and groups conducted" with the BCOA patients. Debbie always tries to go over and above to help the staff with direct patient care."). *Id.* (6/27/11), Bates unclear (Debbie continues to be one of the most important members of the BCOA team. … Her abilities are an example for others to follow."). *Id.* (5/28/13), Bates 1067-69 ("Deb is an important part of the BCOA team. She has been flexible with scheduling to accommodate the need of the unit. Deb has grown in her role in the past year and will continue to do so."); *Id.* (5/29/140, Bates 1052-54 ("Debbie has grown in her role as a Recreational Therapist over the past year. She recently has stepped up in the absence of a full time therapist to make sure that the unit had adequate coverage. Debbie will continue to grow with the Rehabilitation Therapy program. She should focus on program development and creative groups in the future."); *id.* (3/25/15), Bates 1332 ("Deb is an important part of our team. She works hard to engage the patients in activities during their stay on the unit. Throughout the year, Deb has been able to adapt to documentation changes and has done a good job. Her input has been helpful in making the Rehabilitation Therapy documentation meaningful. Moving forward, Deb should continue to challenge herself with coming up with new ideas to engage the patients. Additionally, she should focus on making patient safety a priority when she is working in the unit."). UH Performs—Performance Details, Review Year 2015 (3/18/2016), Bates 1333, Manager Kathryn Holley ("Deb is a valued member of the team and has worked in conjunction with her programming teammate to enhance the documentation for their area. She engages the patients and has worked to develop different groups for higher functioning patients.").

[43] Complaint at 4 (Moss 2014 and 2015 Performance Appraisals, attached as Exhibits B and C).

to engage the patients. Additionally, she should focus on making patient safety a priority when she is working in the unit.

During the years 2016 and 2017, Moss was recognized by her then-new supervisor Kathryn Holley and others at University Hospitals.[44] Example of Moss' work commendations referenced in the "Going the Extra Mile Awards" ("GEM"), include:[45]

"Debbie: Thanks a million for all your help this past weekend. You had some great groups for our patients ..." Daniella Magda, 1/23/2017; "Thank you Debbie." Kathryn Holley, 1/23/2017;

"I want to take the opportunity to tell each of you how very thankful I am to work alongside of you. As individuals you each bring a unique set of talents to the workplace, and those unique talents makes us even stronger and more successful as a team ..." Kathryn Holley, 11/21/2016;

"Thanks for such a great job with programming this week. We have a challenging group to pull together and provide quality activities/groups for and you both worked hard to ensure the patients had a positive experience." Kathryn Holley, 11/4/2016; "Thanks. It helps to have patients that are engaging and share the positive feedback." Debbie Moss.

"Whoa ... Sunday was definitely a busy day. With a full house and multiple levels of functioning to deal with, it was a hectic day. We managed to get much needed paperwork done, do showers, handle numerous visitors all day long and still maintain the safety ..." Nicolette Mullnax, 10/2/2016 (emphasis added); "Team, Great job today on the unit. *We are completely full and we managed to do a great job maintaining the patients safety along with getting patients showered as well.* It definitely makes for a great shift when we all can work together. We ..." Cory Kramer, 10/1/2016 (emphasis added); "Nice work everyone – continued teamwork is awesome!" Katheryn Holley, 10/3/2016).

"BCDA team: "What another difficult and challenging day with combative and aggressive patients! *We all worked as a team and ensured patient safety surrounding the chaos throughout the day.* I appreciate all the hard work from my team today. Despite ..." Daniella Magda, 9/26/2016 (emphasis added); Reply by Moss, "I think we would all agree that we are just doing our jobs. Thanks for the

---

[44] Moss Deposition Testimony at 21 (Apr. 8, 2019) (Christina Rivera was the unit's Assistant Nurse Manager) [hereinafter "Moss Depo"]. *See also* Rivera Declaration (Defendant's Motion for Summary Judgment, Exhibit 5); Holley Depo at 37.

[45] *See, e.g., id.* (Exhibit D, "Going the Extra Mile Awards" to Moss and unit staff).

recognition and for all you and other nurses do!"; "Great work Monday- thank you all for working together to care for patients and families." Reply by Kathryn Holley, 9/28/2016).

In 2016, after Parma Hospital merged with University Hospitals, Moss was assigned Holley as a new supervisor. In an annual performance appraisal of Moss in March 2016, Holley found that Moss was meeting her job performance expectations and inquired about Moss's accommodations. In the fall of 2016, Moss requested to replace an existing accommodation that was not fully functioning (i.e., "CCTV", Closed Circuit Television or "magnifying television").[46]

According to the testimony of University Hospitals human resource staff Deb Sheldon, Moss's job appraisal process (e.g., Fitness for Duty examination) and related review of her accommodations and ability to perform essential job functions was initiated by Holley's "concerns."[47] Sheldon testified:[48]

> A  Ms. Moss never had any challenge to the duties. She never said these are not the duties that I do.
>
> Q  That's right.
>
> …
>
> Q  You just said Ms. Moss had never had any challenges to any of these job duties, is that correct?
>
> A  What's your -- that's correct.
>
> Q  So did anybody else have any challenges for any of these job duties? Did anybody else challenge whether Ms. Moss can complete these job duties?
>
> …
>
> A  Yes. *That's why the process began. The manager [Holley] had concerns over*

---

[46] Moss Interview.

[47] Sheldon Depo at 105-06.

[48] Sheldon Depo at 105-06 (emphasis added).

*that.*

In October 2016, Moss provided Holley the requested documentation for the assistive technology for magnification and reading functions.[49] Moss contends after she submitted to Holley the requested documentation, Holley began observing and questioning Moss about her ability to perform her essential job duties and about those job tasks that Moss was unable to perform because of her visual disability.[50]

In early 2017, Moss participated in a crisis intervention training, which she had completed successfully in prior years. Moss was paired with a partner who provided her with some verbal and physical prompts, in accord with her accommodations provided prior.[51] Moss contends, and without prior notice to her, the instructor relied on visual demonstrations of de-escalation techniques that were not accessible because of her visual impairment. Moss contends that at this training there was no discussion of an interactive process to provide reasonable accommodations so Moss may fully participate in the training.[52] Moss was provided no indication after the training that her participation was deficient.[53]

In February 2017, Moss was asked to a meeting with Sheldon (University Hospitals' Human Resources Department)[54] and supervisor Holley. At that meeting, Moss was placed on

---

[49] *See, e.g.,* University Hospitals, All Accommodation Requests should be Directed to the Human Resources Department (Oct. 4, 2016), letter to Moss from Holley, re: Request for Reasonable Accommodation (acknowledgement of accommodation request and process for provision of accommodations). University Hospitals release form to Moss medical provider for accommodation request, (10/31/16), Bates 1350-51. *Id.* (accommodation request form (2/2/17), Bates 1344-45
[50] Moss Interview.
[51] Moss Interview.
[52] Moss Interview.
[53] Moss Interview.
[54] Sheldon Depo at 7. *Id.* (Exhibit 1, University Hospitals ADA Flowchart).

leave from her position and ordered to submit to a Fitness for Duty examination.[55] The reason given for the leave was concern that Moss was not able to perform her essential job duties because of her vision impairment.[56] Moss was not permitted to return to work until she submitted medical documentation showing she could perform her essential job duties. In the Fitness for Duty examination, Moss was required to submit to drug and alcohol screening tests, to which the referral records categorized as "random" testing.[57]

Moss received an assessment by Erin St. Denis, an Occupational Therapist ("OT") at the Cleveland Sight Center, who completed a Low Vision Evaluation Report.[58] The Occupational Therapist reported Moss as an employee of University Hospitals since 2014 and an individual with Stargardt's disease, which "permanently diminishes" her central vision, but not her peripheral vision, and that although "[i]it is a progressive condition, [] Moss is not likely to get much worse at this point of the condition."[59]

---

[55] *See* University Hospitals Health System Employee Assistance Program Referral Form (2/14/2017), referral for "Fitness for Duty." EAP notes ("ran into a coworker didn't see her coming. Vision issues, larger monitor, adaptive equipment. ADA request.").  EAP Follow-up Consultation Notes, 6/1/17: "Met client, HR & management, went over recs & concerns of safety. Client acknowledges population in unit has changed but doesn't appear concerned w her own safety indicating staff helps her, she wants to cont. to work asking about other positions. HR to meet [sic] w management go over essential functions of job & make decision. Georgene Kohlbacher.").

[56] Moss Interview.

[57] *See* Complaint at 5 (Drug and alcohol screening tests, attached as Exhibit E). *Id.* ("University Hospitals also sent a fitness for duty examination form to her two treating physicians, her chiropractor and her eye doctor, inquiring about medical issues that were unrelated to her job or her visual impairment. University Hospitals asked Ms. Moss's chiropractor about whether she had any lifting restrictions, even though her job duties did not require lifting. (Complaint, Exhibit F). *Id.* at 6 ("Following a medical examination, Ms. Moss's chiropractor released her for work immediately and noted that she had no work restrictions.").

[58] Complaint at 6 (Cleveland Sight Center Report, attached as Exhibit H).

[59] The Cleveland Sight Center Report also notes Moss reported postural strain at her work station and that "[s]he may benefit from an ergonomic evaluation of her work station." *See also* Bates 1358-59. *Id.* Bates 1361-62 (2/18/17) ("With appropriate adaptations, including access to Topaz CCTV, her specialized glasses + Zoom Text talking software, Ms. Moss may be able to continue working part time with support from other staff members when needed. All of the employment related variables and necessary factors cannot be determined by my assessment. visual acuity is severely reduced but Ms. Moss has been working with this condition for many years in her current activity."). *Id.* Bates 1352. *See also* Moss Depo at 7].

The Cleveland Sight Center Report reiterated that, since Moss became an employee of University Hospitals in 2014, "there have been some changes in the population served; now serving a younger geriatric population." It notes while Moss "was previously assessed and accommodations recommendations were made, there are some continued concerns." In an earlier Performance Appraisal and Development Form, Moss's prior supervisor wrote: "Debbie is cognizant of the changing needs of the geriatric patient and plans for recreational groups accordingly."[60]

The report states that because of privacy concerns, Georgene Kohlbacher, who was University Hospitals Employee Assistance Counselor ("EAP"[61]), denied the Cleveland Sight Center's request to make a second evaluation "to observe and further assess how Ms. Moss

---

[60] Moss, Performance Appraisal and Development Form (Dec. 10, 2002); Bates 1180. *See also id.* (Date subsequent but exact date unclear); Bates 1152 ("Debbie works well with the Geriatric population. She is confident in developing groups and planning activities related to their needs. The unit will be developing further groups for less functional pt. Debbie's input will be sought.").

[61] *See* Sheldon Depo at 30 ("Q Explain to me, what is the EAP and when and why would they be involved in this case? A The EAP's an employee benefit. It provides counseling and other services, support programs, to assist the employees. They're also used in cases where there might be a need to -- there are self-referrals and there are mandatory referrals. Q This was a mandatory referral [for Moss], is that right? A It was."). Kohlbacher Depo at 7. *Id.* at 8-10 ("Q What does an EAP counselor do? A So an employee assistance counselor -- the EAP is a benefit that's been provided from UH. It's a free service that the employee can utilize with the dependents that they have in their home. They can call in, they can meet with us in person. We offer to provide this during work time, per policy. People come in on their own to discuss whether it's personal issues, work-related issues, mental health concerns, financial, work-related things, substance abuse. So we do an assessment and we go from there to help them make appropriate recommendations. Q I understand that your involvement if with Ms. Moss was not -- was pursuant to a mandatory Tier 1 referral. Can you explain what that is? A Okay. So a Tier 1 referral is what they call a fitness for duty. And in that process generally a conversation happens between human resources and management, they reach out to us, they go over some of the concerns and whether to pursue the fitness for duty, which is to take them off work to further evaluate whether they are able to perform their job duties. Q So in that scenario then it's initiated by management, not by the employee, right? A In a Tier 1 it is initiated by management and HR, yes. … Q … What is EAP's -- in a Tier 1 referral, what is EAP's relationship with the HR process? What is your role in that process? A When they're referred to an EAP we do a full psychosocial assessment, so we look at everything that's going on at home, in the workplace. *This particular case [Moss] was a medical fitness for duty, so we also get our employee health nurse involved in the initial assessment.* The employee health nurse does the medical piece of things, gets a lot of history. When they're referred to us as a fitness for duty it is our job after we do the evaluation to reach out to the providers that are involved with that particular client for their input to feel if they are able to do their job duties, so we get what they call clearance to return to work.") (emphasis added).

---

functions in her daily routine in her work setting."[62] University Hospitals did not allow Cleveland Sight Center's request to make a second assessment of Moss when conducting her actual job functions, observing Moss in context.

In terms of her workplace accommodations, Moss reported to the Cleveland Sight Center that a CCTV was recommended in the past, and she received a Merlin Model, but this model was not as good as the Topaz model she uses at home.[63] Further assessment of this accommodation type was recommended. Moss also uses Zoom Text (e.g., computer with a large monitor and adaptive keyboard) at her work station, but this accommodation had not been working well. It was recommended that University Hospitals' technology department address these issues.

Moss reported she used University Hospitals volunteers to assist her reading emails, an accommodation established by a supervisor prior to Holley, and that University Hospitals may be using iPads in the future, which may add portability across work stations.[64] With the iPad features, Moss may be able to use its audible reading features to listen to medical reports but may require training on the low vision accessibility features of the iPad. In terms of other accommodations identified, Moss noted she would benefit from bump dots on photocopiers to help her orient the commands, and a signature aid to sign documents.[65] Other accommodations identified for Moss by the Cleveland Sight Center included use of contrast tape to grid-off relevant portions of white boards that she needed to read.[66]

Other accommodation requests by Moss include use of verbal cues by staff, for instance,

---

[62] Kohlbacher Depo at 64.
[63] Moss Interview.
[64] Moss Interview.
[65] Moss Interview.
[66] Moss Interview.

to prevent her bumping into staff wearing dark clothing on dark floors on the unit, or from

walking into a patient room when the patient was being seen by a nurse.[67] The Cleveland Sight

Center provided accommodations recommendations for Moss in the areas of assistive technology

and training for unit staff in "Blindness Basics" (e.g., "What to do when you work with a person

who is blind or visually impaired").[68]

      After Moss's assessment at the Cleveland Sight Center, at the request of University

Hospitals' EAP Counselor Kohlbacher, Dr. Elias Traboulsi MD, provided a summary of Moss's

condition, such that her condition is unable to improve to provide "the ability to see details and

small targets from a distance and even from near. Her peripheral vision remains unaffected."[69]

Dr. Traboulsi reported he was:

> uncertain about the impact on [Moss's] ability to perform individual tasks because
> I have not observed her in her work … from a distance that [Moss] would not be
> able to recognize faces or expressions on faces that would give queues to
> particular situations or feelings.
>
> *My hope is that Ms. Moss receives the appropriate training and is given a little bit*
> *more time and maybe instruction to see if she could meet the necessary*

---

[67] *See, e.g.,* Template University Hospitals Employee ADA Request for Reasonable Accommodations, Moss, Bates 1344-45 (2/2/17).

[68] Complaint at 6 (Cleveland Sight Center Report, attached as Exhibit H) (accommodation list as follows: "1. Topaz EZ HD with 24" monitor. 2. Assistive technology evaluation for a scanner may be beneficial for reading printer materials (not hand written). 3. Work with UH's IT department re: Zoom Text accessibility with UH software. 4. Training in low vision accessibility feature of iPad if/when iPads are introduced to be used by staff. 5. Marking of copier with bump dots for improved accessibility to flat display/touch screen for copier functions. 6. Typoscope for signatures. 7.  Verbal prompts when passing in hall or to re-direct out of room if private session with a patient. 8. Accessible materials for staff trainings and staff/trainer assistance to motor through any physical components to the training. 9. Additional optometrist recommendations: 10x LED hand held magnifier for spot reading, continuation of the 8x DVI microscopic readers OD (right), +24 binocular AOLITE microscope reading glasses. 10. Training of staff on Blindness Basics."). For Blindness Basics, see, e.g., http://neocmn.org/PDF/Blindness%20Basics%20home%20health%20and%20Assisted%20living%20staff%20-%206.pdf (e.g., What Can You Do? • Consider having disability and visual awareness training for your staff as part of new staff orientation and ongoing manager's responsibilities. • Consider having an access audit of your premises. • Ensure that your communication channels allow people with sight loss to fully access all your services. • If you have a website, make sure that blind and partially sighted people can access it.").

[69] *See* Complaint at 6 (Letter from eye doctor, attached as Exhibit G).

---

*requirements to perform this aspect of her work.*[70]

Moss's eye doctor, Lidija Balciunas OD, confirmed she was substantially limited in her ability to see print and facial expressions, particularly in "poor contrast environments," but the doctor was not able to assess how these limitations impacted Moss's ability to perform her essential job functions with or without accommodations without observing Moss in her workplace.[71] Dr. Balciunas determined: "With appropriate adaptations, including access to Topaz cctv her specialized glasses + zoon text talking software, Ms. Moss may be able to continue working part time with support from other staff members when needed. … Ms. Moss has been working with this condition for many years in her current capacity."[72]

---

[70] *See also* Kohlbacher Depo at 31-32 ("Q So now I'd like to turn to the specific medical evaluation that was done here. You mentioned that there was a -- that as a result of the EAP referral, EAP sent Ms. Moss and her medical providers requests for medical information; is that right? A Yes. To Dr. Beris and her ophthalmologist [sic], Dr. Traboulsi, initially."). *Id.* at 83-84. Defendant's Motion for Summary Judgment, supra (Exhibit 10), Bates 1391 (emphasis added).

[71] Sheldon Depo at 101-02 ("A I think there were multiple conclusions [opinions as to Moss's visual impairment and her job essential functions]. She [Evans] was one of those. Q Who were the others? A There was a summary from two physicians. Both ophthalmologists, I believe. Q Those were summaries of Ms. Moss' visual acuity, correct? A Correct. Q They were not summaries of Ms. Moss' functional ability on the job, is that correct? A Correct. And her visual ability. Q In fact, Dr. Balciunas, her ophthalmologist, specifically said that she was unable to render an opinion on the functional aspects of how Ms. Moss' disability affected her ability to do her job, correct? A I think that position also said that the visual deficits would pose concern or the inability to see near and far. Q Okay. So there's a vision impairment, but *Dr. Balciunas specifically said that she could not comment or render an opinion on how that vision impairment would affect Ms. Moss' ability to do the job, correct? A I believe that's true.*") (emphasis added). *See also* Lidija Balciunas OD, Bates 1362 ("I am unable to complete this portion in the manner requested"; that request was "Based on the employee's medical history and your knowledge of the medical condition, estimate the frequency and the duration of the employee's intermittent inability to perform some or all of his/her job functions over the next six months (e.g., 1 episode every 3 months lasting 1-2 days)." *Id.* at Bates 1361 ("With appropriate adaptations, including access to Topaz cctv her specialized glasses + zoon text talking software, Ms. Moss may be able to continue working part time with support from other staff members when needed. All of the employment related variable and necessary factors cannot be determined / fully assessed by my assessment. Visual acuity is severely reduced, but Ms. Moss has been working with this condition for many years in her current capacity.").

[72] Lidija Balciunas OD, Bates 1361 ("With appropriate adaptations, including access to Topaz cctv her specialized glasses + zoon text talking software, Ms. Moss may be able to continue working part time with support from other staff members when needed. All of the employment related variable and necessary factors cannot be determined / fully assessed by my assessment. Visual acuity is severely reduced, but Ms. Moss has been working with this condition for many years in her current capacity.").

---

On June 12, 2017, University Hospitals, via human resources generalist Sheldon, wrote to Moss, stating: "attached is a copy of the overview of the rehab Therapist job duties and essential functions that unfortunately cannot be accommodated by the requested accommodations you submitted. Also, Kathy Holley was to initiate the request for a Medical Leave of Absence so you should be getting a packet soon from the Disability Management Services department."[73]

Sheldon's "overview of the rehab Therapist job duties and essential functions that unfortunately cannot be accommodated by the requested accommodations you submitted," listed essential job functions that purportedly could not be accommodated by University Hospitals. Moss's supervisor Holly prepared written notes to Sheldon, entitled Moss's "Visual Impairment Concerns."[74] These "visual impairment concerns" included:

- Signing treatment plan documents that you cannot see.

- Unable to complete documentation unless you are in your office.

- Incomplete assessment due to lack of visual skills – is patient smiling, crying, staring off, actively hallucinating, etc.

- Concern about the overall loss of visual cues in all interactions with patients and staff – i.e., demonstrating distraction, hallucinations and how that impacts your ability to do a thorough assessment.

- Witnessed the other day that you were unable to respond to a patient's need in group – patient with limited verbal skills who needed assistance during Bingo who was sitting 2 patients away from you. Other patients were assisting that patient because you were not aware he was trying to get your attention even though you were looking in his direction, and thy had to read his Bingo numbers because you could not.

- Witnessed that you walked all the way into a patient room when I was in room working on behavioral issues with patient with no awareness that there was a

---

[73] Complaint at 7 (Email from University Hospitals, attached as Exhibit I).

[74] *See* email from Deborah Sheldon, Human Resource Generalist, (2/14/2017), Bates 1427-28, re: Deborah Moss, accommodation request, with "Notes by Kathy Holley, Manager. Debbie Moss – Visual Impairment Concerns."

situation of concern. I had to speak up to let you know I was in the room and to not disturb the situation.

- Physically walked into staff members in the hallway – I witnessed one, another two were reported to me from past. When I mentioned the one I witnessed you brushed it off and walked away.

- We are implementing a new schedule awareness process for patients, families, and staff with use of white boards in the main hallway. You will need to write out schedule every day on board.

- Staff will not leave you alone in the group room because you are not able to attend to patients needs as they arise. Other therapists can be in the group room alone during their group time if staff needs to be doing other tasks.

- Participation in recent crisis intervention physical de-escalation training class was limited due to your inability to see the techniques and fully practice safe responses with your partner.

Following is the reproduced listing of essential job functions that, according to Sheldon,

"cannot be accommodated by the requested accommodations [Moss] submitted."

## Essential Functions

Assessment of patients on the Behavioral Center for Older Adults – initial assessment includes review of functional and rehabilitative needs that may include cognitive and emotional; activities of daily living; community living skills; social, leisure and vocational skills; self-care; mobility.

Plan, prepare, implement, and evaluate therapeutic groups that target the functional and rehabilitative needs of the patients. Groups will occur at a minimum twice daily. The therapists determine content/topic for groups each day based on patient needs.

Plan and/or provide individual therapy/activity – i.e. Cognitive stimulation, motor activity, for patients that are not able to participate in group therapy.

Provide education verbally or in print to patient/family based on assessed needs and discharge planning.

Participate in Interdisciplinary rounds daily – contribute insights, assessments, and interventions from rehab therapist's perspective. Evaluate progress toward goal and need for changes to plan of care.

Document group participation notes daily, update treatment plan and additional documentation per protocol.

Maintain therapeutic milieu- awareness and ability to support, intervene, re-direct, limit-set with patients throughout the day. Therapeutic interactions with patients are ongoing.

Meet patient satisfaction target for Rehab Therapy section, contribute to overall patient satisfaction scores.

Ensure a safe environment for patients- Non-Violent Crisis Intervention training and demonstrated ability to maintain safety on the unit.

Respond to light calls. Respond to escalating patient situations, assessment of environment for safety risks i.e. dangerous objects, ligature risks, assist patients to leave an escalating environment.

University Hospitals determined that Moss was not qualified to perform the above-listed essential job duties. The decision that Moss "cannot be accommodated by the requested accommodations" that Moss requested appears to be based in part on an assessment by Allison Evans, a University Hospitals Rehabilitation Supervisor, who was assigned to conduct this assessment.[75] Evans did not observe Moss's requested accommodations as used by Moss in her actual work environment,[76] even though Moss had used these accommodations in performing her essential job duties years prior at University Hospitals.[77]

Evans found "situational awareness and attention to detail" to be essential functions of

---

[75] Sheldon Depo at 99 (Sheldon testified that she was not aware if Evans had experience working with persons with visual impairments or that she had experience with assistive technology and accommodations for University Hospital employees with visual impairments).

[76] Sheldon Depo at 101-02 ("Q· ·That determination about the functional part, Allison Evans reached a decision, a conclusion, based in part on a visit that she conducted to Ms. Moss' workplace, correct? A Correct. Q Did Allison Evans ever speak with Ms. Moss about her job or accommodations? A Not that I'm aware of. Q Did anybody ever talk to Ms. Moss -- or to Ms. Evans about potential accommodations in the workplace? A I don't know. Ms. Evans would have worked with the EAP. … She did not work with me directly.").

[77] *See* Bates 1300, email from Allison Evans to Georgene Kohlbacher, May 5, 2017, re: f/u Debbie Moss.

Moss's job that may be assessed only through visual observation of "facial expressions and body language." Evans wrote: "With limitations in these abilities, the safety and quality of care for the patients is compromised."[78]

Evans did not observe or "job shadow" Moss while performing her essential job duties.[79] Observational "job shadowing" is a standard method, well-recognized by the Equal Employment Opportunity Commission ("EEOC"), researchers and practitioners, to conduct a valid job analysis.[80] In May 2017, Evans emailed Kohlbacher: "I was able to visit BCOA [Geriatric Psychiatric Behavioral Care Unit] for a little while on Wednesday. I observed some group and 1:1 patient time. Again, *I have not met with Deb to see her in her environment*, but here are the observations I made."[81] Thus, without observation of Moss at work, Evans concluded Moss was not able to maintain sufficient situational awareness to perform essential job functions because of her visual impairment.[82] Evans wrote: "While technology accommodations can facilitate success with documentation and gathering information on patients, aside from limiting all interaction to 1:1, which could still pose a risk, *there is little that can be done to accommodation for the*

---

[78] *See* Defendant University Hospitals Health Systems, Inc.'s Motion for Summary Judgment, *supra* at 6 (referencing Evans Report as Exhibit 9).

[79] *See* Defendant University Hospitals Health Systems, Inc.'s Motion for Summary Judgment, *supra* at 6 (referencing Evans Report as Exhibit 9). *See also* Kohlbacher Depo at 66-67 (did not know if Evans monitored another employee who was sighted or had a visual impairment, if Evans had experience with people with visual impairments, or if Evans ever talked with Moss).

[80] *See, e.g.,* Barrier Analysis: Questions to Guide the Process; at: https://www.eeoc.gov/federal/directives/barrier-analysis.cfm. ("3) Does the agency offer training and development opportunities to its employees? (e.g., career development programs, job shadowing, details, special assignments, other).)" *Id.* ("1) Does the agency survey its employees to ensure that their current skills will meet agency mission needs?"). *See, e.g.,* Jaimie Ciulla Timmons, Doris Hamner, & Jennifer Bose, Four Strategies to Find a Good Job: Advice from Job Seekers with Disabilities Institute for Community Inclusion (2003), at: https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1373&context=gladnetcollect

[81] *See* Defendant University Hospitals Health Systems, Inc.'s Motion for Summary Judgment, *supra* at 6 (referencing Evans Report as Exhibit 9) (emphasis added).

[82] Moss Interview.

*variability of a psychiatric patient population for someone with such significant vision*

*deficits.*"[83]

I did not find information Evans considered Moss's history in performing essential job functions, or that Moss was not able to perform essential job functions with reasonable accommodation. I did not find information that Evans considered or observed whether other accommodation strategies, such as auditory compensation, had been or may be reasonable accommodations, which had been provided to Moss. Evans job assessment appears to primarily define Moss's essential job functions in "visual terms."

In 2017, University Hospitals placed Moss on involuntary unpaid leave and afterwards terminated her employment. Moss contends her termination was based on her vision impairment and not on an objective and individualized determination of her job performance with reasonable accommodation.[84] Moss claims her termination was based on unfounded fears, stereotypes, and assumptions about her visual impairment.[85]

In September 2017, University Hospitals wrote to Moss that her termination was based on "concerns regarding your ability to safely perform the essential functions of your position as Rehabilitation Therapist, PMC Hanna Pavilion, *due to your significant vision impairment.*"[86] The University Hospitals letter continued:

---

[83] *See* Defendant University Hospitals Health Systems, Inc.'s Motion for Summary Judgment, *supra* at 6 (referencing Evans Report as Exhibit 9) (emphasis added).

[84] Moss Interview.

[85] Moss Interview.

[86] Complaint at 7 (Email from University Hospitals, attached as Exhibit J) (emphasis added). *Id.* ("As you are aware, on February 14, 2017, you were referred to the UH Employee Assistance Program (EAP) for a mandatory fitness for duty due to safety concerns when you were unable to fully participate in de-escalation training which is essential when working with behavioral health/psychiatric patients. You were placed on paid administrative leave pending the fitness for duty evaluations.").

we have met with you on several occasions as part of the interactive process to discuss and determine your ability to safely perform the essential functions of your position with or without reasonable accommodation. … the behavioral health unit is a very dynamic environment that requires excellent situational awareness and attention to detail. Staff must have the ability to interpret the affect [sic] of multiple patients at once through facial expression and body language. You acknowledged the legitimacy of our safety concerns, the increase in patient acuity, increased severity of psychiatric issues, the change in patient demographics, increased code violets, and fewer staff to monitor patient activities and to deliver assistance during patient outbursts. All of these factors contribute to an increased risk to you, patients, and other staff members.

It continued:

On June 9, 2017, I informed you that based on our June 1, 2017 meeting and discussion, we were not able to identify any reasonable accommodation that would allow you to safely perform the essential functions of your job and return to your position at which time you had no suggestions for a reasonable accommodation. … I informed you that your manager had initiated a Medical Leave of Absence (MLOA), … for employees to remain on role for up to 52 weeks. … On August 7, 2017, I called you [and] [w]e discussed the need to bring closure to this matter.

In its Answer to Moss's Complaint, I understand that University Hospitals admits that

Moss is a person with a disability with a substantial limitation in seeing due to Stargardt's

Disease.[87] University Hospitals admits Moss, "due to her vision impairment, has been granted

---

[87] Defendant's Answer, passim. *Id.* (admitting Moss worked as a Rehabilitation Therapist at Parma Hospitals when it was acquired by University Hospitals; that as a Rehabilitation Specialist, Moss's "job duties included working with psychiatric patients, providing therapeutic programming, interacting with patients, assessing patients' functional and rehabilitative needs, and providing appropriate therapies." It admits that Moss "physically walked into other employees in the hallways."). *Id.* (University Hospitals admits crisis intervention trainings were provided to employees in late 2016 and early 2017, and that Moss "worked with a partner who assisted Plaintiff for portions of the crisis intervention training." It admits "portions of the crisis intervention training involved physical interaction training" and that "there was no written test after the crisis intervention training as the focus of the training was on employees being able to successfully carry out intervention techniques."). *Id.* (It admits "that on or around September 6, 2017, University Hospitals advised Plaintiff that her paid time off would conclude at or near the end of September 2017, that Plaintiff would remain on a personal leave of absence until December 31, 2017, that if Plaintiff completed the steps necessary to obtain a medical leave of absence she would remain on role for up to 52 weeks, Plaintiff was encouraged to contact her assigned Career Coach to assist Plaintiff in finding a different position at University Hospitals, and that if she did not secure another position at University Hospitals her employment would be terminated on January 1, 2018.").

reasonable accommodations, including using assistive technology and workplace modifications."

University Hospitals admits, at some time between the time University Hospitals acquired Parma Hospitals and February 2017, Moss "was able to safely and effectively perform some of her job duties with reasonable accommodations." It admits Moss "used computer adaptive equipment and magnification devices to read smaller print at work, verbal and physical cues were used to communicate with Plaintiff, and that Plaintiff was at times able to detect and respond to call lights." It admits "some of the reasonable accommodations provided to Plaintiff were not reduced to writing."

University Hospitals admits after it acquired Parma Hospitals Moss "received some good performance reviews and some commendations." It admits Moss "had problems with her vision and that Ms. Holley became aware of some of these problems as she worked with Plaintiff." It admits Moss "was provided computer adaptive equipment and magnification devices as reasonable accommodations."

University Hospitals admits in February 2017, Moss "was given a Tier I mandatory referral to the Employee Assistance Program for a fitness for duty evaluation in accordance with University Hospitals' policy and that Plaintiff was placed on paid administrative leave pending the outcome of the evaluation." It admits Moss's "physicians were consulted as part of the fitness for duty evaluation for Plaintiff."[88]

University Hospitals admits Moss's "eye doctor was consulted as part of the fitness for duty evaluation for Plaintiff," that "an Occupational Therapist from the Cleveland Sight Center

---

[88] It admits Moss's chiropractor provided University Hospitals with a return to work authorization recommending Moss "could return to work with no chiropractic limitations."

completed an evaluation report for Plaintiff," and "the Occupational Therapist from Cleveland Sight Center was not given access to Plaintiff's workplace because of HIPAA restrictions." It admits the "Occupational Therapist from the Cleveland Sight Center who completed an evaluation report for Plaintiff included in that report some recommended accommodations for Plaintiff," "that the Occupational Therapist from the Cleveland Sight Center who completed an evaluation report for Plaintiff stated that, in regard to crisis intervention and staff training, 'having materials ahead of time for review and partnering with a staff member or trainer who is aware of need for verbal and touch prompts to motor Ms. Moss through any physical components may be beneficial.'"

University Hospitals admits around June 2017, it "informed Plaintiff that no reasonable accommodations had been identified that would allow Plaintiff to safely perform the essential functions of her job, so she would be unable to return to her prior position."[89] It contends it "complied with the requirements of the Americans with Disabilities Act, including engaging in the interactive process, and to the extent reasonable accommodations were not provided it was because they required a fundamental alteration of the services provided and/or presented an undue hardship."[90]

### B.  Assignment in this Matter

Based on my review and analyses to date, I was asked to opine as to the following issues as applied to the present matter:

---

[89] *See* Letter from Deborah Sheldon to Deborah Moss, re: Employment Status (1/18/18) Bates 1388 (termination of Moss employment effective January 1, 2018).
[90] Defendant's Answer at 12.

1. Effective practice in the reasonable accommodation process for persons with visual and other disabilities, as guided by valid and reliable job descriptions and individualized appraisal, to enable individuals with visual and other disabilities to perform essential job functions, and not be excluded from work because of unwarranted bias and stigma on the basis of their disabilities.

2. Short- and longer-term harm from denial of reasonable accommodations to individuals with visual and other disabilities based on non-objective and non-individualized assessments concerning their ability to perform essential job functions.

### III.   METHODOLOGY FOR REVIEW AND ANALYSIS

To address the issues identified above, and develop the bases for my opinions, my research methods included: (1) review of case materials, court filings, expert reports, deposition testimony, and other case file documents; (2) review of federal government policies, procedures, and practices; (3) an interview with Plaintiff;[91] and, (4) review of publicly available governmental reports, and social science and medical literature.

With regard to the case file documents, among materials I reviewed were deposition testimony and exhibits,[92] discovery responses, and production by Plaintiff and Defendants,

---

[91] Topics for my interview with Plaintiff were selected by me prior to the interview and based on my analysis in this matter (*see, e.g.,* Peter Blanck & Arthur Turner, Gestalt research: Clinical field research approaches to studying organizations. In J. Lorsch (ed.), *The handbook of organizational behavior*, 109-125 (1987)). I watched the video entitled *Beyond Boundaries* (1998) interviewing Ms. Moss at work at Parma Medical Center, showing her accommodations, and with positive commentary from her then-supervisor.

[92] *See, e.g.,* Deposition Testimony of Holley, Kohlbacher, Sheldon, Moss.

Defendant's policies and procedures, correspondence among the parties and others, and Plaintiff's employment and medical files, and assessments.

The documents I reviewed allow me to make an analysis of Defendant's accommodation policies and practices as applied to Plaintiff as an employee with a visual impairment. The additional materials I examined include peer-reviewed scientific journals, reports, and ADA regulations, guidance, and policies.

My review techniques, along with the other recognized research methods I employ, strengthen my ability to consider plausible rival hypotheses for the outcomes I find, such as possible reasons for Defendant's actions other than those based on Plaintiff's visual impairment and accommodation requests. My approach reduces material selection bias and increases the "external validity" and relevance of my opinions in this matter.[93]

My opinions are based on my education, knowledge, and professional experiences, and on research findings of the highest scholarly caliber. My review employs information from multiple sources to corroborate my opinions as to whether Defendant's actions comported with professional practice. The body of materials I have reviewed provide a sound basis for reaching my opinions in this matter.[94]

## IV.    OPINIONS

---

[93] *See, e.g.,* Thomas D. Cook & Donald T. Campbell, *Quasi-Experimentation: Design & Analysis Issues for Field Settings,* at 37-38, 70-80, 341-83 (1979); Robert Rosenthal & Peter Blanck, Science and ethics in conducting, analyzing, and reporting social science research: Implications for social scientists, judges and lawyers, *Indiana Law Journal,* 68(4), 1209-28 (1993).

[94] *See, e.g.,* Michel J. Saks, *Scientific Method: The Logic of Drawing Inferences from the Empirical Evidence,* in 1 *Modern Scientific Evidence: The Law and Science of Expert Testimony* at 264 (David Faigman, *et al.* eds., 2010) (scientific method as "application of logic to the problem of how to observe an empirical phenomenon in a way that will allow one to draw valid inferences about that phenomenon.").

My primary and subsidiary opinions are presented in this section of the Report. Under each opinion header, there is discussion and illustrative references to the case and other materials that form the bases for the opinion.

1. *Effective practice in the reasonable accommodation process for persons with visual and other disabilities, as guided by valid and reliable job descriptions and individualized appraisal, to enable individuals with visual and other disabilities to perform essential job functions, and not be excluded from work because of unwarranted bias and stigma on the basis of their disabilities.*

My colleagues and I write:

> Persons with physical and mental disabilities are among those minority groups most stigmatized by society. They are targets of negative stereotypes, are devalued by those sharing mainstream culture values, and suffer negative interpersonal and economic consequences. … *Even when individuals obtain employment they face great attitudinal barriers in the workplace.* Negative attitudes impede the integration of the individuals with disabilities into the workplace and negatively affect the performance of the work group.[95]

There is a substantial body of research showing employment decisions, such as involving reasonable accommodations, for individuals with visual and other disabilities are susceptible to unfair bias and stereotyping. This often occurs when decisions are made in absence of, or in contradiction to, objective and individualized (e.g., as applied to the particular individual in question) job performance and accommodation assessments in the actual workplace setting.[96]

---

[95] Mollie Marti & Peter Blanck, Attitudes, Behavior, and the ADA, in P. Blanck (ed.), *Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research*, 356-84 (2000) (citations omitted) (emphasis added). *See also* Peter Blanck & Mollie Marti, Attitudes, Behavior, and the Employment Provisions of the Americans with Disabilities Act, *Villanova Law Review*, 42(2), 345-408 (1997).

[96] *See, e.g.,* Adrienne Colella, Coworker distributive fairness judgments of the workplace accommodation of employees with disabilities. *Academy of Management Review*, 26, 100–116 (2001); Adrienne Colella, et al., The impact of ratee's disability on performance judgments and choice as partner: The role of disability—job fit stereotypes and interdependence of rewards. *Journal of Applied Psychology*, 83, 102–111 (1998); Adrienne Colella

Research, my own,[97] and by others, shows bias in decisions towards employees with visual and other disabilities may be mitigated when supervisors and managers make their appraisal and accommodation decisions guided by objective and valid job assessments of the employee's actual ability to perform essential job functions.[98]

Research examines the workplace experiences and accommodation of employees with disabilities,[99] using information such as from performance evaluations.[100] They find that, although employees with disabilities may receive positive job performance assessments on paper,[101] supervisors still may hold unfair and unjustified lower future performance expectations

---

& Arup Varma, Disability-job fit stereotypes and the evaluation of persons with disabilities at work. *Journal of Occupational Rehabilitation*, 9, 79-95 (1999); Adrienne Colella, Angelo DeNisi, & Arup Varma, Appraising the performance of employees with disabilities: A review and model. *Human Resource and Management Review*, 7, 27-53 (1997). *See also* Philip Tetlock, The Impact of Accountability on Judgment and Choice: Toward a Social Contingency Model, *Advances in Experimental Social Psychology*, 25, 331-76 (1992) (mitigating out-group bias by holding supervisors accountable for their personnel decisions).

[97] *See, e.g.,* studies cited *passim*. *See also* Lisa Schur, Douglas Kruse, & Peter Blanck, *People with Disabilities: Sidelined or Mainstreamed?* (2013); Lisa Schur, Kyongji Han, Andrea Kim, Mason Ameri, Peter Blanck, & Douglas Kruse, Disability at Work: A Look Back and Forward, *Journal of Occupational Rehabilitation* 27(4), 482–497 (2017); Lisa Schur, Douglas Kruse, Joseph Blasi, & Peter Blanck, *Is Disability Disabling in All Workplaces? Disability, Workplace Disparities, and Corporate Culture*, 48 *Industrial Relations: A Journal of Economy and Society* 381-410, at 397 (2009).

[98] *See, e.g.,* Leonard Sandler & Peter Blanck, Accessibility as a Corporate Article of Faith at Microsoft: Case Study of Corporate Culture and Human Resource Dimensions, *Behavioral Sciences & the law*, 23(1), 39- 64 (2005).

[99] Adrienne Colella & Susanne Bruyere, Disability and employment: New Directions for Industrial and Organizational Psychology, in *APA Handbook of Industrial and Organizational Psychology*, Vol. 1: Building and Developing the Organization, at 473-503 (Sheldon Zedeck, ed., 2011) [Hereinafter "Colella & Bruyere"].

[100] Colella & Bruyere, *supra* at 491. *See also* Adrienne Colella, The organizational socialization of employees with disabilities: Theory and research. In Gerald Ferris (ed.), *Research in Personnel and Human Resources Management*, Vol. 14, 351-417, 353, 366 (1996) (citing studies of discrimination facing employees with disabilities and finding negative bias in performance expectations for persons with disabilities).

[101] *Compare* Sheldon Depo at 19 (nothing in Moss human resource file indicating that she was not meeting job performance expectations); *id.* 29-30 ("Q In October 2016, how long had [Moss] been employed by UH at that point? A Probably 19 years at that point. 19 or 20. Q In the 19 or 20 years that she had been employed there, nobody had ever expressed a concern or provided corrective action indicating that she could not perform her job duties, is that right? A Not that I'm aware of. Q There was no job duty at all that -- prior to her request for a CCTV in October 2016, there was no job duty that anybody at UH identified that she was unable to perform, is that right? A Not to my knowledge. I never found that, correct.").

---

for employees with disabilities.[102] They posit that subjective low performance expectations for employees with disabilities lead to these individuals having more adverse employment outcomes.[103] Thus, "despite good past performance, evaluators tend to hold unfairly low expectations about future performance. These *low performance expectations may be one reason why there is evidence that people with disabilities are prone to receive unrealistic feedback,* [and] *unsatisfactory growth opportunities*.[104]

In meta-synthesis review of the work experiences of employees with disabilities, researchers find in accord that, among other barriers, "[*r*]*egardless of [job] status, however, disability did act to stall or halt career development.*"[105] This conclusion is consistent with research on the attitudinal barriers by supervisors and others in the workplace facing workers with disabilities.[106]

---

[102] Colella & Bruyere, *supra* at 491-92 (citing meta-analysis, Lily Ren, et al., A Meta-Analysis of Experimental Studies on the Effects of Disability on Human Resource Judgments, *Human Resource Management Review*, 18, 191-203 (2008) [hereinafter "Ren *et al.*"].

[103] Colella & Bruyere, *supra* at 492 (acknowledging no direct research to date on this point, but "there is research that does suggest that people with disabilities experience these problems at work.").

[104] Colella & Bruyere, *supra* at 492 (emphasis added). In accord, a meta-analysis by Ren et al., *supra*, on performance evaluations of employees with disabilities finds often unfair low performance expectations for employees with disabilities are associated with less future employment opportunity.

[105] Rebecca Gewurtz & Bonnie Kirsh, Disruption, Disbelief and Resistance: A Meta-Synthesis of Disability in the Workplace, *Work*, 34:33-44, 34 (2009) [Hereinafter "Gewurtz & Kirsh"].

[106] *See, e.g.*, H. Stephen Kaye, et al., Why Don't Employers Hire and Retain Workers with Disabilities?, *Journal of Occupational Rehabilitation*, 21:526-536, 529 (2011) (study of attitudes in "ADA-recalcitrant" employers, such as reluctance to accommodate workers with disabilities, and finding common reasons for not retaining workers with disabilities include lack of awareness on how to handle worker's needs, concern workers acquiring disabilities will become liabilities, over accommodation costs, and over job performance, and belief person cannot do the job); Brigida Hernandez, et al., Reflections from Employers on the Disabled Workforce: Focus Groups with Healthcare, Hospitality and Retail Administrators, *Employee Responsibilities & Rights Journal*, 20:157-64 (2008) (finding persistent manager bias against workers with disabilities and that many workers with known disabilities usually did not advance within their organizations). *See also* Mohammed Ali, Lisa Schur, & Peter Blanck, What types of jobs do people with disabilities want? *Journal of Occupational Rehabilitation*, 21(2), 199–210, 205 (2011) (job preferences are similar between people with and without disabilities).

Studies support that employees with visual and other disabilities often are perceived not to "fit" within an organization, even though they have been performing their essential job functions with reasonable accommodation. This negative bias may be evidenced even when the employee with a disability has shown herself to be qualified for the job with reasonable accommodation.[107] Researchers conclude, therefore, having a disability may be "causally linked to suffering negative HR-related judgments."[108]

There is a body of research demonstrating the substantial attitudinal and organizational barriers faced by employees with visual impairments. Researchers find: "For people who are blind or visually impaired, the impact of employer attitudes has emerged as one of the most consistently identified and important barriers to employment."[109] One study examined the perceived employment barriers facing adults with serious visual impairments, finding these individuals reported systemic and attitudinal barriers to employment, such as evidenced by stigma and bias.[110] The majority of the participants in this study reported negative attitudes towards their visual impairment, "including limited expectations, stereotypes, and misunderstanding, as a major barrier to finding and keeping jobs."[111]

---

[107] *See, e.g.*, Ramona Paetzold, et al., Perceptions of People with Disabilities: When is Accommodation Fair? *Basic and Applied Social Psychology*, 30:1, 27-35, 33-34 (2008) (peers more likely to perceive unfairness in granting of an accommodation to another peer (*e.g.*, employee) with a disability, especially when the person receiving the accommodation is recognized as also being the top performer, and "unfairness perceptions could lead to negative treatment for the person with the disability.").

[108] Ren *et al.*, *supra* at section "5. Discussion.".

[109] Michele Capella McDonnall & Adele Crudden, Predictor of Employer Attitudes Toward Blind Employees, Revisited, *Journal of Vocational Rehabilitation*, 48, 221-31, 222 (2018) (citing studies in support). *See also* Michele C. McDonnall, Additional Evidence for the Validity of the Employer Attitudes Toward Blind Employees Scale, *Rehabilitation Counseling Bulletin*, 60, 155-62, 156 (2017).

[110] *See, e.g.,* Bonnie O'Day, Employment barriers for people with visual impairments. *Journal of Visual Impairment & Blindness*, 93(10), 627-642 (1999) (citing studies in support).

[111] O'Day, *supra. See also* Villanueva-Flores M., R. Valle-Cabrera, & M. Bornay-Barrachina, Career development and individuals with physical disabilities. *Career Development International*, 19(2), 222–243, 232, 235 (2014)

One study conducted in 2018, examined more than three hundred employers via their human resource professionals responsible for employment decisions, and their attitudes about employees with visual impairments abilities to perform essential work tasks. The findings show human resource professionals evidenced negative underlying attitudes (i.e., implicit bias) about the competence of employees with visual impairments as compared to sighted people.[112] Even for human resource professionals who rated their employees with visual impairments' "performance as above average had," there still was a negative "automatic association" against persons with visual impairments.[113] The researchers conclude societal views of persons with visual impairments "*are so strongly associated with lower competence that even those who know from personal experience that [persons with visual impairments] can perform well on a job (i.e., be competent) have difficulty associating [them] with positive competence words.*"[114]

The implication of this body of research is that, to counteract subjective and pervasive bias facing employees with visual impairments by supervisors and coworkers, directly observed behavior of how workers with visual impairments actually perform essential job functions is associated with more objective attitudes and job appraisals about employees with visual impairments.[115]

---

("findings support previous results reported in the literature demonstrating that many individuals with a disability do not have the opportunity to experience a satisfying career or achieve their full potential in organizational settings. … People with a physical disability perceive discrimination in their opportunities for professional development on account of their having a disability … managers need to determine whether the policies and practices of their organizations are actually discriminating against people with disability").

[112] Michele Capella McDonnall & Karla Antonelli, Employers' Implicit Attitudes About the Competence of People who are Blind, *Rehabilitation Psychology*, 63, 502-11 (2018).

[113] McDonnall & Antonelli, *supra* at 508 (citation omitted, emphasis added).

[114] McDonnall & Antonelli, *supra* at 508 (citation omitted, emphasis added).

[115] McDonnall & Antonelli, *supra* at 509.

University Hospitals human resource staff Sheldon testified that besides the accommodation for Moss of the CCTV:[116]

> Q  When did other accommodations become an issue? Who had an issue with them?
>
> A  Kathy Holley, the manager.
>
> Q  When did Kathy Holley first raise a concern about other accommodations?
>
> A  I would say -- I wouldn't phrase it that she has a concern with other accommodations. There's a concern for the safety of Ms. Moss and others, including the patients, and the ability to perform the essential functions of her job.
>
> Q  When did that concern arise?
>
> A  2016 [before October 2016].
>
> …
>
> A  I think the first initiation or the first comment was before that. A concern when Deb Moss ran into someone that she didn't see coming.
>
> …
>
> Q  Tell me what you were aware of and how you were made aware of it.
>
> A  I was made aware by the manager that Debbie ran into someone who she didn't see coming.
>
> …
>
> Q  What kind of investigation did you do of this running into somebody in the hallway?
>
> A  We investigated the concern. Discussed the concern of a vision issue.

---

[116] Sheldon Depo at 32-34. *Id.* at 45 ("Q You're not aware of any instance in which a code violet was called and Ms. Moss failed to appropriately perform, are you? A I know that there was a situation where there's been a code and she walked into a threatening situation unaware of the situation. Q Was it a code violet? A I believe it was, yes. Q What exactly happened and who told you that? A Kathy Holley. She was interacting with the patient. Q When was this and who told you about it? A Kathy Holley told me about it and I don't know the date. Q It was a code violet? A I believe so. I can't say for sure. It was a threatening situation. Q What happened? Was anybody hurt or injured? A Kathy Holley would have the details of that.").

…

Q  Was that Kathy Holley who raised the concern about running into somebody in the hallway?

A  Yes.

Holley testified:[117]

Q  … have you ever supervised individual employees with disabilities apart from Deborah Moss?

A  No.

…

Q  Do you have any experience identifying reasonable accommodations for employees with disabilities?

A  So if I saw that someone was in some type of mobility scooter and needed a ramp, is that -- I mean, that would be an accommodation. I guess it would depend on the disability.

Q  Prior to this case, had you had any experience participating in interactive process discussion with an employee to identify reasonable accommodations?

A  No.

Holley testified she had never supervised a hospital employee with a disability, and not with a visual impairment, other than Moss. In my research and experience, among the strongest predictors of effective supervision and reasonable accommodation of an employee with a disability are: (1) prior contact with employees with disabilities, and (2) adequate training and

---

[117] Holley Depo at 9-10.

engagement by supervisors in the accommodation process. It appears that Holley did not have experience in either of these areas as applied to Moss.[118]

Evans concluded "there is little that can be done to accommodate the variability of a psychiatric patient population for someone [Moss] with such significant vision deficits." This generalized inference was made by Evans without observation of Moss conducting essential job functions, which is in contradiction to standard practice in the reasonable accommodation assessment process. Moreover, it is not apparent that Evans was sufficiently qualified, had the training and experience involving employees with visual impairments, and used a validated assessment to review of Moss's specific accommodation needs and implementation. As an employee of University Hospitals, it is also not apparent from the materials I reviewed how Evans was instructed to be sufficiently objective in her analysis.

In light of findings from the above-referenced body of study, my research and practical knowledge, Evan's assessment of Moss's job performance competencies likely was not practically valid and reliable. Evans report was deficient because Evans did not observe Moss

---

[118] *See, e.g.,* Holley Depo at 65-66 ("Q … When you first became a manager with supervisory responsibility in the UH system, did you receive any training on how to handle disability accommodation requests? A Over the years I have had training about disability requests. Q Would that be training from UH or was that training in your prior position at Cleveland Clinic? A It's been at both. Q Tell me what you learned from UH in your training about disability accommodations. *A You make accommodations when we are able to make the accommodations. And basically we work with H.R. If an employer requests something we involve H.R..*" (emphasis added). Id. at 72 ("Q … Were you aware at this point of any determination or written indication in any performance evaluation that Ms. Moss was not able to perform the essential functions of her job? A No. Q Did Ms. Moss get that updated Topaz? A No. The timing of it, no. Q So she didn't get it in October 2016; correct? A No, she did not get it in October. Q She didn't get it in November 2016; correct? A No. Q December 2016? A No. Q January 2017? A No. Q Did you follow-up with anybody at H.R. on the status of this accommodations request? A I don't believe I followed up on this request. There are several steps and so I just assumed it was going through the process. Q Okay. A I had no reason to think she wasn't going to get this. Q What did you think about the request for accommodations? … THE WITNESS:· I submitted it. I felt that she needed it to do that part of her job. *Q At that point with that specific accommodations request, what was your role within the decision making process about whether that request would be granted or not? A I don't know that I had any decision making in that process.*").

directly in her conduct of her essential duties in the job at question.[119] Moreover, Holley testified she was not aware if Evans had ever supervised recreational therapists at University Hospitals, or if Evans had any experience assessing and working with hospital employees with visual impairments.[120]

Moss testified she performed the essential functions of the rehabilitation therapist position to observe and assess patients in her therapy group, "[t]hrough interaction, questioning, getting up, moving around the room at times, just, again, observing."[121] Moss testified that she may effectively assess if her patients were agitated, for example, "[i]f they are fidgety, restless, sometimes verbal, if they are calling out or starting to get a change in their tone of voice."[122] Holley testified she did not have discussions with Moss about her observations or concerns following "Code Blue" all staff responses to a patient incident (note, "Code Violet" is response for an agitated patient).[123]

When asked by Holley, Moss stated she disagreed with Holley's assertion that Moss was not able to recognize when assistance by a patient was needed during therapeutic activities (e.g., during Bingo game):[124] "I was taking a passive approach. … That patient in particular could

---

[119] *See, e.g.,* Moss Interview ("I did not request that additional staff members assist me as a recreational therapist at University Hospitals.").
[120] Holley Depo at 175-76.
[121] Moss Depo at 41. *See also* Sheldon Depo at 65, 77.
[122] Moss Depo at 42. *Id.* 42-43 (Moss also effectively working with nonverbal patients by observing if they nodded their heads or wrote comments). *Id.* at 55 (in January 2017, Holley told Moss she had "concerns" about Moss's ability to perform her essential job functions, and Moss responded that she was able to perform her essential job functions). *Id.* at 57-58 (Moss disagreed with Holley's conclusion that Moss could not recognize when assistance by a patient was needed during a bingo game activity: "I was taking a passive approach. … That patient in particular could often monopolize group, so I was just being more passive with him and just providing some reassurance with maybe a yes or good job."
[123] Holley Depo at 80-82.
[124] Moss Interview.

often monopolize group, so I was just being more passive with him and just providing some reassurance with maybe a yes or good job."[125] Moss testified that she was able to recognize whether a patient was experiencing an active hallucination.[126] Moss testified that during her employment at University Hospitals, there was no event during her therapeutic sessions in which she was not able to effectively respond to her patient's needs.[127]

Recognizing the essential job functions of Moss's position include direct patient care, it is not consistent with research and practice to conclude *per se*, particularly in the absence of direct observations of those duties, as Evans did, that "there is little that can be done to accommodate the variability of a psychiatric patient population for someone [Moss] with such significant vision deficits."[128]

In addition, the mandatory Fitness for Duty assessment of Moss is medically-driven process, generally and substantially different than the reasonable accommodation and interactive process. Moss was required to submit to a unilateral and mandatory medical Fitness for Duty examination, which required Moss to be "taken off work."[129] Aspects of the Fitness for Duty examination (e.g., drug testing and psychosocial review) bear no relation to the reasonable accommodation interactive process.

---

[125] Moss Depo at 57-58. *Id.* at 76 (Moss testified that she did not have concern about being able to react in a crisis situation that may involve a violent patient outburst).

[126] Moss Depo at 79.

[127] Moss Depo at 82. *Compare* Holley Depo at 126-32.

[128] *See* Holley Depo at 173-74 (it was "not seen as a viable option" to assess Moss's visual impairment on site, also because it "would have involved a lot of different releases of information and approvals from the patient and the families themselves as well.").

[129] Kohlbacher Depo at 11.

Moss was taken off work after she requested reasonable accommodations and before University Hospitals had responded to the accommodation requests; for example, the initial accommodation request to replace existing equipment was in September 2016, and in February 2017 before acting on the accommodation request the Fitness for Duty examination was initiated).[130] University Hospitals Human Resource staff, Sheldon, testified: [131]

> Q  Was the fact that Ms. Moss had requested an accommodation a factor in UH's decision to do the fitness for duty exam?
>
> A  Again, I think it was timing.
>
> Q  Could you explain what you mean by --
>
> A  All the factors coming into play. The new manager, the change of patient demographics, higher acuity of the patients, increased violent behavior by the patients, and a growing concern by the manager for her ability to safely and effectively perform the essential functions of the job.

As said, there appears a likelihood for uninformed bias by Evans in her accommodation analysis, which is further exacerbated in the present situation where supervisor Holley and human resource personnel, and co-workers, had limited knowledge and experience with job accommodations for a person with visual impairments, and in the absence of documented training on the matter.[132] This conclusion is consistent my experience and research, and that of others, on the accommodation and interactive process for individuals with visual impairments.[133]

---

[130] Moss Interview.

[131] Sheldon Depo at 88 (noting the timing of Moss's accommodation request and her mandatory Fitness for Duty examination). *See also* Kohlbacher Depo at 11.

[132] Michele Capella McDonnall & Adele Crudden, Predictor of Employer Attitudes Toward Blind Employees, Revisited, *Journal of Vocational Rehabilitation*, 48, 221-31, 222 (2018).

[133] Michele Capella McDonnall, Jamie O'Mally, & Adele Crudden, Employer Knowledge and Attitudes Toward Individuals who are Blind or Visually Impaired as Employees, *Journal of Visual Impairment & Blindness*, 108, 213-255 (2014) (emphasis added and citing studies in support). *See also* Michele Capella McDonnall, et al., Predictors of employer attitudes toward people who are blind or visually impaired as employees, *Journal of Vocational*

Thus, in the absence of an objective and meaningfully individualized job assessment of employees with visual impairments, employers often resort to unwarranted reliance on misinformed biases[134] about the job abilities of people with visual impairments. This bias may be mitigated when decision-makers are held accountable through fair and objective policies and practices.[135] This is important because researchers find managers and coworkers often treat employees with visual disabilities differently based on personal discomfort and negative assumptions and misconceptions about their abilities.[136]

Holley testified she relied the generalized impressions of Moss's coworkers in assessing Moss abilities to perform essential job functions:[137]

> Q  Had you gotten feedback from any other member of the treatment team relaying any concerns or expressing any opinions about Ms. Moss' performance or her contributions?
>
> A  The one thing that I recall from earlier on in my employment there was that there were staff members that would tell me they would not leave Debbie Moss alone in the group room with a group.
>
> Q  Who told you that?
>
> A  I had PCAs, Patient Care Assistants, were the primary people. Some of the nurses.

---

*Rehabilitation*, 42, 41-50, 42 (2015) (citing studies showing negative attitudes towards employees with disabilities as linked to discrimination in job promotion).

[134] *See, e.g.,* Linda Krieger, The contents of our categories: A cognitive bias approach to discrimination and equal employment opportunity, *Stanford Law Review*, 47, 1161-248 (1995).

[135] *See, e.g.,* Leonard Sandler & Peter Blanck, *supra*.

[136] *See, e.g.,* Robert & Harlan *supra*, at 608 ("some supervisors are so uncomfortable around workers with disabilities, particularly those with visible or life-altering impairments, that they reportedly avoid interacting with them."). *See also* Schur, et al. supra (2017) (citing Lisa Schur, Douglas Kruse, & Peter Blanck, Corporate culture and the employment of persons with disabilities, *Behavioral Sciences and the Law*, 23, 3–20 (2005).

[137] Holley Depo at 40-41.

Holley testified her coworkers approached her to express concerns as to whether Moss was safe in the group room with the patients.[138] It appears that Holley did not know if Moss's coworkers in fact ever raised such concerns with Moss, or asked Moss for her input as to whether she had, or had experienced, concerns about her safety when working with patients. Holley testified she did not take measures to include Moss in such discussions, other than "[t]hese were the employees coming to me about their concern."[139]

Holley testified as to her hypothetical concerns that Moss's visual impairment was raising essential job performance concerns:[140]

Q  Was there anything else prior to October 2016, any other incidents that gave rise or any other concerns that you had about Ms. Moss' ability to perform her job?

A  I was concerned that Debbie Moss' lack of visual acuity was compromising her ability to really assess the patients, how fully could she assess them and, you know, frankly her overall safety on a unit that was unpredictable.

Q  What did you know about her vision acuity?

A  *I didn't know specifics about it.* I knew she didn't have full visual acuity. I knew that she needed the monitor. Documentation had to be done in her office because we had talked about the use of Workstations on Wheels. We were preparing for changes with systems. So there was discussion about equipment.

…

Q  … why would you mention Workstations on Wheels and system changes? How did that have anything to do with Ms. Moss?

A The push was for staff to be at the bedside documenting and that included being able to use the electronic medical record at the bedside and we had these carts called Workstations on Wheels.

---

[138] Holley Depo at 87.

[139] Holley Depo at 87. *Id.* at 98 (Holley did not initiate discussion or debriefing with Moss as to the patient agitation episodes).

[140] Holley Depo at 111-12, 116-17 (emphasis added).

Q  Why did you think that Ms. Moss' visual impairment would cause that to be a concern?

A  She told me she needed her specialized monitor.

…

Q  … So you just mentioned this electronic system and having like carts to bring this electronic equipment around. You anticipated this would be something that would raise a concern for you about Ms. Moss' vision impairment would impair her ability to use that system; is that right?

A  *I didn't know. We didn't know how that would work.*

Q  So that was a hypothetical risk then, it wasn't one that was actually realized that Ms. Moss was not able to access that electronic equipment; correct?

A  *Correct.*

Q  Nobody at UH to your knowledge initiated an interactive process to make a decision or identify proposed accommodations, did they?

A  We weren't at that point.

Research examines the importance of the reasonable accommodation interactive process, which involves good faith, bi-lateral, communication by the parties.[141] Research shows the benefits of the interactive process in the accommodation process for people with visual

---

[141] *See generally* Lisa Schur, Douglas Kruse, & Peter Blanck, *People with Disabilities: Sidelined or Mainstreamed?* (2013). *Compare* E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014) ("The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues. See 29 C.F.R. § 1630.2(o)(3). It requires bilateral cooperation and communication."). *Id.* ("it is imperative that [the parties] have a duty to engage in good faith, and that empty gestures on the part of the [covered entity] will not satisfy the good faith standard. … [for example] for the purpose of discussing alternative reasonable accommodations").

disabilities.[142] Studies show that organizations often reasonably accommodate individuals with disabilities across a wide range of unique situations.[143]

Researchers and practitioners also benchmark effective practices and policies that facilitate the accommodation of persons with visual disabilities.[144] Among other factors, staff training and attitudes about accommodation,[145] play a central role in determining whether individuals are accommodated effectively and able to perform essential job functions. Well-recognized practices in the accommodations process that University Hospitals may have pursued in this matter, include:

- analysis of Moss essential job functions considered in an individualized and objective manner, with direct observation of how Moss actually performs essential job tasks (e.g., using a standard worksite assessment or observation during trial work period);

   o for example, to conduct a reliable and valid job analysis of Moss using "Job shadowing," which is a well-recognized method by the Equal Employment Opportunity Commission ("EEOC"),[146] the Lighthouse (i.e., providing people

---

[142] *See, e.g.,* Peter Blanck, Americans with Disabilities and their Civil Rights, *University of Pittsburgh Law Review*, 66, 687-719, at 687-719, 706-707 (2005).

[143] *See* Peter Blanck & Helen Schartz, Special Issue: Corporate Culture and Disability, *Behavioral Sciences and the Law* 23: 1–2 (2005) (co-sponsored by U.S. Department of Education to increase dialogue among organizations, persons with disabilities, policymakers, and researchers, and, enhance study of culture and persons with disabilities). My colleagues and I examine role of organizational culture in programs for people with disabilities and how it may facilitate accommodation and inclusion opportunities. *See, e.g.,* Lisa Schur, Douglas Kruse, & Peter Blanck, Corporate Culture and the Employment of Persons with Disabilities, *Behavioral Sciences & the Law*, 23(1), 3-20.

[144] *See, e.g.,* Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture, at Appendix A: Inclusive Employment Benchmarks (available at: http://www.dol.gov/odep/research/CorporateCultureAppendixA.pdf); *see also* Peter Blanck, Merrill Lynch Global Philanthropy, Corporate Culture and Disability Symposium (2003).

[145] Culture and climate are similar concepts. *See, e.g.,* Schur et al., *supra*.

[146] *See, e.g.,* Barrier Analysis: Questions to Guide the Process; at: https://www.eeoc.gov/federal/directives/barrier-analysis.cfm. ("3) Does the agency offer training and development opportunities to its employees? (e.g., career development programs, job shadowing, details, special assignments, other).)" *Id.* ("1) Does the agency survey its

who are visually impaired skills for maximum independence[147]), researchers,[148]

and practitioners, as reported in leading journals such as the *Journal of Visual*

*Impairment & Blindness*.[149]

- ■ meaningful input by Moss about her successful or preferred accommodations in a good

  faith interactive dialogue, with observation of how Moss uses or may use the proposed

  accommodations;

- ■ consideration of alternative means to implement reasonable accommodations for Moss

  that allow her to perform essential job functions, and not create program or safety

  hardships;[150] and,

---

employees to ensure that their current skills will meet agency mission needs?"). *See, e.g.,* Jaimie Ciulla Timmons, Doris Hamner, & Jennifer Bose, Four Strategies to Find a Good Job: Advice from Job Seekers with Disabilities Institute for Community Inclusion (2003), at:
https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1373&context=gladnetcollect

[147] *See* The Lighthouse, at: http://www.lvib.org/programs/vocational-rehabilitationjob-readiness/ ("The Vocational Rehabilitation Program (Job Readiness) provides individuals who are blind and visually impaired with training and skills that enable them to confidently and effectively acquire and retain competitive employment. National statistics indicate that there is an over 70% unemployment rate among individuals with visual impairments. Through training and public awareness/education efforts, the Lighthouse is working to ensure individuals have opportunities to engage in employment. This program covers elements such as: … ■ Job shadowing … ■ Worksite accommodations").

[148] *See, e.g.,* Michele C. McDonnall, Li Zhou, Li, & Adele Crudden, Employer attitudes towards persons who are blind or visually impaired: Perspectives and recommendations from vocational rehabilitation personnel, *Journal of Rehabilitation*, 79(3), 17-24, at 21 (2013).

[149] *See, e.g.,* Jamie O'Malley & Anne Stevenson, Reflections on Developing an Employment Mentoring Program for College Students Who Are Blind, *Journal of Visual Impairment & Blindness (Online); Huntington* Vol. 111(3), 271-76 (2017).

[150] *See, e.g.,* Disability Case Study Research Consortium, Conducting and Benchmarking Inclusive Employment Policies, Practices, and Culture, at Appendix A: Inclusive Employment Benchmarks (available at: http://www.dol.gov/odep/research/CorporateCultureAppendixA.pdf); Peter Blanck, Merrill Lynch Global Philanthropy, Symposium, *supra* (2003). My research also examines verbal and nonverbal communication in clinical context. *See, e.g.,* Miron Zuckerman, Peter Blanck, Bella DePaulo, & Robert Rosenthal, Developmental changes in decoding discrepant and nondiscrepant nonverbal cues, *Developmental Psychology*, 16, 220-28 (1980); Peter Blanck & Robert Rosenthal, Developing strategies for decoding "leaky" messages: On learning how and when to decode discrepant and consistent social communications. In R. Feldman (ed.), Development of nonverbal behavior in children. 203-29 (1982); Peter Blanck, Ross Buck, & Robert Rosenthal, Peter Blanck, Ross Buck, & Robert Rosenthal (eds.), *Nonverbal communication in the clinical context* (1986).

---

■ consideration of disability and visual awareness training for unit staff, and for a new unit manager Holley, with an associated accessibility audit of unit premises (e.g., lighting, and wall and floor contrast).[151]

The Job Accommodation Network ("JAN") provides free "Accommodation and Compliance Series: Employees with Low Vision,"[152] which provides such information to employers for accommodations. JAN suggests supervisory personnel and co-workers often benefit from training to implement reasonable accommodations for workers with low vision.

For among these reasons, Holley and staff at University Hospitals were deficient in their job performance review and accommodation process for Moss. Essentially, they used a unilateral and medicalized mandatory Fitness for Duty examination as the basis of their review process.[153] As said, a Fitness for Duty examination (often part of a "Employee Assistance Program" or "EAP") is a "work-based "intervention program designed to assist employees by way of counseling in resolving personal problems (e.g., marital, financial or socioemotional and family issues) that may be adversely affecting the employee's performance."[154]

---

[151] *See also* Cleveland Sight Center, *supra*, Blindness Basics, see, e.g., http://neocmn.org/PDF/Blindness%20Basics%20home%20health%20and%20Assisted%20living%20staff%20-%206.pdf (e.g., What Can You Do? • Consider having disability and visual awareness training for your staff as part of new staff orientation and ongoing manager's responsibilities. • Consider having an access audit of your premises. • Ensure that your communication channels allow people with sight loss to fully access all your services. • If you have a website, make sure that blind and partially sighted people can access it.").

[152] Available at: https://askjan.org/publications/Disability-Downloads.cfm?pubid=966838 (Publication Updated 01/24/2019). *Id.* at 8 (analogous to the present matter, individual worker had low vision and was "having problems reading printed paper copies. A portable magnifier and a CCTV were used to magnify materials.").

[153] *See* Sheldon Depo at 30 ("Q Explain to me, what is the EAP and when and why would they be involved in this case? A The EAP's an employee benefit. It provides counseling and other services, support programs, to assist the employees. They're also used in cases where there might be a need to -- there are self-referrals and there are mandatory referrals. Q This was a mandatory referral [for Moss], is that right? A It was.").

[154] *See, e.g.,* Job Accommodation Network (JAN), at https://askjan.org/solutions/Employee-Assistance-Program.cfm?cssearch=2066518_1.

Holley made subjective determinations about Moss's ability to perform her essential job functions. Holley relied on uninformed and undocumented co-worker impressions as to capabilities of Moss as an employee with a visual impairment, who for years was reported to exceed her job performance expectations. Holley's testimony speaks to the potential for explicit and implicit bias towards Moss on the basis of her visual impairment.[155]

Q  Do you know if Ms. Moss has visual perceptions in her peripheral vision?

A  That's why I needed the Fitness for Duty. I didn't know.

Q  What specifically did you need to know about her vision?

A  I needed to know what her visual abilities were and what the limitations were, if there were any.

…

Q  … Was there any instance you can recall where Ms. Moss failed to identify a patient in distress?

A  So again, it was a concern because I know my patient population and what can occur.

Q  … there is not a specific incident that you thought Deb Moss has failed to identify a patient in distress?

A  I can't give you a specific incident.

…

Q  Was there any instance that you are aware of, during the 13 months that you were Ms. Moss' · supervisor, where Ms. Moss failed to identify a patient who was causing harm to self or others?

A  So again, I don't have a specific instance.  Knowing my patient population and the risks, I needed the Fitness for Duty to understand what was happening and what we needed to do.

---

[155] Holley Depo at 159-60 (emphasis added).

Q  Was there any instance that other staff members had brought to your attention involving Ms. Moss' failure to identify a patient causing harm to self or others?

*A  No.*

Holley's bias and non-validated perceptions are further reflected in her testimony:[156]

Q  Were there any instances where Ms. Moss failed to recognize or properly assess distractions or hallucinations that you are aware of?

A  So again, *I can't speak specifically to that because I did not see her do all of her assessments. But again the concern knowing the patient population is there.*

Q  Did anybody else specifically raise that concern to you that you know anybody, other members of the treatment team, to say Hey, Deb Moss missed this?

A  No.

Based on the materials I have reviewed, my knowledge and expertise regarding employees with visual impairments, and my interview with Moss, I conclude that there was no adequate factual basis for University Hospitals to find that Moss was not a qualified employee with a disability who was able to effectively and safely perform the essential functions of her job.

Holley and University Hospitals conducted a deficient job performance and accommodation assessment of Moss. Holley's testimony supports my conclusion; specifically, that Moss's job performance and accommodation process was based generalized and speculative concerns about Moss's safety or other employment issues, which were not borne out by Moss's actual work performance.[157]

---

[156] Holley Depo at 165-66 (emphasis added).

[157] Holley Depo at 181-84 (emphasis added). *Id.* at 192-93 ("Q Statistically, was there any hard evidence that more falls occurred during Ms. Moss' sessions or during the period where she was primarily responsible for patient safety? A I would have to go back and check that. I don't have that off the top of my head. Q As part of the Fitness for Duty process, did you check that data? A No. Q Why not? A My concern was not specifically the falls, it was Deb's overall safety on the unit. Q What did you fear for her safety on the unit? A I was afraid she was going to get hurt. Q

Q  During the 13 months that you were supervising Ms. Moss on this unit, was there any instance in which Ms. Moss had failed to identify a safety risk that posed a fall risk?

A  *Not that I can speak specifically to.*

Q  Can you identify a single instance in which Ms. Moss' vision impairment led to her failing to perceive an elopement risk?

A  *Not that I can speak specifically to.*

Q  Is there any instance in which Ms. Moss failed to identify or recognize a patient experiencing internal stimuli that you are aware of?

A  With her visual impairment, I'm not sure what she missed or didn't, you know, wasn't able to see because of that. I wasn't always present so no, *I can't really say specifically.*

…

Q  Did Ms. Moss' vision impairment prevent her from doing any of those [recreational therapy] activities [such as chair exercises, lifting and moving limbs as patients are seated] with patients?

A  She tended to do the activities she felt comfortable and safe doing. So from that standpoint I would say no because she was comfortable and safe doing them. *I can't speak to some of the other activities that occurred on the unit.*

Q  Were there any required activities that she was unable to do that she was required to do?

A  *I didn't have a requirement.*

Holley, and University Hospitals, also rejected the possibility of advice from local experts in her review of Moss's job performance and accommodations. Holley and Kohlbacher did not

---

How would she get hurt? A Primarily my concern at that point was being assaulted by a patient. Q How often did patient-staff assaults occur during the 13 month period that you were there and supervising Ms. Moss? A So not all assaults are reported. It's something that we have worked on. So I don't have clear data about a number. But we did know that the number -- initially the number of codes during some of that time frame were increasing. Q The number of codes increasing, that's not something you are attributing to Ms. Moss' visual impairment; correct? A I'm attributing it to the overall acuity of the unit. Q Was Ms. Moss ever assaulted or have any close calls that you are aware of during the 13 months that she worked there under your watch? A Not that I'm aware of.").

allow the Cleveland Sight Center staff to conduct an onsite job performance and accommodation review of Moss, and when presented with recommendations from the Cleveland Sight Center apparently disregarded those recommendations. This was because, as Holley testified: "As manager of the unit, *it's my unit.*"[158] Holley testified:[159]

> Q  So the Cleveland Sight Center though, they suggested that these auditory compensation techniques and assistance from staff and nurses that those would be a reasonable accommodation to do her work. Do you believe those were not sufficient?
>
> A  *They were not sufficient.*
>
> Q  Who made that determination?
>
> A  *So I did. As manager of the unit, it's my unit and given the information I'm the one· who has to say yes this will work or no this won't work.*
>
> Q  Do you think patient safety was compromised for the 13 months before the Fitness for Duty Exam?
>
> A  *I can't say that it wasn't compromised. I can't.*
>
> Q  Can you think of an instance – particular instance in which it was compromised?
>
> A  *I cannot think of a particular instance. That's what I was trying to prevent.*

Holley took it upon herself, because it was "her unit," to be the sole judge of Moss's job proficiency and accommodation needs, despite objective information to the contrary. The result was an incomplete, and likely unfounded, determination that led to Moss's termination. This decision was despite the fact that Moss was a longstanding employee with a visual impairment who had successfully performed her job, with no information documented in the Fitness for Duty

---

[158] Holley Depo at 204-05 (emphasis added).
[159] Holley Depo at 204-05 (emphasis added).

Evaluation or otherwise that her work performance was inadequate.[160] EAP lead Kohlbacher

testified Moss likely was the first case of an employee with a visual impairment with who she

had worked.[161]

When considering the factors I have reviewed in this report, it is reasonable to conclude a

likely determinant of Moss's deficient job appraisal process and ultimate termination included,

among other factors:

- hiring of new unit manager Holley, with no prior experience working with employees

  with visual disabilities such as Moss;

  - and because of that lack of experience and training, potential for attitudinal bias

    by Holley towards Moss;

  - in the context of a new hospital owner requiring unit staff reductions;

  - in the context of new hospital management believing there were changing patient

    demographics and behavior;

- generalized assumptions about Moss's job abilities, as a person with a visual impairment,

  which were not based on direct observation and actual patient direct care activity;[162]

  - conducted in the absence of a valid and objective job assessment and

    accommodation process; and,

  - in contradiction to Moss's successful job performance, with aid of assistive

    technology and reasonable supports (e.g., assistance reading emails);

---

[160] *See also* Holley Depo at 221 ("Q As part of the Fitness for Duty evaluation process, did you seek input from other staff who worked with Ms. Moss about whether they had any concerns with her ability to do her job? A No.").
[161] Kohlbacher Depo at 59.
[162] *See* Sheldon Depo at 155-56.

- with human resources staff not aware Moss ever requested "another" staff member to assist in her therapeutic care duties;[163]

- driven by "concerns" from two or three isolated occurrences reported by Holley, which were not adequately investigated, or deemed necessary to review by human resources (i.e., Moss (1) bumping into staff member in hospital hallway,[164] (2) walking into room in which Holley was with a patient in an agitated state,[165] and (3) not being aware of patient during a "Bingo" game[166]);

■ with Holley as the source of information, which was relied upon by Sheldon and others to

---

[163] *See* Sheldon Depo at 122.

[164] *See, e.g.,* Sheldon Depo at 157 ("Q The instance of bumping into somebody in the hallway, she wasn't written up for that. There was no documentation of that, correct? A Running into somebody is not a violation of a policy. So you would not be written up for that. Q The scenario you talked about, you said if somebody's walking towards you and you bump into them, that you might not have seen them, is that correct? A That's what I said, yes. Q What about the other person walking towards her? Maybe they didn't see her, correct? A That could be too.").

[165] *See* Sheldon Depo at 45 ("Q You're not aware of any instance in which a code violet was called and Ms. Moss failed to appropriately perform, are you? A I know that there was a situation where there's been a code and she walked into a threatening situation unaware of the situation. Q Was it a code violet? A I believe it was, yes. Q What exactly happened and who told you that? A Kathy Holley. She was interacting with the patient. Q When was this and who told you about it? A Kathy Holley told me about it and I don't know the date. Q It was a code violet? A I believe so. I can't say for sure. It was a threatening situation. Q What happened? Was anybody hurt or injured? A Kathy Holley would have the details of that."). *Id.* at 152-153 (Sheldon could not recall if this involved a "Code Violet" alert or not). *Id.* at 155-56 ("

[166] *See, e.g.,* Sheldon Depo at 118-19. *Id.* at 150-52 ("Q So this concern about bingo -- how was this concern validated, by the way? How do we know that Ms. Moss couldn't see the patient trying to get her attention? How do we know that it's a concern that another patient is reading his bingo numbers? A How was it identified? Q Yes. A It was witnessed. Q Who witnessed it? A You would have to ask Kathy Holley."). Q Had you reviewed Ms. Moss' -- I mean you did say you reviewed Ms. Moss' prior performance evaluations, correct? A I did. Q She had sterling reviews on -- specifically on her ability to organize group activities and differentiate group activities, correct? A Yes, she had very good reviews. There were some concerns about improving engagement with the patients and a focus on safety. Q What was the specific safety concern that was raised? A I don't think there was a specific concern. Q In fact, the performance evaluation, like most evaluations, always says here's something to work on, right? There was always going to be something listed as something to work on, correct? Goals for the next year? A Likely, yes. Q Yes. Okay. But with respect specifically to Ms. Moss' ability to engage in group activities, this was something that she had developed a great reputation for over her 19 years, correct? This was the thing she was best at, right? A The documentation of her evaluations were all good, yes. Q Okay. *A No one's saying she was a bad employee.*") (emphasis added). *Compare* Holley Depo at 75-79, 85-88 (Holley reported that staff (apparently unnamed) relayed concerns to her about Moss's safety). *See also* Kohlbacher Depo at 54 (Holley was sole source of information to her about Moss's reported employment deficiencies, and nobody else referred these issues).

---

believe there were job performance issues presented by Moss;[167] and thus,

- a generalized "concern" (i.e., by Evans without direct observation of Moss in her job) driven by Holley, and directed to University Hospitals human resource staff to conduct a mandatory Fitness for Duty examination of Moss.[168]

Taken together, and in light of research and practice, an likely alternative explanation for Moss's termination is that, once Holley arrived as the new unit manager, Moss did not have a fair chance of demonstrating her essential job function proficiency because of generalized associations with her visual impairment,[169] which apparently only were reported by Holley.[170] This faulty logic was in contradiction to Moss's longstanding successful job performance with

---

[167] *See* Sheldon Depo at 42-44 ("Q So where and how did you gain knowledge that the acuity level was higher? A From the leadership. Q Who specifically told you that? A Kathy Holley. Q Kathy Holley, who's only -- she's a new manager, though? A Uh-huh. Q So Kathy Holley – A She would have access to the information about the patients. I wouldn't have that. … *Q But Kathy Holley's your source of information for the concept that there's a higher acuity at this facility, is that right? A Correct. Q Any other source of information for that? A No. Q Younger patients. How do you know that and what do you mean by that? A Again I would know that from Kathy Holley, that there would have been more geriatric -- when I say -- older geriatric patients.· And I don't have the numbers of the ages of those patients, but they were becoming younger.* Q Can you give me a sense of the timescale of when that transition happened?· Was it abrupt, or was it gradual? A I don't know. Q Do you know when it started? When the trends started. A I believe once University Hospitals had taken over. Q Once again, that started January 1, 2014, is that right? A Correct. Q Violent behavior. What do you mean by that? A More -- when I talked about the code violets, that's when a code is called because a patient is exhibiting violent behavior, threatening behavior. In 2016 there were 15 code violets and by May of '17, there had already been 12 in those five months.") (emphasis added).
[168] *See also* Sheldon Depo at 88.
[169] *See also* Sheldon Depo at 91-92 ("Q Okay. What sources of information did UH rely on in determining that Ms. Moss could not perform the first essential duty in her job position, performing assessments for functional rehabilitation needs? *A Let me say first that Kathy Holley, the manager, would have been the one that would have done the job -- done the performance evaluation and followed this process. She could speak to what validation methods she used.* Q Okay. A And then there was concern over the ability -- there wasn't a blanket statement that she could not perform all of the essential functions. There was a concern over which ones she could effectively do with or without reasonable accommodation. *Q That concern was based on Ms. Moss' vision, correct? A Absolutely. Q· ·Her vision acuity? A Yes.* Q It wasn't based upon a patient quality outcome data or patient satisfaction survey or a chart review, correct? A Again, *Kathy Holley would have to speak to the method in which she evaluated performance. The concern was related to a vision issue.* Q Okay. A The ability to effectively perform the functions.").
[170] *See* Sheldon Depo at 161 ("Q Did you ever observe Ms. Moss working in her job before she was removed from work? A I did not. Q EAP didn't either, right? A No. That's not part of our role. No. Q Allison Evans didn't observe her. Kathy Holley is the only witness observer participating in this fitness for duty process that had ever actually observed Ms. Moss working, is that correct? A Part of this process, yes.").

reasonable accommodations.

Sheldon's testimony is in accord with such generalized assumptions, which often is faced by employees with visual impairments such as Moss:[171]

> Q  How serious is that of a concern, somebody bumping into somebody in a hallway?
>
> *A  Bumping into someone is not a concern. It creates the awareness of a concern, that if you can't see someone, you run into them, what else are you not seeing?*
>
> Q  … What's the concern about bumping into people in the hallway?
>
> *A  It demonstrates that you cannot see someone coming toward you. … Therefore, if you're interacting with patients, how do you see them? How do you read the treatment plan? How do you identify them? How do you identify the reception to the therapies that are being administered?· Is it effective? Are they escalating? Are they hallucinating? Are they staring off?· Are they crying?*
>
> Q  So once you find out that somebody has that vision impairment, all sorts of other questions arise in the mind that haven't arisen before, correct, about somebody's ability to do the job?
>
> *A  That's one of those. It's a clue. Yes, it is.*

Moss's "hall bumping" apparently was a forbearer to Sheldon's conclusion that, despite her past exemplary employment record, Moss was no longer capable of performing essential job functions as required of a certified recreational therapist.

According to Sheldon, Moss's visual impairment was the "clue" to the purported undue burden and safety challenges raised by Moss's continued employment. In Sheldon's words, the *"clue"* of disability led Holley, Sheldon, Evans, and Kohlbacher to embark on requiring Moss to submit to medical exams and a medical Fitness for Duty appraisal that required Moss

---

[171] Sheldon Depo at 155-56.

mandatorily to "take off work" or deal with the "consequences" of probable termination.[172] It seems the search was on for reasons to prevent Moss from returning to work, rather than on a meaningful analysis of Moss's actual job qualifications (e.g., through direct observations, Job Shadowing, or a trial work period) with provision of reasonable accommodation.

University Hospitals approach is in contradiction to reasonable accommodation research and practice because of: (1) the non-individualized assessment (e.g., in consideration of Moss as a person with a visual impairment), and (2) the generalized nature of the job assessment as conducted by Evans, which was presumed to indicate Moss's essential job function deficiencies.

EAP manager Kohlbacher, the coordinator of the review process as applied to Moss, testified:[173]

> Q  Through the EAP process, did you have any obligation to identify or provide reasonable accommodations? Is that part of your job duties?
>
> A  *My job duties are not to provide the reasonable accommodations.* My duties are to coordinate what providers are involved in this case; and the recommendations they are making, I kind of coordinate that with HR management and it's up to them to decide what they can and cannot provide.
>
> Q  So was your role to identify any accommodations or simply to pass on information that medical providers provide?
>
> A  I am the pass on person.

Another alternative rationale I may derive from the materials I reviewed was that Moss's job

---

[172] *See, e.g.,* Kohlbacher Depo at 11-12 (Fitness for Duty is "a mandatory process, so they are being taken off work for whatever particular reason. So it is there choice whether they want to participate or not, But if they choose not to, then there are probably consequences that they will have to deal with through HR management."). *Id.* at 16-17.

[173] Kohlbacher Depo at 13 (emphasis added). *Id.* at 18 (Kohlbacher never observed Moss at work or met with her). *Id.* at 23 (Kohlbacher did not have access to information about Moss's prior requests for reasonable accommodations). *Id.* at 49 (Kohlbacher did not review Moss's performance prior job evaluations at University Hospitals).

evaluation process was to demonstrate supervisor Holley's already presumed beliefs that Moss's termination from her position was, as Sheldon testified, "out of concern for Deb Moss."[174] It appears the evaluation process was to ensure that Moss, and the other staff and patients, may be kept safe from a harm that may evidence in the future.[175] However, Sheldon testified that she was aware of no instance in which Moss was alleged to have behaved inappropriately or ineffectively during a hospital incident such as a patient agitation situation.[176]

2. *Short- and longer-term harm from denial of reasonable accommodations to individuals with visual and other disabilities based on non-objective and non-individualized assessments concerning their ability to perform essential job functions.*

For persons with visual disabilities like Ms. Moss, an objective and individualized accommodation and interactive process is crucial because persons with visual disabilities are among those minority groups stigmatized in employment.[177] Research and practice experience supports that employees with visual impairments often are targets of negative and generalized attitudes by their employers in their job performance.[178]

---

[174] Sheldon Depo at 162.

[175] Sheldon Depo at 159-61 ("Q … What is the concern about if Ms. Moss is alone with patients? A The inability to perceive the reactions of the patient she's working with. The inability to perceive a threat to the patient if they're self-harming, a threat to themselves; a threat to other staff; a threat to Debbie herself. Q Has Ms. Moss ever failed to perceive a self-harm situation that you're aware of? A Not that I'm aware of. Q Has Ms. Moss ever failed to perceive a patient eloping that you're aware of? A Not that I'm aware of, but our goal is to prevent safety – Q Absolutely. A -- incidents. Q In fact, there has been an elopement incident on this particular floor that didn't involve Ms. Moss, correct? A I don't know.").

[176] Sheldon Depo at 163.

[177] Moss Interview.

[178] *See, e.g.,* Michele C. McDonnall, Li Zhou, Li, & Adele Crudden, Employer attitudes towards persons who are blind or visually impaired: Perspectives and recommendations from vocational rehabilitation personnel, *Journal of Rehabilitation*, 79(3), 17-24, at 22 (2013) (findings "indicate that VR personnel, particularly rehabilitation counselors, anticipate greater employer resistance to hiring someone with a visual disability. Overall, VR personnel

The uninformed views manifested by supervisor Holley and her coworkers, conceived without first-hand information, included that they knew what was in Moss's "best interests" in terms of her employment.[179] As one researcher concludes, for instance, where an employer who deems it "unsafe" for an employee with a disability to work:

> *may make this determination in good faith and with a clear conscience or even a sense of virtue, never stopping to examine whether it reflects unwarranted generalizations about the abilities of the person or the requirements of the job.* The elusiveness of the cognitive errors that cause us to overestimate certain risks underscores the importance of injecting science and objectivity into the direct threat analysis. As seen in public health and environmental policy, popular conceptions of risks often diverge from the scientific measure of those risks.[180]

Generalized implicit and explicit negative attitudes are maintained especially when there is a lack of a meaningful job analysis of the individual's actual work performance. This likely was the case in the present matter, where supervisor Holley had little or no experience in working with employees with visual impairments.[181] Employees with visual impairments like Moss, therefore, too often are unfairly devalued in the employment process, and as a result suffer employment and economic consequences.[182]

Well-recognized practice in the accommodations request and interactive process involve a number of decision points. Deficiencies in these steps often result in short- and long-term harm to a person with a disability such as Moss. In Moss's case, University Hospitals used a non-

---

believe that more than half of the employers they interact with initially have negative attitudes towards hiring people who are blind or visually impaired. Compared to business relations staff, rehabilitation counselors estimated a higher percentage of employers have initial negative attitudes.").

[179] For a review of the relevant research, *see* Ann Hubbard, Understanding and implementing the ADA's direct threat defense, *Northwestern University Law Review*, 1279-1355, 1289 (2001).

[180] *See* Hubbard, *supra* at 1289-90 (citations omitted, emphasis added).

[181] *See* Hubbard, *supra* at 1289.

[182] Mollie Marti & Peter Blanck, Attitudes, Behavior, and the ADA, in P. Blanck (ed.), *Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research*, 356-84 (2000) (citations omitted).

objective review process, with the resultant harm to an individual such as Moss recognized in research and practice.[183]

Since 1989, Moss has been certified by the National Council on Therapeutic Recreation ("NCTRC") and has worked successfully as a Therapeutic Recreation Specialist.[184] NCTRC certification is a "benchmark" for Moss's profession "to routinely monitor its own practice through an ongoing process of self-regulation. *Paramount to this process is the creation of a credentialing program that enables the profession to safeguard consumers by stating who is competent to practice.*"[185] As a credentialed therapist Moss, University Hospitals was on notice that Moss satisfied her professional standards with effective reasonable accommodations.

The depth of the career and dignitary harms to Moss as a person with a visual impairment from the present dispute likely are extensive. The detrimental effects to Moss also include short- and longer-term economic and dignitary harms, for instance, in her self-confidence and abilities to self-advocate for accommodation requests as a person with a visual disability.[186] The harms experienced by Moss include career, monetary, and dignitary costs, such as negative effects

---

[183] *See, e.g.,* Blanck, *supra*. For example, I did not find information on consideration of Moss's preference in the accommodation process, or indication of review of alternative ways to implement the accommodation request, as would be expected in effective practice.

[184] *See* Moss National Council for Therapeutic Recreation Certification ("CTRS"), case file (1996, 1997 et seq.). *See also* National Council for Therapeutic Recreation Certification ("NCTRC") ("premier credentialing organization for the profession of Therapeutic Recreation"), at: https://www.nctrc.org/about-certification/national-job-analysis/ *See, e.g.,* 2014 CTRS® Job Analysis Report, National Council for Therapeutic Recreation Certification®, Protecting and Promoting Since 1981 CTRS®–The Qualified Provider NCTRC Report on the International Job Analysis of Certified Therapeutic Recreation Specialists ("RATIONALE: A benchmark for any profession is its ability to routinely monitor its own practice through an ongoing process of self-regulation. Paramount to this process is the creation of a credentialing program that enables the profession to safeguard consumers by stating who is competent to practice. The establishment of a valid job analysis is essential to the integrity of a credentialing program and its associated exam program. The job analysis translates practice into a usable format for test development. It delineates the important tasks and knowledge deemed necessary for competent practice.").

[185] *See* National Council for Therapeutic Recreation Certification ("NCTRC"), *supra*.

[186] Moss Interview.

associated with increased stress and anxiety, and not being able to pursue her career in recreational therapy.[187]

There were reasonable accommodations provided by University Hospitals to Moss during her years of employment that enabled Moss to be a productive and valued employee, as certified by her profession. Once Moss's new supervisor Holley arrived, University Hospitals appears to have undertaken a job review process that did not provide Moss a fair and objective opportunity to demonstrate her capabilities in essential job functions, even in light of the purported new composition of patient population in her unit.[188]

Moss presently is working part time at a daycare center.[189] Research and experience show that persons with visual disabilities like Moss are motivated to work and maintain their jobs, to remain productive members of society.[190] My review herein leads me to reject potential counter-hypotheses that Moss, *per se*, was neither qualified with accommodation nor motivated to work in the therapeutic rehabilitation position.[191]

Even if it may be found that University Hospitals expressed a commitment to equal employment opportunity for employees such as Moss, objective job appraisal practices were not followed in this matter. This result likely was due to attitudinal and behavioral bias, in combination with University Hospitals' deficient job appraisal practices in this case.[192]

---

[187] Moss Interview.

[188] Moss Depo at 117. Once such an assessment was made, University Hospitals may have been in a position to objectively determine if reasonable accommodations were possible.

[189] Moss Interview.

[190] Moss Interview ("My objective has always been to remain productively employed in my profession.").

[191] *See, e.g.,* Mohammed Ali, Lisa Schur, Douglas Kruse, & Peter Blanck, What jobs do people with disabilities want? The same as anyone else, *Journal of Occupational Rehabilitation*, 21(2), 199-210 (2011).

[192] *See, e.g.,* Jost et al., *supra* (reviewing hundreds "of studies on implicit bias. These studies testify to the enduring historical (and psychological) legacies of racism, sexism, and other forms of group-based inequality and they

Moss testified that her termination by University Hospitals has had a "huge" impact on her life: "I mean, financially, is number one. Not being able to do a job that I went to school for and figured I'd be doing until I retired. Self-esteem, anxiety, just, I mean all the things that come with a drastic change in lifestyle."[193]

My article, "The Right to Live in the World: Disability Yesterday, Today, and Tomorrow," was prepared for the Jacobus tenBroek Disability Law Symposium at the request of the National Federation of the Blind ("NFB").[194] Among other topics, I discussed the views of Dr. Jacobus tenBroek, a founder of the NFB, that for people with visual impairments "The Right to Live in the World" includes an *opportunity* for full and equal participation in employment. Dr. tenBroek wrote that "disability more often than not play[s] little role in determining [aspects of integration in society] … . Rather, that judgment for the most part results from . . . *public attitudes, attitudes which not infrequently are quite erroneous and misconceived*."[195]

Like many persons with visual impairments, Moss sought and was entitled to receive a

---

suggest, not so surprisingly after all, that these legacies have left behind at least *some* residue in our hearts and minds.") (emphasis in original). *Compare* Calvin Lai, Kelly Hoffman, & Brian Nosek, Reducing implicit prejudice, *Social and Personality Psychology Compass*, 7(5), 315–330 (2013) (presently, research evidence insufficient to show that changing implicit prejudice alone is associated with changes discriminatory behavior).

[193] Moss Depo at 162 (… I mean, going from a structured schedule to not so much structured or going from working three days a week to sometimes five days a week for less money. You know, the decrease in contributions to my 401(k) for preparing for retirement, My traveling, vacation are limited to little.").

[194] Peter Blanck, "The Right to Live in the World": Disability Yesterday, Today, and Tomorrow, *Texas Journal on Civil Liberties and Civil Rights*, 13, 367-401 (2008).

[195] Blanck, "The Right to Live in the World," *supra* at 389 (*quoting* Jacobus tenBroek, The Right to Live in the World: The Disabled in the Law of Torts, 54 *California Law Review,* 841, 842 (1966) (emphasis added)). *Id.* (Dr. tenBroek comments negative attitudes about people with visual impairments include: "public imaginings about what the inherent physical limitations must be; public solicitude about the safety to be achieved by keeping the disabled out of harm's way; public feelings of protective care and custodial security; … and public aversion to the sight of them and the conspicuous reminder of their plight."). The ADA Amendments Act of 2008 finds "people with physical or mental impairments having the talent, skills, abilities, and desire to participate in society are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers." H.R. 3195, § 2(a)(3), available at http://thomas.loc.gov/home/gpoxmlc110/h3195_ih.xml.

fair shot to maintain her job at University Hospitals. This opportunity was not to be based on Moss being visually impaired, but rather on her demonstrated essential job qualifications.[196]

---

[196] *See* Ali et al. at *supra*, at 205 (job preferences similar between people with and without disabilities).

## V.      **CONCLUSION**

The opinions herein reflect my views to date and may be supplemented by additional

information presented to me through this matter's discovery and litigation process. I respectfully

reserve the right to amend and supplement this declaration based on such new information. I

state the views contained herein are true and correct to the best of my knowledge and belief.

Peter Blanck, Ph.D., J.D.
May 9, 2019

# VI.   <u>APPENDICES</u>

**APPENDIX 1**

**CURRICULUM VITAE**

**Attached to this Report.**

# VITA

# PETER BLANCK

Birth: 27 August 1957.  Elmont, New York, U.S.A.
Married, Wendy; Children, Jason (daughter-in-law Elise), Daniel, Albert, & Caroline; Harry (dog)

## EDUCATION

| | |
|---|---|
| 1983-1986 | STANFORD UNIVERSITY SCHOOL OF LAW, Stanford, CA.  J.D. President, Volume 38, STANFORD LAW REVIEW. |
| 1982-1983 | HARVARD UNIVERSITY, Department of Psychology and Social Relations, Cambridge, MA.  Post-Doctoral Fellow. |
| 1979-1982 | HARVARD UNIVERSITY, Cambridge, MA.  Ph.D., Social Psychology. |
| | Doctoral Thesis: "Children's ability to decode discrepant and consistent social communications:  Learning how, when, and who to decode." |
| | Minor field:  Organizational Behavior: "Field research in organizations." |
| 1975-1979 | UNIVERSITY OF ROCHESTER, Rochester, N.Y. |
| | B.A.  Magna cum laude, Psychology. |

## EMPLOYMENT

| | |
|---|---|
| 2005-current | *University Professor*, Syracuse University–highest faculty rank granted to eight prior individuals in the history of the University, "honors faculty whose exceptional scholarly and other professional accomplishments merit recognition by peers in the U.S. and abroad." The late U.S. Senator Daniel P. Moynihan was University Professor at Syracuse. |
| | In addition, appointments as professor in the Syracuse University Colleges of Law and of Arts and Sciences, School of Education, Falk College, and the Maxwell School of Citizenship and Public Affairs. |
| 2005-current | *Chairman*, Burton Blatt Institute, Syracuse University |
| 2002-2006 | *Charles M. and Marion Kierscht Professor of Law*, University of Iowa, College of Law |
| 2000-2006 | *Director*, Law, Health Policy & Disability Center, University of Iowa, College of Law |
| 1999-2006 | University of Iowa, College of Public Health, Department of Occupational Medicine and Environmental Health, Professor (by Courtesy) |
| 1997-2006 | University of Iowa, College of Medicine, Department of Preventive Medicine and Environmental Health, Professor (by Courtesy) |

| 1994-1995 | Princeton University, Woodrow Wilson School of Public and International Affairs, Center of Domestic and Comparative Policy, Fellow |
| 1994-2006 | University of Iowa, Department of Psychology, Professor |
| 1993-2006 | University of Iowa, College of Law, Professor of Law |
| 1990-1993 | University of Iowa, College of Law, Associate Professor of Law |
| 1987-1990 | Covington & Burling.  Associate, Washington, D.C. |
| 1986-1987 | Law Clerk, Judge Carl McGowan, United States Court of Appeals, D.C. Circuit. |
| 1982-1983 | Harvard University, Graduate School of Business. Research Associate and faculty. |

## RESEARCH GRANTS, CONTRACTS, AND MAJOR GIFTS (Illustrative)

For a detailed listing of awards to LHPDC and BBI, see http://bbi.syr.edu; total more than $80 million.

| 2018 | Saks Institute for Mental Health Law, Policy, and Ethics, University of Southern California, Los Angeles, Supported Decision-Making: Professional to Professional Online Support, Sub-Contract to BBI, PI, 1-year grant. |
| 2017 | American Bar Association, Commission on Sexual Orientation and Gender Identity, Commission on Disability Rights, "Sexual Orientation and Gender Identity, Disability, and Intersectionality: Implicit and Explicit Attitudes and Behaviors in the Legal Profession," PI, 2-year grant. |
| 2016 | National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR), Administration on Community Living (ACL), U.S. Department of Health & Human Services, SE ADA Center, PI, 5-year grant. |
| 2016 | Saks Institute for Mental Health Law, Policy, and Ethics, University of Southern California, Los Angeles, Supported Decision-Making: Giving Mental Health a Voice, Sub-Contract to BBI, PI, 3-year grant. |
| 2015 | National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR), Administration on Community Living (ACL), U.S. Department of Health & Human Services, Understanding and Increasing Supported Decision-Making's Positive Impact on Community Living and Participation Outcomes, PI, 5-year grant. |
| 2015 | YMCA Greater Grand Rapids, Mary Free Bed YMCA, Universal by Design, PI. |
| 2014 | Quality Trust for Persons with Disabilities, Administration on Community Living (HHS), National Resource Center Supported Decision-Making (NRC-SDM), PI, 5-year agreement. |
| 2014 | Onondaga Community College, U.S. Dept. Labor, Office of Disability & Employment Policy, Onondaga Pathways to Careers (OPC) Demonstration Project, BBI, 3-year grant. |

2013     Quality Trust for Persons with Disabilities, Supported Decision-Making as an Alternative to Guardianship, PI, 4-year agreement.

2013     Tresness Family, Gift to BBI for Communication, Hope and Assistive Technology (CHAT) Program.

2013     Olinsky Law Group, Social Security disability supports, 10-year agreement.

2012     Rehabilitation Engineering and Assistive Technology Society of North America (RESNA), Accessible Technology Action Center (ATAC), Office of Disability Employment Policy (ODEP), U.S. Department of Labor.

2012     IMPAQ, Evaluation of One-stop Career Centers' Accessibility to Persons with Disabilities, U.S. Department of Labor, PI, 2-year grant.

2012     Institute for Rehabilitation and Research, National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Community and Work Participating Disparities: A program of the ADA Participatory Action Research Consortium (ADA-PARC), Katherine McDonald BBI PI, 5-year grant.

2011     National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Southeast ADA Center, PI, 5-year grant.

2011     U.S. Department of Veterans Affairs, Veteran Employees in Large U.S. Business, BBI PI, 1-year contract with second year option.

2010     U.S. Department of Labor/Veterans (DOL/VETS), Homeless Veterans Reintegration Project Technical Assistance Center, Gary Shaheen BBI PI, 3-year grant.

2009     National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Center on Effective Delivery of Rehabilitation Technology (CERT) by Vocational Rehabilitation Agencies, 5-year grant.

2009-2011   New York State, Office Mental Health, Medicaid Infrastructure Grant (MIG)

2008     Rehabilitation Services Administration (RSA), U.S. Department Education, Southeast Technical Assistance & Continuing Education (TACE) Consortium, 5-year grant.

2008     Syracuse University Kauffman Foundation Enitiative Grant, Entrepreneurship Bootcamp for Veterans with Disabilities, 2-year grant.

2008     National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department of Education, Asset Accumulation and Economic Self-Sufficiency for People with Disabilities, 3-year grant.

2007     POETA (Partnership in Opportunities for Employment in Technology for the Americas), of The Organization of American States (OAS), for disability research in Latin America.

2007     World Bank, for Global Partnership for Disability and Development (GPDD).

| | |
|---|---|
| 2007 | YAI/National Disability Institute, for study on corporate attitudes and disability. |
| 2007 | Israeli Ministry of Social Welfare, for the BBI/Israel Projects. |
| 2006 | National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Department Education, Southeast Disability Business & Technical Assistance Center (SE DBTAC), 5-year grant. |
| 2006 | U.S. Department of Labor, Office of Disability Employment Policy (ODEP), for national consortium on "Disability Case Study Research Consortium on Employer Organizational Practices in Employing People with Disabilities." |
| 2006 | U.S. Department of Labor, Employment Training Administration (ETA), to evaluate emergency preparedness policies in gulf coast. |
| 2006 | U.S. Department of Labor, Office of Disability Employment Policy (ODEP), to study Self-Employment with Onondaga County, New York. |
| 2006 | Center for International Rehabilitation (CIR), international disability rights. |
| 2006 | U.S. National Institute on Disability Research and Rehabilitation (NIDRR), U.S. Depart. Education, Demand-Side Employment Placement Models for Persons with Disabilities. |
| 2006 | Destiny Corporation, BBI Project Gift. |
| 2005 | Hammerman Family Foundation, BBI Endowment Gift. |
| 2005 | Appropriation in FY 2005 Omnibus Appropriations Bill – Rehabilitation Research and Training Center (RRTC) on Workforce Investment and Employment Policy. |
| 2004 | U.S. Dept. Labor and Social Security Administration–research on Workforce Investment Act One-Stops, and Disability Program Navigators. |
| 2004 | Stan and Gail Richards, LHPDC Endowment Gift. |
| 2003 | NIDRR, U.S. Dept. Education, Asset Accumulation & Tax Policy for Persons with Disabilities. |
| 2003 | Merrill Lynch Global Philanthropy, "Corporate Culture and Disability." |
| 2003-2005 | Nellie Ball Trust Research Grant, "Stigma and Mental Disability." |
| 2003 | Guardsmark LLC, gift to establish the Alan Ross Hawley Lecture Series at the Law Health Policy & Disability Center. |
| 2002 | NIDRR, Technology for Independence: A Community-Based Resource Center. |
| 2002-2007 | Job Accommodation Network (JAN), U.S. Department of Labor, research of provision of workplace accommodations. |

| | |
|---|---|
| 2002 | U.S. Department of Labor, research on Workforce Investment Act. |
| 2002-2006 | NIDRR, direct Rehabilitation Research and Training Center (RRTC) on Workforce Investment and Employment Policy for Persons with Disabilities |
| 2002 | Milbank Foundation, disaster mitigation for persons with disabilities. |
| 2001-2007 | NIDRR, "IT Works," information technology jobs for persons with disabilities. |
| 2001 | U.S. Dept. Labor – research on Workforce Investment Act One-Stops. |
| 2000 | Microsoft – Research on Corporate disability and employment policy. |
| 2000 | NIDRR, subcontract with Community Options, Inc., Director, Researchers' Symposium – Qualitative Research Methods research on ADA and employment policy. |
| 1999-2005 | Robert Wood Johnson Foundation, subcontract with George Washington Univ., research and technical assistance employment policy and persons with disabilities. |
| 1999-2005 | U.S. Department of Justice, subcontract Great Plains Disability Bus. & Tech. Ass't. Ctr., research, technical assistance on employment policy, persons with disabilities. |
| 1999-2005 | U.S. Rehabilitation Services Administration (RSA), subcontract with University of Missouri, provide technical assistance, employment policy persons with disabilities. |
| 1999 | Polk County Health Services to conduct research and provide technical assistance on employment policy and persons with mental disabilities. |
| 1998-1999 | U.S. Social Security Administration, subcontract Iowa Dept. Human Services, conduct research employment policy, persons with disabilities. |
| 1998-2004 | NIDRR, subcontract with Community Options, Inc., ADA and employment policy. |
| 1997-1998 | Iowa CEO, to study the implications of the staffing industry on the employment of persons with disabilities, and case study of Manpower Inc. |
| 1997 | National Organization on Disability, social participation persons with disabilities. |
| 1997 | Director, Obermann Center for Advanced Studies Fellowship Grant, University of Iowa grant to study ADA. |
| 1997 | National Council on Disability to Iowa Law, Health Policy and Disability Center, grant to support conference and study of "Socially Assisted Dying." |
| 1994-2006 | Director, Law, Health Policy & Disability Center, Iowa College of Law Foundation. |
| 1992-1996 | Annenberg Washington Program, grant to study the ADA. |
| 1991-1996 | State of Wyoming, to Iowa Law College, Integration Persons with Mental Disabilities. |

| | |
|---|---|
| 1990-1994 | State of Oklahoma, data sharing administered at University of Iowa College of Law, Empirical Study of the Americans with Disabilities Act. |

## RESEARCH and APPLIED EXPERIENCE (Illustrative)

| | |
|---|---|
| 2011-2016 | Advisory Board, Institute on Disability and Public Policy (IDPP) |
| 2011- | Israel Ministry of Welfare and Social Services, Member, Expert Committee on Future of Deinstitutionalization and Community Living in Israel. |
| 2010- | The Saks Institute for Mental Health Law, Policy, and Ethics, Board Member, University of Southern California, Los Angeles. |
| 2008- | Centre for Disability Law and Policy, Advisory Forum Board, Galway, Ireland. |
| 2008-2012 | National Research Advisory Panel, National Technical Assistance and Research Center to Promote Leadership for Increasing Employment and Economic Independence of Adults with Disabilities (NTAR Leadership Center). |
| 2006- | Faculty Affiliate, Aging Studies Institute, Syracuse University. |
| 2004-2006 | Chair, Blue Ribbon Panel, ADA Impact Study, National Council on Disability. |
| 1995-2001 | U.S. District Court Facilitator, *Chris S. et al. v Geringer et al.,* State of Wyoming. |
| 1994-1996 | Senior Fellow, Annenberg Washington Program, "Communicating the ADA." |
| 1993-1996 | Senior Fellow, Annenberg Washington Program, "Communications Technology for Everyone: Implications for the Classroom and Beyond" |
| 1992-1993 | Fellow, Annenberg Washington Program, "The Americans with Disabilities Act" Annenberg Washington Program, "Communicating with Juries." |
| 1991-1994 | Member, Compliance Advisory Board, *Weston v. WSTS,* State of Wyoming. |
| 1988-1992 | Legal/Program Counsel, Developmental Disabilities Ser. Division, State of Oklahoma. |
| 1982-1983 | Research Associate, Graduate School of Business Administration, Harvard University. |
| 1979-1982 | Research Assistant to Robert Rosenthal, Psychology & Social Rel., Harvard University. |
| 1978-1979 | Research Assistant to Miron Zuckerman, Department of Psychology, Univ. of Rochester. |
| 1977-1978 | Research Assistant to Edward L. Deci, Department of Psychology, Univ. of Rochester. |

## PRIMARY RESEARCH, TEACHING AND PRACTICE INTERESTS

Legal:  Contracts; Civil Procedure; public law litigation; social science & law; web and technology accessibility.

Disability Law:  Americans with Disabilities Act law and policy; rights of individuals with disabilities in institutions and community settings; international disability and human rights law and history; accessibility & Universal Design.

Psychology and the Law:  Law and ethics in behavioral sciences; verbal and nonverbal communication in applied settings; social science experimental and field research methods.

## TEACHING EXPERIENCE

| | |
|---|---|
| 2018 | Syracuse University, College of Law, Contracts. |
| 2016 | Syracuse University, College of Law, Civil Procedure. |
| 2009 & 2010 | Syracuse University, College of Law, Disability Law. |
| 2006-2007 | Syracuse University Undergraduate Honors Program. |
| 2000-2005 | Law, Health Policy, and Disability Law. |
| 1998-1999 | Learning Disability and the Law. |
| 1995 | Family, Society, and Disability Law, University of Iowa, College of Law. |
| 1991 | Federal Disability Law, University of Iowa, College of Law. |
| 1991-1993 | Litigation, Social Science & Social Change, University of Iowa, College of Law. |
| 1990-1998, 2001 | Contracts I, University of Iowa, College of Law (small and large section classes). |
| 1982 | Social Psychology, Harvard University.  Career Management, Harvard Business School. |
| 1981 | Social Psychology, Harvard University. |

| | |
|---|---|
| 1980 | Psychological Statistics, Harvard University. |
| 1978-1979 | Social Psychology, Introductory Psychology, University of Rochester. |

## HONORS

| | |
|---|---|
| 2015 | 2015 Distinguished Service Award, NARRTC (formerly known as the National Association of Rehabilitation Research and Training Centers). |
| 2011 | Distinguished Fellow, Institute for Veterans and Military Families, Syracuse University. |
| 2010 | Honorary Professor, Centre for Disability Law & Policy, National University Ireland, Galway; appointed by President James J. Browne. |
| 2009 | Distinguished Visiting Professor, Graduate School of Social Welfare, Hokusei Gakuen University, Sapporo, Japan. |
| 2008 | University of Rochester Sports Hall of Fame–Inducted. Varsity Squash, four letters, 1975-1979, Co-Captain, 1978-1979. |
| 2007 | Keynote Address, Israeli Knesset, Israeli Disability Day |
| 2004 | Inaugural Lecturer, Thornburgh Family Lecture, Disability Law Policy, Univ. Pittsburgh. |
| 2003-2005 | Recipient, The Nellie Ball Trust Research Grant. |
| 2000 | Switzer Scholar in Rehabilitation, National Rehabilitation Association. |
| 2000-2005 | Center Fellow, University of Iowa Center for Human Rights. |
| 1998-1999 | Advisory Committee, Research Alliance for Wellness at Work, Inc. |
| 1995-1996 | Member, General Accounting Office (GAO) Advisory Board, Report on ADA Title I. |
| 1995-1996 | Chair, Legislative & Social Issues Committee, American Association Mental Retardation. |
| 1994-2000 | Member, President's Committee on Employment of People with Disabilities. |
| 1993-1996 | Member, Legal & Social Issues Committee, American Association Mental Retardation. |
| 1993-1995 | Commissioner, American Bar Assoc. Commission on Mental & Physical Disability Law. |
| 1993-1996 | Senior Fellow, Washington Annenberg Program |
| 1992-1994 | President, Legal Process and Advocacy Division, Amer. Assoc. on Mental Retardation. |
| 1990 | Order of the Coif, Honorary, University of Iowa, College of Law. |
| 1987 | Society of Experimental Social Psychology, member. |
| 1984 | Irving H. Hellman, Jr. Memorial Fund Grant, _Stanford Law Review_, Stanford Law. |
| 1981 | Edwin B. Newman Psi-Chi/American Psychological Association Award for Excellence in Graduate Research. |
| 1981 | Sigma Xi, member; Psi-Chi, member. |
| 1977-1979 | Captain, Varsity Squash, University of Rochester. |

## STATE BAR AND COURT ADMITTANCE

Commonwealth of Massachusetts Bar, Admitted January 16, 1987.
District of Columbia Bar, Admitted November 30, 1987.
United States Court of Appeals, District of Columbia Circuit Bar, Admitted January 28, 1987.
United States Court of Appeals, Tenth Circuit Bar, Admitted March 8, 1988.
United States District Court for the District of Columbia, Admitted October 3, 1988.
United States Court of Appeals for the Federal Circuit, Admitted October 13, 1988.
United States Court of Appeals, Fifth Circuit Bar, Admitted February, 2008.
United States Court of Appeals, Eleventh Circuit Bar, Admitted June 2010.
Supreme Court of the United States, Admitted February 20, 1990.

## EDITORIAL BOARDS/JOURNAL & BOOK REFEREE (Illustrative)

Editor, _Cambridge Disability Law and Policy Series_, Cambridge University Press (with R. Malloy) (2009- ).
Advisory Board, _Yearbook on European Disability Law & Policy_ (2008-2016)
Advisory Board, _Stone Canoe: A Journal of Arts and Ideas from Upstate New York_ (2007-2014).
Guest Editor, _Journal of Disability Policy Studies_ (2018-2019).
Guest Editor, _Assistive Technology Journal_ (2006-2007).
Guest Editor, _Inclusion_ (2014-2015).

Guest Editor, *Journal of Occupational Rehabilitation* (2016-2017, 2018-2019).
Editorial Board, *Inclusion* (2014- ).
Editorial Board, *Psychology, Public Policy and Law* (2006- ).
Editorial Board, and Guest Editor, *Disability Studies Quarterly* (2004- )
Contributing Editor, In Pursuit: A Blueprint for Disability Law and Policy.  *American Bar Association* (1999).
Advisory Committee, National Organization on Disability, *Disability Agenda* (1998-1999).
Editorial Board, and Guest Editor, *Behavioral Sciences & the Law* (1997, 2014).
Editorial Advisory Board, *Special Education Reporter* (1995-1997).
Associate Editor, Legal Forum, *Spine* (1994-1999).
Editorial Advisory Board, *Mental & Physical Disability Law Reporter* (1993-1997), Chair (1995-1997).
Consulting Editor, *Psychology, Public Policy and Law* (1995- ).
Basic and Applied Social Psychology.
Developmental Psychology.
Journal of Personality and Social Psychology.
Journal of Occupational Behavior.
Law & Society Review.
Mental Retardation.
National Science Foundation Grants in Law & Psychology.
Personality & Social Psychology Bulletin.
Social Science & Medicine.
Telecommunications Policy Journal.
University of Nebraska Press; University of Michigan Press.
Journal of Comparative Policy Analysis.

## PROFESSIONAL ACTIVITIES (Illustrative)

President and Founding Member, Raising the Floor (RtF) U.S., 2013-.
Chairman, Global Universal Design Commission (GUDC), 2008-.
Consultant, Aging of the Union Army Research Project, University of Chicago, Dr. Robert Fogel, PI, 2000-2006.
Member, Advisory Committee for the Research Alliance for Wellness at Work, Inc. 1998-1999.
Facilitator, The Partnership for Resolution of Mental Health Issues in Wyoming, 1995-2000.
Chairman, Quality Assurance Committee, State of Wyoming, 1995-1996.
Member, State-County Management Committee, Dept. Health & Human Services, State of Iowa, 1994-1996.
Member, Executive Committee, Ctr. International Rural & Environmental Health, University of Iowa, 1992-1993.
Annenberg Washington Program, Convener, Programs on the Americans with Disabilities Act, 1992-1996.
Annenberg Washington Program, Co-Convener, Program on Communicating with Juries, 1992.
Member, Compliance Advisory Board, Weston v. WSTS, Dept. of Human Services, State of Wyoming, 1991-1994.
APA/Committee on Standards in Research (CSR), Chairman, 1990-1992.
APA/Division 41, Core Committee on Amicus Briefs, Member, 1990-1992.
APA/Division 41 Liaison with Coalition for Psychology in the Public Interest (CPPI), 1989-1990.
Amer. Acad. Judicial Ed., Course Fact Finding, Communication in the Courtroom, Harvard Law School, 1990-1993.
Henry Murray Research Center, Radcliffe College, MacArthur Foundation Grant on Longitudinal Studies Mental
        Health, Consultant, 1990-1991.

## LEGAL BRIEF PARTICIPATION, ORAL ARGUMENTS AS COUNSEL AND AMICUS

In re: Guardianship of the Person and Estate of Ryan Keith Tonner, an Incapacitated Person, Seventh Court of
        Appeals, Amarillo, Texas, No. 07-13-00308-CV (2015) (Co-counsel with Jonathan Martinis, Maame
        Gyamfi) (in preparation).
Sherrie Kaw vs. School District of Hillsborough County, United States Court of Appeals for the Fifth Circuit,
        No. 8:07-cv-02222-T-27TGW (2011). Oral Argument for Appellant Kaw (Co-counsel with Matt Dietz).
Santiago Lopez vs. Pacific Maritime Association, United States Court of Appeals for the Ninth Circuit,
        No. 09-55698 (2011, co-author w Claudia Center). Request for rehearing en banc for Amici Curiae.
American Association of Persons with Disabilities v. Holland, United States Court of Appeals for the Eleventh
        Circuit, No. 3:01-cv-01275-J-99 HTS (2010, co-author).  Request for rehearing en banc.

Alexey Korneenkov and Olesya Korneenkov v. Mukasey, United States Court of Appeals for The Fifth Circuit, No. 07-60712 (2008, co-author).  Made Oral Argument (Aug. 2009).

U.S. v. Georgia, et al. / Goodman, Tony v. Georgia, et al., United States Supreme Court (2005, co-author Brief of Honorable Dick Thornburgh and the National Organization on Disability as Amici Curiae).

Chevron v. Echazabal, No. 00-1406, United States Supreme Court (2002, counsel of record, co-author of Brief of National Council on Disability as Amicus Curiae).

EEOC v. Hertz, Case No. 96-CV-72421 DT, (E.D. Mich. S.D. Oct. 16, 1997).

## TESTIMONY BEFORE CONGRESS, LEGISLATURES, AND ADMINISTRATIVE BODIES (Illustrative)

Social Security Advisory Board, "Social Security Disability: Time for Reform," Written Commentary, March 8, 2013.

U.S. House of Representatives, Committee on Government Reform, Subcommittee on Human Rights and Wellness, Testimony on "Living with Disabilities in the United States: A Snapshot," June 24, 2004.

U.S. House of Representatives, Subcommittee on Social Security, Testimony on the definition of disability under Social Security and the ADA, July 11, 2002.

General Accounting Office (GAO), Testimony on Expert Advisory Panel, The Future of Federal Disability Policies and Programs, July 10, 2002.

U.S. House of Representatives, Subcommittee on The Constitution, Testimony on the Application of the ADA's Accessibility Requirements to Private Internet Web Sites and Services, February 9, 2000.

U.S. House of Representatives, Committee on Education and the Workforce, Remarks on the ADA, Oct. 1998.

Wyoming Legislature, Select Committee on Mental Health Issues, September & November, 1998.

## MEMBERSHIP PROFESSIONAL ORGANIZATIONS/NON-PROFIT BOARDS (Past and Present)

American Association of Applied & Preventative Psychology, Fellow.
American Bar Association, Member.
Massachusetts Bar Association, Member.
District of Columbia Bar Association, Member.
American Association on Mental Retardation, Member, and past President, Legal Process & Advocacy Division.
American Psychological Association, Member.
  Personality and Social Psychology -- Division 8.
  Psychology and Law -- Division 41.
American Psychological Society, Charter Fellow.
Law and Society Association, Member.
Disability Rights Advocates, Past Board Member (1996-2009).
National Organization on Disability (N.O.D.), Board member (1996-2009).
Disability Rights Law Center, Past Board Member (2005-2009).
YAI/National Institute for People with Disabilities Network, Trustee (2006-2014).
Beit Issie Shapiro, Professional Advisory Committee (2006-2008).
Iowa Children's' Museum, Board Member (2003-2005).
University of Rochester, Board of Rochester Athletics (2007- ).
Global Universal Design Commission (GUDC).  Chairman (2008- ).
The Sarah Jane Brain Foundation.  Advisory Board (2009).
Red House Arts Center, Syracuse, NY, Board Member (2011-2014).
The Everson Museum of Art, Syracuse, NY, Trustee (2012-2016).

## UNIVERSITY SERVICE / COMMITTEES

### Syracuse University College of Law

Appointments and Leaves (2017- )
Faculty Summer Research Grant & Elite Publications Grants (2016-2018; Chair, 2018- )
Appointments (2006-2009)
Ad Hoc Committee on Centers and Institutes (Chair, 2006-2007)
Promotion & Tenure (2006-2010)

### Syracuse University

Syracuse University Search Committee for University Chief Diversity Officer (2018-2019)
Syracuse University Search Committee for University Vice President for Research (2017)
Syracuse University Strategic Plan Working Group—Change: Innovation and Institutional Renewal (2014-2015)
Advisory Board, Syracuse University Hillel (2007-2011)
Strategic Planning Workgroup, "Change: Innovation and institutional renewal–Establishing the culture, structures, and mechanisms to ensure that SU undergoes productive change" (2014-2015)

### Iowa College of Law

Building & Equipment
Computer (2001-2002, 2003-2004, Chair)
Joint Program, Interdisciplinary Studies & Undergraduate Education
Placement Research & Professional Development
Speakers (2002-2003, Co-Chair)

### Iowa University-Wide

Member Executive Board, University of Iowa Center on Aging (2001-2005).
Chair, Provost Task Force to Examine Issues Facing Students with Learning Disabilities (1998-1999).
Co-Chair, Task Force on the Health of the Student (1994-1995).
Advisor, Undergraduate Honors Program in Psychology (1993-2005).
Committee for Ethical, Legal and Social Issues for the Human Genome Project (ELSI) (1993-1995).
Research Advisory Committee in the Social Sciences (1993-1994).

## POST-DOCTORAL FELLOWS

| | | |
|---|---|---|
| David Dawson, Ph.D. | (1998 – 2000) | University of Iowa. |
| Naomi Schreuer, Ph.D. | (2008 – 2009) | Haifa University, Israel. |
| Tal Araten Bergman, Ph.D. | (2008 - 2009 ) | Haifa University, Israel. |
| Michal Soffer, PhD. | (2008 - 2010 ) | Hebrew University, Israel. |
| Omolara Funmilola Akinpelu, M.ED., Ph.D. | (2009 - 2012) | University of Ilorin, Nigeria. |
| Ynesse Abdul-Malak, RN, MPH, Ph.D. | (2017 - 2018) | Maxwell School of Citizenship and Public Syracuse University, New York. |

## <u>PUBLICATIONS</u>

See also http://bbi.syr.edu for listing of other web-based articles and accessible formats where possible.

1.  Blanck, P., Zuckerman, M., DePaulo, B.M., & Rosenthal, R. (1980).  Sibling resemblance in nonverbal skill and style. <u>Journal of Nonverbal Behavior</u>, 4, 219-26.

2.  Zuckerman, M., Blanck, P., DePaulo, B.M. & Rosenthal, R. (1980).  Developmental changes in decoding discrepant and nondiscrepant nonverbal cues. <u>Developmental Psychology</u>, 16, 220-28.

3.  Zuckerman, M., Larrance, D.T., Porac, J.F., & Blanck, P. (1980).  Effects of fear of success on intrinsic motivation, causal attribution, and choice behavior.  <u>J. Personality & Social Psychology</u>, 39, 503-13.

4.  Blanck, P., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1980).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style. <u>Resources in Education</u>. November (ERIC Documents).

5.  Blanck, P., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1981). Sex differences in eavesdropping on nonverbal cues: Developmental changes.  <u>Journal of Personality and Social Psychology</u>, 41, 391-96.

6.  Blanck, P., Rosenthal, R. (1982).  Developing strategies for decoding "leaky" messages: On learning how and when to decode discrepant and consistent social communications.  In R.S. Feldman (ed.), <u>Development of nonverbal behavior in children</u>.  Pp. 203-29. New York: Springer-Verlag.

7.  Blanck, P., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1982).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style.  <u>Developmental Psychology</u>, 18, 491-98.

8.  Snodgrass, S.E., Rosenthal, R., & Blanck, P. (1982).  Sex role socialization via teacher's behavior and sexually stereotyped materials.  <u>Resources in Education</u>.  (ERIC Documents - - ED209588).

9.  Blanck, P., Reis, H.T., & Jackson, L. (1984).  The effects of verbal reinforcement on intrinsic motivation for sex-linked tasks.  <u>Sex Roles</u>, 10, 369-86.

10.  Blanck, P. & Rosenthal, R. (1984). The mediation of interpersonal expectancy effects: The counselor's tone of voice.  <u>Journal of Educational Psychology</u>, 76, 418-26.

11.  Rosenthal, R., Blanck, P., & Vannicelli, M. (1984). Speaking to and about patients: Predicting therapists' tone of voice.  <u>Journal of Clinical and Consulting Psychology</u>, 52, 679-86.

12.  Blanck, P., & Sonnenfeld, J.A. (1984).  The Wane Division of the American Instruments Corporation (A). In J.A. Sonnenfeld, <u>Managing Career Systems: Channeling the flow of executive careers</u>. pp. 203-26. Illinois: Irwin.

13.  Blanck, P. & Sonnenfeld, J.A. (1984).  The Wane Division of the American Instruments Corporation (B). In J.A. Sonnenfeld, <u>Managing Career Systems: Channeling the flow of executive careers</u>. pp. 227-41. Illinois: Irwin.

14.  Blanck, P., Dowd, J.J., & Sonnenfeld, J.A. (1984).  Patrick J.J. Rich.  In J.A. Sonnenfeld, <u>Managing Career Systems: Channeling the flow of executive careers</u>. pp. 477-89.  Illinois: Irwin.

15. Blanck, P., Rosenthal, R., & Cordell, L.H. (1985).  The appearance of justice: Judges' verbal and nonverbal behavior in criminal jury trials.  38 Stanford Law Review 89-164.

16. Blanck, P., Buck, R., & Rosenthal, R. (1986). General introduction: Nonverbal communication in the clinical context.  In P.D. Blanck, R. Buck, & R. Rosenthal (eds.), Nonverbal communication in the clinical context.  pp. 1-12.  Univ. Park: Penn State Press.

17. Blanck, P., Rosenthal, R., Vannicelli, M., & Lee, D.T. (1986).  Therapists' tone of voice: Descriptive, psychometric, interactional, and competence analyses.  Journal of Social & Clinical Psychology, 4, 154-78.

18. Blanck, P., Rosenthal, R., & Vannicelli, M. (1986).  Talking to and about patients: The therapists' tone of voice.  In P. Blanck, R. Buck, & R. Rosenthal (eds.).  Nonverbal communication in the clinical context. pp. 99-143. University Park: Penn State Press.

19. Blanck, P., & Turner, A.N. (1987). Gestalt research: Clinical field research approaches to studying organizations.  In J. Lorsch (ed.), The handbook of organizational behavior. pp. 109-125.  New York: Prentice-Hall.

20. Blanck, P. (1987). Off the record: Nonverbal behavior in the courtroom.  Stanford Lawyer, 21 (spring), 18-23 (Author's Reply-Letters, Stanford Lawyer, 22 (Fall), 84); also reprinted in Student Lawyer (1987, December), 16(4), 8-10.

21. Blanck, P. (1987). The process of field research in the courtroom: A descriptive analysis. Law and Human Behavior, 11(4), 337-358.

22. Blanck, P., Rosenthal, R., Hart, A.J., & Bernieri, F. (1990). The measure of the judge: An empirically-based framework for exploring trial judges' behavior.  Iowa Law Review, 75(3), 653-684.

23. Blanck, P. (1991).  What empirical research tells us: Studying judges' and juries' behavior.  American University Law Review, 40(2), 775-804.

24. Grisso, T., Baldwin, E., Blanck, P., & Rotheram-Borus, M.J. (1991).  Standards in research: APA's mechanism for monitoring the challenges.  American Psychologist, 46(7), 758-766.

25. Blanck, P. (1991).  The emerging work force: Empirical study of the Americans with Disabilities Act, Journal of Corporation Law, 16(4), 693-803.

26. Blanck, P. (1992).  Psychiatry in a litigious society.  Review of Review of Clinical Psychiatry and the Law-Volume 2, Contemporary Psychology, 37(1), 15-16.

27. Blanck, P. (1992).  Empirical study of the employment provisions of the Americans with Disabilities Act: Methods, preliminary findings and implications, New Mexico Law Review, 22(3), 119-241.

28. Blanck, P.D. (1992).  On integrating persons with mental retardation: The ADA and ADR, New Mexico Law Review, 22(3), 259-76.

29. Blanck, P. (1992).  Review of Mental health experts and the criminal courts.  Clinical Psychology Review, 12, 3-4.

30.     Saks, M.J. & Blanck, P. (1992).  Justice Improved: The unrecognized benefits of aggregation and sampling in the trial of mass torts, Stanford Law Review, 44, 815-51.

31.     Blanck, P., Bellack, A., Rotheram-Borus, M.J., Rosnow, R.L. & Schooler, N. (1992).  Scientific rewards and conflicts of ethical choices in human subject research.  American Psychologist, 47(7), 959-65.

32.     Blanck, P. & Rosenthal, R. (1992).  Nonverbal behavior in the courtroom.  In Applications of nonverbal behavioral theories and research (R. Feldman, ed.) pp. 89-115.  Lawrence Erlbaum Press: New York.

33.     Blanck, P. (1993).  The Americans with Disabilities Act: Putting the employment provisions to work, The Annenberg Washington Program, White Paper, Washington, D.C.

34.     Blanck, P. (1993). Calibrating the scales of justice: Studying judges' behavior in bench trials, Indiana Law Journal, 68(4), 1119-98.

35.     Rosenthal, R. & Blanck, P. (1993).  Science and ethics in conducting, analyzing, and reporting social science research: Implications for social scientists, judges and lawyers, Indiana Law J., 68(4), 1209-28.

36.     Rosnow, R.L., Rotheram-Borus, M.J., Ceci, S.J., Blanck, P., & Koocher, G.P. (1993).  The Institutional Review Board as a mirror of scientific and ethical standards, American Psychologist, 48(7), 821-26. *Reprinted in* (1998) Methodological Issues & Strategies in Clinical Research, Joan E. Sieber & Alan E. Kazdin (eds.), pp. 603-709.

37.     Blanck, P. (1993). Interpersonal expectations in the courtroom.  In P.D. Blanck (ed.), Interpersonal expectations:  Theory, research and applications, pp. 64-87.  Cambridge University Press: New York.

38.     Blanck, P. (1994).  The Americans with Disabilities Act: Issues for back and spine-related disability, Spine, 19(1), 103-107.

39.     Blanck, P. (1994).  Straight talk on the ADA, Journal of Orthopedic & Sports Physical Ther., 19(1), 1.

40.     Blanck, P., Schoenberg, C., & Tenney, J. (Feb. 28, 1994).  AIDS-related benefits equation: Soaring costs times soaring needs divided by federal law, New York Law Journal, 211(38), 1-4.

41.     Blanck, P., Schoenberg, C., & Tenney, J. (1994). AIDS-related benefits equation: Soaring costs times soaring needs divided by federal law, AIDS Policy & Law, 9(4), 1-7 *Reprinted in* Mealey's Litigation Reports: Americans with Disabilities Act 2(5), 20-28 (June, 1994); expanded version, AIDS Policy & Law, Buraff Publications, Washington, DC (March 4, 1994).

42.     Blanck, P. (1994).  Reflections on the law and ethics of the Human Genome initiative.  In Genes and human self-knowledge. pp. 183-88 (S. Lawrence, E. Fales & R. Weir, eds.), University of Iowa Press.

43.     Blanck, P. (1994).  Empirical Study of the Americans with Disabilities Act (1990-1993), Journal of Vocational Rehabilitation, 4(3), 211-23.

44.     Blanck, P. (1994).  The emerging society and the Americans with Disabilities Act.  Review of Implementing the Americans with Disabilities Act; Rights and responsibilities of all Americans, Contemporary Psychology, 39(6), 596-97.

45.     Blanck, P. (1994). Legal Forum, Spine, 19(15), 1653.

46.    Blanck, P., Anderson, J.A., Wallach, E.J., & Tenney, J.P. (1994).  Implementing reasonable accommodations using ADR under the ADA: A case of a white collar employee with bipolar mental illness, Mental & Physical Disability Law Reporter, 18(4), 458-64.

47.    Blanck, P. (1994).  Communications Technology for Everyone: Implications for the classroom and beyond, The Annenberg Washington Program, Washington, D.C. [Accessible CD Rom Version, 1995].

48.    Blanck, P. (1994).  Communicating the Americans with Disabilities Act: Transcending Compliance - - A case report on Sears Roebuck & Co., The Annenberg Washington Program, White Paper, Washington, D.C.  Reprinted (1996).  In Driving Down Health Care Costs (J. Burns, ed.), pp. 209-241, Panel Publishers: New York.

49.    Blanck, P.& Folberg, R. (1994). The Americans with Disabilities Act: Emerging issues for ophthalmologists, Ophthalmology, 101, 1635-40.

50.    Blanck, P. (1994).  Review of Implementing the Americans with Disabilities Act: Rights and responsibilities of all Americans, American Journal on Mental Retardation, 99(2), 224-26.

51.    Blanck, P. (1994).  Employment integration, economic opportunity and the Americans with Disabilities Act: Empirical Study from 1990 to 1993, Iowa Law Review, 79(4), 853-923.

52.    Wallach, E.J., Tenney, J.P. & Blanck, P. (Dec. 19, 1994).  Extending the ADA's reach: Sponsors of self-insured funds may be sued under Title I of the ADA, National Law Journal, B5-B7.

53.    Blanck, P. (1994).  Celebrating Communications Technology for Everyone, Federal Communications Law Journal, 47(2), 185-91.

54.    Blanck, P. (1995).  Recent developments in ADA case law and implications for spine professionals, Spine, 20(1), 116-19.

55.    Wallach, E.J., Tenney, J.P., & Blanck, P. (Apr. 17, 1995).  If Supervisors may be personally liable for ADA discrimination, how should employers respond? National Law Journal, C2-C3, C17.

56.    Blanck, P. (1995).  Resolving disputes under the Americans with Disabilities Act: A case example of an employee with a back impairment, Spine, 20(7), 853-59.

57.    Blanck, P. (1995).  Communications technology for everyone: Accessible curriculum, AAMR News & Notes, 7(6), 1&6; 8(1), 1&6.

58.    Blanck, P., Wallach, E.J., & Tenney, J.P. (1995).  Supervisor personal liability for ADA discrimination: Emerging issues for physicians, Spine, 20(13), 1528-32.

59.    Wallach, E.J., Tenney, J.P., & Blanck, P. (1995).  Employee rights under the ADA, Employment Law Strategist, 2(11), 8,5 (Lender Pub.).

60.    Blanck, P. (1995).  Assessing five years of Employment Integration and economic opportunity under the Americans with Disabilities Act, Mental & Physical Disability Law Reporter, 19(3), 385-93.

61.     Blanck, P. (1995).  Disaster Mitigation for Persons with Disabilities: Fostering a New Dialogue, The Annenberg Washington Program, Washington, D.C.  Reprinted in <u>AAMR News & Notes</u> (Nov.-Dec. 1995), 8(6), 3-5.

62.     Blanck, P. (1995).  Implementing the Americans with Disabilities Act: A Case Report on Sears, Roebuck & Co., <u>Spine</u>, 20(19), 2161-67.

63.     Cate, F.H., Blanck, P., & Makoul, G. (1995).  Communications in Medicine: The Annenberg Washington Program and a decade of making a difference, The Annenberg Washington Program, Washington, D.C.

64.     Blanck, P. (1995).  Implementing the Americans with Disabilities Act: 1996 Follow-up Report on Sears, Roebuck & Co., <u>Spine,</u> 21(13), 1602-08.

65.     Blanck, P. (1996).  The Appearance of Justice revisited, <u>Journal of Criminal Law & Criminology</u>, 86(3), 887-927.

66.     Blanck, P. (1996).  Communicating the Americans with Disabilities Act:  Transcending Compliance – 1996 Follow-up report on Sears, Roebuck & Co., The Annenberg Washington Program, Washington, D.C.

67.     Blanck, P. (1996).  Empirical Study of the Americans with Disabilities Act: Employment Issues from 1990-1994, <u>Behavioral Sciences & the Law</u>, 14(1), 5-27.

68.     Blanck, P. (1996).  Transcending Title I of the Americans with Disabilities Act: A Case Report on Sears, Roebuck & Co., <u>Mental & Physical Disability Law Reporter</u>, 20(2), 278-86.

69.     Moseley, P.L., Blanck, P., & Merritt, R. (1996). Hospital privileges and the Americans with Disabilities Act, <u>Spine</u>, 21(19), 2288-93.

70.     Blanck, P. (1996).  Studying the Employment Provisions of the Americans with Disabilities Act, <u>Encyclopedia Britannica: 1997 Medical and Health Annual</u>, 215-19.

71.     Blanck, P. & Marti, M.W. (1996).  Genetic Discrimination and the Americans with Disabilities Act: Legal, Health and Policy Implications, <u>Behavioral Sciences and the Law</u>, 14, 411-32.

72.     Blanck, P. & Marti, M.W. (1997).  Attitudes, Behavior, and the Employment Provisions of the Americans with Disabilities Act, <u>Villanova Law Review</u>, 42(2), 345-408.

73.     Blanck, P. (1997).  Assessing Employment Integration under Title I of the Americans with Disabilities Act. <u>The Continuing Struggle: Civil Rights and the Clinton Administration</u> (C. Yu & W. Taylor, eds., Citizen's Commission on Civil Rights), 169-76.

74.     Blanck, P. (1997).  The Economics of the Employment Provisions of the Americans with Disabilities Act: Part I – Workplace Accommodations, <u>DePaul Law Review</u>, 46(4), 877-914.

75.     Blanck, P., Kirschner, K. & Bienen, L. (1997).  Socially-Assisted Dying and People with Disabilities: Some Emerging Legal, Medical, and Policy Implications.  <u>Mental & Physical Disability Law Reporter</u>, 21(4), 538-43.

76.     Blanck, P. (1997).  Students with Learning Disabilities, Reasonable Accommodations, and the Rights of Colleges and Universities to Establish and Enforce Academic Standards: *Guckenberger v. Boston University*. Mental & Physical Disability Law Reporter, 21(5), 679-86.

77.     Blanck, P. (1998). Debunking Myths about the Employment of Persons with Mental Disabilities, Contemporary Psychology, 43(1), 68-70.

78.     Blanck, P. & Butkowski, C. (1998).  Pregnancy-Related Impairments and the Americans with Disabilities Act.  Sorosky, J. (ed.) Obstetrics and Gynecology Clinics of North American, 25(2), 435-445.

79.     Blanck, P. (1998).  The Americans with Disabilities Act and the Emerging Workforce: Employment of People with Mental Retardation.  American Association on Mental Retardation, Washington, D.C.

80.     Blanck, P. & Steele, P. (1998).  The Emerging Role of the Staffing Industry in the Employment of Persons with Disabilities – A Case Report on Manpower Inc. Iowa CEO and Law, Health Policy and Disability Center, Iowa City, IA.

81.     Berven, H.M. & Blanck, P. (1998).  The Economics of the Americans with Disabilities Act: Part II: Patents, Innovations and Assistive Technology.  Notre Dame Journal of Law, Ethics & Public Policy, 12(1), 9-120.

82.     Bienen, L., Kirschner, K., & Blanck, P. (1998).  Introduction to Conference on Socially-Assisted Dying. Cornell Journal of Law & Public Policy, 7, 255-66.

83.     Blanck, P. (1998).  Job placement for Employees with Disabilities – Manpower Leads the Way, Employment Relations Today, 25, 57-65.

84.     Blanck, P. (1998).  Civil Rights, Learning Disability, and Academic Standards, Journal of Gender, Race, & Justice, 2(1), 33-58.

85.     Blanck, P. (1999).  Empirical Study of Disability, Employment Policy, and the ADA, Mental & Physical Disability Law Reporter, 23Z(2), 275-80.

86.     Berven, H.M. & Blanck, P. (1999).  Assistive Technology Patenting Trends and the Americans with Disabilities Act, Behavioral Sciences & the Law, 17(1), 47-71.

87.     Blanck, P. (1999).  Introduction to the Special Section: Employment and the Americans with Disabilities Act, Behavioral Sciences & the Law, 17(1), 3-5.

88.     Blanck, P. & Pransky, G. (1999).  Workers with Disabilities, in 14(3) State of the Art Reviews in Occupational Medicine: Special Populations and Occupational Health, 581-93 (Hanley and Belfus Pub., Glenn Pransky & Howard Frumkin, eds.).

89.     Blanck, P. & Berven, H.M. (1999).   Evidence of Disability after Daubert, Psychology, Public Policy and Law, 5(1), 16-40.

90.     Schwochau, S. & Blanck, P. (2000).  The Economics of the Americans with Disabilities Act: Part III - - Does the ADA Disable the Disabled? Berkeley Journal of Employment and Labor Law, 21(1), 271-313.

91.     Blanck, P. (2000).  Studying Disability, Employment Policy, and the ADA.  In Leslie Francis & Anita Silvers (eds.), Tenth Anniversary of the Americans with Disabilities Act 209-20 (Routledge Press).

92.     Blanck, P. & Sandler, L.A. (2000).  ADA Title III and the Internet: Technology and Civil Rights, Mental & Physical Disability Law Reporter, 24(5), 855-59.

93.     Blanck, P. (ed.) (2000).  Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 329-55, Northwestern University Press.

94.     Blanck, P. (2000).  The Economics of the ADA, in P. Blanck, (ed.), Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, & Research, 201-27, Northwestern U. Press.

95.     Berven, H.M. & Blanck, P. (2000).  Unanticipated Economic Gains and the ADA: Assistive Technology Patent Trends, in P.D. Blanck, (ed.), Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 329-55, Northwestern University Press.

96.     Marti, M.W. & Blanck, P. (2000).  Attitudes, Behavior, and the ADA, in P.D. Blanck (ed.), Employment, Disability, and the Americans with Disabilities Act: Issues in Law, Public Policy, and Research, 356-84, Northwestern University Press.

97.     Blanck, P., Sandler, L.A., Schmeling, J.L., & Schartz, H.A. (2000).  The Emerging Workforce of Entrepreneurs with Disabilities: Preliminary Study of Entrepreneurship in Iowa, Iowa Law Review, 85, 1583-1670.

98.     Debate - - Blanck, P. & Olson, W. (2000).  The Unintended Consequences of the Americans with Disabilities Act [Proceedings], Iowa Law Review, 85, 1811-34.

99.     Blanck, P. & Millender, M. (2000).  Before Civil Rights: Civil War Pensions and the Politics of Disability in America, Alabama Law Review, 52, 1-50.

100.    Blanck, P. (2001).  Civil War Pensions and Disability. Ohio State Law Journal, 62, 109-249.

101.    Blanck, P. & Schartz, H.A. (2001).  Towards Reaching a National Employment Policy for Persons with Disabilities, 1-10, in Emerging Workforce Issues: W.I.A., Ticket to Work, and Partnerships, R. McConnell (ed.), Switzer Seminar Monograph Series, National Rehabilitation Association.

102.    Blanck, P., Schartz, H.A. & Schartz, K.M. (2001).  Labor Force Participation and Income of Individuals with Disabilities in Sheltered and Competitive Employment: Cross-Sectional and Longitudinal Analyses from Seven States during the 1980s and 1990s, President's Task Force on Employment of Adults with Disabilities.

103.    Blanck, P. & Song, C. (2001).  "With Malice Toward None: With Charity Toward All": Civil War Pensions for Native and Foreign-Born Union Army Veterans, Journal of Transnational Law & Contemporary Problems, 11(1), 1-76.  Portion reprinted in The Civil War Veteran: A Historical Reader, Larry M. Logue & Michael Barton (eds.), New York University Press, 221-26 (2007).

104.    Blanck, P. (2001).  Introduction to The Social Construction of Disability: Historical, Contemporary, and Comparative Views, Journal of Transnational Law & Contemporary Problems, 11(1), i-ii.

105.  Blanck, P. & Song, C. (2002).  Civil War Pension Attorneys and Disability Politics, <u>University of Michigan Journal of Law Reform</u>, 35(1 & 2), 137-217.

106.  Blanck, P. & Schmeling, J.L. (2002).  Americans with Disabilities Act: Recent and Pending U.S. Supreme Court Decisions and Implications for Spine Professionals, <u>Spine</u>, 27(4), 439-443.

107.  Zwerling, C., Whitten, P.S., Sprince, N.L., Davis, C.S., Wallace, R.B., Blanck, P., & Heeringa, S.G. (2002).  Workforce Participation by Persons with Disabilities: The National Health Interview Survey Disability Supplement, 1994-5, <u>Journal of Occupational and Environmental Medicine</u>, 44(2), 358-64.

108.  O'Day, B., Schartz, H., & Blanck, P. (eds.)  (2002).  Introduction: Disability, Public Policy and Employment, <u>Behavioral Sciences & the Law</u>, 20(6), 537-39.

109.  Schartz, K., Schartz, H., & Blanck, P.  (2002). Employment of Persons with Disabilities in Information Technology Jobs: A Literature Review for "IT Works," <u>Behavioral Sciences & the Law</u>, 20(6), 637-57.

110.  Blanck, P., Clay, L., Schmeling, J., Morris, M., & Ritchie, H. (2002).  Applicability of the ADA to "Ticket to Work" Employment Networks, <u>Behavioral Sciences & the Law</u>, 20(6), 621-36.

111.  Blanck, P., Linares, C., & Song, C. (2002).  Evolution of Disability in Late Nineteenth Century America: Civil War Pensions for Union Army Veterans with Musculoskeletal Conditions, <u>Behavioral Sciences & the Law</u>, 20(6), 681-97.

112.  Schwochau, S. & Blanck, P. (2003).  Does the ADA Disabled the Disabled? More Comments, <u>Industrial Relations</u>, 42(1), 67-77.

113.  Blanck, P. & Song, C. (2003).  "Never Forget What They Did Here": Civil War Pensions for Gettysburg Union Army Veterans and the Politics of Disability in Late Nineteenth Century America, <u>William & Mary Law Review</u>, 44, 1109-71.

114.  Blanck, P., Schartz, H.A., & Schartz, K.M. (2003).  Labor Force Participation and Income of Individuals with Disabilities in Sheltered and Competitive Employment: Cross-Sectional and Longitudinal Analyses of Seven States during the 1980s and 1990s, <u>William & Mary Law Review</u>, 44, 1029-1108.

115.  Odem, N. & Blanck, P. (2003).  Physician Shareholder Practice Groups and ADA Coverage, <u>Spine</u>, 28(3), 319-12 (Feb. 1, 2003).

116.  Schartz, H., O'Day, B., & Blanck, P. (eds.) (2003).  Introduction: Disability, Public Policy, and Technology, <u>Behavioral Sciences & the Law</u>, 21(1), 1-3.

117.  Ritchie, H. & Blanck, P.  (2003).  Promise of the Internet for Disability: Study of Online Services and Accessibility of Centers for Independent Living Web Sites, <u>Behavioral Sciences & the Law</u>, 21(1), 5-26.

118.  Klein, D., Myhill, W., Hansen, L., Asby, G., Michaelson, S., & Blanck, P. (2003).  Opening Doors to Education:  Iowa School Website Accessibility, <u>Behavioral Sciences & the Law</u>, 21(1), 27-49.

119.  Blanck, P., Ritchie, H., Schmeling, J.A., & Klein, D.  (2003).  Technology for Independence: A Community-Based Resource Center, <u>Behavioral Sciences & the Law</u>, 21(1), 51-62.

120.    Blanck, P.  (2003).  Topic Paper: Righting the ADA--Chevron v. Echazabal: The ADA's "Direct Threat" Defense, Prepared for the National Council on Disability, Washington, DC, at http://www.ncd.gov/newsroom/publications/03publications.html.

121.    Blanck, P. & Schartz, H.A. (2003).  Comparative Study of the Emerging Workforce of Persons with Disabilities 347-85, in Different but Equal: The Rights of People with Intellectual Disabilities, S. Herr, H. Koh, & L. Gostin (eds.), Oxford University Press.

122.    Blanck, P., Schartz, H.A., Schartz, K., & Schmeling, J.  (2003).  "IT Works:" Disability and Employment in Information Technology, SCI/Life, Fall 2002/Winter 2003, 26-27.

123.    Blanck, P., Schur, L., Kruse, D., Schwochau, S. & Song. C.  (2003).  Calibrating the Impact of the ADA's Employment Provisions, Stanford Law & Policy Review, 14(2), 267-90.

124.    Zwerling, C., Whitten, P.S., Sprince, N.L., Davis, C.S., Wallace, R.B., Blanck, P., & Heeringa, S.G. (2003).  Workplace Accommodations for People with Disabilities: National Health Interview Survey Disability Supplement, 1994-5, Journal of Occupational and Environmental Medicine, 45(5): 517-525.

125.    Blanck, P., Schwochau, S. & Song. C.  (2003).  Is it Time to Declare the ADA A Failed Law? 301-37, in What is Causing the Decline in the Employment of People with Disabilities? : A Policy Puzzle, David C. Stapleton and Richard V. Burkhauser (eds.), UpJohn Institute.

126.    Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2003).  Disability Civil Rights Law and Policy, Thomson/West Publishers.

127.    Logue, L. & Blanck, P.  (2004).  "There Is Nothing That Promotes Longevity Like a Pension:" Public Policy and Mortality of Civil War Union Army Veterans, Wake Forest Law Review, 39, 49-67.

128.    Blanck, P.  (2004).  Justice for All? Stories about Americans with Disabilities and their Civil Rights, Journal of Gender, Race & Justice, 8, 1-32.

129.    Blanck, P., Wilichowski, A, & Schmeling, J.  (2004).  Disability Civil Rights Law and Policy: Accessible Courtroom Technology, William and Mary Bill of Rights Journal, 3, 825-42.

130.    Schmeling, J., Schartz, H.A., & Blanck, P.  (2004).  United States Country Report in 2004, in International Disability Rights Monitor, Center for International Rehabilitation, 349-70.

131.    Sewell, R., Song, C., Smith, R., Bauman, N., & Blanck, P.  (2004). Union Army Veterans with Hearing Loss and the Evolution of Disability in America During 1862-1920, The Laryngoscope: Journal for the Triological Society, 114(12), 2147-2153, December.

132.    Schmeling, J., Schartz, H.A., & Blanck, P.  (2005).  The New Disability law and Policy Framework: Implications for Case Managers, 88-121, in Case Management for Rehabilitation Health Professionals (2nd Ed., Vol. 1, Foundational Aspects), edited by Fong Chan, Michael J. Leahy, & Jodi Saunders, Aspen Professional Services Publisher.

133.    Blanck, P. & Schartz, H.  (2005). Special Issue: Corporate Culture and Disability, Behavioral Sciences & the Law, 23(1), 1-2.

134. Schur, L., Kruse, D., & Blanck, P. (2005).  Corporate Culture and the Employment of Persons with Disabilities, <u>Behavioral Sciences & the Law</u>, 23(1), 3-20.

135. Sandler, L. & Blanck, P. (2005).  Accessibility as a Corporate Article of Faith at Microsoft: Case Study of Corporate Culture and Human Resource Dimensions, <u>Behavioral Sciences & the Law</u>, 23(1), 39-64.

136. Klein, D., Schmeling, J., & Blanck, P. (2005).  Emerging Technologies and Corporate Culture at Microsoft: A Methodological Note, <u>Behavioral Sciences & the Law</u>, 23(1), 65-96.

137. Ball, P., Monaco, G., Schmeling, J., Schartz, H., Blanck, P. (2005).  Disability as Diversity in Fortune 100 Companies, <u>Behavioral Sciences & the Law</u>, 23(1), 97-121.

138. Searcy, M., Duck, S., & Blanck, P. (2005). Nonverbal Behavior in the Courtroom and the "Appearance of Justice."  41-61. In Ronald Riggio & Robert Feldman (Eds.), <u>Applications of Nonverbal Communication</u>, Lawrence Erlbaum Publishers.

139. Blanck, P.  (2005). Review of the "The Disability Pendulum," <u>Law and Politics Book Review</u>, 15(5) (May), pp. 354-58, available at http://www.bsos.umd.edu/gvpt/lpbr.

140. Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2005). <u>Disability Civil Rights Law and Policy: Cases and Materials</u>, Thomson/West Publishers.  [Teacher's Manual, 2006.]

141. Blanck, P. (Ed.)  (2005).  <u>Disability Rights</u>, in the collection of the International Library of Essays on Rights (senior eds. of the library, T.D. Campbell & C. Stuart), Ashgate Publishing Limited [with reprints of Blanck et al. articles].

142. Blanck, P., Schartz, H.A., Ritchie, H., & Rosenthal, R.  (2005). Science and Ethics in Conducting, Analyzing, and Reporting Disability Policy Research, 141-59.  In <u>Advances in Social and Organizational Psychology: A Tribute to Ralph Rosnow</u>, Lawrence Erlbaum Publishers.

143. Blanck, P. (ed.) (Fall 2005).  Introduction: Special Issue on Disability Law and Policy, 25(4) <u>Disability Studies Quarterly</u>, Part 1, available at http://www.dsq-sds.org/_articles_html/2005/fall. (Part 2 co-edited with H. Schartz).

144. Hendricks, D.J., Batiste, L., Hirsh, A., Dowler, D. Schartz, H., & Blanck, P.  (Fall 2005).  Cost and Effectiveness of Accommodations in the Workplace: Preliminary Results of a Nationwide Study, 25(4) <u>Disability Studies Quarterly</u>, Part 1, available at http://www.dsq-sds.org/_articles_html/2005/fall/.

145. Ball, P., Morris, Hartnett, J., & Blanck, P.  (2005). Breaking the Cycle of Poverty: Asset Accumulation by People with Disabilities, 25(4) <u>Disability Studies Quarterly</u>, Part 2; available at http://www.dsq-sds.org/_articles_html/2005/fall/.

146. Schmeling, J., Schartz, H., Morris, M. & Blanck, P.  (2005).  Tax Credit and Asset Accumulation: Finding from the Harris/NOD Survey of Americans with Disabilities, 25(4) <u>Disability Studies Quarterly</u>, Part 2; available at http://www.dsq-sds.org/_articles_html/2005/fall/.

147. Blanck, P. (2005).  Americans with Disabilities and their Civil Rights: Past, Present, Future, <u>Workplace Discrimination and the Law in North America</u>, NAFTA Labor Secretariat Publisher, Washington, D.C.

148.    Hill, E., Siegal, C., Waterstone, M., & Blanck, P. (2006). Anti-Discrimination Law: Judicial Interpretations, Vol. 1: 112-116, in <u>Encyclopedia of Disability</u>, Sage Publishers.

149.    Schwartz, J.A., Siegal, C., Waterstone, M., Hill, E., & Blanck, P. (2006). Disability Policy, Vol. 1: 468-476, in <u>Encyclopedia of Disability</u>, Sage Publishers.

150.    Waterstone, M., Hill, E., Siegal, C., & Blanck, P. (2006). Discrimination Law: United States, Vol. 1: 452-461, in <u>Encyclopedia of Disability</u>, Sage Publishers.

151.    Schmeling, J. & Blanck, P. (2006). United States Country Report in 2005, in <u>International Disability Rights Monitor</u>, Center for International Rehabilitation, xxx-xxx.

152.    Blanck, P. & Song, C. (2005). "I Don't Believe Any Colored Ex-Soldier Can Get Justice:" Disability, Race and Pensions for Union Army Veterans, Unpublished Manuscript; on file at <u>disability.law.uiowa.edu</u>.

153.    Blanck, P. (2005). Americans with Disabilities and their Civil Rights: Past, Present, Future, <u>University of Pittsburgh Law Review</u>, 66, 687-719.

154.    Blanck, P. (2005). The Burton Blatt Institute: Centers of Innovation on Disability at Syracuse University, <u>Syracuse Law Review</u>, 56(2), 201-32.

155.    Rich, R.F., Erb, C.T., Prudhomme, T.I., & Blanck, P. (2006). <u>Disability Claims, Review, Hearings and Appeals Procedures: An Analysis Of Administrative Best Practices</u>; Technical Report submitted to the U.S. Social Security Administration, Disability Research Institute, available at: <u>www.dri.uiuc.edu/research/p04-03c/legal_issues_final_report.doc</u>.

156.    Blanck, P., Hill, E., Siegal, C., & Waterstone, M. (2006 Supp. to the 1st Ed.). <u>Disability Civil Rights Law and Policy: Cases and Materials</u>, Thomson/West Publishers.

157.    Schartz, H., Schartz, K., Hendricks, D.J., & Blanck, P. (2006). Workplace Accommodations: Empirical Study of Current Employees, <u>Mississippi Law Journal</u>, 75, 917-43.

158.    Blanck, P. (2006). <u>U.S. Society and Laws Protect the Rights of Persons with Disabilities</u>, <u>e-Journal USA</u>, 5-8, at: <u>http://iipdigital.usembassy.gov/st/english/publication/2008/05/20080526235001srenod0.2262384.html#axz z2Mxa3VOw5</u>.

159.    Schartz, H., Hendricks, D.J., & Blanck, P. (2006). Workplace Accommodations: Evidence-Based Outcomes, <u>Work</u>, 27, 345–354.

160.    Blanck, P. & Malloy, R.P. (Eds.) (2006 - present). <u>Disability Law and Policy</u>, Book Series for Cambridge University Press.

161.    Reina, M.V., Adya, M. & Blanck, P. (2007). Defying Double Discrimination, <u>Georgetown Journal of International Affairs</u>, 8, 95-104.

162.    Blanck, P., Adya, M., Myhill, W., Samant, D., & Chen, P. (2007). Employment of Persons with Disabilities: Twenty-Five Years Back and Forward, <u>Minnesota Law and Inequality: A Journal of Theory and Practice</u>, 25, 323-353.

163. Blanck, P.  (2007). Enforcing ICT Accessibility Rules, <u>The Accessibility Imperative: Implications of the Convention on the Rights of Persons with Disabilities for Information and Communication Technologies, G3ict, World Times Inc.</u>, 186-93.

164. Myhill, W. N., Samant, D., Klein, D., Kaplan, S., Reina, M. V. & Blanck, P.  (2007). Distance Education Initiatives and Their Early 21st Century Role in the Lives of People with Disabilities, in "Distance Education Research Trends" (ed. E. Bailey, Nova Science Publishers), 1-38.

165. Logue, L. & Blanck, P.  (2008). "Benefit of the Doubt": African-American Civil War Veterans and Pensions, <u>Journal of Interdisciplinary History</u>, xxxviii: 3 (Winter, 2008), 377–399.

166. Baker, P., Caves, K. & Blanck, P. (Eds.) (2008).  Special Issue on Disability Policy and Law, <u>Assistive Technology Journal</u>, 20, full issue.

167. Myhill, W., Cogburn, D.L., Samant, D., Kwasi Addom, B., & Blanck, P.  (2008). Developing Accessible Cyberinfrastructure-Enabled Knowledge Communities in the National Disability Community: Theory, Practice, and Policy, <u>Assistive Technology Journal</u>, 20, 157-74.

168. Blanck, P. (2008).  Closing: Special Issue on Disability Policy and Law, Flattening the (In-Accessible) Cyber World for People with Disabilities, <u>Assistive Technology Journal</u>, 20, 175-80.

169. Blanck, P.  (2008).  "The Right to Live in the World": Disability Yesterday, Today, and Tomorrow, 2008 Jacobus tenBroek Disability Law Symposium, <u>Texas Journal on Civil Liberties and Civil Rights</u>, 13, 367-401.

170. Adya, M. & Blanck, P.  (2008). Judges' Nonverbal Behavior, in <u>Encyclopedia of Psychology and Law</u>, ed. Brian L. Cutler, Sage, 388-90.

171. Blanck, P., Myhill, W., Solstad Vedeler, J., Morales, J., & Pearlman, P.  (2009). Individuals with Cancer in the Workforce and their Federal Rights, <u>Work and Cancer Survivors</u> (ed. Michael Feuerstein), Springer, 255-76.

172. Schur, L., Kruse, D. Blasi, J, & Blanck, P.  (2009). Is Disability Disabling in All Workplaces? Disability, Workplace Disparities, and Corporate Culture, <u>Industrial Relations</u>, 48(3), 381-410, July.

173. Blanck, P., Schartz, H., Hendricks, DJ, Schartz, K., & Myhill, W.N.  (2009). Empirical Study of the Americans with Disabilities Act, in <u>Assessing the Employment Provisions of the Americans with Disabilities Act</u>, (BBI Working Paper; at http://bbi.syr.edu).

174. Blanck, P., Hill, E., Siegal, C., & Waterstone, M.  (2009). <u>Disability Civil Rights Law and Policy</u>, Second Edition, Thomson/West Publishers. [Statutory Supplement & Teacher's Manual, 2009]

175. Araten-Bergman, T., Solstad Vedeler, J., Myhill, W., & Blanck, P.  (2009). Employment and Labor, In S. Burch (Ed.) Vol. I, <u>Encyclopedia of American Disability History</u>, NY, NY: Facts on File, Inc., 321-27.

176. Blanck, P. & Myhill, W.  (2009).  Disabilities, Care of Children with: Legal and Public-policy Perspectives; Care for Children with Mental and/or Physical Disabilities from Birth through Adolescence, Shweder, R.A., T.R. Bidell, A.C. Dailey, S.D. Dixon, P.J. Miller, & J. Modell, eds. <u>The Child: An Encyclopedic Companion</u>. Chicago: University of Chicago Press, 275-76.

177.   Schreuer, N.U., Myhill, W., Aratan, T., Samant, D., & Blanck, P.  (2009). Workplace Accommodations: Occupational Therapists as Mediators in the Interactive Process, Work, 33, 1-12.

178.   Samant, D., Soffer, M., Hernandez, B., Akinpelu, O., Adya, M., Levy, J., Repoli, E., Kramer, M., & Blanck, P.  (2009). Corporate Culture and Employment of People with Disabilities: Role of Social Workers and Service Provider Organizations, Journal of Social Work in Disability & Rehabilitation, 8, 171–188.

179.   Myhill, W. & Blanck, P.  (2009). Disability and Aging: Historical and Contemporary Challenges, Marquette University Law School Elder's Advisor, 11(1), 47-80.

180.   Logue, L. & Blanck, P.  (2009). Civil War, In S. Burch (Ed.) Vol. I, Encyclopedia of American Disability History, NY, NY: Facts on File, Inc., 181-83.

181.   Blanck, P. & Logue, L.  (2009). Lemon, George, In S. Burch (Ed.) Vol. II, Encyclopedia of American Disability History, NY, NY: Facts on File, Inc., 559-60.

182.   Stein, M.A., Stein, P.J.S. & Blanck, P. (2009). Disability, Vol. 2, Legal History Encyclopedia, NY, NY: Oxford University Press, 334-37.

183.   Hill, E. & Blanck, P.  (2009). Future of Disability Rights:  Part Three—Statutes of Limitations in Americans with Disabilities Act, "Design and Construct" Cases, Syracuse Law Review, 60, 125-159.

184.   Hill, E. & Blanck, P.  (2009).  Future of Disability Law and Advocacy and "The Right to Live in the World", Second Jacobus tenBroek Disability Law Symposium, Texas Journal on Civil Liberties and Civil Rights, 15, 1-31.

185.   Logue, L. & Blanck, P.  (2010). Race, Ethnicity, and Disability: Veterans and Benefits in Post-Civil War America, Cambridge University Press. [Reviewed in American Historical Review, 116(5), Dec. 2011, at 1504.]

186.   Soffer, M., Rimmerman, A., Blanck, P., & Hill E.  (2010). Media and the Israeli Disability Rights Legislation: Progress or Mixed and Contradictory Images? Disability and Society, 25(6), 687–700.

187.   Soffer, M., McDonald, K., & Blanck, P.  (2010). Poverty Among Adults with Disabilities: Barriers to Promoting Asset Accumulation in Individual Development Accounts, American Journal of Community Psychology, 46(3-4), 376-385.

188.   Gottlieb, A., Myhill, W., & Blanck, P.  (2010). Employment of People with Disabilities, International Encyclopedia of Rehabilitation, at http://cirrie.buffalo.edu/encyclopedia/en/article/123/.

189.   Blanck, P.  (2010). Disability and Aging: Historical and Contemporary Views, in Disability and Age Discrimination: Perspectives in Law and Psychology (ed. R. Wiener), Springer, 49-70.

190.   Nakagawa, J. & Blanck, P.  (2010). Future of Disability Law in Japan: Employment and Accommodation, Loyola International & Comparative Law Review, 33(1), 173-221.

191.   Ali, M., Schur, L., Kruse, D., & Blanck, P.  (2011).  What Jobs Do People with Disabilities Want? The Same as Anyone Else, Journal of Occupational Rehabilitation, 21(2), 199-210 (2011). Online First Article, 10-6-10 at http://www.springerlink.com/content/8784326332537566/fulltext.pdf.

192.    Blanck, P.  (2012). Disability and Diversity: Historical and Contemporary Influences, Workplace Inclusion of Employees with Disabilities, <u>Managing Diversity in Today's Workplace: Vol. 1: Gender, Race, Sexual Orientation, Ethnicity, and Power</u>, 173-208, in Women and Careers in Management Series, Michele Paludi (ed.) Praeger.

193.    Lord, J., Raja Samant, D., & Blanck, P.  (2013). Beyond the Orthodoxy of Rule of Law and Justice Sector Reform: A Framework for Legal Empowerment and Innovation through the Convention on the Rights of Persons with Disabilities, in <u>World Bank Legal Review</u> (Eds. H. Cisse, S. Muller, C. Thomas & C. Wang), 4: 45-65.

194.    Blanck, P., Goldstein, B., & Myhill, W.  (2013). <u>Legal Rights of Persons with Disabilities: An Analysis of Federal Law</u>: Second Edition, LRP Publications.

195.    Schur, L., Kruse, D., & Blanck, P.  (2013). <u>People with Disabilities: Sidelined or Mainstreamed?</u> Cambridge University Press.

196.    Blanck, P., Waterstone, M., Myhill, N. & Siegal, C.  (3rd ed., 2014). <u>Disability Civil Rights Law and Policy: Case and Materials</u>, West Publishers.

197.    Blanck, P. (Ed.) (2014). Introduction: Disability, Law and Public Policy, and the World Wide Web, <u>Behavioral Sciences & the Law,</u> 32(1), 1-3.

198.    Blanck, P. (2014). The Struggle for Web Equality by Persons with Cognitive Disabilities, <u>Behavioral Sciences & the Law</u>, 32(1), 4-32.

199.    Schur, L., Nishii, L., Adya, M., Kruse, D., Bruyere, S., & Blanck, P. (2014).  Accommodating Employees with and without Disabilities, <u>Human Resource Management</u>, 53(4), 593-621.

200.    Blanck, P. (2014). <u>*eQuality*: The Struggle for Web Accessibility by Persons with Cognitive Disabilities,</u> Cambridge University Press.

        Reviewed by G. Anthony Giannoumis. (2015). Articulating a right to the Web for persons with cognitive disabilities, <u>Universal Access to the Information Society</u>; DOI 10.1007/s10209-015-0432-1.

        Reviewed by Shirly Avrami. (2017). eQuality: The Struggle for Web Accessibility by Persons with Cognitive Disabilities, <u>Social Security</u> [in Hebrew] at: https://www.btl.gov.il/Publications/Social_Security/bitahon101/Documents/70-new-books.pdf

201.    de Paor, A., Quinn, G., & Blanck, P. (Eds.) (2015). Introduction, 1-8, <u>Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response,</u> Routledge Press.

202.    de Paor, A., Quinn, G., & Blanck, P. (Eds.) (2015). Conclusion, 269-74, <u>Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response</u>, Routledge Press.

203.    Blanck P. & de Paor, A. (2015). U.S. Legislative and Policy Response–Some Historical Context to GINA, 97-113, <u>Genetic Discrimination: Transatlantic Perspectives on the Case for a European Level Legal Response</u>, Routledge Press.

204.    Blanck, P. & Martinis, J. (2015). "The Right to Make Choices": National Resource Center for Supported Decision-Making, <u>Inclusion</u>, 3(1), 24-33.

205.	McDonald, K.E., Williamson, P., Weiss, S., Adya, M., Blanck, P. (2015). The March Goes On: Community Access for People with Disabilities, <u>Journal of Community Psychology</u>, 43(3), 348-363.

206.	Lord, J.E., Raja Samant, D., & Blanck, P. (2015). Law and People with Disabilities, in <u>International Encyclopedia of Social & Behavioral Sciences</u>, ed. J. Wright; Oxford: Elsevier, 2d ed., Vol. 13, 497–503.

207.	Blanck, P. (2015). ADA at 25 and People with Cognitive Disabilities: From Voice to Action, <u>Inclusion</u>, 3(2), 46-54.

208.	Blanck, P. (2015). *eQuality*: Web Accessibility and People with Cognitive Disabilities, <u>Inclusion</u>, 3(2), 75-91.

209.	International Labour Organization (Murray, B., Blanck, P., Myhill, W., & O'Reilly, A.: Contributing Authors) (3d edition, 2015). <u>Decent work for persons with disabilities: promoting rights in the global development agenda</u>, International Labour Organization (ILO), Geneva, Switzerland.

210.	Blanck, P. (2016). ADA at 25 and Persons with Cognitive Disabilities: From Action to Inclusion, <u>Inclusion</u>, 4(1): 1-5.

211.	Blanck, P. (2016). The First "A" in the ADA: And 25 More "A"s Toward Equality for Americans with Disabilities, <u>Inclusion</u>, 4(1): 46-51.  *Reprinted as* Blanck, P. (2016). The First "A" in the ADA: And Twenty-Five More "A"s Towards Equality for Americans with Disabilities, in <u>The Future of Disability Law: Presentations from the 2015 Jacobus tenBroek Disability Law Symposium</u> 27-36 (ed. D. Ferleger; National Federal of the Blind, Baltimore: MD).

212.	Morris, M., Rodriguez, C., & Blanck, P. (2016). ABLE Accounts: A Down Payment on Freedom, <u>Inclusion</u>, 4(1): 21-29.

213.	Blanck, P. (2016, April 29). Universal Architectural Design and People with Disabilities, <u>Numbers Magazine by Kreab</u>, 14, 64-69 (Spanish and English).

214.	de Paor, A. & Blanck, P. (2016). Precision Medicine and Advancing Genetic Technologies—Disability and Human Rights Perspectives, Special Issue on Precision Medicine, Law & Disability, <u>Laws</u>, 5(3), 36-59.

215.	Ekberg, K., Pransky, G., Besen, E., Fassier, J., Feuerstein, M., Munir, F., & Blanck, P. (2016). New Business Structures Creating Organizational Opportunities and Challenges for Work Disability Prevention, <u>Journal of Occupational Rehabilitation</u>, 26(4), 480-489.

216.	Pransky, G., Fassier, J.P. Besen, E., Blanck, P., Ekberg, K., Feuerstein, M., Munir, F. (2016). Sustaining Work Participation across the Life Course, <u>Journal of Occupational Rehabilitation</u>, 26(4), 465-479.

217.	Blanck, P. & Flynn, E. (Eds.) (2017). <u>Routledge Handbook of Disability Law and Human Rights</u>, Taylor & Francis Group, London, UK.

218.	Blanck, P. (2017). *eQuality*: The Right to the Web, in <u>Routledge Handbook of Disability Law and Human Rights</u>, 166-94, Taylor & Francis Group, London, UK.

219.     Blanck, P., Campanella, T., & Martinis, J. (2017). Advocacy and Legal Considerations to Ensure Civil Rights, in <u>A Comprehensive Guide to Intellectual and Developmental Disabilities</u> (eds. Michael Wehmeyer, Ivan Brown, Maire Percy, Karrie Shogren, & Alan Fung), 79-88 (2nd ed., 2017, Paul H. Brookes Publishing Company).

220.     Arstein-Kerslake, A., Browning, M., Watson, J., Martinis, J., & Blanck, P. (2017). Future Directions in Supported Decision-Making, <u>Disability Studies Quarterly</u>, 37(1).

221.     Blanck, P. (2017). Disability in Prison, <u>University of Southern California Interdisciplinary Law Journal</u>, 26(2), 309-22.

222.     Giannoumis, A.G., Land, M., Wondwossen, B., & Blanck, P. (2017). Web Accessibility and Technology Protection Measures: Harmonizing the rights of persons with cognitive disabilities and copyright protections on the web, <u>Cyberpsychology: Journal of Psychosocial Research on Cyberspace</u>, Special issue on "Internet use and disability–risks, opportunities and challenges," *11*(1), article 5. doi: 10.5817/CP2017-1-5.

223.     Blanck, P. (2017). Web Accessibility for People with Cognitive Impairments: A Legal Right? In <u>Global Inclusion: Disability, Human Rights, and Information Technology</u> (eds. Michael Stein & Jonathan Lazar), University of Pennsylvania Press, 41-57.

224.     Blanck, P. & Rotella, M. (2017, March 21). Universal Design and People with Disabilities: "Destiny Arms," a Global Universal Design Commission Living Laboratory, <u>Numbers Magazine by Kreab</u> 19, 59-61 (Spanish and English).

225.     Martinis, J., Campanella, T., Blanck, P., Wehmeyer, M., & Shogren, K. (2017). Supported Decision-Making as an Alternative to Guardianship and Means of Increasing Self-Determination for People with Intellectual and Developmental Disabilities, 247-59, in <u>Handbook of Positive Psychology in Intellectual and Developmental Disabilities: Translating Research into Practice</u> (eds. K. Shogren, M. Wehmeyer, & N. Singh) (Springer: NY).

226.     Perry, M.L., Rotella, M., & Blanck, P. (2017, November 3). Universal Design's Positive Return on Investment and Social Impact: The Mary Free Bed YMCA Living Laboratory and Study, <u>Numbers Magazine by Kreab</u> 22, 44-50 (Spanish and English).

227.     Blanck, P. & Adya, M. (2017). Future Directions in Employment, Occupational Rehabilitation, and Disability: Introduction to the Special Section, <u>Journal of Occupational Rehabilitation</u>, 27(4), 479–481 (P. Blanck & M. Adya, eds.) (DOI 10.1007/s10926-017-9741-y).

228.     Uyanik, H., Shogren, K., & Blanck, P. (2017). Supported Decision-Making:  Implications from Positive Psychology for Assessment and Intervention in Rehabilitation and Employment, <u>Journal of Occupational Rehabilitation</u>, 27(4), 498–506 (DOI 10.1007/s10926-017-9740-z).

229.     Schur, L., Han, K., Kim, A., Ameri, M., Adya, M., Blanck, P., & Kruse, D. (2017). Disability at Work: A Look Back and Forward, <u>Journal of Occupational Rehabilitation,</u> 27(4), 482–497 (DOI 10.1007/s10926-017-9739-5).

230.     Harpur, P., Connolly, U., & Blanck, P. (2017). Hierarchies of Impairments at Work in Australian and Irish Workers Access to Compensation for Injuries, <u>Journal of Occupational Rehabilitation,</u> 27(4), 507–519 (DOI 10.1007/s10926-017-9745-7).

231.    Jeste, D., Eglit, G., Palmer, B., Martinis, J., Blanck, P., & Saks, E. (2018). An Overview of Supported Decision in Serious Mental Illnesses, <u>Psychiatry: Interpersonal and Biological Processes,</u> 81(1), 28-40.

232.    Logue, L. M. & Blanck, P. (2018). <u>Heavy Laden: Union Veterans, Psychological Illness, and Suicide,</u> Cambridge University Press.

233.    Shogren, K., Wehmeyer, M., Martinis, J., & Blanck, P. (2019). <u>Supported Decision-Making: Theory, Research, and Practice to Enhance Self-Determination and Quality of Life</u>, Cambridge University Press.

## Forthcoming Publications and Working Papers

234.    Blanck, P. (2019). Why American is Better Off Because of the Americans with Disabilities Act and the Individuals with Disabilities Education Act, <u>Touro Law Review</u> (forthcoming).

235.    Blanck, P., et al. (2019). Disability and LGBT+ Advancement and Rights in the Legal Profession, <u>University of the District of Columbia David A. Clarke School of Law, Law Review</u> (in preparation).

236.    Blanck, P. (2019). <u>Disability Law and Policy</u>, Foundation Press *Concepts and Insights Series* (in preparation).

237.    Morris, M., Goodman, N., Baker, A., Palmore, K., & Blanck, P. (2019). Closing the Disability Gap: Reforming the Community Reinvestment Act Regulatory Framework, <u>Georgetown Journal on Poverty Law & Policy</u> (in submission).

238.    Blanck, P. & Martinis, J. (2019). <u>Supported Decision-Making as an Alternative to Guardianship: Law, Policy, Research, and Practice,</u> American Association on Intellectual and Developmental Disabilities (AAIDD) (in preparation).

239.    Blanck, P. (2019). Introduction to Supported Decision-Making: Special Issue on Research, Policy, and Law Developments, <u>Journal of Disability Policy Studies</u> (in preparation).

240.    Blanck, P. & Martinis, J. (2019). State of the Nation and States and Supported Decision-Making, <u>Journal of Disability Policy Studies</u> (in preparation).

241.    Shogren, K., Wehmeyer, M., Martinis, J, & Blanck, P. (2019). State of the Research and Supported Decision-Making, <u>Journal of Disability Policy Studies</u> (in preparation).

242.    Pereña Vicente, M., Monell, V., Saks, E., Martinis, J., & Blanck, P. (2019). Cross-cultural advances in policy and research perspectives: Spanish and European research and experience in law and policy change, <u>Journal of Disability Policy Studies</u> (in preparation).

243.    Saks, E., Martinis, J., & Blanck, P. (2019). Supported Decision-Making and Serious Mental Illness Research and Policy: The Saks Institute Studies, <u>Journal of Disability Policy Studies</u> (in preparation).

244.    Blanck, P. (2019). Workplace Diversity & Inclusion, and Occupational Rehabilitation for People with Disabilities: Introduction to Special Section on Developments in Workplace Research, <u>Journal of Occupational Rehabilitation</u> (P. Blanck, Ed. Special Section) (in preparation).

245. Hammel, J., McDonald, K. E., Frieden, L., & Blanck, P. (2019). People with Disabilities and the Americans with Disabilities Act Participatory Action Research (ADA-PARC), <u>Journal of Occupational Rehabilitation</u> (in preparation).

246. Giannoumis, A.G. & Blanck, P. (2019). Future of Information and Communications Technology for People with Disabilities: A Comparative Case Study of Auto-Personalization with Implications for Occupational Rehabilitation, <u>Journal of Occupational Rehabilitation</u> (in preparation).

247. Adya, M., Killeen, M., Myhill, M., White, J. & Blanck, P. (2019). Pathways to Employment for People with Disabilities, <u>Journal of Occupational Rehabilitation</u> (in preparation).

248. Blanck, P., Abdul-Malak, Killeen, M., & Adya, M. (2019). Disability and LGBTQ Diversity in the Legal Profession: Preliminary Findings from a National Study, <u>Journal of Occupational Rehabilitation</u> (in preparation).

249. Morris, M., Adya, M., Whaley, B. & Blanck, P. (2019). Financial Inclusion and Pathways to Employment for People with Disabilities, <u>Journal of Occupational Rehabilitation</u> (in preparation).

250. de Paor, A. & Blanck, P. Gene editing and disability: Implications for the Future of Work, <u>Journal of Occupational Rehabilitation</u> (in preparation).

251. Blanck, P. (2019). Supported Decision-Making Theory, Research, and Practice: The Next Five to Seven Years, in Lord, J. & Kayess, R. (Eds.) (2019). <u>Routledge Handbook of International Disability Law</u>, Taylor & Francis Group, London, UK (in preparation).

252. Blanck, P. & Abdul-Malak, Y. (2019). Psychology and Disability: Introduction, <u>Caribbean Journal of Psychology</u> (in preparation).

253. Blanck, P. (2019). Disability Rights in the Legal Profession: Findings from a National Study, <u>Georgetown Journal on Poverty Law & Policy</u> (in preparation).

254. Blanck, P. (2020). <u>*eQuality* 2.0: The Struggle for Web Accessibility by Persons with Cognitive Disabilities</u>, 2d edition, Cambridge University Press (in preparation).

255. Blanck, P., et al. (2nd ed., 2020). <u>Treatise on Disability Civil Rights Law and Policy</u>, West Publishers (in preparation).

256. Blanck, P., Waterstone, M., Myhill, N., et al. (4th ed., 2020). <u>Disability Civil Rights Law and Policy: Case and Materials</u>, West Publishers (in preparation).

257. Soffer, M., McDonald, K., & Blanck, P. (2019). Community Participation for Individuals with Disabilities, (in preparation).

## Newspaper/Magazine/Newsletter Articles and Commentary

Blanck, P. (Mar., 8, 2010).  Commentary:  E-Books Must Be Accessible, and That Means Audio, The Chronicle of Higher Education, at http://chronicle.com/article/E-Books-Must-Be-Accessible/64518/.

Blanck, P. (Nov. 11, 1991). Persons with disabilities can be assets to business. O'Brien County Bell, Primghar, IA.

[Reprinted] (Nov. 14, 1991).  Disability act being phased in. Tama News-Herald, Tama, Iowa.

[Reprinted] (Dec. 4, 1991). Disability act will soon begin to have an impact.  Bloomfield Democrat, Bloomfield, IA.

Blanck, P.D. (Oct. 7, 1992).  Disabilities act myths are often unfounded.  Journal-Gazette, Fort Wayne, IN.

[Reprinted] (Oct. 12, 1992).  Disabilities getting a bad rap. Middlesex News, Framingham, MA.

[Reprinted] (Oct. 22, 1992).  Look at reality, not myth, in disabilities act.  Valley Foothills News, Yuma, AZ.

[Reprinted] (Oct. 23, 1992).  Realities, myths of disabilities.  The Evening Bulletin, Providence, RI.

[Reprinted] (Oct. 23, 1992).  Realities, myths of disabilities.  The Providence Journal, Providence, RI.

Blanck, P.  (Jan. 1993).  Americans with disabilities: The hidden electorate. Region VIII, AAMR Newsletter, ND.

Blanck, P.D. (Sept. 24, 1993).  ADA – Separating fact from fiction.  31(3) FYI at 4, U. of Iowa.

[Reprinted] (Oct. 19, 1993).  Emphasize the facts about disabilities act.  Des Moines Register, Iowa (at 7a).

Blanck, P.D. (Dec. 1993).  Americans with Disabilities Act and health care reform.  Scripps-Howard News service.

Blanck, P.D. (Dec. 1993).  Judges and juries are getting a bad rap.  Scripps-Howard News service.

[Reprinted] (Nov. 26, 1993).  Judging juries.  Syracuse Herald-Journal, Syracuse, NY.

[Reprinted] (Nov. 29, 1993).  Judges and juries do better than the public might think. Daily Local News, West Chester, PA.

[Reprinted] (Nov. 30, 1993).  Jurors do a better job than most people think.  Winston-Salem Journal, Winston-Salem, NC.

Blanck, P. (Dec. 1994).  Transcending the ADA at Sears, Roebuck and Co.: For the price of dinner and a movie.

Blanck, P.D. (Jan. 1995).  Buck v. "The Bell Curve."

Blanck, P.D. & Pope, M.H. (1995).  Editorial: Spine research, law and public policy. 20(5) Spine 511-12.

Blanck, P.D. (Sept. 1995).  Editorial: Disaster Mitigation for People with Disabilities.

Blanck, P.D. (May 6, 1998).  Letter to Editor: JAMA, 279(17), 1349.

Blanck, P.  (Sunday, Sept. 2, 2001). Op. Ed. Business: Make Use of Disabled Work Force.  IA City Press Cit., 9A.

Blanck, P.  (Aug. 2005). Guest Column, Corporate Culture & Disability, ADA Compliance Guide Newsletter, Washington, D.C., available at http://www.thompson.com.

Logue, L. & Blanck, P. (Apr. 6, 2017). A Creature of Its Time: The Pension Bureau, National Museum of Civil War Medicine, The Clara Barton Missing Soldiers Office, available at: http://www.clarabartonmuseum.org/pension/.

Logue, L. & Blanck, P. (July 20, 2018). Vets, PTSD and suicide: An age-old problem? Stars and Stripes, available at: https://www.stripes.com/opinion/vets-ptsd-and-suicide-an-age-old-problem-1.538675.

## Harvard Business School Case Publications

9-483-031(1982).          Patrick J.J. Rich (with J. Dowd).

9-483-050 (1982).         A note on career planning in industry.

9-483-058 (1982).         The Wane Division of the American Instruments, Corporation (A).

9-483-094 (1982).         The Wane Division of the American Instruments, Corporation (B).

## PRESENTATIONS

See also http://bbi.syr.edu for listing of other web-based presentations and accessible formats where possible.

1.     Blanck, P., Reis, H.T., & Jackson, L. (1979).  The effects of the verbal reinforcement on intrinsic motivation for sex-linked tasks.  Presentation meeting of the American Psychological Association, NY.

2.     Blanck, P., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M, & Zuckerman, M. (1980).  Longitudinal and cross-sectional age effects in nonverbal decoding skill and style.  Presentation at the meeting of the Eastern Psychological Association, Hartford.

3.     Blanck, P., Rosenthal, R., Snodgrass, S.E., DePaulo, B.M., & Zuckerman, M. (1980).  Developmental changes in females' superiority at decoding nonverbal cues.  Presentation at the meeting of the American Psychological Association, Montreal.

4.     McLeod, P.L., Rosenthal, R., Blanck, P., & Snodgrass, S.E. (1980). Micromomentary movement and the decoding of face and body cues.  Presentation meeting of American Psychological Association, Montreal.

5.     Blanck, P. & Rosenthal, R. (1980).  Nonverbal sensitivity and athletic team performance.  Presentation at the meeting of the New England Psychological Association, Boston.

6.     Blanck, P. & Rosenthal, R. (1981).  Measuring sensitivity to verbal and nonverbal discrepant and consistent multichannel messages: The MOVANS Test.

7.     Presentation at the meeting of the Eastern Psychological Association, New York.

8.     Snodgrass, S.E., Rosenthal, R., & Blanck, P. (1981).  Sex role association via teachers' behavior and sexually stereotyped materials.  Presentation at meeting of Association of Women in Psychology, Boston.

9.     Blanck, P. & Rosenthal, R. (1981).  Nonverbal styles and skills in best-friend relationships.  Presentation at the meeting of the New England Psychological Association, Brandeis University.

10.    Blanck, P., Rosenthal, R., & Cordell, L.H. (1985).  Nonverbal communication in the clinical and legal context.  Presentation at the meeting of the California Psychological Association, San Francisco.

11.    Blanck, P. & Rosenthal, R. (1986).  Judges' verbal and nonverbal in criminal jury trials.  Symposium of jury decision-making.  Presentation meeting of the American Psychological Association, Washington, D.C.  Colloquium. (1986). Trial judges' behavior in criminal jury trials.  U. Nebraska, Lincoln, Law School.

12.    Blanck, P. (1988).  The Archeology of Field Research in the Courtroom.  Presentation at the meeting of the Law and Society Association, Vail, Colorado.

13.    Blanck, P. (1989).  Trial judges' behavior in criminal jury trials.  University of Iowa, College of Law.

14.    Bernieri, F., Blanck, P., Rosenthal, R., Vannicelli, M., & Yerrell, P.H. (1990).  Therapists' speech: Channel congruency, affect, and variability. Presentation American Psychological Association, Boston, MA.

15.    Blanck, P. (1990).  Legal policy and methodological issues in deinstitutionalizing the mentally retarded.  Presentation at the meeting of American Psychology-Law Society Division 41 Conf., Williamsburg, VA.

16.     Blanck, P. (1990).  Panelist on "Selecting impartial juries." Annenberg Washington Program Forum, Washington, D.C.

17.     Blanck, P. (1991).  Ethical, moral, and legal issues in the primary and secondary analysis of videotape data of family interactions.  Presentation at Henry Murray Research Center, Radcliffe College, Harvard Univer.

18.     Blanck, P. (1991).  Empirical study of the Americans with Disabilities Act: Model of Study and Preliminary Results.  Presentation at the American Association for Mental Retardation, Washington, D.C.

19.     Blanck, P. (1991).  The interface of law and psychology, Keynote at the Iowa Psychological Association meeting, Iowa City, IA.

20.     Blanck, P. (1991).  The Americans with Disabilities Act: A new Bill of Rights, Presentation at the University of Iowa, College of Law celebration of the Bicentennial of the Bill of Rights, Iowa City, IA.

21.     Saks, M.J. & Blanck, P. (1992).  Improving on Justice: The Unrecognized Benefits of Sampling and Aggregation in the Trial of Mass Torts.  Presentation at the meeting of the American Association of Law Schools, San Antonio, TX.

22.     Blanck, P. (1992).  Americans with Disabilities Act, Colloquium, Department Sociology, University Iowa.

23.     Blanck, P. (1992).  Ethical and legal implications of the human genome initiative.  Presentation at the Iowa Humanities Symposium, "Genes and Human Self-Knowledge," University of Iowa, College of Medicine, Iowa City, IA.

24.     Blanck, P. (1992).  Americans with Disabilities Act: Advising employers and employees.  Presentation at the University of Iowa, College of Law Symposium (CLE) on Employee Rights and Benefits.

25.     Blanck, P. (1992).  Introduction to Program on "Communicating with Juries." Presentation at the Annenberg Washington Program, Washington, D.C.

26.     Blanck, P. (1992).  The Emerging Work Force of Persons with Disabilities: The ADA and ADR.  Address to the Industry-Labor Council Meeting "Giving Us the Tools," National Center for Disability Services, St. Louis, MO.

27.     Blanck, P. (1992).  The Emerging Work Force of Persons with Disabilities.  Address to the Equal Employment Opportunity Commission, Washington, D.C.

28.     Blanck, P. (1992).  Americans with Disabilities Act: Advising employers and employees.  Presentation at the University of Iowa, College of Law (CLE).

29.     Blanck, P. (1992).  Fact Finding and Decision Making, Address at the meeting of the Ohio Judicial Conference, Columbus, OH.

30.     Blanck, P. (1992).  Americans with Disabilities Act: Facts and Myths.  Presentation at the University Hospital School Rounds, University of Iowa.

31.     Blanck, P. (1992).  Americans with Disabilities Act: The Basics, Invited Lecture at Goodwill Industries, Inc. & Iowa City Chamber of Commerce, Iowa City, IA.

32.     Blanck, P. (1992).  Americans with Disabilities Act: Basics, Invited Lecture at Alliance for the Mentally Ill meeting, Iowa City, IA.

33.     Blanck, P. (1993).  The Emerging Work Force: Studying the ADA.  Invited Public Address at the Woodrow Wilson School of Public Policy, Princeton University.

34.     Blanck, P. (1993).  Americans with Disabilities Act: Issues for Rehabilitation Professionals, Invited Lecture at Rehabilitation Psychology Program, University of Iowa.

35.     Blanck, P. (1993).  Americans with Disabilities Act: Issues for Pulmonary Physicians, Invited Rounds at Univ. Iowa Hospitals.

36.     Blanck, P. (1993).  Social Change through Law:  Where is the Difference, Invited Presentations, Teaching Texts & Diversity, University of Iowa.

37.     Blanck, P. (1993).  The ADA and ADR, Invited Presentation, American Association on Mental Retardation Convention, Washington, D.C.

38.     Blanck, P. (1993).  Americans with Disabilities Act: Issues for Eye Researchers and Clinicians, Invited Rounds Univ. Iowa Hosp.

39.     Blanck, P. (1993).  The ADA and ADR, Invited Presentation, USPDI Conference on ADA and Technology, Washington, D.C.

40.     Blanck, P. (1993).  The ADA and ADR, Invited Presentation, Access Center Conference, Davenport, IA.

41.     Blanck, P. (1993).  Field of Dreams and the ADA, Keynote Address, Iowa ARC, Cedar Rapids, IA.

42.     Blanck. P. (1993). Rural employment and the ADA, Invited Address, Rural Employment Alt., Conroy, IA.

43.     Blanck, P. (1993).  Implementing the ADA, Keynote, Missouri Association County Developmental Disabilities Ser., St. Louis, MO.

44.     Blanck, P. (1993).  Implementing the ADA, Invited Address, Iowa City Public Library, IA.

45.     Blanck, P. (1994).  Health care reform: Access and partnerships. Presentation to the President's Committee on Mental Retardation Health Care Reform Conference, Washington, D.C.

46.     Blanck, P. (1994).  ADA and ADR, Address to the Iowa Risk Project, Iowa City, IA.

47.     Blanck, P. (1994).  Putting the employment provisions of the ADA to work, CLE, Univ. Iowa, College of Iowa, Iowa City, IA.

48.     Blanck, P. (1994).  Introduction/Moderator to Program "Communications technology for everyone," Conference at the Annenberg Washington Program, Washington, D.C.

49.     Blanck, P. (1994).  Emerging issues in ADA and ADR, Address to the American Association on Mental Retardation Annual Convention, Boston, MA.

50.    Blanck, P. (1994).  Moderator, Implementing Consent Decrees, American Association on Mental Retardation Annual Convention, Boston, MA

51.    Blanck, P. (1994). Inclusive Education and the ADA, Presentation at the Department of Special Education, Univ. Iowa, Iowa City, IA.

52.    Blanck, P. (1994). Community integration and the ADA, Invited Address, Barry-Lawrence Retreat, Branson, MO.

53.    Blanck, P. (1994).  Communications Technology for everyone.  Invited Address, Smithsonian Museum, Washington, D.C.

54.    Blanck, P. (1994).  Empirical Study of the ADA, Invited Address, Department of Psychology, & Woodrow Wilson School, Princeton University, NJ.

55.    Blanck, P. (1994).  The Appearance of Justice, Moderator for conference co-sponsored by Princeton University, Woodrow Wilson School, and the Annenberg Washington Program, Princeton, NJ.

56.    Blanck, P. (1995).  On diversity, disability, and employment, Invited address, American Association of Law Schools Conference, New Orleans, LA.

57.    Blanck, P. (1995).  Human rights and persons with intellectual disability: International and national perspectives, Symposium, Yale Law School, New Haven, CT.

58.    Blanck, P. (1995).  ADA and occupational medicine, Invited address, Iowa Conference on Occupational Medicine, Iowa City, IA.

59.    Blanck, P. (1995).  Implications of ADA for Psychologists, Invited address, American Psychology–Law Society Conv., NY, NY.

60.    Blanck, P. (1995).  ADA in the Workplace – Evolutionary or Revolutionary, Invited address, California Committee on Employment of Persons with Disabilities Conference, Sacramento, CA.

61.    Blanck, P. (1995).  ADA in the workplace: "Back" to work, Invited address, Southam Occupational Health & Safety Conference, Toronto, Canada.

62.    Blanck, P. (1995).  ADA's Impact on the Workplace: Empirical Findings, Invited address, National Employment Lawyer's Association, San Francisco, CA.

63.    Blanck, P. (1995).  U.S. Disability Policy and Law, Invited Address to Handikapp Ombudsmannen, Stockholm, Sweden.

64.    Blanck, P. (1995).  Voices of Freedom: America Speaks Out on ADA, National Council on Disability Forum, Washington, D.C.

65.    Blanck, P. (1995).  Work Force Diversity and the ADA, Invited Address, Northern States Power Company, Minneapolis, MN.

66.    Blanck, P. (1995).  ADA, Employment, Civil Rights. Invited Address, American Association on Mental Retardation Public Policy Forum, Washington, D.C.

67.   Blanck, P. (1996).  Persons with Mental Retardation in the Juvenile Justice System.  Invited Address, American Association on Mental Retardation Annual Conference, San Antonio, TX.

68.   Blanck, P. (1996).  Institutional reform litigation.  Panel Address, American Association on Mental Retardation Annual Conference, San Antonio, TX.

69.   Blanck, P. (1996).  How Does ADA Work for You? / Getting ADA to Work for You.  Invited Address, St. Francis Health Care Center, Green Springs, OH.

70.   Blanck, P. (1996).  The ADA and internal medicine, Medicine & Society Lecture Series, Department of Internal Medicine, University of Iowa.

71.   Blanck, P. (1996).  The ADA and rehabilitation medicine, Prince Lecture and Prince Visiting Professorship, Rehabilitation Institute of Chicago, Northwestern University, IL.

72.   Blanck, P. (1996).  Emerging ADA Law, Faculty Workshop, Northwestern University Law School.

73.   Blanck, P. (1996).  Emerging Issues under the ADA, Keynote Address, Assoc. ADA Coordinators Conference, Raleigh Durham, NC.

74.   Blanck, P. (1996).  ADA Title I, Ergonomics and Workers' Compensation Law, Invited Address, Worksafe Iowa Conference, Reducing Workplace Injuries & Illnesses through Ergonomics, Iowa City, IA.

75.   Blanck, P. (1996).  Transcending the ADA, Invited Address, Villanova Law School Symposium on the ADA, Villanova, PA.

76.   Blanck, P. (1996).  Disability and Rural Health, Health in a Changing Rural Environment Conf., IA City.

77.   Blanck, P. (1997).  The Ergonomics of the ADA, Invited Address, DePaul Law School, Symposium on the ADA, Chicago, IL.

78.   Blanck, P. (1997). Socially Assisted Dying: Opening Remarks. Conf. Socially Assisted Dying, Northwestern University, Chicago, IL.

79.   Blanck, P. (1997).  ADA and Psychiatry, Grand Rounds, Department of Psychiatry, University of Iowa.

80.   Blanck, P. (1997).  Corporate Culture and the ADA, ADA Title I Conference Sponsored by the Industry-Labor Council, Chicago, IL.

81.   Blanck, P. (1997).  The emerging role of the staffing industry in employing people with disabilities. Working together, leading the way, Conference sponsored by Iowa CEO, Des Moines, IA.

82.   Blanck, P. (1997).  Students with Learning Disabilities, Reasonable Accommodations, and the rights of institutions of higher education to establish and enforce academic standards.  Invited Presentation at the Journal of Gender, Race and Justice, Annual Symposium, Iowa City, IA.

83.   Blanck, P. (1998).  Exploring the Future: Trends and Challenges. Keynote Address at Region VII, Four State, Issues Forum, Kansas City, MO. [also speaking Economic Cents of Hiring Persons with Disabilities.]

84.     Blanck, P. (1998). Human & Civil Rights: An Iowa Perspective. Keynote 1998 Iowa Civil Rights Commission, Des Moines, IA.

85.     Blanck, P. (1998).  ADA: Issues and Impact. Invited Presentation, Current Topics in Occupational Health Symp., Iowa City, IA.

86.     Blanck, P. (1998).  Treatment and Habilitation and the ADA.  Invited Presentation, American Bar Assoc. Conference "In Pursuit" … A Blueprint for Disability Law and Policy: ABA National Conference.

87.     Blanck, P. (1998).  Closing Roundtable.  Invited Moderator at American Bar Association Conference "In Pursuit" … A Blueprint for Disability Law and policy: An ABA National Conference.

88.     Blanck, P. (1998).  The Emerging Role of the Staffing Industry in Employing People with Disabilities and Manpower, Inc., Keynote Address, Shriners Hospitals Choices Conference, Chicago, IL.

89.     Blanck, P. (1998).  The ADA and the Emerging Workforce. Invited Address, American Association on Mental Retardation Disability Summit, Washington, D.C.

90.     Blanck, P. (1998).  ADA, Disabilities, and Discrimination in Health Care, Presentation before the Bioethics Forum, Univ. Iowa.

91.     Blanck, P. (1998).  Statement of Professor Peter David Blanck, Before the U.S House of Representatives Committee on Education and the Workforce, Monday, October 5, 1998, Washington, D.C.

92.     Blanck, P. (1998).  Statement of Professor Peter David Blanck, Before the U.S. Commission on Civil Rights, Public Hearings on the Americans with Disabilities Act, Thursday, November 12, 1998, Washington, D.C.

93.     Blanck, P. (1999).  Work and Disability. Invited Address, Annual Meeting of the American Assoc. Law Schools, New Orleans, LA.

94.     Blanck, P. (1999).  Civil War Pensions, Civil Rights, and the Americans with Disabilities Act. Invited Address, Symposium on ADA Backlash, University of California at Berkeley.

95.     Blanck, P. (1999).  The ADA and the Emerging Workforce. Invited Address, Annual Colloquium, University of Iowa, Department of Rehabilitation Counseling.

96.     Blanck, P. (1999). Genetic Knowledge and Disability, Symposium Moderator, Rehab. Inst. Chicago, IL.

97.     Blanck, P. (1999).  The ADA and the Emerging Workforce. Invited Plenary Address, Joint Employment & Technical Training Conference, U.S. Department of Labor, Washington, D.C.

98.     Blanck, P. (1999).  The Unintended Consequence of the ADA. Invited Address, National Disability Management Conference, Rehearsing Your Future, Washington Business Group on Health & Unum-Provident Corp., Washington, D.C.

99.     Blanck, P. (1999).  Disability and Compliance. Invited Address, National Workers' Compensation and Disability Conf., Chicago, IL.

100.  Blanck, P. (1999).  The Year of the ADA at the U.S. Supreme Court, University of Iowa College of Law Continuing Legal Education, Iowa City, IA.

101.  Blanck, P. (2000).  The Disabilities of Civil War Veterans: Empirical Study. Invited Address, Disability Institute ADA Symposium, University of Alabama School of Law, Tuscaloosa, AL.

102.  Blanck, P. (2000).  Entrepreneurs with Disabilities. Invited Address, President's Committee on Employment of People with Disabilities Annual Meeting, Washington, D.C.

103.  Blanck, P. (2000).  Civil War Pensions and Disability in America. Invited Address, ADA Tenth Anniversary Symposium, Ohio State University, Columbus, OH.

104.  Blanck, P. (2000).  Employment, ADA, and Supreme Court. Address, Issues Forum, Kansas City, MO.

105.  Blanck, P. (2000).  Graduating from High School/High Tech, Keynote Address, Grant Wood Area Educational Agency Graduation, Cedar Rapids, IA.

106.  Blanck, P. (2000).  Disability, Employment Policy and the ADA. Invited Address, Central States Occupational Medicine Association Meeting, Davenport, IA.

107.  Blanck, P. (2000).  ADA and Health Care, Panel, Rehabilitation Institute Chicago and Northwestern Univ. Conf., Chicago, IL.

108.  Blanck, P. (2000).  Rethinking ADA Civil Rights Enforcement, Moderator for National Retreat for the National Council on Disability Meeting, Washington, D.C.

109.  Blanck, P. (2000).  Employment Policy and the ADA: Research Questions and Challenges. Invited Address, Mary Switzer Lec. Ser., NIDRR, Lansing, MI.

110.  Blanck, P. (2000).  Studying Employment Policy and the Workforce of Persons with Disabilities. Rehabilitation Services Administration Annual Conference, Plenary Address, Philadelphia, PA.

111.  Blanck, P. (2000).  The Disabilities of Civil War Veterans. Invited Address, University of Nebraska College of Law, Lincoln, NE.

112.  Blanck, P. (2000).  Conceptions of Disability after the Civil War, Invited Address, University of Chicago, Center for Population Economics, Graduate School of Business, Chicago, IL.

113.  Blanck, P. (2000).  Studying the Impact of the ADA: Past and Present Issues, University of Michigan Law School, Invited Address, ADA Symposium, Ann Arbor, MI.

114.  Blanck, P. (2001).  Employment, Disability Policy and the ADA, Featured Address, "The Future is Not What It Used to Be," Conference on Workforce of Iowans with Disabilities, Des Moines, IA.

115.  Blanck, P. (2001).  Before Civil Rights: Veterans' Pensions and the Politics of Disability in America, 1862-1907, Invited Faculty Colloquium, Stanford Law School, CA.

116.  Blanck, P. (2001).  Veterans' Pensions and the Politics of Disability in America, Invited Discussant, National Bureau of Economic Research Conference, Health and Labor Force Participation over the Life Cycle: Evidence from the Past, Cambridge, MA.

117.    Blanck, P. (2001).  Before Civil Rights: Veterans' Pensions and the Politics of Disability in America, 1862-1907, Invited Faculty Colloquium, William & Mary Law School, VA.

118.    Blanck, P. (2001).  Keynote Address: Emerging Issues for the New Millennium, Annual Conference on Vocational Rehabilitation, Rehabilitation Institute of Chicago, Chicago, IL.

119.    Blanck, P. (2001).  Civil War Pensions and the Politics of Disability, Invited Enrichment Speaker Series/Faculty Colloquium, University of Houston, School of Law, Houston, TX.

120.    Blanck, P. (2001).  The Emerging Workforce of Entrepreneurs with Disabilities, America's Workforce Network Research Conference, U.S. Department of Labor, Washington, D.C.

121.    Blanck, P. (2001).  Civil War Pension Attorneys and the Politics of Disability in America, Invited Address, Conceptions of Disability Symposium, Bills of Right Institute, William & Mary Law School, VA.

122.    Blanck, P. (2001).  Economics of Employing People with Disabilities, Invited Speaker, Cornell Univ., RRTC Employment Conference, Washington, D.C.

123.    Blanck, P. (2001).  Ticket to Work and Work Incentives, Expert Roundtable Participant, Social Security Administration Conference, Washington, D.C.

124.    Blanck, P. (2001).  Civil War Pensions and the Politics of Disability in America, Invited Address, American Historical Association Convention, Chicago, IL.

125.    Blanck, P. (2001).  National Workplace Forum: Setting a National Agenda for Increasing the Employment of Individuals with Disabilities, U.S. Chamber of Commerce & Virginia Commonwealth University, Invited Presented, Washington, D.C.

126.    Blanck, P. (2002). Exploring the Future of Disability Civil Rights. Keynote Region VII, Four State, Issues Forum, Kansas City, MO.

127.    Blanck, P. (2002).  Exploring the Future of Disability Rights.  Keynote Conversations with J. Young at the World Institute on Disability/Virginia Commonwealth University Policy Forum, Los Angeles, CA.

128.    Blanck, P. (2002).  Exploring the Future of American Disability Civil Rights, and Comparisons to the UK Disability Discrimination Act.  Keynote Address, Employers' Forum on Disability, London, England.

129.    Blanck, P. (2002).  Ticket to Work and Work Incentives, Expert Roundtable Participant, Applicability of the ADA to Employment Networks (ENs), Social Security Administration Conference, Washington, D.C.

130.    Blanck, P. (2002).  The Definition of Disability under the Social Security Act and its Relation to the Americans with Disabilities Act, Testimony before the U.S. House of Representatives Subcommittee on Social Security, Thursday, July 11, Washington, D.C.

131.    Blanck, P. (2002).  ADA Research & Policy Agenda, Advisory Panel, GAO Meetings, Washington, D.C.

132.    Blanck, P. (2002).  The Future of American Disability Civil Rights, Keynote Address at the Iowa Rehabilitation Professionals Annual Meeting, Des Moines, IA.

133.  Blanck, P. (2002).  National Summit on Technology and Disabilities, Invited participant and facilitator, RESNA Conference, Providence, RI.

134.  Blanck, P. (2002).  AT Outcome Measurement: Where are we now and where are we headed? Washington University Program in Occupational Therapy Conference, St. Louis, MO.

135.  Blanck, P. (2003).  Nonverbal Communication in Applied Research Involving Persons with Disabilities, Invited participant, Claremont Applied Social Psychology Conference, Applications of Nonverbal Communication, Claremont, CA.

136.  Blanck, P. (2003).  "It Works," Invited moderator, The Information Technology Association of America (ITAA) Annual Workforce Convocation, Arlington, VA.

137.  Blanck, P. (2003).  The De-Evolution of the ADA: Federalism, and the Rise of State Disability Law, Invited speaker, Annual Conference of State Court Chief Justices, San Juan, PR.

138.  Blanck, P. (2003).  Politics and Practice of Accommodation, Invited Speaker, Job Accommodation Network (JAN), Annual Conference, Arlington, VA.

139.  Blanck, P. (2003).  Poverty and Disability, Invited Speaker, Intersection of Disability with Gender, Race and Justice, Symposium sponsored by the Journal of Race, Gender and Justice, Iowa City, IA.

140.  Blanck, P. (2003).  Keynote Address, Journal of Gender, Race & Justice Annual Symposium, Justice for All?  Exploring Gender, Race and Sexual Orientation within Disability Law, Iowa City, IA.

141.  Blanck, P. (2003).  American Disability Law and Policy, Invited Speaker, International Seminar: Anti-Discrimination Legislation: Disability Experience, Norwegian "Commission against Discrimination of Disabled People", appointed by the Norwegian Government 2003-2004, Oslo, Norway.

142.  Blanck, P. (2003).  Law and Ethics of Data Sharing, Invited Speaker, Data Sharing Workshop, National Institutes of Health, National Institute of Child Health and Development (NIH/NICHD), Bethesda, MD.

143.  Blanck, P. (2003).  ADA and the European Year of the Disabled, Invited Address, Merrill Lynch Conf. European Year Disabled, London, UK.

144.  Blanck, P. (2003).  The Law and Politics of the ADA, Invited Speaker, Research Council of Norway, Conference on "Anti-Discrimination Legislation as an Instrument to Promote Equal Opportunities for People with Disabilities - International Experiences", Oslo, Norway.

145.  Blanck, P. (2003).  The Law and Politics of the ADA, Invited Speaker, Conference on "Anti-discrimination Legislation: The Disability Experience," Norwegian Governmental Commission Against Discrimination of People with Disabilities, Oslo, Norway.

146.  Blanck, P. (2003).  Is the ADA a Failed Law? Speaker, Middlesex University, London, GB.

147.  Blanck, P. (2004).  Disability Law and Policy in Rehabilitation Education.  Keynote Address, National Council on Rehabilitation Education (NCRE), Annual Meeting, Tucson, AZ.

148.    Blanck, P.  (2004).  The Accessible Courtroom, Invited Speaker, The Legal and Policy Implications of Courtroom Technology, International Conference Sponsored by The Courtroom 21 Project and William and Mary Bill of Rights Journal, Williamsburg, VA.

149.    Blanck, P.  (2004). Realities and Opportunities in the 21st Century Workplace–Disability Issues, Invited Panelist, U.S. Equal Employment Opportunity Commission, Forum with Chair Cari Dominguez, DC.

150.    Blanck, P.  (2004). Future of Disability Law and Policy, Invited Talk, U.S. Equal Employment Opportunity Commission, Office of Legal Counsel, Washington, DC.

151.    Blanck, P.  (2004).  Union Army Veterans' Pensions and the Politics of Disability in Nineteenth Century America, Distinguished Lecture on Human Rights, Syracuse University College of Law, Syracuse, NY.

152.    Blanck, P.  (2004).  Employees with Disabilities: Employer Misconceptions Versus Data and Practice, Master Tutorial Presenter, Society for Industrial and Organizational Psychology, Ann. Conf., Chicago, IL.

153.    Sewell, R., Song, C., Smith, R., Bauman, N., & Blanck, P.  (2004). Union Army Veterans with Hearing Loss and the Evolution of Disability in America During 1862-1920, Paper, Annual Meeting of the Triological Society, Phoenix, AZ.

154.    Blanck, P.  (2004). Disability Rights: Thematic Issues, Moderator at Equality and Disability: Exploring The Challenge and Potential of Framework Directive 2000/78/EC, Conference organized in Louvain-La-Neuve, Belgium (29-30 April).

155.    Blanck, P. (2004). Definition of Disability, Social Security Advisory Board Forum, Invited Discussant, DC.

156.    Blanck, P.  (2004).  Disability Law and Technology Policy, State of Technology Conference, Rehabilitation Engineering Research Center (RERC) on Mobile Wireless Technologies for Persons with Disabilities, Georgia Centers for Advanced Telecommunications Technology, Invited Address, Atlanta Georgia.

157.    Blanck, P. (2004).  The Past, Present and Future of Disability Rights, Keynote address, at the Job Accommodation Network (JAN), Annual Conference, Orlando, FL.

158.    Blanck, P.  (2004). Past and Future of Disability Law and Policy, Inaugural Thornburgh Family Lecture on Disability Law and Policy, University of Pittsburgh, PA.

159.    Blanck, P.  (2004).  Celebrating Disability Rights, Keynote address for the Arkansas Rehabilitation Services Commission Meeting for Disability Awareness Month, Little Rock, Arkansas.

160.    Blanck, P.  (2004).  Disability Law and Policy, Invited address, at the Miller Center of Public Affairs, University of Virginia, Charlottesville, VA.

161.    Blanck, P. (2004).  Demystifying Workplace Accommodations, Panel at National Business Group on Health Annual Conference, Orlando, FL.

162.    Blanck, P.  (2004).  Disability Discrimination in North America, Panel at Workplace Discrimination and the Law in North America, NAFTA Labor Secretariat, Washington, DC.

163.    Blanck, P.  (2004). Disability Civil Rights Law and Policy.  Keynote Address, Israeli Association of Rehabilitation Professionals, Annual Meeting, Tel Aviv, Israel.

164.     Blanck, P.  (2004). Disability Civil Rights Law and Policy.  Invited Address, Israeli Knesset, Special meeting of the Committee on Labour, Social Welfare and Health Committee, chaired by MK Shaul Yahalom, Jerusalem, Israel.

165.     Blanck, P. (2005). Fifth Meeting of the Working Group on Data Collection to Measure the Extent and Impact of Discrimination in Europe, European Commission, Section on Employment, Social Affairs and Equal Opportunities, Invited Presentation on the U.S. Experience with the Measurement of the Americans with Disabilities Act, Brussels, Belgium.

166.     Blanck, P.  (2005). Disability Rights and Legal Education.  Invited Lecture Series on Diversity and Legal Education, University of Mississippi, School of Law, Oxford, Miss.

167.     Blanck, P.  (2005). Future of Disability Law and Policy, Keynote Address, Alabama Transition Conference, Auburn University.

168.     Blanck, P.  (2005).  Introduction to Disability Law, Invited Address, Library of Congress, Center for International Rehabilitation, & the American Society for International Law (ASIL) Conference on International Disability Rights, Washington, D.C.

169.     Blanck, P.  (2005).  Employment and Disability, Annual Symposium, Invited Panelist, Disability Research Institute (DRI), University of Illinois at Urbana-Champaign, Funded by a grant from the U.S. Social Security Administration, National Press Club, Washington, D.C.

170.     Blanck, P.  (2005). Americans with Disabilities and Civil Rights, Invited Address, Grinnell College, IA.

171.     Blanck, P.  (2005).  Disability Civil Rights Law and Policy, Keynote Address, YAI/National Institute for People with Disabilities Network, Annual Conference, New York, NY.

172.     Blanck, P.  (2005). ADA as Disability Law and Policy, 29th International Congress on Law and Mental Health, International Academy of Law and Mental Health Congress, Paris, France.

173.     Blanck, P.  (2005). Disability Law and Policy, Disability Law Summer Symposium, National University of Ireland, Galway.

174.     Blanck, P.  (2005). EEOC ADA Workshop, Moderator, Iowa City, Iowa.

175.     Blanck, P.  (2005).  Disability Law and Policy, Evidence-Based Outcomes, Plenary address for the RERC on Workplace Accommodations State of the Science Conference, Atlanta, Georgia.

176.     Blanck, P.  (2005).  Disability Law and Policy, Keynote address for the Arkansas Workers' Compensation Annual Conference, Little Rock, Arkansas.

177.     Blanck, P.  (2005). Future of Disability Law and Policy, Loyola Law School, Los Angeles, CA.

178.     Blanck, P.  (2005).  The Future of the Americans with Disabilities Act, invited speaker, University of Mississippi Law School, Conference on the ADA at 15, Oxford, Miss.

179.     Blanck, P.  (2005). Americans with Disabilities Act, Lecture, Harvard Law School, Cambridge, MA.

180.  Blanck, P.  (2005). The Burton Blatt Institute and the Future of Disability Law and Policy, faculty colloquium, Center for Policy Research. Maxwell School, Syracuse University, NY.

181.  Blanck, P.  (2006).  Empirical Study of the Americans with Disabilities Act, invited speaker, New York University School of Law Conference on Assessing the Employment Provisions of the Americans with Disabilities Act, NYC, NY.

182.  Blanck, P.  (2005).  The Burton Blatt Institute and the Future of Disability Law and Policy, Syracuse University College of Law Lecture Series, N.Y.C. Lubin House Lecture Series, NY.

183.  Blanck, P.  (2006). Disability Law and Policy, Disability Law Summer Symposium, National University of Ireland, Galway.

184.  Blanck, P.  (2006).  On the Legacy of Professor Stanley Herr, Beit Issie Shapiro's First Fellow, Keynote Address, Beit Issie Shapiro Annual Conference, Tel Aviv, Israel.

185.  Blanck, P.  (2006). The Challenge of Monitoring Social Reform in the Area of Disability–The International Perspective, Keynote Address, Conference on Disability Studies as a Field of Human Rights, Inquiry and Teaching, US–Israel Binational Conference; sponsored by the Israeli Ministry of Justice, Commission for Equal Rights of People with Disabilities, Tel Aviv, Israel.

186.  Blanck, P.  (2006). Employment Demand, Invited panelist, Interagency Committee on Disability Research (ICDR), Interagency Subcommittee on Employment, Research Summit on "Employer Perspectives on Workers with Disabilities: A National Summit to Develop a Research Agenda," Crystal City, VA.

187.  Blanck, P.  (2006). New Paths in Disability Law and Policy, Keynote Address, The Indiana Governor's Council for People with Disabilities Annual Conference, Indianapolis, Indiana.

188.  Blanck, P.  (2006). The US (ADA) approach and its impact on eAccessibility, speaker at the European Workshop on Achieving eAccessibility: The role of Equality Legislation and Other Measures, European Union Commission, Brussels, Belgium.

189.  Blanck, P.  (2006). Social regulation of accessibility to ICT for people with disabilities: What can Norway learn from other countries? Invited speaker, NOVA Institute, Oslo, Norway.

190.  Blanck, P.  (2006). Disability Politics Historically and Today, Faculty Colloquium, University of San Diego School of Law, San Diego, CA.

191.  Blanck, P.  (2006). Future and Past of Disability, Colloquium, Social Psychology Department, University of California, Riverside, CA.

192.  Morris, M. & Blanck, P. (2007). Access to Ownership for Persons with Disabilities: A Post Katrina Analysis, Presentation at the American Association of Law Schools Annual Meeting, Washington, DC.

193.  Blanck, P.  (2007).  Politics of Disability Inequality after the Civil War and Today, Presentation at the Journal of Law and Inequality Symposium Commemorating the First 25 Years of Academic Legal Analysis of Issues in Inequality, University of Minnesota Law School, Minneapolis, Minn.

194.  Blanck, P.  (2007).  Litigating ICT Access, Presentation at Global Forum to United Nations Global Initiative for ICT and Development, Global Initiative for Inclusive Technologies (G3ict), W2i, Wireless

Internet Institute with the Secretariat for Convention on the Protection and Promotion of the Rights and Dignity of Persons with Disabilities and UNITAR, UN Institute for Training and Research, NYC, NY.

195.  Logue, L. & Blanck, P.  (2007). Aging and Disability, Presentation at "Aging and Disability Conference," Maxwell School, Syracuse University, NY.

196.  Blanck, P. & Reina, M.  (2007).  The Rights of People with Disabilities: Policy and Legal Aspects, U.S. Department of State Bureau of International Information Programs and the U.S. Embassy in Madrid, invited speaker for digital video conference, NY and DC.

197.  Blanck, P.  (2007). People with Disabilities in Times of Crisis and War, Presentation at the Israeli OMRDD Conference, Haifa, Israel.

198.  Blanck, P.  (2007). American Disability Law and Policy, Workshop Presentations at the Israeli National Social Security Office, Jerusalem, Israel.

199.  Blanck, P.  (2007). The Digital Divide in the US and Abroad, Presentation at T4P'07, First International Conference on Technology for Participation and Accessible eGovernment Services, Agder University College, Kristiansand, Norway.

200.  Blanck, P.  (2007). Corporate Culture, Litigation and the Global Access to the Internet, Presentation at Trondheim University, Trondheim, Norway.

201.  Blanck, P. (2007).  Disability Law and Policy in the Theater, Presentation at the Kennedy Center's Leadership Exchange in Arts and Disability (LEAD) conference, Minneapolis, MN.

202.  Logue, L. & Blanck, P.  (2007). African-American Veterans and Civil War Pensions, Presentation at "Military Service, Social (Dis) advantage, and the Life Course," Maxwell School Conference on Disability and the Military Experience, Syracuse University, NY.

203.  Blanck, P.  (2007).  Exploring New Markets: What You Need to Know to Tap into the Disability Community, Address at the Opportunity Conference, hosted by U.S. Secretary of Labor Elaine L. Chao, Washington, D.C.

204.  Blanck, P.  (2007). Disability Rights and E-Accessibility, European Commission, Brussels, Belgium.

205.  Blanck, P.  (2007).  Disability Pensions for Union Army Veterans: Historical and Contemporary Lessons, Faculty Colloquium, for The John J. Heldrich Center for Workforce Development, at the Edward J. Bloustein School of Planning and Public Policy, and the School of Management and Labor Relations, Rutgers University, NJ.

206.  Blanck, P.  (2007). Future of Disability Rights, Keynote Address to the Israeli Knesset on Disability Day, Jerusalem, Israel.

207.  Blanck, P.  (2007). Disability World Developments, Lecture to Bekol–Organization of Hard of Hearing and Deaf People in Israel, Jerusalem, Israel.

208.  Blanck, P.  (2008).  American Disability Law and Policy in Transition, Eastern Kentucky University College Education Dean's Lecture Series, Richmond, KY.

209.    Blanck, P.  (2008). International Developments in Accessible ICT, G3ict Forum, Hosted by the Ecuadorian Ministry of Social Development, Quito, Ecuador.

210.    Blanck, P.  (2008).  The Past and Future of Disability Law and Policy, closing presentation at the 2008 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

211.    Blanck, P.  (2008). Best Practices, Corporate Attitudes and Employment of Persons with Disabilities, Address at Office of Disability Employment Policy (ODEP) Annual Conference, Washington, D.C.

212.    Blanck, P.  (2008). Research on the Employment of Persons with Disabilities, Interagency Subcommittee on Employment, Interagency Committee on Disability Research (ICDR) Conference, Washington, D.C.

213.    Blanck, P.  (2008). Reframing the Disability Issue for Employers, Cornell/AAPD Policy Forum, Washington, DC.

214.    Blanck, P. (2008).  Disability Rights, Options for Independence Annual Conference Keynote Address, Auburn, NY.

215.    Blanck, P. (2008).  Reasonableness of Accommodations, Presentation at the Kennedy Center's Leadership Exchange in Arts and Disability (LEAD) conference, Ft. Lauderdale, FL.

216.    Blanck, P.  (2008).  Disability Rights for Health and Medical Professions, Colloquium, 2nd Annual Conference of the Ono Research Institute for Health and Medical Professions, Ono Academic College, Kiryat Ono, Israel.

217.    Blanck, P.  (2008). Disability Law and Policy, Colloquium address, Ono Academic College Law School, Kiryat Ono, Israel.

218.    Blanck, P. (2008). Age and Disability, Speaker at Law and Psychology of Age and Disability Discrimination Conference, University of Nebraska.

219.    Blanck, P. (2009).  Disability as an Element of Diversity in the Legal Profession, Diversity Summit: State of Diversity in the Legal Profession, American Bar Association Presidential Initiative, Mid-Year Meetings, Boston, MA.

220.    Myhill, W. & Blanck, P.  (2009). Disability and Aging, Speaker at Symposium on Aging and Disability, Marquette University Law School, Milwaukee, WI.

221.    Blanck, P.  (2009).  The Future is Now in Disability Law and Policy, Closing presentation at the 2009 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

222.    Blanck, P.  (2009).  Future of Disability Law and Policy, Remarks at the Opening Ceremonies for the Centre for Disability Law and Policy, National University of Ireland, Galway, Ireland.

223.    Blanck, P.  (2009). Disability Law and Policy: Past, Present, Future, Disability Studies and Research Centre, University of New South Wales, Sidney, Australia.

224.    Blanck, P.  (2009).  Disability and Social Justice, Centre International Governance & Justice Regulatory Institutions Network, ANU College Asia and Pacific, Australian National University, Canberra, Australia.

225.     Blanck, P.  (2009).  Disability Civil Rights Law and Policy, Lectures as Distinguished Visiting Professor, Graduate School of Social Welfare at Hokusei Gakuen University, Sapporo, Japan.

226.     Blanck, P.  (2009).  Future of the ADA, Japan Association of Employment of Elderly and Persons with Disabilities, An independent administrative agency in Ministry of Health, Labor & Welfare, Tokyo, Japan.

227.     Blanck, P.  (2009).  The ADA, American Society and People, Japan Disability Forum: A national network of disability organizations to promote the implementation of the Convention on the Rights of Persons with Disabilities as well as an anti-discrimination law for persons with disabilities in Japan, Tokyo, Japan.

228.     Blanck, P.  (2009). Law of the ADA, Graduate School & Faculty of Law, Kobe University, Japan.

229.     Blanck, P. (2010). U.S. and Japanese Disability Law, at Japan's Anticipated Disability Law and the Americans with Disabilities at Twenty: Workshop on Comparative Law, Policy and Research, in Los Angeles, CA, Co-sponsored by Burton Blatt Institute & Hokusei Gakuen University, Sapporo, Japan.

230.     Blanck, P. (2010). U.S. Disability Law and the CRPD, panelist at International Disability Law Conference on the Convention on the Rights of Persons with Disabilities, at Loyola Law School, Los Angeles, CA.

231.     Blanck, P. (2010).  U.S. Disability Law and Policy after Obama, International and Comparative Perspectives on Employment and Disability Law Conference, National University of Ireland, Galway.

232.     Blanck, P. (2010).  Universal Design: Inclusion, Innovation, Livability and Economics, Address at Access to the World, Implementation of Universal Design Legislation Seminar, Centre for Excellence in Universal Design (CEUD), Irish National Disability Authority (NDA), Dublin, Ireland.

233.     Blanck, P. (2010).  ADA at 20 and Mobility Access, Keynote address at ADA 20/20: Looking Back, Looking Forward on Mobility, Sponsored by BraunAbility, National Press Club, Washington, DC.

234.     Blanck, P. (2010). Future of Disability Law, Policy and Research, Colloquium, University of Tokyo, Japan.

235.     Blanck, P. (2010). Americans with Disabilities Act at Twenty, Colloquium address at University of Tsukuba, Graduate School of Comprehensive Science, Japan.

236.     Blanck, P. (2010). Developments in U.S. Disability Law, presentation at International Disability Law Conference, at Remning University, Beijing, China.

237.     Blanck, P. (2010). Cloud Computing for People with Cognitive Disabilities: Legal, Policy, and Universal Design Considerations, presentation at the Coleman Institute Workshop on Implications of Cloud Computing for People with Cognitive Disabilities, University of Colorado at Boulder, Law School, CO.

238.     Blanck, P. (2010). Developing an Accessible National Information Infrastructure for People with Cognitive Disabilities, panelist at the Tenth Annual Coleman Institute Conference, "All Together Now: The Power of Partnerships in Cognitive Disability & Technology," University of Colorado at Boulder, Law School, CO.

239.     Blanck, P. (2011).  $r_{osenthal}$: Effect size indicator, and $R^2$: Robert Rosenthal's goodness of fit, Colloquium to the Social Psychology Department, University California, Riverside, CA.

240.     Blanck, P. & Lord, J. (2011). Disability as a Protected Class for Seeking Political Asylum, presentation at the 2011 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

241.   Blanck, P. (2011).  Disability History and Law, Colloquium, University of Wisconsin's Financial Literacy and Disability Project (FLAD) and the UW Disability Studies Cluster, Madison, WI.

242.   Blanck, P. (2011). Disability and Economics: Challenges and Opportunities, Symposium on Disability and Economics, Burton Blatt Institute and University of Tokyo Project on Research on Economy and Disability, Syracuse, NY.

243.   Blanck, P. (2011). Future of Deinstitutionalization and Community Living in Israel, Conference, and Expert Committee Member, sponsored by Israeli Ministry of Welfare and Social Services, Tel Aviv, Israel.

244.   Blanck, P. (2011). Understanding Disability, Discussant to Thomas Shakespeare, at the Center for International Rehabilitation Research Information and Exchange (CIRRIE), in cooperation with WHO/PAHO, World Bank, U.S. International Council on Disability and Inter-Agency Committee on Disability Research, U.S. Launch and Symposium on the World Report on Disability, Washington DC.

245.   Blanck, P. (2011). Right to Technology Access for People with Cognitive Disabilities, Closing Keynote Address, State of the States, State of the Nation, 2011: Coleman Institute National Conference on Cognitive Disability and Technology in Challenging Economic Environments, University of Colorado, Boulder, CO.

246.   Blanck, P. (2011). Equal Employment Opportunity Commission (EEOC) Regulations Implementing the American with Disabilities Amendments Act (ADAAA): Expanding Coverage under the "Disability" Definition, American Bar Association (ABA) Center for Continuing Legal Education, on behalf of the ABA Commission on Mental and Physical Disability Law, Webinar Panelist.

247.   Blanck, P. (2011). Universal Design in the World, Keynote, III International Meeting on Technology and Innovation for Persons with Disabilities, Universal Design in Brazilian Industry, São Paulo, Brazil.

248.   Blanck, P. (2011). Universal Design in Electrical & Electronics Industry, Panelist, at the III International Meeting on Technology and Innovation for Persons with Disabilities, The Universal Design in the Brazilian Industry, São Paulo, Brazil.

249.   Blanck, P. (2011). World Bank, Legal Innovation and Empowerment through the CRPD, Panel speaker, Law, Justice & Development Week 2011, World Bank, Washington D.C.

250.   Blanck, P. (2011). Accessibility and Universal Design: The Global Universal Design Commission (GUDC), Conference sponsored by Israeli Ministry of Welfare and Social Services, Tel Aviv, Israel.

251.   Blanck, P. (2012). U.S. Genetic Antidiscrimination Law, Invited speaker at the Symposium on Genetic Discrimination, European Union Parliament, Brussels, Belgium.

252.   Blanck, P. (2012). Hot Issues in Disability Law, Invited speaker, National Council on Disability (NCD) Quarterly Meetings, NY, NY.

253.   Blanck, P. (2012). Introduction and Moderator, Psychotropic Medication and the Law, The Saks Institute for Mental Health Law, Policy, and Ethics, Los Angeles, CA.

254.   Blanck, P. (2012). Implementing the American with Disabilities Amendments Act (ADAAA), Plenary speaker, American Bar Association (ABA), ABA Commission on Mental and Physical Disability Law, Annual Conference, Washington, D.C.

255.    Blanck, P. (2012). The Right to the Web and the Cloud, Interagency Committee on Disability Research (ICDR) Assistive Technology/Technology (AT/T) Forum (June 26, 2012, Webinar).

256.    Blanck, P. (2012). Full and Equal Participation by Persons with Disabilities to the Courts and Civil Society, Speaker, Access to Justice for Persons with Disabilities, Side Event of the Fifth Session of the Conference of States Parties to the Convention on the Rights of Persons with Disabilities, United Nations, NY, NY.

257.    Blanck, P. (2012). ADA Legal Update: What's on the Docket? Colloquium, University of Houston Law Center, ILRU (Independent Living Research Utilization) Southwest ADA Center, Houston, TX.

258.    Blanck, P. (2012). Right to the Web for People with Cognitive Disabilities, Keynote Address, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

259.    Blanck, P. (2012). Disability and the Experience of Social Isolation, Speaker at Symposium on Social Isolation and Disconnectedness as a Risk Factor for Family Members across the Lifespan, National Human Services Assembly, National Collaboration for Families, Washington, D.C.

260.    Blanck, P. (2013). Civil Rights of People with Disabilities, Upstate Medical University, SUNY, Diversity Lecture Series, Syracuse, NY.

261.    Blanck, P. (2013). eQuality: The Right to the Web for People with Cognitive Disabilities, Faculty Colloquium, Southwestern Law School, Los Angeles, CA.

262.    Blanck, P. (2013). Social Security Reform: Toward Fiscal and Structural Balance, Discussant at Social Security Disability: Time for Reform, Social Security Advisory Board Disability Forum, Washington, D.C.

263.    Blanck, P. (2013). "When Gawd make cripple, He mean him to be lonely;" Disability, the Web and an Inclusive World, Presentation at the Symposium on Including Disability: How Legal Discourse Can Shape Life's Transitions, UCLA Law Disability Symposium, Los Angeles, CA.

264.    Blanck, P. (2013). Disability Law and Policy: U.S. and Japan, Symposium on U.S. and Japanese Disability, Loyola Law School, Los Angeles, CA.

265.    Blanck, P. (2013). The Right to the Web for People with Cognitive Disabilities and Ownership of Web Content, Participant at Cherry Blossom Symposium on Intellectual Property and Federal Policy: Universal Access in the Digital Environment, American University Washington College of Law, Washington, D.C.

266.    Blanck. P. (2013). The Right to Web Equality for People with Cognitive Disabilities, Guest Speaker at NIDRR Presents, National Institute for Disability Rehabilitation Research, Washington, D.C.

267.    Blanck, P. (2013). Emergency Care for Homebound and Vulnerable Populations, Keynote Address at 2013 Rural and Ready Symposium, Sault Sainte Marie, Mich.

268.    Blanck, P. (2013). Web Quality for People with Cognitive Disabilities, Talk Co-hosted by the Irish National Disability Authority (NDA) Centre for Excellence in Universal Design, National University of Ireland (NUI) Galway Centre for Disability Law and Policy, Dublin, Ireland.

269.    Blanck, P. (2013). The Future of Accessible Technology—Legal Perspectives, NOVA—Norwegian Social Research Institute—Talk at the European Assistive Technology Ecosystem Symposium, 4th DREAM Network-Wide Event, Oslo, Norway.

270.  Blanck, P. (2013). Declaration of the Right to Web Equality for People with Cognitive Disabilities, Address, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

271.  Blanck, P. (2013). Symposium on Best Practices in Supported Decision-Making, Research Group Facilitator, American University, Washington College of Law, Washington, D.C.

272.  Blanck, P. (2014). Closing Remarks, Workshop on the UN Convention for the Rights of Persons with Disabilities, University of Haifa, Haifa, Israel.

273.  Blanck, P. (2014). eQuality, Speaker at the U.S. and Japan Accessibility Policy Symposium, Center on Japanese Studies, University of California, Berkeley, CA.

274.  Blanck, P. (2014). Emergency Planning for People with Disabilities, Address to Northern Virginia Emergency Response System (NVERS) and the Regional Hospital Coordination Center (RHCC), Virginia Department of Emergency Management, and Northern Virginia Hospital Alliance, Symposium on Emergency Operations Planning: An Inclusive Approach, Alexandria, VA.

275.  Blanck, P. (2014). Supported Decision Making as an Alternative to Guardianship, Plenary Session at the 2014 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

276.  Blanck, P. (2014). Web eQuality for People with Cognitive Disabilities, National University of Ireland (NUI) Galway Centre for Disability Law and Policy, DREAM Symposium, Galway, Ireland.

277.  Blanck, P. (2014). Web Equality and Persons with Disabilities, 2014 International Summit on Accessibility, Carleton University, Ottawa, Canada.

278.  Blanck, P. (2014). New Directions in Disability Policy, Presentation to the National Council on Disability, Washington, D.C.

279.  Blanck, P. (2014). Legal Aspects of Internet Access for People with Cognitive Disabilities, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

280.  Blanck, P. (2015). Co-Facilitator, Integrating the Internet Now and in 25 Years, Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

281.  Blanck, P.  (2015).  The Future of Disability, Plenary Panelist, 2015 Jacobus tenBroek Disability Law Symposium, National Federation of the Blind, Baltimore, MD.

282.  Blanck, P. (2015). Launching for a Successful Career: Preparing Students for the Future, Moderator at Saks Institute Spring Symposium 2015, Mental Health on Campus: Keys to Success for University, Community College and Veteran Students, University of Southern California, CA.

283.  Blanck, P. (2015). *eQuality* and the Future of the Web for People with Disabilities, National ADA Symposium on the Americans with Disabilities Act, Atlanta, GA.

284.  Blanck, P. (2015). U.S. Strategic Litigation: Moving courts in the direction of supported decision-making and Lessons for Israel, at Symposium: Just Being Me: My Right to be in the World (Community Living) and my Right to make my own Decisions in the World (Legal Capacity). A Global Context for the Reform Process in Israel. Jerusalem, Israel.

285.   Blanck, P. (2015). *eQuality* and Web Access, Webinar for Institute on Disability and Public Policy for the ASEAN Region Association of Southeast Asian Nations (ASEAN).

286.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, Symposium Speaker at Ritsumeikan University, Kyoto, Japan.

287.   Blanck, P.  (2015). The Future of the Web, Keynote Address, First Japanese Association on Higher Education and Disability (AHEAD) Symposium, University of Tokyo, Japan.

288.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, Symposium Speaker at University of Melbourne, Australia.

289.   Blanck, P.  (2015). Supported Decision Making and the U.S. Experience, Symposium Speaker at University of Melbourne, Australia.

290.   Blanck, P.  (2015). Web *eQuality* and People with Disabilities, University of Sydney, Australia.

291.   Blanck, P.  (2015). Supported Decision Making and the U.S. Experience, Symposium Speaker at University of Sydney, Australia.

292.   Blanck, P.  (2015). The National Resource Center for Supported Decision Making, Address to the Australia Office of the Public Guardian and the University of New South Wales, Sydney, Australia.

293.   Blanck, P.  (2015). Corporate Culture and Disability, Address to the Australian Human Rights Commission, Sydney, Australia.

294.   Blanck, P. (2015). *eQuality* for Individuals with Cognitive Disabilities, Lecture, Sapienza University of Rome, Gruppo Asperger Lazio ONLUS, Rome, Italy.

295.   Blanck, P. (2015). The Future of Workplace Accommodations, Improving Research of Employer Practices to Prevent Disability, Liberty Mutual Research Institute for Safety, Hopkinton, MA.

296.   Blanck, P. (2015). Americans with Disabilities Act at 25, Talk at the Harvard Law School, Prison Legal Assistance Project, Cambridge, MA.

297.   Blanck, P. (2015). *eQuality*: Future of Web Accessibility for People with Disabilities, Federal Communications Commission (FCC), Colloquium Series, Washington, D.C.

298.   Blanck, P. (2015). Emerging Technology in Employment and Education, Presenter to the U.S. National Council on Disability, Quarterly Meeting, Concord, NH.

299.   Blanck, P. (2015). The Future of the Americans with Disabilities Act, Keynote Address, Maine Association for Community Service Providers Annual Meeting, Auburn, ME.

300.   Blanck, P. (2015). Research and Evidence Based Practice, Presentation & Facilitation, Supported Decision-Making Invitational Symposium 2015: Promoting the Right to Choose: Moving from Theory to Practice, Quality Trust for Individuals with Disabilities, American University, Washington College of Law, D.C.

301.   Blanck, P. (2015). Universal Design Certification, Mary Free Bed YMCA Dedication, Grand Rapids, MI.

302. Blanck, P. (2016). *eQuality*: Future of Web Accessibility for People with Disabilities, Hall Center for the Humanities, Invited lecture, Disability Studies Seminar, University of Kansas, Lawrence, KS.

303. Blanck, P. (2016). *Sheehan* and Beyond: Disability Rights Litigation and Use of Force, Invited speaker, Beating Mental Illness: Race, Gender, Disability and the Problem of Police Brutality, University of Southern California, CA.

304. Blanck, P. (2016). *eQuality* and the Future of Web Accessibility for People with Disabilities, Keynote, American Network of Community Options and Resources (ANCOR) Annual Conference, Chicago, IL.

305. Blanck, P. (2016). *eQuality*, Web Access and Disability Rights, Juan Carlos University, Madrid, Spain.

306. Blanck, P. (2016). Supported Decision-Making as an Alternative to Guardianship: Comparisons between the United States and Spain, Rey Juan Carlos University, Madrid, Spain. [University and public lectures].

307. Blanck, P. (2016). *Fireside Chat* with Bill Coleman and Sue Swenson, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

308. Blanck, P. (2016). The Architect of Her Life: Elyn's Journey: Supported Decision Making (SDM) Approach–Giving people with mental illness a voice in their treatment. Commentator, University of Southern California Gould School of Law, Los Angeles, CA.

309. Blanck, P. (2016). Self-Determination and Legal Capacity: Developments in Supported Decision-Making for Persons with Intellectual and Psychosocial Disabilities, University of California, San Diego, Center for Healthy Aging, San Diego, CA.

310. Blanck, P. (2017). Self-Determination and Legal Capacity: Developments in the USA on Supported Decision-Making for Persons with Intellectual and Psychosocial Disabilities, Centre for Law & Social Justice & Disability Law Hub, University of Leeds, Leeds, UK. [and other lectures on *eQuality*]

311. Blanck, P. (2017). Disability Civil Rights: Past, Present, and Future, Faculty Colloquium, Mississippi Valley State University, Itta Bena, MS.

312. Blanck, P. (2017). The Burton Blatt Institute: Law in Action and Research, Faculty Colloquium, University of Kentucky, College of Law, Lexington, KY.

313. Blanck, P. (2017). Supported Decision-Making for People with Disabilities: Law, Research and Practice, Lectures in Spain at: Barcelona Fundacio Malalts Mentals de Catalunya; King Juan Carlos University, Law School Symposium, Madrid.

314. Blanck, P. (2017). *Fireside Chat* with Bill Coleman, Coleman Institute on Cognitive Disability, National Conference, Univ. Colorado, Boulder, CO.

315. Blanck, P. (2018). Critical Disability Studies: Studying Intersectionality and Fluidity, York University, Toronto, Canada.

316. Blanck, P. (2018). Bias and Barriers Facing Lawyers with Disabilities and who Identify as LGBTQ+, National Academies Workshop on Aging, Disability, and Independence, National Academies of Sciences, Engineering, and Medicine, Washington, D.C.

317.    Blanck, P. (2018). Diversity and Inclusion in the Legal Profession: ABA Project on LGBT+ Lawyers and Lawyers with Disabilities, Sponsored by the William Wayne Justice Center for Public Interest Law and the Mithoff Pro Bono Program, University of Texas Law School, Austin, TX.

318.    Blanck, P. (2018). Best Buddies as Supported Decision-Making in Action, Best Buddies National Jobs Meeting, Miami, FL.

319.    Blanck, P. & Abdul-Malak, Y. (2018). Breaking Down LGBTQ Bias in the Legal Profession: Lessons from the National ABA/BBI Project, Plenary Address, National LGBT Bar Association Lavender Law Conference, New York, NY.

320.    Blanck, P. (2018). Supported Decision-Making: Empirical Findings, King Juan Carlos University, Law School Symposium, Madrid, Spain.

321.    Blanck, P. (2018). Accessible and Universally Designed Development: Inclusion, Diversity, and People with Disabilities, Invited Speaker at the Institute for Accessibility Development Conference, Tsinghua University, Beijing, China.

322.    Blanck, P. (2018). The Future of Disability Rights, Invited Colloquium and Public Address, School of Law, City University of Hong Kong, China.

323.    Blanck, P. (2018). Breaking Down Disability Bias in the Legal Profession: Lessons from the National ABA/BBI Project, Disability Rights Bar Association Western Conference, Los Angeles, CA.

324.    Blanck, P. (2018. Diversity and Inclusion in the Legal Profession: Findings from a National Study of Lawyers with Disabilities and who Identified as LGBTQ+, American Institute of Certified Public Accountants (AICPA) Meetings on Diversity in the Profession, Chicago, IL.

325.    Blanck, P. (2018). Past, Present, and Future of American Disability Rights, Keynote Address, State ADA Coordinator's Office and the Georgia Association of State Facility Administrators (GASFA), ADA for State and Local Governments Conference, Atlanta, Georgia.

326.    Blanck, P. (2019). Master address on Accessible Tourism, and the importance of Accessibility and Universal Design, Ecuador International Day of Disability, Quito, Ecuador.

## Forthcoming Presentations

327.    Blanck, P. (2019). Disability Rights in the Legal Profession: Findings from a National Study, University of the District of Columbia David A. Clarke School of Law, Washington, DC.

328.    Blanck, P. (2019). *eQuality*: Right to the Web for People with Disabilities, Colloquium Oslo Metropolitan University, Oslo, Norway.

**APPENDIX 2**

**PRIOR TESTIMONY IN THE LAST FOUR YEARS**

In the last four years:

I have been qualified, and testified, as an expert in trial in:

- IN RE: Leslie McDonald, Protected Person, State of Maine Probate Court, Kennebec

  County Probate Court, Augusta, Maine (August, 2016) (Guardianship proceeding).

I have been deposed as an expert witness in:

- Joshua Dunn, et al. v. Jefferson Dunn, in his official capacity as Commissioner of the

  Alabama Department of Corrections, et al. (U.S.D.C. Middle Dis. AL, May 10, 2016)

  (American with Disabilities Act class action litigation by prisoners with disabilities).

**APPENDIX 3**

**FEE RATE IN THIS MATTER**

My hourly fee in this matter is $400, and I charge for transportation and out-of-pocket expenses.

**APPENDIX 4**

**PRIMARY DOCUMENTS REVIEWED**

- Complaint, Answer, and Defendant's Motion for Summary Judgement with Exhibits
- Orders dated December 14 and 17, 2018
- Beyond Boundaries DVD
- Social science and other references cited herein that are publicly available

DEPOSITION TRANSCRIPTS:
- Deposition of Georgene Kohlbacker
- Deposition of Deborah Sheldon
- Deposition of Kathryn Holley
- Deposition of Deborah Moss

DISCOVERY PRODUCTION:
- Opportunities for Ohioans with Disabilities File
- Employee Assistance Program notes
- Correspondence regarding Employee Assistance Program
- Application and Personnel Evaluations
- Benefits and Compensation documents
- Verifications for Certifications from National Council for Therapeutic Recreation Certification

- UH Fitness for duty documents