```
 1              IN THE UNITED STATES DISTRICT COURT

 2        NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

 3

 4   DEBORAH MOSS,

 5           Plaintiff,

 6        vs.                      JUDGE JAMES S. GWIN

 7                                 CASE NO. 1:18-cv-02257

 8

 9   UNIVERSITY HOSPITALS

10   HEALTH SYSTEMS, INC.,

11           Defendant.

12

13              DEPOSITION OF DEBORAH SHELDON

14                  THURSDAY, APRIL 4, 2019

15                      9:59 A.M.

16              Giffen & Kaminski, LLC

17           1300 East Ninth Street, Suite 1600

18                  Cleveland, Ohio

19

20

21

22

23

24   REPORTED BY:

25   Sarah R. Drown
```

```
 1          THE STATE OF OHIO,    )   SS:

 2          COUNTY OF CUYAHOGA.   )

 3

 4               I, Sarah R. Drown, a Registered Professional

 5          Reporter and Notary Public within and for the State

 6          of Ohio, duly commissioned and qualified, do hereby

 7          certify that DEBORAH SHELDON, was first duly sworn

 8          to testify the truth, the whole truth and nothing

 9          but the truth in the cause aforesaid; that the

10          testimony then given by her was by me reduced to

11          stenotypy in the presence of said witness,

12          afterwards transcribed on a computer/printer, and

13          that the foregoing is a true and correct transcript

14          of the testimony so given by her as aforesaid.

15               I do further certify that this deposition was

16          taken at the time and place in the foregoing caption

17          specified.  I do further certify that I am not a

18          relative, counsel or attorney of either party, or

19          otherwise interested in the event of this action.

20               IN WITNESS WHEREOF, I have hereunto set my hand

21          and affixed my seal of office at Cleveland, Ohio, on

22          this 29th day of April, 2019.
```



```
24          Sarah R. Drown, RPR, Notary Public
            within and for the State of Ohio
25          My Commission expires April 22, 2022.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 13

```
 1   Q   So can you walk me through this process for --
 2       it looks like we've got a number of potential
 3       ways that somebody could get funneled into the
 4       ADA process, but obviously the one I'm
 5       interested in is employee requested an
 6       accommodation.
 7   A   Correct.
 8   Q   So can you walk me through what happens at UH
 9       when an employee requests an accommodation?
10   A   When they request an accommodation, a packet of
11       information is sent to them, or provided to
12       them, and then they return that packet.  The
13       information goes to the department of
14       disability management services for evaluation.
15   Q   Can you explain, what is disability management
16       services?
17   A   They handle all of the leaves.  So FMLA,
18       medical leave.  From a medical perspective,
19       things like that.
20   Q   So every single request for accommodations goes
21       through the disability management services?
22   A   Correct.
23   Q   What about accommodations that were in place
24       prior to the transition with UH?  Did UH
25       commence that process from the beginning or did
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 14

```
 1        it preserve and maintain existing
 2        accommodations?
 3   A    Can you ask that question again?
 4   Q    Sure.
 5             So Parma had employees that were there
 6        with disabilities and accommodations
 7        potentially before UH came in with this merger.
 8        What was the process?  What was the
 9        documentation for employees who already had
10        accommodations?  Did they have to start the
11        process again when UH merged?
12                      MR. BULEA:       Objection to
13        the form of the question.
14             You can answer.
15   A    The information -- I wouldn't have been privy
16        to the information.  It would have been held at
17        the -- what was called the employer's health
18        source department.  That's who handled them.
19   Q    What is the employer's health source
20        department?
21   A    They would be what is the equivalent to
22        University Hospitals disability management
23        services.  So they would handle that
24        information.
25   Q    So that would --
```

SHELDON, DEBORAH
04/04/2019                                                                  Page 18

```
 1      accommodation request.

 2   Q  Are you also responsible for employee

 3      discipline or performance evaluations or any of

 4      those other HR functions for employees at

 5      Parma?

 6   A  I'm not responsible for performance

 7      evaluations.  My involvement with corrective

 8      action disciplinary process is to work with the

 9      leaders to make sure that it's a fair and just

10      process.

11   Q  But if there were corrective action or somebody

12      was not performing or meeting expectations for

13      performance, would you know about that?

14   A  If the manager shares it with me, yes.

15   Q  A manager could not unilaterally discipline or

16      fire somebody without it going through you at

17      Parma, is that right, for the time period --

18      from 2015 until now, is that right?

19   A  Corrective actions -- copies of corrective

20      actions that are issued are sent to the human

21      resources department.  We do make a request

22      that we're aware of those before they're issued

23      so we have the opportunity to make sure that

24      they're fair and just.

25   Q  Have you ever reviewed Ms. Moss' -- her HR
```

```
 1      file?

 2   A  Yes, I have.

 3   Q  At what point did you first review Ms. Moss' HR

 4      file?

 5   A  Through this process.

 6   Q  When you say "this process," like when did you

 7      first review her HR file?

 8   A  I cannot recall the -- to give you a date of

 9      that.

10   Q  We'll circle back to that.

11          Prior to just, say, October 2016,

12      Ms. Moss was never disciplined, to your

13      knowledge, was she?

14   A  Not to my knowledge, no.

15   Q  There was literally nothing in her HR file at

16      all that indicated that she was not meeting

17      performance expectations in any area, was

18      there?

19   A  There was not.

20   Q  So I would like now to turn to what we've

21      marked as Exhibit P 2.  Or what we will mark as

22      Exhibit P 2.

23                      -  -  -  -  -

24          (Plaintiff's Exhibit 2 was marked.)

25                      -  -  -  -  -
```

SHELDON, DEBORAH
04/04/2019                                                                Page 20

```
 1   A   What is this I'm looking at?

 2   Q   That's what I was going to ask you.  I'm not

 3       sure who produced this document or in what -- I

 4       don't know what this document is.  I was hoping

 5       you might know what this document is.

 6   A   I do not know what this document is.  I've

 7       never seen this document before.

 8   Q   Okay.  So do you think that this could have

 9       been the disability management case notes?

10   A   I think it's part of the EAP process.

11   Q   Ah.  Okay.  Well, we'll skip over that, then,

12       for now if you're not familiar with number 2.

13                   MR. BULEA:        I can help you

14       on a break, if you want.

15                   MS. WHITE:        Absolutely.

16       Yeah.  You know, I want to save my questions

17       for the right people.

18                   MR. BULEA:        Sure.  Yeah.

19   Q   All right.  So let's move, then, to Exhibit 3.

20           Actually, let me just -- before I get

21       into Exhibit 3, let me just ask you, when did

22       Ms. Moss first request an accommodation that

23       came to your attention?

24   A   The fall of 2016.

25   Q   What did she request?
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 21

```
 1    A    Adaptive equipment.

 2    Q    Do you remember what the adaptive equipment

 3         was?

 4    A    I think it was called a TOPAZ monitor, if I

 5         recall correctly.

 6    Q    How was that request processed and responded to

 7         by UH?

 8    A    So that came from Debbie Moss.  And then we

 9         then provided her with the process, the forms

10         that come from University Hospitals for the

11         whole ADA process.  We provided her with the

12         necessary forms to be returned.

13    Q    Okay.  When you say "forms," you're talking

14         about notes from her doctor, is that right,

15         among other things?

16    A    Correct.  So the supporting documentation that

17         would then go to disability management

18         services.

19    Q    Were you aware that Ms. Moss had a CCTV at her

20         workplace at the time that she made her

21         request?

22    A    I learned that once this process began, yes.

23    Q    Apart from Ms. Moss, did you have any

24         communications with her supervisor or anybody

25         else about her request for accommodations or
```

```
 1      her need for accommodations?

 2   A  Once this process started?

 3   Q  Yes.

 4   A  Yes.

 5   Q  So what were those conversations and when did

 6      they happen?

 7   A  There were conversations that the accommodation

 8      request was made, that we would begin the

 9      process, that the paperwork was sent.

10      Conversations that we haven't received the

11      paperwork back.  And then conversations once

12      the paperwork was provided.  And then

13      conversations about what those accommodation

14      requests were.

15   Q  So now let's move to Exhibit 3, then, and take

16      a look at this and let me know if this rings a

17      bell.

18                  - - - - -

19         (Plaintiff's Exhibit 3 was marked.)

20                  - - - - -

21   A  Okay.

22   Q  Can you identify these documents?

23   A  I've not seen them before.  These are the

24      documents that the employee provides and/or

25      their provider sends to disability management
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 23

```
 1      services.

 2   Q  How would a provider receive this document,

 3      P 3?

 4   A  These are part of the packet.  When the process

 5      begins, the packet goes to the employee and

 6      they then work with their provider to complete

 7      the paperwork and submit it to disability

 8      management services.

 9   Q  So explain to me, then, what your role is here

10      in this process of evaluating this request for

11      accommodations.

12   A  So I'm on the receiving end of the information

13      itself, not the forms.  So I have not seen this

14      before.

15   Q  Okay.

16   A  I'm on the receiving end, that -- the

17      information goes to both disability and then

18      EAP, in this particular case, and then we're on

19      the receiving end of learning what those

20      accommodation requests are and evaluating

21      whether they can be reasonably accommodated.

22   Q  Was there any part of this process that could

23      alert you to the fact that this was an

24      accommodation she had already been receiving?

25   A  Well, like I said, through the process I
```

| | | |
|---|---|---|
| 1 | | understood -- I learned that she already had a |
| 2 | | CCTV. |
| 3 | Q | When did you learn that? |
| 4 | A | At the initiation of this process. |
| 5 | Q | So in October 2016? |
| 6 | A | Or thereabouts.  I mean I can't recall the |
| 7 | | exact date. |
| 8 | Q | So you knew in October 2016, or around the time |
| 9 | | that this request was first made, that she |
| 10 | | already had a CCTV? |
| 11 | A | I did learn that.  And that was of no concern |
| 12 | | at all. |
| 13 | Q | But you felt that the paperwork was still |
| 14 | | needed from the doctor to support the request |
| 15 | | for an updated CCTV? |
| 16 | A | The CCTV accommodated Debbie's needs for a |
| 17 | | particular portion of her job but not the bulk |
| 18 | | of her job.  So that provided assistance for |
| 19 | | when she was working on the computer, which is |
| 20 | | a small subset of the duties of the job. |
| 21 | Q | So she only requested a particular |
| 22 | | accommodation for a particular portion of her |
| 23 | | job, right? |
| 24 | A | Correct. |
| 25 | Q | Why ask for all of the paperwork for an |

SHELDON, DEBORAH
04/04/2019                                                                          Page 25

```
 1        accommodation that she already had?

 2   A    We were asking for what other accommodations

 3        could she request that would meet the essential

 4        functions of her job, that would allow her to

 5        perform the essential functions of her job.

 6   Q    Where was that conversation happening?  Was

 7        that happening at the very commencement of this

 8        request for accommodations?

 9   A    Once the paperwork was received, there was a

10        meeting in early 2016.  I'm sorry.  Early 2017.

11   Q    Who was at that meeting and what was the topic

12        of that meeting?

13   A    That initial meeting was with myself; Kathy

14        Holley, the manager; and Debbie Moss.

15   Q    How do you document work that you've done in

16        your work?  Like is there a record of that

17        meeting somewhere?  Did you take notes

18        afterwards?

19   A    I take notes.  There's I think -- it was

20        provided.  There's a very detailed list of the

21        meetings that were held, the phone calls, who

22        participated, and what occurred.

23   Q    Are they handwritten notes?

24   A    There are handwritten notes as well.

25   Q    But they're not Exhibit 2?
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 26

```
 1   A   No.

 2   Q   So tell me what -- who initiated that meeting

 3       in January and what was the purpose of that

 4       meeting with --

 5   A   The meeting in February?

 6   Q   I'm sorry.  I thought you said you met in

 7       January about the request for accommodations.

 8   A   The request didn't come until January.  Even

 9       though the packet was provided in October, the

10       request did not come in until January.  And we

11       met in early February.

12   Q   How could you have gotten a packet back without

13       a request for accommodations?

14   A   The request came in the fall of 2016.  We

15       provided a packet to Ms. Moss in 2016, in the

16       fall, and then we didn't receive that paperwork

17       back -- it's my understanding that the forms

18       from Debbie Moss were not returned until

19       January of 2017.

20   Q   I just want to make -- this is kind of an

21       important point, so I want to make sure I

22       understand what I'm reading here.

23           I'm looking at Exhibit 3 and it has an

24       authorization from Debbie Moss dated October

25       17, 2016 of facts from -- it's also dated
```

SHELDON, DEBORAH
04/04/2019                                                              Page 37

```
 1   A   I believe that's true.

 2   Q   Her job also involves reading and signing

 3       documents, is that right?

 4   A   It does, and it became aware that she was

 5       signing documents without the use of the

 6       adaptive equipment, therefore, unable to see

 7       them.

 8   Q   Who said that?  I mean who told you that?

 9   A   Kathy Holley.

10   Q   When did she tell you that?

11   A   I don't recall the date.

12   Q   So with Exhibit P 4 -- I just want to make sure

13       I understand.

14           At this point, this is January 27, 2017,

15       there has been no request and no indication to

16       Ms. Moss that there's any concern about her

17       ability to perform any other functions of her

18       job at that point, right?  Nobody's talked to

19       Ms. Moss to say you're not doing something well

20       or not performing your job at that point, is

21       that right?

22   A   I'm trying to recall the meeting in October,

23       how much was discussed then.  I think that was

24       in early February after the request came in.

25       There was a limited request for accommodations.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 38

```
 1   Q   So there's a limited request, but why was this
 2       not sufficient for UH to agree to provide the
 3       CCTV?
 4   A   Again, there was never a concern for the CCTV.
 5       There was never a concern.
 6   Q   Then what more did you or Karen Ladakas or
 7       Kathryn Holley need to agree to provide a CCTV?
 8       Why was that initial request that Ms. Moss made
 9       for a discreet item not simply provided at that
10       point?
11   A   Because there were much bigger hurdles, such as
12       the interactive -- the patient care duties of
13       the job that a CCTV did not accommodate.
14   Q   When did those hurdles present themselves?
15   A   The hurdles presented themselves.  There were
16       changes in the department, such as a new
17       manager.  There were reduction in staff.  There
18       was a higher acuity of the patients with more
19       severe psychosocial illnesses, a younger
20       patient population, and there was an increase
21       in the violent behavior by the patients.
22   Q   We'll take those one at time, but I just want
23       to make sure I got all of the those.
24           So you said new manager, reduction in
25       staff, higher acuity, younger patients, more
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 28

```
 1      request for accommodations, is that right?
 2   A  Or that you're aware that -- it can happen --
 3      as you see in the flowchart, it can happen in
 4      different scenarios.
 5   Q  Okay.
 6   A  In this case she presented a piece of paper, I
 7      think with the monitor on it, and we knew that
 8      was her request.  We provided then the packet
 9      to begin the formal process.
10   Q  Okay.  So she requested that monitor.  Her
11      doctor had submitted a form saying yes, indeed
12      she's legally blind and needs a CCTV.
13         What more information did you need at
14      that point to decide whether to act on that
15      request for a CCTV?
16   A  At this point -- at this date, I didn't have
17      this information.
18   Q  Okay.
19   A  I became involved again in late January 2017,
20      when I was told that the paperwork was fully
21      submitted with a request that included a CCTV,
22      but other things that only impacted a subset of
23      her duties.
24   Q  Tell me the other things that impacted a subset
25      of her duties.  I'm trying to figure out why
```

SHELDON, DEBORAH
04/04/2019                                                              Page 29

```
 1          did a request for a monitor morph into a demand
 2          for information about other parts of her job
 3          duties.
 4   A      There was a concern for her ability to perform
 5          the functions of her job.  So this, a CCTV,
 6          would assist her in a small subset of her
 7          duties.  The bulk of her duties were related to
 8          patient care and this did not assist with those
 9          duties.
10   Q      Ms. Moss did not request -- in this very formal
11          lengthy process, she didn't make a formal
12          request for accommodations for patient care in
13          October 2016, is that right?
14   A      No, she did not.
15   Q      In October 2016, how long had she been employed
16          by UH at that point?
17   A      Probably 19 years at that point.  19 or 20.
18   Q      In the 19 or 20 years that she had been
19          employed there, nobody had ever expressed a
20          concern or provided corrective action
21          indicating that she could not perform her job
22          duties, is that right?
23   A      Not that I'm aware of.
24   Q      There was no job duty at all that -- prior to
25          her request for a CCTV in October 2016, there
```

```
 1      request for accommodations, is that right?

 2   A  Or that you're aware that -- it can happen --

 3      as you see in the flowchart, it can happen in

 4      different scenarios.

 5   Q  Okay.

 6   A  In this case she presented a piece of paper, I

 7      think with the monitor on it, and we knew that

 8      was her request.  We provided then the packet

 9      to begin the formal process.

10   Q  Okay.  So she requested that monitor.  Her

11      doctor had submitted a form saying yes, indeed

12      she's legally blind and needs a CCTV.

13         What more information did you need at

14      that point to decide whether to act on that

15      request for a CCTV?

16   A  At this point -- at this date, I didn't have

17      this information.

18   Q  Okay.

19   A  I became involved again in late January 2017,

20      when I was told that the paperwork was fully

21      submitted with a request that included a CCTV,

22      but other things that only impacted a subset of

23      her duties.

24   Q  Tell me the other things that impacted a subset

25      of her duties.  I'm trying to figure out why
```

SHELDON, DEBORAH
04/04/2019                                                    Page 29

```
 1        did a request for a monitor morph into a demand

 2        for information about other parts of her job

 3        duties.

 4   A    There was a concern for her ability to perform

 5        the functions of her job.  So this, a CCTV,

 6        would assist her in a small subset of her

 7        duties.  The bulk of her duties were related to

 8        patient care and this did not assist with those

 9        duties.

10   Q    Ms. Moss did not request -- in this very formal

11        lengthy process, she didn't make a formal

12        request for accommodations for patient care in

13        October 2016, is that right?

14   A    No, she did not.

15   Q    In October 2016, how long had she been employed

16        by UH at that point?

17   A    Probably 19 years at that point.  19 or 20.

18   Q    In the 19 or 20 years that she had been

19        employed there, nobody had ever expressed a

20        concern or provided corrective action

21        indicating that she could not perform her job

22        duties, is that right?

23   A    Not that I'm aware of.

24   Q    There was no job duty at all that -- prior to

25        her request for a CCTV in October 2016, there
```

SHELDON, DEBORAH
04/04/2019                                                                          Page 30

```
 1        was no job duty that anybody at UH identified
 2        that she was unable to perform, is that right?
 3   A    Not to my knowledge.  I never found that,
 4        correct.
 5   Q    Who at UH would have been aware of the request
 6        for accommodations?  Who would have been aware
 7        and who would have had some responsible role in
 8        that process?
 9   A    At this point in time?
10   Q    Yes.
11   A    Human resources, the manager; disability
12        management services; employee assistance
13        program, the EAP in this case; corporate health
14        from a global standpoint.  Anyone who's
15        involved in the health of the employees.
16   Q    Explain to me, what is the EAP and when and why
17        would they be involved in this case?
18   A    The EAP's an employee benefit.  It provides
19        counseling and other services, support
20        programs, to assist the employees.  They're
21        also used in cases where there might be a need
22        to -- there are self-referrals and there are
23        mandatory referrals.
24   Q    This was a mandatory referral, is that right?
25   A    It was.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 31

```
 1    Q    That occurred in February of 2017?

 2    A    Correct.

 3    Q    Ms. Moss did not request EAP assistance at that

 4         point, did she?

 5    A    No, she did not.

 6    Q    Actually, she never requested EAP assistance?

 7    A    No, she didn't.

 8    Q    What would have happened if she had not been

 9         involved with EAP?  She could have been subject

10         to corrective action, is that right?

11    A    Correct.

12    Q    If disability management services had had

13         Dr. Traboulsi's medical information in October

14         2016, would it have been appropriate to wait

15         another two months before providing that

16         accommodation or making a decision on it?

17                    MR. BULEA:        Objection to

18         the form of the question.

19              You can answer.

20    A    Can you ask it again?

21    Q    Yeah.

22              Why wait two months to have any action on

23         her request for accommodations for the CCTV?

24    A    From October?

25    Q    Yes.
```

SHELDON, DEBORAH
04/04/2019                                                                 Page 47

```
 1      meeting.

 2   A  Which part are you referring to?

 3   Q  So it's marked -- it's 1374, Bates-stamped at

 4      the bottom.  So there's these page numbers at

 5      the bottom.

 6   A  Uh-huh.  Okay.

 7   Q  So I'm on this.  It says:  Claim conference

 8      call.  HR manager, Jane Reese, Karen Ladakas.

 9      Concerns reviewed.  Manager to have a sit down

10      with the employee regarding completing --

11      employee completing ADA employee portion per

12      manager, who's had closed-c TV since 2013.  Has

13      someone from nursing office read LMS emails.

14      Concerned unable to see visual cues from

15      patients in group therapy, unable to see

16      patients clearly, safely as she is in psych

17      ward.

18          Does that ring a bell?

19   A  The call or this, what I'm reading?

20   Q  The call at all, and then we'll jump into the

21      content.

22   A  Yeah.  The calls regarding the concerns, yes.

23   Q  Does this accurately reflect that call?

24   A  Concerns over getting an ADA completion of it,

25      realization that she had a CCTV.  It became
```

```
 1        aware to me that someone's reading her emails.
 2        There was a concern of her visual cues and that
 3        she was unable to see patients clearly, yes.  I
 4        was aware of those topics.
 5   Q    Okay.
 6   A    And that she was unable to fully participate in
 7        the crisis prevention or -- in violent crisis
 8        interaction, the de-escalation class.
 9   Q    Who is AHN?
10   A    I'm going to guess --
11                    MR. BULEA:        Don't guess.
12                    THE WITNESS:      Okay.
13                    MR. BULEA:        If you don't
14        know, you don't know.  We can find out.
15                    THE WITNESS:      Okay.
16                    MR. BULEA:        She doesn't
17        want you to guess.
18                    THE WITNESS:      Okay.
19   Q    So at the time that this phone call happened
20        among -- were these the folks that were in on
21        that phone call?  Was that you, Kathy Holley's
22        the manager, Jane Reese, and Karen Ladakas, is
23        that correct?
24   A    That's correct.
25   Q    Was there anything else that was discussed at
```

```
 1        that meeting, to your recollection, that's not

 2        reflected in these notes?

 3     A  Concern for her ability to safely perform her

 4        job.

 5     Q  Okay.  So this was your first meeting about

 6        that, though, right?  Was there a prior meeting

 7        about concerns for her safety in performing her

 8        job?

 9     A  We had conversations I believe in January.  We

10        were waiting for information, knowing that the

11        request that we had did not fully meet the --

12        the accommodation request we had did not

13        address all of the functions of her job, the

14        essential functions of her job.

15     Q  At that point you had not sent her for a

16        fitness for duty exam and she had not requested

17        any other specific accommodations --

18     A  That's correct.

19     Q  -- at that point?  Okay.

20                    MR. BULEA:       You're doing

21        great, but just let her finish her question

22        before you answer so the court reporter can get

23        it down.

24     Q  You became aware then, at this meeting, if you

25        hadn't been before, that she had a CCTV since
```

```
 1        at least 2013, right?

 2   A    I became aware of it during this process, yes.

 3   Q    Was there any other documentation of other

 4        accommodations that she had received?

 5   A    Not that I'm aware of.

 6   Q    Were you concerned that there were other

 7        accommodations that you might not have known

 8        about?

 9   A    It became evident that there weren't any.

10   Q    You thought that there were not any

11        accommodations?

12               MR. BULEA:        Accommodations

13        or documentation, you mean?

14               MS. WHITE:        Accommodations.

15   A    The CCTV.

16   Q    That was the only accommodation you thought she

17        had?

18   A    I learned that someone was assisting her in

19        reading her emails.

20   Q    Okay.  Yeah.  Sorry.  Thank you for clarifying

21        that portion.

22           Did you have any concern about that, by

23        the way, somebody reading her emails for her?

24   A    No concern.

25   Q    You didn't ask her to get a doctor's note to
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 51

```
 1        justify that or fill out forms or go to the

 2        disability management services for that

 3        accommodation?

 4   A    No.

 5   Q    At that meeting you guys -- sorry.

 6             At that meeting it was anticipated and

 7        acknowledged that there was a crisis

 8        intervention training that was coming up, is

 9        that right?

10   A    That it already happened?

11   Q    No, that it was going to happen.

12   A    Oh.  Yes, correct.

13   Q    Did anybody reach out to Ms. Moss to begin the

14        interactive process, to identify and ensure

15        that reasonable accommodations would be

16        provided for her at the crisis intervention

17        training?

18   A    There was no request for any accommodation for

19        that training.

20   Q    You guys -- I'm sorry.

21             The folks present at this meeting,

22        including you, recognized that her vision

23        impairment may pose a problem for her to

24        benefit from and receive and participate in

25        that training, is that right?
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 52

```
 1   A   Can you say that one more time, please?

 2   Q   Sure.

 3           On February 1, 2017, in this meeting

 4       between you, Ms. Holley, Jane Reese, and Karen

 5       Ladakas, that group of folks, including you,

 6       recognized that Ms. Moss was going to have a

 7       de-escalation training in a little over a week

 8       and that her vision impairment may pose an

 9       issue with her participation in that meeting,

10       is that right?

11   A   I can tell you that the topic of the

12       de-escalation training at that meeting was not

13       a focus of that.

14   Q   "De-escalation class on 2/9/2017.  AHN to be in

15       class as well.  Monitor assessments more

16       closely, even to reassess to check on her

17       ability to perform essential functions.  Ask

18       AHN to weigh in on employee's ability to

19       participate in the class."

20           Is that right?

21   A   Those are not my notes.

22   Q   Okay.  But does that ring a bell as to what was

23       discussed about -- was this team concerned that

24       Ms. Moss was not going to be able to

25       participate in the crisis intervention
```

SHELDON, DEBORAH
04/04/2019                                                                 Page 53

```
 1      training?

 2   A  The team was concerned about Ms. Moss' ability

 3      to perform the essential functions of her job.

 4   Q  The team was concerned that Ms. Moss, because

 5      of her vision impairment, might not be able to

 6      fully participate in the crisis intervention

 7      training, is that right?

 8                  MR. BULEA:        Objection.

 9      Asked and answered.

10            You can answer.

11   A  Clearly there's a concern in her ability to

12      interact for -- so that is a function of the

13      job, is to participate in that training.

14   Q  Yes.  And it's a benefit that's offered to

15      employees as well?

16   A  Yes, it is.

17   Q  At this point the HR team and Ms. Moss' manager

18      are aware that she has a vision impairment and

19      the team is actually anticipating that the

20      vision impairment might make it more difficult

21      for her to -- it might make it difficult for

22      her to participate in the class?  She might not

23      be able to participate in the class because of

24      her vision impairment, is that right?

25                  MR. BULEA:        Objection.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 54

```
 1              You can answer.

 2   A   There was a concern, that she be assessed

 3       during that training.

 4   Q   Nobody told Ms. Moss that she was going to be

 5       observed during this training to determine

 6       whether she could -- she had the ability to do

 7       it, was there?

 8   A   I don't know that.

 9   Q   You're not aware of anybody -- you're not aware

10       of any communication to Ms. Moss, though,

11       right?

12   A   I'm not.

13   Q   Did anybody initiate the interactive process to

14       identify potential accommodations that would

15       prevent Ms. Moss to fully participate in the

16       crisis intervention training?

17   A   There was an exhaustive process to try -- for

18       this training?

19   Q   Yes, for this training.

20   A   That particular, no.

21   Q   No.  Why not?

22   A   We were in the middle of the process.

23       Evaluating the accommodations that had been

24       requested of us.

25   Q   So she requested one item, the CCTV?
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 55

1   A   Correct.

2   Q   And then suddenly you're now questioning her

3       ability to even do her job safely, correct?

4                   MR. BULEA:        Objection.

5           You can answer.

6   A   Yes.

7   Q   You specifically highlighted that in a week and

8       a half she's going to have a training coming up

9       that she might not be able to do, is that

10      right?

11  A   That was -- they knew there was a training.  I

12      guess it would be another way to evaluate her

13      ability to perform the essential functions of

14      her job.

15  Q   But nobody reached out to say "Ms. Moss, do you

16      have any other accommodations or do you need

17      any accommodations for that crisis intervention

18      training"?

19                  MR. BULEA:        Objection.

20      Asked and answered.

21          You can answer.

22  A   Correct.

23  Q   This crisis intervention training is a pretty

24      important class.  It's actually a required

25      class for everybody who has this particular job

SHELDON, DEBORAH
04/04/2019                                                                          Page 56

```
 1       role, is that right?  It's in the job

 2       description.

 3   A   Yes.

 4   Q   Ms. Moss has successfully completed that crisis

 5       intervention training over a dozen times, isn't

 6       that right?

 7   A   The format in which the training was delivered

 8       has changed.

 9   Q   How did the format change?

10   A   I don't have the specifics of that.

11   Q   When did it change?

12   A   I don't have the date of that either.

13   Q   Was this a training that was provided with

14       visual demonstration?

15   A   Yes.

16   Q   What else?  What other features of the

17       training -- how did the training work

18       otherwise?

19   A   I don't have the details of that.  I can't

20       speak to that.

21   Q   On this particular call it sounds like the team

22       was realizing that there were some

23       accommodations that there were no documentation

24       of, for instance, Ms. Moss has had a CCTV since

25       2013, right?
```

SHELDON, DEBORAH
04/04/2019                                                            Page 86

```
 1        little bit more closely.

 2             The required credentials here include

 3        nonviolent crisis prevention training within

 4        three months of employment, correct?

 5   A    Correct.

 6   Q    So Ms. Moss had been in this exact position and

 7        this job description had not changed since

 8        2009, correct?

 9   A    That I'm aware of, correct.

10   Q    She had successfully completed the nonviolent

11        crisis intervention training, correct?

12   A    That I'm aware of, yes.

13   Q    She had done it a number of times, correct?

14   A    That I'm aware of, yes.

15   Q    Now, whenever you say you're aware of, how much

16        of Ms. Moss' personnel file did you review?

17   A    A good portion of it.

18   Q    Did you review back to 1996?

19   A    Potentially.

20   Q    She took that nonviolent crisis intervention

21        training and demonstrated proficiency in it

22        almost -- I mean almost every other year, is

23        that correct, approximately?

24   A    That's correct.

25   Q    In your review of her personnel file, you
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 87

```
 1        didn't find any indication of anybody ever

 2        indicating that she was not able to complete

 3        that crisis intervention training, did you?

 4    A   No.  And no one has said that.

 5    Q   Okay.  So let's look at the position summary

 6        and essential duties.

 7             "Organization and conduct daily

 8        therapeutic programs to facilitate

 9        rehabilitation of people with psychosocial

10        illnesses; assess, maintain, and develop

11        programs to enhance social, cognitive,

12        physical, emotional functioning of patients."

13             Correct?

14    A   Correct.

15    Q   We also have a -- including performance.

16             Perform assessment for functional and

17        rehabilitation -- rehabilitative needs that may

18        include activities of daily living, community

19        living skills, social, leisure, and vocational

20        skills, self-care, correct?

21    A   Correct.

22    Q   I'm not going to read the whole thing.

23             On February 14, 2017, which of these

24        functions could Ms. Moss not perform?

25    A   The concern was surrounding 1, 2, 3, and 4.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 99

```
 1    A    I do not.

 2    Q    You've never seen Allison Evans' report or

 3         feedback?

 4    A    I saw Allison Evans' feedback.

 5    Q    So let's talk about -- what was Allison Evans'

 6         feedback?

 7              Who is Allison Evans?  Let's start at the

 8         beginning.

 9    A    She's an occupational therapist.

10    Q    Who is she employed by?

11    A    University Hospitals.

12    Q    What does she do for University Hospitals?

13    A    She at the time was a supervisor in rehab

14         therapy.  Rehab services.

15    Q    Does she treat, like, UH patients, or is she

16         employed in, like, UH's HR?

17    A    She's not employed by HR.

18    Q    Okay.  What kind of patients does she see?

19    A    A multidisciplinary group of patients.

20    Q    Does she specialize in visual impairment?

21    A    I do not know that.

22    Q    Has she ever worked with anybody with a visual

23         impairment?

24    A    I can't answer that.

25    Q    You said that you wanted documentation or
```

```
 1        information from somebody who was qualified to

 2        evaluate functional limitations for people with

 3        vision impairment in work, is that right?

 4   A    Correct.

 5   Q    Was she that person?  Did she have that

 6        expertise?

 7   A    It's my understanding Allison Evans was asked

 8        to do a functional capacity assessment to

 9        assess the ability in the workplace.

10   Q    Was she asked to identify assistive technology

11        or reasonable accommodations?

12   A    I'm not aware of that.  That would have been a

13        conversation with EAP.

14   Q    Tell me what you know about her findings.

15   A    They're included in the document.  There's a

16        summary.  It's kind of a lengthy list I recall

17        seeing.

18                  MR. BULEA:      She's just

19        wondering, I think, if you can recall them

20        off -- what your understanding was.

21          I don't mean to reask your question.

22        Sorry.

23                  MS. WHITE:      No.  No.

24        Please.

25   A    Go ahead and ask me again.
```

SHELDON, DEBORAH
04/04/2019

```
 1   Q   What do you know about what Allison Evans
 2       concluded with Ms. Moss?

 3   A   Allison Evans concluded that based on the
 4       assessment of the duties, that she -- that
 5       Ms. Moss would be unable to perform the
 6       functions because of the perceptional -- visual
 7       perception that would be required in a rehab
 8       therapist's role.

 9   Q   Were you satisfied that Ms. Evans was competent
10       to perform that assessment and reach those
11       conclusions?

12   A   I had no concerns about her at all.

13   Q   You relied on her conclusions as well?

14   A   I think there were multiple conclusions.  She
15       was one of those.

16   Q   Who were the others?

17   A   There was a summary from two physicians.  Both
18       ophthalmologists, I believe.

19   Q   Those were summaries of Ms. Moss' visual
20       acuity, correct?

21   A   Correct.

22   Q   They were not summaries of Ms. Moss' functional
23       ability on the job, is that correct?

24   A   Correct.  And her visual ability.

25   Q   In fact, Dr. Balciunas, her ophthalmologist,
```

```
 1        specifically said that she was unable to render

 2        an opinion on the functional aspects of how

 3        Ms. Moss' disability affected her ability to do

 4        her job, correct?

 5    A   I think that position also said that the visual

 6        deficits would pose concern or the inability to

 7        see near and far.

 8    Q   Okay.  So there's a vision impairment, but

 9        Dr. Balciunas specifically said that she could

10        not comment or render an opinion on how that

11        vision impairment would affect Ms. Moss'

12        ability to do the job, correct?

13    A   I believe that's true.

14    Q   That determination about the functional part,

15        Allison Evans reached a decision, a conclusion,

16        based in part on a visit that she conducted to

17        Ms. Moss' workplace, correct?

18    A   Correct.

19    Q   Did Allison Evans ever speak with Ms. Moss

20        about her job or accommodations?

21    A   Not that I'm aware of.

22    Q   Did anybody ever talk to Ms. Moss -- or to

23        Ms. Evans about potential accommodations in the

24        workplace?

25    A   I don't know.  Ms. Evans would have worked with
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 103

```
 1      the EAP.

 2   Q  Okay.

 3   A  She did not work with me directly.

 4   Q  Okay.  Let's go to Exhibit 13.

 5                    -  -  -  -  -

 6          (Plaintiff's Exhibit 13 was marked.)

 7                    -  -  -  -  -

 8   Q  Have you ever seen this document before?

 9   A  I have not.

10   Q  This wasn't one of the doctors' reports that

11      you relied upon?

12   A  I received a summary.

13   Q  Okay.  What was the information that you

14      received about Dr. Traboulsi's conclusions?

15   A  That there was a loss of central vision,

16      peripheral remained unaffected.  That this

17      physician could not make a determination

18      because he had not observed her in the

19      workplace.  If that's a he.

20          He had an appreciation that she would not

21      be able to recognize faces or expressions on

22      patients, which is a big part of the role of a

23      rehab therapist.

24   Q  Facial expressions, though, is not part of that

25      initial job description, though, was it?  We
```

```
 1   A   Correct.

 2   Q   That information included -- you were aware

 3       that this doctor said "I'm uncertain about the

 4       impact of her core central vision on her

 5       ability to perform individual tasks because

 6       I've not observed her in the workplace and I'm

 7       not in a good position to make comments about

 8       that aspect," is that correct?

 9   A   It says that.

10   Q   So let's move on to Exhibit 14.

11                   MR. BULEA:        Can we go off

12       for a second?

13                   MS. WHITE:        Sure.

14                        -  -  -  -  -

15           (Discussion held off the record.)

16                        -  -  -  -  -

17           (Plaintiff's Exhibit 14 was marked.)

18                        -  -  -  -  -

19   BY MS. WHITE:

20   Q   P 14.  If you could take a look at this.

21           Have you seen this document before?

22   A   I have not.

23           No, I assume this is something that went

24       through the EAP.

25   Q   Were you aware of the content of this document?
```

SHELDON, DEBORAH
04/04/2019                                                          Page 108

```
 1   A   Do you want me to read the whole thing?

 2   Q   Well, let me ask you about parts of this

 3       document, then.

 4           Were you aware that the Cleveland Sight

 5       Center had conducted a low vision evaluation

 6       report of Ms. Moss?

 7   A   I was aware that the Cleveland Sight Center

 8       made an assessment.  How they approached that,

 9       I'm not aware of that.

10   Q   But that was part of the fitness for duty

11       evaluation process, is that correct?

12   A   An evaluation?

13   Q   Yes.

14   A   An evaluation was, correct.

15   Q   Let's see if we can try to connect the dots

16       here.  Once again, if you're not the

17       appropriate witness, we're probably going to

18       have the appropriate witness tomorrow.

19           I just want to direct your attention real

20       quick to document -- we'll toggle between

21       document P 11 on the second page -- I'm sorry,

22       the third page.  1358 is the Bates stamp at the

23       bottom.

24   A   Okay.

25   Q   This is low vision assessment from the
```

SHELDON, DEBORAH
04/04/2019                                                    Page 109

```
 1        ophthalmologist at the Cleveland Sight Center.

 2              Midway through vocational issues it says

 3        "Her ophthalmologist referred her to the

 4        Cleveland Sight Center to address the

 5        functional questions that the forms require."

 6   A    Okay.

 7   Q    Does that sound right to you?  Does that ring a

 8        bell?

 9   A    That sounds correct.

10   Q    So the initial assessment went to

11        Dr. Balciunas, who's an ophthalmologist.

12        Dr. Balciunas offered some comments on

13        Ms. Moss' visual acuity, but said for the

14        functional questions that there was a referral

15        to the Cleveland Sight Center?

16                    MR. BULEA:       Objection.

17   Q    Is that right?

18                    MR. BULEA:       You can answer.

19   A    That's what this says.

20   Q    Okay.  Then going back to P 14, here we are

21        with an occupational therapy low vision

22        evaluation report from the Cleveland Sight

23        Center, correct?

24   A    Correct.

25   Q    You have never seen this document before?
```

SHELDON, DEBORAH
04/04/2019                                                        Page 110

```
 1   A   I have not.

 2   Q   So I'm going to run some proposed

 3       accommodations that were, you know, recommended

 4       in this report by you and ask you if you've

 5       ever heard of these before.  We'll just start

 6       on page 1447.

 7           "Ms. Moss reported that the new copiers

 8       at work have a flat touchscreen.  She would

 9       benefit from bump dots to assist her in

10       orienting to the position of copy function

11       display."

12           Have you ever heard that before?

13   A   I heard that in a summary.  Or read that in a

14       summary.

15   Q   Okay.  Was that provided?

16   A   No, but it was not of concern.

17   Q   It was of concern to Ms. Moss.  She

18       specifically requested that accommodation.

19   A   I understand that.  Those -- again, any

20       accommodation requests that came to us were not

21       of concern to facilitate.

22   Q   Okay.

23   A   Never once a concern.

24   Q   I'm going to go to a couple other items.

25           "Ms. Moss is required to write out daily
```

```
 1        schedule on a whiteboard as part of a schedule

 2        awareness.  OT problem solved with Ms. Moss

 3        regarding the use of contrast electrical tape

 4        to grid off whiteboard fields from the daily

 5        schedule.  She reports this method has been

 6        done and is effective."

 7             Have you ever heard that recommendation?

 8   A    I heard that there was a schedule awareness and

 9        that whiteboards were going to be used.

10   Q    In fact, Ms. Holley specifically stated that

11        whiteboard in schedule awareness was an issue

12        in her list of factors that led to her to

13        recommend the fitness for duty evaluation,

14        correct?

15   A    I remember that subject.

16   Q    Okay.

17   A    Yes.

18   Q    Kathy Holley poses a concern.  Cleveland Sight

19        Center has proposed a solution.

20             Did that solution ever make it to you?

21        Did you ever consider that?

22   A    I don't recall the grid off, no.

23   Q    So there was never an interactive discussion

24        with Ms. Moss about whether that could solve

25        that problem?
```

```
 1   A   No.  Ms. Moss never discussed that with me.

 2   Q   This was definitely conveyed to UT -- I'm

 3       sorry, to UH through the EAP process?

 4   A   Correct.

 5   Q   Which was the fit for duty --

 6   A   And again, that would have been a small subset.

 7   Q   Well, let's go on to another one.

 8           Ms. Moss reported that on occasions she

 9       has bumped into staff when they are wearing

10       dark clothing that poorly contrasted with dark

11       flooring on the unit.  She reported this as a

12       minor concern -- as a mild concern.

13       High-contrast light on dark helps with improved

14       viewing.  Also it was reported that she's

15       walked into a patient's room when being seen by

16       nursing.  Use of verbal cues from staff is

17       acceptable etiquette when working with persons

18       with low vision or blindness.

19           Do you have any thoughts about those

20       recommendations?

21   A   Do you have a specific question?

22   Q   Yes.

23           So you specifically mentioned that one of

24       Ms. Holley's concerns that you thought was a

25       legitimate concern was Ms. Moss bumping into
```

SHELDON, DEBORAH
04/04/2019                                                                        Page 113

```
 1        people in the hallway, correct?

 2   A    Correct.

 3   Q    So here's a proposed solution, that higher

 4        contrast flooring or lighting would help with

 5        improved viewing to prevent or reduce bumping

 6        into staff in the hallway.

 7             Do you have any thoughts about whether

 8        that would be effective?

 9   A    That being effective would not be my

10        determination to make.

11   Q    Whose determination was that to make?

12   A    That would be a medical assessment.

13   Q    So what did UH -- UH has been presented with

14        this proposal.

15             What did UH do to consider this proposal?

16   A    I can't say that I recall.  I know there was a

17        hallway issue, the contrast.  I do not recall

18        seeing a recommendation or a request for

19        accommodation for changing a flooring.

20   Q    Wow.  So the EAP process -- you're facilitating

21        the fitness for duty exam.  That is processed

22        through the EAP process and somehow this

23        recommendation did not make its way back to

24        you, is that right?

25   A    I don't recall seeing that or knowing that.
```

```
 1   Q   UH Parma is just under -- I mean they're in a

 2       big renovation process right now.  Correct?

 3   A   True.

 4   Q   So is any flooring being replaced as part of

 5       that renovation?

 6   A   Well, if it's -- it's an addition going on.  So

 7       there would be new flooring.

 8   Q   And lighting?

 9   A   It's a new addition.  So there would be new

10       lighting.

11   Q   There's also a section here that speaks of

12       walking into a patient's room when being seen

13       by nursing.  Use of verbal cues from staff is

14       acceptable etiquette when working with a person

15       with low vision or blindness.

16           Do you have any thoughts about that?

17   A   My thought would be a person would need to know

18       someone's coming to be able to use a verbal

19       cue.

20   Q   Okay.  Because you can't see somebody who's not

21       inside the room, right?

22   A   Nor can the person inside the room see if

23       someone's coming.

24   Q   That's right.

25           In fact, you might not even see them at
```

SHELDON, DEBORAH
04/04/2019                                                    Page 115

```
 1       all.  You might hear that they're coming,
 2       correct?  Like if a staff member's back is
 3       turned to the door, they might hear somebody
 4       approaching inside the room for situational
 5       awareness, is that correct?
 6   A   They might.
 7   Q   Okay.
 8   A   It depends on what's happening in the room.
 9   Q   Do you know whether Ms. Moss can see movement?
10   A   She has peripheral vision I'm told.
11   Q   No doctor has ever said that she can't perceive
12       people coming and going, have they?
13   A   I've not been told that.
14   Q   In fact, they were quite specific, that it's --
15       the facial expression is the -- in the central
16       vision is the main visual limitation, correct?
17   A   What was the original question?
18   Q   Strike that.
19   A   Okay.
20   Q   I'll move on.  I want to talk about one other
21       item on here.
22            "Ms. Moss is required to participate in
23       crisis intervention and staff training.  Having
24       materials ahead of time for review and
25       partnering with a staff member or trainer who's
```

```
 1        aware of the need for verbal and touch prompts
 2        to motor Ms. Moss through any physical
 3        components may be beneficial."
 4             Do you have any thoughts about that?
 5   A    I don't see it as an issue.
 6   Q    You don't see the crisis intervention
 7        performance as an issue?
 8   A    I don't see that providing information ahead of
 9        time -- again, I do not conduct that training,
10        I don't know how it's implemented, but it
11        certainly would be a fair request.
12   Q    Okay.  There was a team at UH, though, who
13        anticipated that this crisis intervention
14        training was coming up and that Ms. Moss'
15        visual impairment may pose an issue for the
16        crisis intervention training, correct, the one
17        on -- this is the February 9, 2017 crisis
18        intervention training.  Right?
19                  MR. BULEA:      Objection.
20             You can answer.
21   A    They knew that that training was coming, yes.
22   Q    Nobody --
23   A    They knew there were concerns about her ability
24        in the workplace, yes.
25   Q    Did it occur to anybody who was in that room
```

SHELDON, DEBORAH
04/04/2019                                                        Page 117

```
 1        that physical prompts might be a way to address

 2        and make accessible a presentation that's

 3        conducted in a visual format?

 4   A    I can't respond because I wasn't in that room.

 5   Q    You were in the phone call, though.  Did

 6        anybody mention anything about that?

 7   A    I don't recall that.

 8   Q    But you think that would be effective, though,

 9        right, this proposed accommodation, the

10        physical prompts?

11   A    I would have to -- that would have to be asked

12        of the people conducting and creating the

13        training.  It's a fair question to ask them.

14   Q    Okay.  Who provides that training?

15   A    I believe our organizational development and

16        learning.  It might be in conjunction with

17        protective services.  I can't say for sure.  It

18        may, in fact, be more protective services.

19   Q    But UH either contracts for the service or

20        provides it internally, correct?

21   A    Correct.

22   Q    What is UH's process to anticipate the need for

23        auxiliary aids in communication for training

24        materials?

25   A    For training materials?
```

```
 1   Q   And formats.

 2   A   I'm not involved in those.  So I don't know

 3       exactly what those are.

 4   Q   So you don't have, like, protocols to

 5       anticipate in advance if an employee with a

 6       sensory disability might need, for instance, a

 7       microphone at a staff meeting or materials

 8       provided in large print or any other auxiliary

 9       aids?

10   A   I would have to ask those people that conduct

11       that training.

12   Q   Okay.  Nobody asked the people who conducted

13       this training, correct?

14   A   I did not.

15   Q   Okay.  Nobody else in that phone call asked

16       either, to your knowledge, correct?

17   A   Not to my knowledge.

18   Q   Moving on to additional item on the report.

19           "It was also reported that Ms. Moss has

20       difficulty noticing when patients get up from

21       their seats, need assistance, i.e., during

22       bingo, or reading patients' facial expressions.

23       Ms. Moss reported that she uses auditory

24       compensation strategies to listen for tone of

25       voice or responsiveness when she initiates a
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 119

```
 1      question or interaction.  She reports that she

 2      will also ask other staff or nurses for

 3      feedback regarding patient behavior or affect,

 4      otherwise Ms. Moss is unable to see faces or

 5      expression."

 6           Do you have any thoughts on auditory

 7      compensation strategies?

 8   A  Not all patients are able to communicate in an

 9      auditory manner.

10   Q  That's right.  There's the suggestion here, to

11      ask other staff or nurses for feedback

12      regarding patient affect or behavior, correct?

13   A  That was one of the concerns, that we don't

14      have the staff in that department any longer to

15      help accommodate that.

16   Q  How frequently does this department have

17      nonverbal patients?

18   A  Kathy Holley would have to answer that.

19   Q  It's not all the time, though, is it?

20   A  I don't know.

21   Q  UH doesn't have the staff to have more than one

22      person present in the room during group

23      sessions of up to 14 people?

24   A  At times they can be on their own.

25   Q  Ms. Moss is a part-time employee --
```

```
 1    A    Correct.

 2    Q    -- correct?

 3              Did UH ever consider the cost of

 4         providing -- of ensuring that there would be

 5         double staffing in the event that there's a

 6         nonverbal patient?

 7    A    To have staff to accommodate the needs was

 8         deemed to be an unreasonable accommodation.

 9    Q    Who deemed it to be unreasonable?  Who

10         considered it and when?

11                    MR. BULEA:         Objection.

12              You can answer.

13    Q    I'm sorry.  I can break it down.

14    A    That's --

15    Q    Who deemed it unreasonable?

16    A    That was a decision through human resources,

17         the manager.

18    Q    Who specifically in HR?

19    A    Myself.

20    Q    How did you make that determination?

21    A    We don't have the staff to do that.  The

22         departments all have a budgeted amount of

23         employees.

24    Q    Do you have a pool of resources to draw upon

25         for purposes of reasonable accommodations?
```

SHELDON, DEBORAH
04/04/2019                                                      Page 121

```
 1   A   Not that I'm aware of.
 2   Q   So you were considering solely the resources of
 3       the geriatric psych department in determining
 4       whether or not this request could be
 5       reasonable?
 6   A   Correct.  We could not assign another employee
 7       to do that.  We can't add functions to another
 8       person's job.
 9   Q   Why not?
10   A   Because it's an unreasonable expectation.
11   Q   Why is it unreasonable?  Are you talking about
12       in terms of cost, or do you -- did somebody
13       think it's unacceptable, to --
14   A   You would be adding responsibilities to another
15       person's job description.
16   Q   Please explain to me what is unreasonable about
17       that.
18   A   Because you're adding -- you would be adding
19       responsibilities to another job.  Are you
20       asking about --
21   Q   Yes.
22   A   -- a specific job?
23   Q   Yeah.  I'm just asking, like, what -- so it
24       sounds like you at UH actually considered
25       whether or not providing a second staff
```

SHELDON, DEBORAH
04/04/2019                                                                Page 122

```
 1      member -- ensuring a second staff member would

 2      be present at all times would be unreasonable,

 3      correct?

 4   A  Correct.

 5   Q  That was actually considered.

 6          At what point in the process, by the way,

 7      was that considered?

 8   A  I don't have an exact date.  It was in the

 9      beginning, when the request came in.  There was

10      no other request beyond the one that would

11      assist at the computer.

12   Q  Ms. Moss never specifically requested another

13      employee to be present at all times, correct?

14   A  Not that I'm aware of.

15   Q  Kathy Holley's the one who assumed that that

16      would be a necessity to ensure safety, correct?

17   A  You would have to ask Kathy Holley that.

18   Q  How did you get the idea that this would be a

19      reasonable -- or that this would be a potential

20      accommodation to assess?

21   A  Trying to do an exhaustive effort to find a way

22      to make Ms. Moss be able to perform the

23      functions of her job.

24   Q  Did you actually go to the extent of, like,

25      pricing out how much it would be to ensure the
```

SHELDON, DEBORAH
04/04/2019                                                                        Page 123

```
 1        staffing level, to make sure that there would
 2        be two staff available during all group
 3        sessions that Ms. Moss is working in?
 4    A   No.
 5    Q   There usually were two staff members present
 6        most of the time on that unit, weren't there,
 7        during group sessions?
 8    A   You would have to ask Ms. Holley that.
 9    Q   Have you asked Ms. Holley that?
10    A   I have not.
11    Q   So whenever you were doing this evaluation, you
12        didn't know whether this was simply ensuring
13        that there would always be two present or
14        actually creating a new position or somehow
15        adding duties on, correct?
16    A   Please rephrase that or say that again.
17    Q   Okay.  So if you didn't know -- you don't know
18        whether there were often another nurse or
19        another staff member present during -- in the
20        same room during the group sessions, do you?
21    A   No.  To my awareness, there are times when they
22        were alone.
23    Q   There are some times when they're alone,
24        correct?
25    A   Correct.
```

SHELDON, DEBORAH
04/04/2019                                                                Page 124

```
 1   Q   Not all the time, though, right?

 2   A   No.  Sometimes they're alone, requiring the

 3       ability to be able to assess the situation.

 4   Q   With sight, correct?

 5   A   Correct.

 6   Q   I'd like to talk about the recommendations that

 7       the Cleveland Sight Center made and I want to

 8       see if any of these were discussed.

 9           Did anybody ever propose training the

10       staff on blindness basics?  Do you remember

11       having that come up in conversation or

12       considering that as an accommodation?

13   A   I don't recall that, but I don't see that as a

14       concern.

15   Q   I'd like now to move to --

16               MR. BULEA:        Can we take a

17       quick bathroom break before you go to the next

18       document?

19               MS. WHITE:        Absolutely.

20       Yeah.

21               -  -  -  -  -

22               (Recess taken.)

23               -  -  -  -  -

24   BY MS. WHITE:

25   Q   So just one other item on P 14.  I just want to
```

SHELDON, DEBORAH
04/04/2019                                                                     Page 125

```
 1     note that this report seems to be dated in --

 2     actually, there's a fax stamp on top that say

 3     April 28, 2017.

 4          So it appears to me that UH received this

 5     report from the Cleveland Sight Center with

 6     these particular recommendations on April 28,

 7     2017.  Dose that sound about right?

 8  A  Yes.

 9  Q  So let's move to P 15.

10                    -  -  -  -  -

11     (Plaintiff's Exhibit 15 was marked.)

12                    -  -  -  -  -

13  Q  Once again I'm not sure what your awareness of

14     this document is.

15          Have you ever seen this document before?

16  A  I have not seen this.

17  Q  Well, I'm just going to ask you a few questions

18     about it, understanding that you have not seen

19     it before.

20          But this is -- it looks like it's an

21     email from Allison Evans, who is the OT who

22     conducted an evaluation for UH, right, of

23     Ms. Moss, correct?

24  A  Correct.

25  Q  Allison Evans is reporting that she received
```

```
 1        the OT report, unfortunately it is quite

 2        similar in the report from the OD, in that it

 3        just comments on technology accommodations for

 4        documentation and reading purposes.

 5             Did Allison Evans, to your knowledge,

 6        ever consider any of those accommodations that

 7        we just discussed that the Cleveland Sight

 8        Center presented?

 9   A    I can't speak on behalf of Allison.

10   Q    Okay.

11   A    I know we considered them.  There was never a

12        concern.

13   Q    The particular accommodations that we just

14        discussed with the Sight Center?

15   A    Yeah.  So I guess let me reiterate.

16             Any accommodations that were presented to

17        us were never a concern.  Ms. Moss was out of

18        work.  Had she come back and had accommodations

19        that we could have accommodated, we would have

20        been very happy to do that.

21             Those accommodations that were ever

22        presented to us did not address all the

23        functions of her role.  That was the concern.

24   Q    Well, let's circle back to P 14.

25             I would like you to tell me what --
```

```
 1      reading these reports and these

 2      recommendations, in your mind which essential

 3      functions of the job were not addressed by this

 4      report that UH had concerns about?

 5   A  If you go back to the job description --

 6   Q  Yeah.

 7   A  -- numbers 1 through 4.

 8   Q  Okay.  So we had 1 through 4.

 9          Then we had the Sight Center report

10      saying that Ms. Moss can use auditory

11      compensation strategies to listen for tone of

12      voice or responsiveness when she initiates

13      questions or interaction.

14          She reports she will ask other staff and

15      nurses for feedback regarding patient behavior

16      or affect.

17          And she reports higher contrast flooring

18      could help with potentially bumping into

19      people.

20          She reports that high-contrast tape could

21      help with scheduling.

22          She reports that a typoscope could help

23      with signatures.

24          She reports that bumps on the copy

25      machine could help with using the copy machine.
```

```
 1              She reports that partnering with a staff

 2       member or trainer who's aware of the need for

 3       verbal or touch prompts could assist Ms. Moss

 4       in participating in crisis intervention

 5       trainings that have a physical component.

 6              What more did you need to know in order

 7       to conduct an assessment or make a

 8       determination about whether Ms. Moss could

 9       perform the essential functions of her job?

10   A   We talked about the flat touchscreen.  Not an

11       issue.

12              The typoscope signature guide, not an

13       issue.

14   Q   So what issues remained?  Specifically what

15       issues remained?

16   A   The direct interaction with the patient.

17   Q   Okay.

18   A   It's a patient care role.  So the interactions

19       with the patient to create these therapies,

20       implement these therapies, assess the patient,

21       assess the risk to herself and others.  That's

22       a significant part of the role that she was in.

23       Those are a concern for her, the patients, and

24       other staff.

25   Q   You don't believe that the auditory
```

```
 1   Q   Going into the meeting on June 1, was UH open
 2       to the possibility that Ms. Moss might be able
 3       to return, or had the decision been made at
 4       that point?
 5   A   To terminate?
 6   Q   Yes.
 7   A   There was absolutely no determination to
 8       terminate.  There was an encouragement to find
 9       other ways to keep Ms. Moss employed at
10       University Hospitals.
11   Q   Had the conclusion been made that Ms. Moss
12       would not be permitted to return to her
13       position as a recreational therapist at UH?
14   A   Without accommodations to reasonably perform
15       those functions, yes.
16   Q   What do you mean by "without accommodations"?
17           Like, you mentioned several times that
18       Ms. Moss never in your mind raised any other
19       accommodations.  What do you mean by that?
20   A   So maybe I'm not clear.  The accommodations
21       that were presented only addressed a small
22       subset of the job duties that impacted
23       basically the computer and other factors.
24       There were not accommodations that fully
25       addressed being able to perform the essential
```

```
 1      functions of her job.  We were very open to
 2      that.
 3   Q  But you had not reviewed that Cleveland Sight
 4      Center low vision evaluation report prior to
 5      June 1, 2017, correct?
 6   A  No.  Those do not come to HR.
 7   Q  What information were you relying on then?
 8   A  We get a summary.
 9   Q  Okay.
10   A  So, again, any accommodations request that were
11      presented to us were never of concern.  Not any
12      accommodation request that was presented to us
13      was a concern.
14          The concern, which was communicated on
15      multiple occasions, was that the accommodations
16      as presented did not address the concern of the
17      patient care aspect of the role, which was a
18      primary part of her role.
19   Q  I think that my confusion is when you say
20      concerns as presented -- "the accommodations as
21      presented."
22          The Cleveland Sight Center OT low vision
23      evaluation report contained a number of
24      accommodations.  Were those accommodations that
25      were actually considered as part of the
```

```
 1      process?

 2   A  We considered anything that was presented.

 3   Q  Did you specifically consider auditory

 4      compensation strategies?

 5   A  Is there a description of those?  Do you have a

 6      definition of what that is?

 7   Q  It's in the Cleveland Sight Center report.

 8          Did you consider using auditory

 9      compensation strategies to listen for tone of

10      voice or responsiveness when initiating

11      questions or interactions and asking other

12      staff or nurses for feedback regarding patient

13      affect or behavior?

14   A  So that includes using other staff.  That was

15      deemed not -- not a reasonable -- not to be a

16      reasonable accommodation.

17   Q  You were part of the decision-making process

18      for other staff being ruled out as an

19      accommodation, correct?

20   A  Yes.

21   Q  Who else was part of that decision-making

22      process?

23   A  Again, that would have been the manager, who

24      would have consulted with legal to make sure we

25      had a fair process.
```

```
 1                      MR. BULEA:        I just want

 2        to -- I know --

 3                      MS. WHITE:        Yeah.

 4                      MR. BULEA:        It's fine to

 5        say you talked with legal.  We don't want to

 6        disclose any conversation.

 7                      THE WITNESS:      Correct.

 8                      MS. WHITE:        Absolutely.  I

 9        respect that line.

10   Q    Was that before June 1, 2017, that other staff

11        and the involvement of other staff was ruled

12        out?

13   A    Before June of '17.  I can't say it was before

14        that.  It was through this entire process.  We

15        at any point did not think that that was a

16        reasonable accommodation, to use other staff.

17   Q    Okay.

18   A    So if you have another staff that assists, that

19        makes the reason for the other person.

20   Q    Let's go back for just a second.

21   A    Sure.

22   Q    I want to make sure that we're abundantly clear

23        on this.

24             So if we can go to P 5, this list of

25        Kathy Holley's concerns.  I want to go through
```

```
 1         this list one more time now and put you in the

 2         mindset of at the conclusion of the EAP

 3         process.

 4              So the fitness for duty evaluation has

 5         been performed, information has been requested,

 6         reports have been received, but the decision

 7         was made that that information was not

 8         sufficient to -- for UH to determine that

 9         Ms. Moss could safely perform the essential

10         functions of her job, correct?

11    A    Correct.

12    Q    So P 4, document 1427.  Sorry.  P 5.  1427 to

13         1428.  These were the concerns at the beginning

14         of the process.

15              So I want to go back and I want to go one

16         at a time and ask you which ones were still a

17         concern at the conclusion of the process going

18         into the June 1, 2017 meeting.

19    A    Which of these were a concern?

20    Q    Yes.  I'm going to go one at a time.

21              MR. BULEA:      She'll ask you.

22    Q    So "Signing treatment plans and documents you

23         cannot see."

24              At the conclusion of the fitness for duty

25         evaluation, what accommodations did you
```

```
 1        consider and which ones did you rule out?  Did
 2        you make a determination about whether Ms. Moss
 3        could perform that?
 4   A    There was not a concern about signing treatment
 5        plans if she was in her office to do that.
 6   Q    Okay.
 7   A    But there were occasions, based on Kathy
 8        Holley, that that was not happening.
 9   Q    So that would, then, not be something that
10        Ms. Moss couldn't do because of disability,
11        that would be more of a performance factor, is
12        that right?
13   A    Ask again, please.
14   Q    Ms. Moss can see treatment documents when they
15        are provided in accessible format, correct?
16   A    I believe so, yes.
17   Q    A number of options to render documents
18        accessible were specifically requested by
19        Ms. Moss or identified in the Cleveland Sight
20        Center report, correct?
21   A    A number of methods to address.
22   Q    To make documents -- to make -- sign treatment
23        plans?
24   A    The CCTV, yes.
25   Q    Okay.
```

```
 1   A   That was not a concern.

 2   Q   So the conclusion of that, we could check this

 3       off the list and say we got a plan for how

 4       Ms. Moss could safely perform the essential

 5       functions of this job without -- with

 6       accommodations with respect to signing

 7       treatment plan documents.  She could use the

 8       CCTV, correct?

 9   A   Yes.  If she's in her office to do it.

10   Q   Yes.

11   A   I think Kathy Holley could speak to -- that

12       happens during patient interaction, though.

13   Q   "Unable to complete documentation unless you

14       are in your office."

15           What's a potential accommodation for

16       that?  Also, is there an obligation to complete

17       documentation outside of the office?

18   A   Kathy Holley would have to speak to that.

19   Q   You have your job description.  You had the

20       input from the fitness for duty exam.

21           The fitness for duty exam was in part to

22       determine whether or not this was addressed.

23           Was this addressed in the fitness for

24       duty exam?

25   A   I think if you look at the job description it
```

```
 1          talks about the interdisciplinary process and

 2          the reviewing of treatment plans while the

 3          patient care is going on.

 4               Documenting while the patient care is

 5          going on, that is a concern that the

 6          accommodations did not address.

 7     Q    So you don't think that she could complete the

 8          documentation with a CCTV or other

 9          accessibility documentation?

10     A    Not outside of her office.

11     Q    Did you consider other assistive technology,

12          like, you know, voice recognition software or

13          other assistive technology?

14     A    We considered what was presented to us.

15     Q    Cleveland Clinic raised a number of items.

16               I can review these and ask you about

17          them, but I'll just represent that one of them

18          was, for instance, Ms. Moss could utilize an

19          iPad, which would provide a high degree of

20          portability between workstations and possibly

21          be able to complete documentation outside of

22          the office.  With low vision accessibility

23          features, she would be able to access emails

24          with the use of audible reading features, i.e.,

25          VoiceOver, which are built into the iPad.  And
```

```
 1        if medical reports are accessible from the

 2        iPad, she may be able to listen to them using

 3        VoiceOver.  She would benefit from training to

 4        learn low visibility accessibility features of

 5        the iPad if UH incorporates this technology for

 6        staff.

 7             Had you ever heard of that before?  Was

 8        that ever raised?

 9   A    The potential of using an iPad?

10   Q    Yes.

11   A    I did hear that.  I don't know that it was put

12        into play in the system.

13   Q    Is that a workable solution potentially?

14   A    Well, there's a lot of ifs.  That was a pretty

15        long statement.

16   Q    Yes, it was.

17   A    A lot of ifs.  I don't know if the patient's

18        information was accessible via an iPad.  I

19        don't know if that was implemented.

20   Q    Who could figure that out and what steps were

21        taken to figure that out?

22   A    Kathy Holley could.

23   Q    Kathy Holley could assess whether an iPad

24        software could be accessible with VoiceOver

25        technology?
```

```
 1   A   I thought you were asking about the patient

 2       record on the iPad.

 3   Q   No.  I'm asking about if the assistive

 4       technology recommendation is a reasonable

 5       accommodation.

 6   A   I don't know if she can assess that or not.

 7   Q   At the conclusion of the fitness for duty

 8       evaluation process, though -- I want to circle

 9       back to what Kathy Holley raised as a concern

10       in the beginning.  "Ms. Moss is unable to

11       complete documentation unless she is in her

12       office."

13            Raised in the fitness for duty process

14       was an OT report by the Cleveland Sight Center

15       offering a number of recommendations for how

16       documentation could be completed outside of the

17       office, is that correct?

18   A   Any accommodations that we received were not of

19       concern.

20   Q   At the conclusion of the process, did Ms. Moss

21       through the Cleveland Sight Center propose an

22       accommodation that would potentially eliminate

23       this concern by Ms. Holley?

24   A   I don't know if that particular one would

25       address that situation.  I don't know that.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 146

```
 1   Q    You don't know if an iPad would assess the
 2        concern about unable to complete documentation
 3        unless you're in the office?
 4   A    I can't say for sure, no.
 5   Q    If you are uncertain right now, did you have
 6        enough information -- did you have sufficient
 7        information to make the conclusion that
 8        Ms. Moss could not perform the essential
 9        functions of this job if this concern was not
10        addressed?
11   A    Yes, because there's far more that involves not
12        using technology.
13   Q    We'll get there.
14   A    That's the larger picture.
15   Q    We'll get there.  I'm asking about this
16        particular concern.
17             Was this concern addressed, "unable to
18        complete documentation unless you are in your
19        office"?
20   A    I do not think the documentation was an issue,
21        correct.
22   Q    Ms. Holley thought it was an issue and this was
23        a specific concern that you said influenced the
24        decision to send Ms. Moss to a fitness for duty
25        evaluation.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 147

```
 1   A   Again, it was the big picture.

 2   Q   Okay.  This is a piece of the picture, though.

 3   A   It is, but it's not the whole picture.

 4   Q   "Incomplete assessment due to lack of visual

 5       skills.  Is the patient crying, smiling,

 6       staring off, actively hallucinating, et

 7       cetera."

 8           What information -- what reasonable

 9       accommodations did UH consider to address those

10       concerns of Ms. Holley?

11   A   Whatever ones were presented to us.

12   Q   "Auditory compensation strategies to listen for

13       tone of voice or responsiveness to initiate

14       questions or interactions."

15           Was that -- I mean would that assist

16       with --

17   A   If someone is staring off or actively

18       hallucinating, I don't know that there's an

19       auditory compensation that would address that

20       issue.

21   Q   When somebody is hallucinating, how does

22       anybody know that they're hallucinating?

23       They're usually saying things, aren't they?

24                   MR. BULEA:        Objection.

25               You can answer.
```

```
 1    A    That's a clinical question.

 2    Q    "Concern about overall loss of visual cues and

 3         all interactions with patients and staff, i.e.,

 4         demonstrating distraction, hallucinations, and

 5         how that impacts your ability to do a thorough

 6         assessment."

 7              Was that still a concern at the

 8         conclusion of the fitness for duty evaluation

 9         process?

10    A    Yes.

11    Q    What specific accommodations did UH consider

12         with respect to that concern?

13    A    I would have to go back to the list.  Again,

14         this is the -- nothing presented was going to

15         help her with the visual cue piece of it, the

16         perceptional ability to assess patients and

17         interact with them.

18    Q    The auditory compensation strategies would not?

19    A    Again, not everything has an auditory component

20         to it.

21    Q    No, not everything does, but some does, right?

22    A    Correct.

23    Q    Others have movement?

24    A    Correct.

25    Q    Even sighted people don't have eyes in the back
```

SHELDON, DEBORAH
04/04/2019                                                    Page 149

```
 1      of their head, correct?

 2   A  Correct.

 3   Q  Witness the other day that you were unable to

 4      respond to a patient's need in group patient

 5      with limited visual skills -- verbal skills who

 6      needed assistance during bingo who was sitting

 7      two patients away from you.  Other patients

 8      were assisting that patient because you were

 9      not aware he was trying to get your attention,

10      even though you were looking in his direction,

11      and they had to read his bingo numbers because

12      you could not.

13          Do you recall that particular concern?

14   A  I recall this, yes.

15   Q  Okay.  Did you consider any strategies for how

16      bingo numbers could be read or groups could be

17      facilitated?

18   A  Again, this was written in February.

19   Q  Yes.

20   A  The accommodations that came at the end of that

21      assessment, the accommodations that were

22      presented did not capture an ability to assess,

23      to effectively perform the essential functions

24      of the job with those accommodations.

25   Q  But these are the specific concerns that were
```

SHELDON, DEBORAH
04/04/2019                                                                     Page 150

```
 1      raised.

 2              So I just want to know, did anybody go

 3      through the process of problem solving how a

 4      group bingo could be facilitated or other group

 5      projects with accommodations?

 6   A  Were they considered?

 7   Q  Yes.

 8   A  Yes.

 9   Q  What was the conclusion?

10   A  Using other staff would not have been -- again,

11      this doesn't tell us which accommodation was

12      suggested for which bullet point.

13   Q  Yes, that's right.  This was sort of -- is it

14      fair to say this was UH's roadmap of what the

15      specific concerns were, correct, at the time

16      the EAP process and the fitness for duty

17      process was initiated?

18   A  That's correct.

19   Q  So the purpose of the fitness for duty

20      evaluation would be to gather information that

21      would be relevant to answering the question of

22      whether these concerns could be addressed with

23      an accommodation, right?

24   A  (Indicating.)

25   Q  So this concern about bingo -- how was this
```

SHELDON, DEBORAH
04/04/2019                                                          Page 151

```
 1         concern validated, by the way?  How do we know
 2         that Ms. Moss couldn't see the patient trying
 3         to get her attention?  How do we know that it's
 4         a concern that another patient is reading his
 5         bingo numbers?
 6    A    How was it identified?
 7    Q    Yes.
 8    A    It was witnessed.
 9    Q    Who witnessed it?
10    A    You would have to ask Kathy Holley.
11    Q    Had you reviewed Ms. Moss' -- I mean you did
12         say you reviewed Ms. Moss' prior performance
13         evaluations, correct?
14    A    I did.
15    Q    She had sterling reviews on -- specifically on
16         her ability to organize group activities and
17         differentiate group activities, correct?
18    A    Yes, she had very good reviews.  There were
19         some concerns about improving engagement with
20         the patients and a focus on safety.
21    Q    What was the specific safety concern that was
22         raised?
23    A    I don't think there was a specific concern.
24    Q    In fact, the performance evaluation, like most
25         evaluations, always says here's something to
```

SHELDON, DEBORAH
04/04/2019                                                              Page 152

```
 1      work on, right?  There was always going to be
 2      something listed as something to work on,
 3      correct?  Goals for the next year?
 4   A  Likely, yes.
 5   Q  Yes.  Okay.
 6          But with respect specifically to
 7      Ms. Moss' ability to engage in group
 8      activities, this was something that she had
 9      developed a great reputation for over her 19
10      years, correct?  This was the thing she was
11      best at, right?
12   A  The documentation of her evaluations were all
13      good, yes.
14   Q  Okay.
15   A  No one's saying she was a bad employee.
16   Q  "Witness that you walked all the way into a
17      patient room when I was in the room working on
18      behavioral issues with a patient with no
19      awareness that there was a situation of
20      concern.  I had to speak up to let you know I
21      was in the room and to not disturb the
22      situation."
23          Correct?
24   A  Uh-huh.
25   Q  Is that the code violet situation you were
```

SHELDON, DEBORAH
04/04/2019                                                              Page 153

```
 1      describing?

 2   A  Yes, it is.

 3   Q  It doesn't say "code violet" here, though, does

 4      it?

 5   A  It does not.  I said I couldn't recall if it

 6      was a code violet or not.

 7   Q  What's the layout of the rooms there?  I

 8      mean -- well, strike that.

 9         The Cleveland Sight Center suggested

10      verbal prompts from staff would address the

11      particular concern of perceived lack of

12      awareness of a situation in a room.  Is that

13      not sufficient?

14   A  I think you had just said not everyone -- no

15      one has eyes in the back of their head.  So how

16      would someone know they're coming?

17   Q  That's right.

18         So if Kathy Holley was in the room alone

19      with a patient, she might not see somebody

20      behind her, correct?

21   A  That's true.

22   Q  Ms. Moss, if she's going into a room with a

23      door closed, she's not necessarily going to

24      know who's in there, correct?

25   A  This doesn't say that the door was closed.
```

SHELDON, DEBORAH
04/04/2019                                                                    Page 154

```
 1                    MR. BULEA:        She's asking
 2        you --
 3    Q   No.  No.  I'm just asking you as an example, a
 4        for instance.
 5    A   I'm sorry.  Say it again now, please.
 6    Q   If the door is closed and Ms. Moss was entering
 7        the room, she wouldn't -- even if she were
 8        sighted, she would not be able to see what was
 9        in the room if there was a door between her and
10        the room, correct?
11    A   Correct.
12    Q   Knowing that there are even some instances were
13        sighted staff are not going to be able to rely
14        on their vision, why is a verbal cue not good
15        enough?  Why is that not sufficient to address
16        this particular concern?
17    A   I'm not saying that a verbal cue isn't an
18        assistive measure.
19    Q   Okay.
20    A   She's saying here that she walked all the way
21        into the room.  So there was not awareness, the
22        ability to perceive that there was a situation
23        going on.
24    Q   This must have been a situation that -- the
25        visual was the only issue, it was one that
```

```
 1      was -- apparently didn't have auditory cues

 2      that something was going on, correct?

 3   A  Correct.  And I believe if you ask Ms. Holley

 4      that, you have to be careful with not

 5      escalating a situation.  So oftentimes you want

 6      to do keep it ...

 7   Q  Quiet.

 8   A  Yeah.

 9   Q  Because the auditory piece is very important.

10      The tone of voice, how people speak.  You can

11      pick up a lot of cues in an auditory way,

12      correct?

13   A  When you want there to be auditory, yes.

14   Q  "Physically walked into staff members in the

15      hallway.  I witnessed one.  Two others reported

16      to me from past.  When I mentioned the one, you

17      brushed it off and walked away."

18   A  Yes.

19   Q  How often do people bump into each other in the

20      hallways at UH?  It's a busy place, right?

21   A  I don't think I can answer that question.

22   Q  How serious is that of a concern, somebody

23      bumping into somebody in a hallway?

24   A  Bumping into someone is not a concern.  It

25      creates the awareness of a concern, that if you
```

```
 1        can't see someone, you run into them, what else

 2        are you not seeing?

 3    Q   That's the concern that you have here?  I'm

 4        really trying to -- I'm honestly trying to

 5        understand.

 6            What's the concern about bumping into

 7        people in the hallway?

 8    A   It demonstrates that you cannot see someone

 9        coming toward you.

10    Q   Okay.

11    A   Therefore, if you're interacting with patients,

12        how do you see them?  How do you read the

13        treatment plan?  How do you identify them?  How

14        do you identify the reception to the therapies

15        that are being administered?  Is it effective?

16        Are they escalating?  Are they hallucinating?

17        Are they staring off?  Are they crying?

18    Q   So once you find out that somebody has that

19        vision impairment, all sorts of other questions

20        arise in the mind that haven't arisen before,

21        correct, about somebody's ability to do the

22        job?

23    A   That's one of those.  It's a clue.  Yes, it is.

24    Q   UH didn't have that clue for the first 19 years

25        that Ms. Moss worked there, did they?
```

```
 1   A   Yes, they did.

 2   Q   But even with that one clue, the bigger picture

 3       was that for 19 years she was able to safely

 4       perform all of the essential functions of the

 5       job, correct?

 6   A   I can't speak to what happened prior to my

 7       arrival there.

 8   Q   The instance of bumping into somebody in the

 9       hallway, she wasn't written up for that.  There

10       was no documentation of that, correct?

11   A   Running into somebody is not a violation of a

12       policy.  So you would not be written up for

13       that.

14   Q   The scenario you talked about, you said if

15       somebody's walking towards you and you bump

16       into them, that you might not have seen them,

17       is that correct?

18   A   That's what I said, yes.

19   Q   What about the other person walking towards

20       her?  Maybe they didn't see her, correct?

21   A   That could be too.

22   Q   Cleveland Sight Center proposed higher contrast

23       flooring and better lighting as a way to avoid

24       bumping into somebody in the hallway.

25           Would that address this particular
```